UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JEFFREY NEUFELD, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　　　　Plaintiff,<br><br>vs.<br><br>CIGNA HEALTH AND LIFE INSURANCE COMPANY and CARECENTRIX, INC.,<br><br>　　　　　　　　　　　Defendants. | No. 3:17-cv-1693<br><br>CLASS ACTION<br><br>**COMPLAINT**<br><br>DEMAND FOR JURY TRIAL<br><br>October 6, 2017 |

Plaintiff, Jeffrey Neufeld, by his undersigned attorneys, alleges the following based upon his knowledge as set forth herein and upon information and belief. Further additional evidence supporting the claims set forth herein can be obtained after a reasonable opportunity for discovery.

## INTRODUCTION

1.　　Plaintiff, who received health benefits through a group health plan issued and administered by Defendants (the "Plan"),[1] brings this action on behalf of himself and a Class and Subclass of similarly situated persons alleging (a) violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*., and (b) violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, resulting from Defendants' common fraudulent and deceptive scheme to artificially inflate medical costs causing consumers to pay more than they should have paid for medically necessary products and services.

---

[1] Unless otherwise specified, the term "Plans" as used herein includes both health plans that are funded by an employer but administered through "administrative-services-only" ("ASO") contracts between one or more Defendants and the plan, and health plans implemented through an insurance policy underwritten and issued by one or more Defendants to cover medical expenses incurred by the plan.

2.      About 90% of all United States citizens are now enrolled in private or public health plans that cover some, or all, of the costs of medical products and services. A feature of most of these plans is the shared cost of medical products and services. Normally, when a patient[2] seeks medically necessary products or services under his or her health care plan, the plan/insurer pays a portion of the cost and the patient pays the remaining portion of the cost in the form of a copayment or coinsurance or deductible payment.

3.      Defendant Cigna Health and Life Insurance Company ("Cigna"), is a fully integrated health insurance company. Cigna provides and administers health benefits plans for patients.

4.      Cigna provides healthcare through a provider network. According to Cigna Corporation's Form 10-K:

> **Participating Provider Network**
> We provide our customers with an extensive network of participating health care professionals, hospitals, and other facilities, pharmacies and providers of health care services and supplies. **In most instances, we contract with them directly; however, in some instances, we contract with third parties for access to their provider networks and care management services.** In addition, we have entered into strategic alliances with several regional managed care organizations (e.g., Tufts Health Plan, HealthPartners, Inc., Health Alliance Plan, and MVP Health Plan) to gain access to their provider networks and discounts.

5.      Cigna also contracts with outside third-party benefit managers ("managers") directed by Cigna to provide health benefits to patients. These managers establish networks of medical service and product providers ("providers") to provide health services and products and benefits to patients.

---

[2] The term "patient" refers to a Plan participant or beneficiary under a health benefit Plan issued or administered by one or more defendants.

6.      In Plaintiff's case, Cigna retained Defendant, CareCentrix, Inc. ("CareCentrix") to provide home patient care and durable medical equipment, including, but not limited to, sleep management solutions. CareCentrix in turn has established a network of over 9,000 providers to provide these products and services to patients.

7.      As set forth below, Defendants have engaged in a scheme to defraud patients by overcharging patients for the cost of medically necessary services and products. Patients, including Plaintiff and the Class and Subclass (defined below), paid undisclosed excess charges in exchange for receiving these products and services. Unbeknownst to the Class and Subclass members, Defendants misrepresented the purported costs of these products and services in the form of invoices for increased charges to patients.

8.      Plaintiff's Plan provides that he is required to pay a "portion of Covered Expenses for services and supplies" that is a "Copayment, Coinsurance or Deductible." "Covered Expenses" are "expenses" for "charges" for these services or supplies. "Charges" are the amount "the provider has contracted directly or indirectly with Cigna . . ." Since a "portion" is a "share," the patient, at most, should pay only a share of the amount the provider contracts to be paid for products or services.

9.      Contrary to the express language of the Plans, Defendants and/or their agents exercised their unilateral discretion to charge patients unauthorized and excessive amounts for products and services that exceeded the charges by providers.

10.     For example, on June 22, 2017, Plaintiff purchased a disposable CPAP[3] filter from J&L Medical Services ("J&L"), an authorized CareCentrix provider, pursuant to his Plan.

---

[3] CPAP stands for "continuous positive airway pressure." CPAP machines are used to treat sleep apnea, a disorder in which the patient's breathing is interrupted during sleep.

CareCentrix sent Plaintiff an invoice for the filter listing total charges of $25.68 that Plaintiff was required to pay towards his deductible. J&L, the provider, had contracted directly with CareCentrix and indirectly with Cigna to provide the filter for only $7.50, and was in fact paid only $7.50 for the filter.

11.     Hidden from the Plaintiff, Defendants and/or their agents unilaterally charged Plaintiff an unlawful $18.18 "Spread" over J&L's contracted charge for the product.

12.     Had Defendants lived up to their obligations, the Plaintiff would not have been billed more than the $7.50 charge that J&L agreed to be paid by Defendants. Accordingly, Defendants should and easily could have charged Plaintiff a maximum of only $7.50 in accordance with the Plan terms. Instead, they imposed a premium of almost 350% beyond the total amount Plaintiff should have paid.

13.     Through this fraudulent billing scheme, Defendants overcharged their customers for medical products and services in violation of the Plans and Defendants' fiduciary duties. Under Defendants' scheme as illustrated by this actual example, Plaintiff's payment is unlawful because a material portion of the payment ($18.18) is not a payment for a "portion" of Covered Expenses.

14.     Defendants violated the Plan and breached their fiduciary duties by secretly determining that Plaintiff must pay inflated Deductible payments, and secretly collecting those inflated Deductible payments from Plaintiff.

15.     Defendants utilize the U.S. Mail and interstate wire facilities to engage in their fraudulent billing scheme in violation of RICO. Defendants represented to Plan participants that their payment amounts were based on some portion of the actual cost for the product or service when, in fact, Defendants submit false invoices to patients to cause them to pay more than the actual cost and Defendants simply pocket the overpayment in the form of "Spread."

16.     In order to implement Defendants' fraudulent scheme, Defendants' Provider Manual dictates that participating providers like J&L effectively cannot disclose the existence of the excessive charges as further alleged below. As a result of these "gag clauses," the "Spread" remains hidden from participants and beneficiaries.

17.     Defendants' fraudulent scheme to artificially inflate the costs of medically necessary products or services, and then to surreptitiously retain those excess amounts, jeopardizes the entire health care delivery system. For one, patients are paying higher amounts than they otherwise would have paid had Defendants not artificially inflated the payment amounts. Therefore, patients believe that they are saving money through the use of their health benefits, when, in reality, they are charged excessive amounts beyond what their health plans require them to pay.

18.     Indeed, the very purpose of obtaining or participating in a health plan is to enable patients to receive the purported benefits through the insurance company's negotiating and buying power. That is, patients should never pay more than the charges by the providers under these agreements, while substantial premiums and other costs and fees cover the other expenses of the health plans, including their administration. Moreover, plan administrators such as Cigna and its affiliates and the managers they hire such as CareCentrix are paid significant fees as compensation for their services that are entirely separate from the "Spread," making the "Spread" excess, undisclosed profit in exchange for little to nothing.

19.     As a result of Defendants' fraudulent scheme to collect this "Spread," Defendants overcharged Plaintiff and the other Class and Subclass members for healthcare products and services during the Class Period (defined below). Defendants' misconduct has caused Plaintiff and

the other Class and Subclass members to suffer significant damages. Plaintiff seeks relief as follows:

20.      With regard to ERISA, under Count I, ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a participant or beneficiary may bring an action to enforce his rights under the terms of the plan or to clarify his rights to future benefits under the terms of the plan. Defendants have violated the ERISA Plans by establishing and charging Spread and should not be allowed to continue to do so.

21.      Under Count II, ERISA § 406(a), 29 U.S.C. § 1106(a), provides that a party in interest shall not receive direct or indirect compensation unless it is reasonable, and prohibits transfers of plan assets and use of plan assets by or for the benefit of fiduciaries and plan service providers. In setting the amount of and taking excessive undisclosed Spread compensation, Defendants allowed and received unreasonable compensation and misused the assets of the ERISA Plans, including participant contributions and the Plan contracts that provided Defendants with the ability to extract these funds.

22.      Under Count III, ERISA § 406(b), 29 U.S.C. § 1106(b), provides that a fiduciary shall not deal with plan assets in its own interest or for its own account, act in any transaction involving the plan on behalf of a party whose interests are adverse to participants or beneficiaries, or receive any consideration for its own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan. In setting the amount of and taking Spread compensation, Defendants set their own compensation, received plan assets and consideration for their personal accounts in violation of this provision, and were acting under other conflicts of interest.

23.     Under Count IV, ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan, and with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. In setting the amount of and taking excessive undisclosed "Spread" compensation, Defendants have breached their fiduciary duties of loyalty and prudence.

24.     Under Count V, ERISA § 702, 29 U.S.C. § 1182, prohibits Defendants from discrimination and requiring discriminatory premiums and contributions based on health factors. Defendants have required insureds who have medical conditions that require products and services that are subject to Defendants' "Spreads" to pay greater premiums and contributions than those patients who do not need products and services that are subject to Defendants' "Spreads" for their health benefits.

25.     Under Count VI, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which it may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Defendants breached all three provisions.

26.     Under Count VII, Defendants had actual or constructive knowledge of and participated in and/or profited from the prohibited transactions and fiduciary breaches alleged in Counts II-V by the Defendants who are found to be fiduciaries, and are liable to disgorge ill-gotten

gains and/or plan assets and to provide other appropriate equitable relief, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

27.     With regard to RICO, under Count VIII, Cigna engaged in a scheme to defraud in violation of RICO, 18 U.S.C. § 1962(c), by overcharging patients for the cost of medically necessary products and services alleged below and is liable for all statutory remedies.

28.     Under Count IX, CareCentrix has engaged in a scheme to defraud in violation of RICO, 18 U.S.C. § 1962(c), by overcharging patients for the cost of medically necessary products and services as alleged below and is liable for all statutory remedies.

29.     Under Count X, Defendants have engaged in a scheme to defraud in violation of RICO, 18 U.S.C. § 1962(d), by overcharging patients for the cost of medically necessary products and services as alleged below and are liable for all statutory remedies.

30.     As further alleged below, Plaintiff seeks to represent a nationwide Class of all patients and Plan participants whose health Plans are insured or administered by Cigna, its affiliates and its managers. Plaintiff further seeks to represent a nationwide Subclass of all patients and Plan participants whose health plans are insured or administered by Cigna and/or its affiliates through CareCentrix.

## JURISDICTION

31.     **Subject Matter Jurisdiction.** This court has subject matter jurisdiction over this action pursuant to (a) 28 U.S.C. § 1331, which provides for federal jurisdiction over civil actions arising under the laws of the United States, including ERISA and RICO; (b) 29 U.S.C. § 1132(e)(1) providing for federal jurisdiction of actions brought under Title I of ERISA; and (c) 18 U.S.C. § 1964 providing for federal jurisdiction to prevent and restrain violations of 18 U.S.C § 1962. Further, declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rules 58 and 65 of the Federal Rules of Civil Procedure.

32. **Personal Jurisdiction.** ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) provides for nationwide service of process. Upon information and belief, Defendants are residents of the United States and subject to service in the United States, and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Connecticut. Defendants also reside or may be found in this District or have consented to jurisdiction in this District. In any event, this Court has personal jurisdiction over Defendants because a substantial portion of the wrongdoing alleged in this Complaint took place in the State of Connecticut; Defendants are authorized to do business in the State of Connecticut; Defendants conduct business in the State of Connecticut and this District; Defendants have principal executive offices and provide medical products and services in the State of Connecticut and this District; Defendants advertise and promote their services in the State of Connecticut and this District; Defendants have sufficient minimum contacts with the State of Connecticut; Defendants administer health plans from the State of Connecticut; and/or Defendants otherwise intentionally avail themselves of the markets in the State of Connecticut through the marketing and sale of insurance and related products and services in this State so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

33. **Venue.** Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to the claims herein occurred within this District, both Defendants reside in this district, and/or a substantial part of property that is the subject of the action is situated in this District. Venue is also proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Defendants reside or may be found in this District and some or all of the fiduciary breaches or other violations for which relief is sought occurred in

or originated in this District. Venue is also proper in this District pursuant to 18 U.S.C. § 1965, because most Defendants reside, are found, have an agent, or transact their affairs in this District, and the ends of justice require that any Defendant residing elsewhere be brought before this Court.

## PARTIES AND NON-PARTIES

34.    Plaintiff Neufeld is a citizen and resident of Texas who received coverage under a group health Plan provided by an employer using a governing form plan document provided by Cigna ("Cigna Open Access Plus Medical Benefits"). This Plan is a welfare benefit plan, as that term is defined in 29 U.S.C. § 1002(1)(A), subject to ERISA ("ERISA Plan.") This Plan at all relevant times has been administered by Cigna.

35.    Defendant Cigna, incorporated in Connecticut, is a wholly-owned subsidiary of Cigna Corporation with its principal place of business in Bloomfield, Connecticut.[4] Cigna underwrites life and health insurance policies. The company provides group term life, accidental death and dismemberment, dental, weekly income, and long-term disability insurance. Cigna also administers health benefits for health insurance policies it sells and health plans it administers.

36.    Defendant CareCentrix is a Delaware corporation with its principal place of business in Hartford, Connecticut. CareCentrix represents that it is "the leader in managing patient care to the home." It is "single point-of-contact to coordinate and manage all home-based services

---

[4] Cigna Corporation is a global health services organization. In 2015, it reported revenue in excess of $37.9 billion, and the company is currently ranked 79th on the Fortune 500. Cigna operates through three segments: (1) Global Health Care, which is comprised of the Commercial operating segment, which encompasses both the U.S. commercial and certain international health care businesses serving employers and their employees, and other groups, and the Individuals and Government operating segment, which offers Medicare Advantage and Medicare Part D plans to seniors and Medicaid plans; (2) Global Supplemental Benefits, which offers supplemental health, life and accident insurance products in selected international markets and in the U.S.; and (3) Group Disability and Life, which provides group long-term and short-term disability, group life, accident and specialty insurance products and related services.

and care" for Cigna patients. It claims to oversee 23 million covered lives. Cigna claims that it "has partnered with CareCentrix in an exclusive relationship to provide high-quality, cost-effective services to our Cigna customers in all markets for durable medical equipment (DME), home healthcare, and home infusion services."

## SUBSTANTIVE ALLEGATIONS

### The Home Healthcare Industry

37.   The home healthcare industry, valued at $228.9 billion in 2015, is expected to continue to grow rapidly as a result of an aging population, rising healthcare costs, and technological improvements that increasingly have made home healthcare a feasible option for patients recovering from an illness or injury. https://globenewswire.com/news-release/2017/01/02/902559/0/en/Home-Healthcare-Market-Growth-to-exceed-391-41-Bn-by-2021.html

38.   Home health services (also referred to as home healthcare) include part-time or intermittent services, full-time services needed on a short-term basis; physical, occupational, or speech therapy; medical social work; nutrition services; medical supplies, appliances and equipment; and home infusion therapy. Durable medical equipment consists of items "which are designed for and able to withstand repeated use by more than one person; customarily serve a medical purpose; generally are not useful in the absence of injury or sickness; are appropriate for use in the home; and are not disposable. Such equipment includes, but is not limited to, crutches, hospital beds, respirators, wheel chairs, and dialysis machines."

### Health Plans in General in the United States

39.   Health Plans, including the Plans that provide for healthcare services and medical equipment, are paid for by a premium for a defined period or through employer plans that either provide benefits by purchasing group insurance policies or are self-funded but administered by

health insurance companies and their affiliates.[5] Premiums and contributions to coverage in all types of plans can be paid by individual plan participants or beneficiaries, employees, unions, employers or other institutions.

40.     If a Plan covers health care, including durable medical equipment, the cost is often shared between the patient and the Plan. Such cost sharing can take the form of deductible payments, coinsurance payments and copayments. In general, deductibles are the dollar amounts the patient pays during the benefit period (usually a year) before the Plan starts to make payments. Coinsurance generally requires a patient to pay a stated percentage of the cost of health care or durable medical equipment. Copayments are generally fixed dollar payments made by a patient toward health care or durable medical equipment.

41.     Consumers purchase health insurance and enroll in employer-sponsored health plans to protect them from unexpected high medical costs. Patients, including Plaintiff and other Class and Subclass members, at a minimum, expect to pay the same prices or better than uninsured or cash-paying individuals for health care, including durable medical equipment. Otherwise, they not only would receive no benefit from their Plans, but also would, in fact, be punished for having a health plan. Therefore, Class and Subclass members reasonably expect to pay less than cash-paying customers who do not have health coverage.

**The Relationships Among Patients/Employers, Providers, Managers and Insurers**

42.     Contractual relationships exist between the employer or individual and the health insurance company that underwrites and/or administers the Plan; the insurer/administrator and the

---

[5] According to Cigna, over 85% of its market is in ERISA-covered health plans, while 5% is in the individual market and government-related plans like Medicare. Approximately 83% of Cigna's customers are in "administrative services only" arrangements where Cigna and its affiliates manage and administer self-funded plans, while approximately 17% of plans are insured through Cigna policies. Whatever the plan structure, Cigna and its affiliates administer and manage the Plans and healthcare benefits directly and through managers such as CareCentrix.

manager; and the insurer/administrator/manager and the provider. An employer or individual buys healthcare coverage from a health insurance company to provide a variety of healthcare benefits, including home healthcare and durable medical equipment. Health insurance companies manage the healthcare and medical equipment services offered pursuant to their Plans, or they retain managers like CareCentrix to perform these functions.

43.      The following diagram represents (in simplified form) the contractual relationships among the parties when a manager is involved:



(a)      **Employer/Individual–Insurer Agreements (*i.e.*, Health Plans).** Employers and individuals buy health Plans which typically provide coverage for healthcare. These Plans contain uniform provisions that set forth key terms such as the mechanism for and amount of the deductible, copayment, and/or coinsurance that a patient must pay to obtain healthcare benefits. Plaintiff and Class and Subclass members are intended beneficiaries of such agreements and they are participants and beneficiaries in the Plans.

(b)      **Insurer–Manager Agreements**. Health insurance companies, such as Cigna, contract with and/or own managers, which act as their agents to administer the healthcare benefits purchased through the health insurance Plans that the insurers issue or administer. CareCentrix is a Cigna manager.

(c)      **Manager–Provider Agreements**. These managers in turn, oversee networks of home health care service and equipment providers, including J&L. The managers contract directly with these "providers," which provide healthcare services and

- 13 -

medical equipment directly to the patients. Under these agreements, the providers do not bill the patients directly. Rather, the provider submits a claim on behalf of the patient to the manager and the manager bills the patient. The manager pays the provider only the amount the provider agrees to be paid under its contract with the manager, not the amount the manager bills the patient. For example, the contract between CareCentrix and J&L requires "claims [to] be paid based on the lower of the Provider's usual billed charge or the contracted/negotiated rate."[6] It further provides that "Services should be billed at the contracted rates or authorized rates as appropriate. The Provider Agreement rate is payment in full for covered services and is all inclusive . . . **No billing to the patient or Health Plan of the difference between the negotiated or contracted rate and the Provider's list price is permitted.**" (Emphasis in original.)[7]

44.     When the Insurer does not use a manager, then the Insurer contracts directly with the Provider.

45.     The relationship among the parties is shown graphically as follows:



---

46.     Pursuant to the health Plans, insurers must ensure that, when they contract with and direct a manager to act as their agent to manage certain health benefits, the manager follows the Plans' terms, such that patients are not overcharged for their healthcare benefits.

47.     To the contrary, insurers, and managers, acting as agents and/or in concert with health insurance companies, routinely require that patients pay substantially higher prices for healthcare and durable medical equipment than are allowed under the Plans. Here, Defendants engaged in such practices with respect to Class and Subclass Members' Plans.

**Patients, Participants and Beneficiaries in Defendants' Health Plans Pay Undisclosed, Unauthorized and Excessive Fees for Home Healthcare**

48.     The Defendants in this case have taken the general employer/individual–insurer–manager–provider structure and, through various agreements, created their unlawful, fraudulent billing scheme. Under these agreements, the insurer and/or the manager charges the patients a price (or portion of such a price) for healthcare or durable medical equipment that is set by the manager and/or insurer/administrator. Alternatively, the insurer or manager charges the patients a flat copayment, which also is set by the Defendants.

49.     The patients' price or copayment routinely is higher than the price the insurer and manager agree to pay the provider for providing the health services or equipment to the patients.

50.     Moreover, under the confidentiality provisions of the Provider Agreements, providers cannot tell patients that they are being overcharged, much less sell services or equipment to them at a lower price separate and apart from the Plans. Specifically, the Provider Manual for CareCentrix's provider network states: "As a participant in the CareCentrix network of Providers, you are required to . . . [n]ot, under any circumstance, tell the patient/member that they are not responsible for any co-pays, coinsurance, or deductibles." Accordingly, providers are barred from

disclosing that a portion of the co-pays, coinsurance or deductibles are in fact over charges for which patients are not responsible.

51.     If a provider violates the "gag clause," it risks termination from the insurers' network. As a result, Plaintiff and the Class and Subclass have been deprived of the opportunity to purchase their healthcare and medical equipment not only at prices their Plans dictate, but also at the retail cash price the provider would charge to someone without coverage.

52.     Using the example of a CPAP machine alleged above, this is how Defendants' scheme works:

(a)     A primary referred source such as a doctor contacts a medical-equipment provider. J&L, either directly, or indirectly through a manager, CareCentrix.

(b)     CareCentrix and J&L have a contract under which CareCentrix pays J&L $7.50 for a disposable CPAP filter.

(c)     J&L provides the filter to the patient and then submits a claim on behalf of the patient to CareCentrix in accordance with both the Plan and the Provider Manual.

(d)     CareCentrix then bills the patient an inflated amount that is greater than the equipment cost that the manager pays to the provider. In this instance, CareCentrix billed the patient $25.68.

(e)     Thus, when a patient pays a deductible, as Plaintiff did, the patient is overcharged because his payment is based on the inflated amount that CareCentrix charges the patient (or that CareCentrix requires the provider to charge the patient).

(f)     Defendants then secretly and unlawfully pocket the excess $18.18 "Spread."

- 16 -

(g)     Defendants keep this scheme secret by including the gag clause in the Provider Manual.

(h)     Additional specific examples of Plaintiff being overcharged by Defendants for durable medical equipment purchases include the following:

(i)     On or about June 22, 2017, Plaintiff was billed by CareCentrix $147.78 for a full-face Mirage CPAP/BIPAP mask—*a 156% premium over the actual $95 fee* that CareCentrix paid to J&L. Without disclosing it to Plaintiff, Defendants billed the $52.78 overcharge or "Spread."

(j)     On or about August 20, 2017, Plaintiff was billed by CareCentrix $37.61 for CPAP headgear—*a 188% premium over the actual $20 fee* that CareCentrix paid to J&L. Without disclosing it to the customer, Defendants billed the $17.61 overcharge or "Spread."

(k)     On or about August 20, 2017, Plaintiff was billed by CareCentrix $24.43 in coinsurance for CPAP tubing—*a 175% premium over the actual $14 fee* paid to J&L. Without disclosing it to the customer, Defendants billed the $10.43 overcharge or "Spread," which Plaintiff paid.

53.     Upon information and belief: (1) Cigna developed and directed the fraudulent billing scheme through its Plans; (2) Cigna charged or required the managers to charge patients excessive and unlawful copayment, coinsurance or deductible payments, and dictated that these patient payments not be discounted or excused/waived; and (3) CareCentrix and/ or Cigna through contracts with providers blocked providers from disclosing the existence of Spread.

54.     Clearly, Defendants' collection, and retention of unlawful "Spread" would not be possible if the true cost of the service or equipment was disclosed and the provider was not prohibited by contract and from disclosing the lower contract price for the services or equipment.

55.     Upon information and belief, these unlawful activities have affected at the very least thousands of participants. The losses to date and the risk of future losses to the participants and beneficiaries of the Plans is great, particularly given that the bulk of Defendants' market is with ERISA-covered health plans—plans whose participants and beneficiaries are owed the highest duties known to law by the fiduciaries that administer and manage these important employee benefits.

### Defendants' Plans with Plaintiff and the Class and Subclass

56.     Health insurance plans are subject to state regulation. The plan forms typically must be filed with and approved by the appropriate state regulators.

57.     Because they are approved form plans, the relevant terms of the Plans insuring Plaintiff and Class and Subclass members are substantively the same. For this reason, upon information and belief, the rights relevant to the claims alleged herein are shared by all members of the Class.

58.     These terms of the Plans—and more importantly, how these Plans are administered by Cigna, its affiliates, and its providers—do not differ materially across Plans. Accordingly, upon information and belief, the rights relevant to the claims alleged herein are shared by all members of the Class and Subclass regardless of the funding arrangement underpinning the health plan benefits that Defendants offer and administer.

59.     Cigna's Plans define "Covered Expenses" as "expenses incurred by or on behalf of a person for the charges listed below . . . ." Included among those "Covered Expenses" are "charges made for Home Health Services under the terms of a Home Health Care Plan established within

14 days after the date Home Health Care begins," and "charges made for purchase or rental of Durable Medical Equipment for use outside a Hospital or Other Health Care Facility." The products Plaintiff purchased are Durable Medical Equipment.

60.    "Charges" are defined as the amount "the provider has contracted directly or indirectly with Cigna."

61.    According to the Plans, patients "may be required to pay a portion of the Covered Expenses for services and supplies. That portion is the Copayment, Deductible or Coinsurance." Accordingly, by definition, the Copayment, Deductible, and Coinsurance payments must *only* be for a portion of expenses for contracted charges by a provider of healthcare services or equipment.

62.    Pursuant to a typical Plan, including Plaintiff's, copayments, coinsurance, and deductibles are defined as follows:

(a)    "Co-payments" are "fixed dollar amounts (for example, $15) you pay for covered health care, usually when you receive the service."

(b)    "Co-insurance is *your* share of the costs of a covered service, calculated as percentage of the allowed amount of the service."

(c)    The "deductible" is the amount owed for health care services the health insurance or plan covers before the health insurance or plan begins to pay. Class members must pay all the costs up to the deductible amount before this plan begins to pay for covered health services.

**Defendants Are Fiduciaries and Parties In Interest**

63.    Plaintiff and the members of the Class and Subclass (as defined below) are participants in employee welfare benefit plans as that term is defined in 29 U.S.C. § 1002(1)(A), insured or administered by Defendants to provide participants with medical care.

64.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

65.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

66.     In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA Plans and their participants. The power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power. An appointing fiduciary must take prudent and reasonable action to determine whether the appointees are fulfilling their own separate fiduciary obligations.

67.     Defendants are fiduciaries of all of the Class and Subclass members' ERISA Plans to which they provided health and durable medical equipment benefits or for which they administered such benefits in that they *exercised* discretionary authority or control respecting the

following plan management activities, ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), and in that they *had* discretionary authority or discretionary responsibility in the administration of the ERISA Plans of participants and beneficiaries in the Class and Subclass, ERISA § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii), because, by way of example, they did and/or could do one or more of the following:

(a)  dictate the amount paid to providers for healthcare or durable medical equipment;

(b)  charge and/or dictate the amount the manager charged patients for healthcare or durable medical equipment;

(c)  charge and/or require the manager to charge patients more for healthcare or durable medical equipment than they should have been charged pursuant to the terms of the ERISA Plans, thereby creating and setting the amount of the "Spread;"

(d)  collect and/or require the manager or provider to collect the "Spread" from patients;

(e)  determine the amount of and require the collection of additional profits and compensation for services provided pursuant to the ERISA Plans;

(f)  set their own compensation for services performed as fiduciaries by dictating "Spread;"

(g)  unilaterally collect their own compensation for services performed as fiduciaries by collecting "Spread;"

(h)  set and change the compensation of their own affiliates with respect to the ERISA Plans by allocation of the proceeds of "Spread;"

(i)      prohibit the provider from selling to patients healthcare or durable medical equipment covered by the ERISA Plans at prices that were lower than the prices that the provider/manager was required to charge the patients;

(j)      select and retain the managers that will, in the case of Cigna, assist in certain healthcare management and coordination functions, and perform all healthcare management and coordination;

(k)      manage the provision of healthcare and durable medical equipment, including processing and paying for the services and equipment;

(l)      improperly trade off the interests of plan participants and beneficiaries for the benefit of themselves or their affiliates;

(m)      dictate and negotiate whether a type of healthcare or item of durable medical equipment was covered; and

(n)      monitor each other's performances, and take appropriate action to protect plan participants and beneficiaries from other fiduciaries' and service providers' failure to act in the best interests of plan participants and beneficiaries.

68.     Moreover, the Plans expressly granted Cigna broad discretionary authority under the Plans, including the authority to determine benefit payments.

69.     The "Spread" was additional compensation for the provision of healthcare and durable medical equipment coverage that was collected by Defendants that was neither disclosed to nor agreed to by the participants and beneficiaries that were required to make these additional payments to receive their healthcare or durable medical equipment. Defendants had and exercised discretion to determine the amount of and require the payment of this additional undisclosed

compensation, as well as whether to disclose it. ERISA § 3(21)(A)(i), (iii), 29 U.S.C. § 1002(21)(A)(i), (iii).

70.     The "Spread" is additional "premium" within the meaning of ERISA § 702, for the provision of prescription drug coverage that was collected by Defendants that was neither disclosed to nor agreed to by the participants and beneficiaries that were required to make these additional contributions to receive their healthcare or durable medical equipment. Defendants had and exercised discretion to determine the amount of and require the payment of this additional undisclosed premium payment, as well as whether to disclose it—or require its concealment. ERISA § 3(21)(A)(i), (iii), 29 U.S.C. § 1002(21)(A)(i), (iii).

71.     In addition to their fiduciary status under the foregoing provisions, Defendants are fiduciaries of all of the Class and Subclass members' ERISA Plans in that they *exercised* authority or control respecting management or disposition of plan assets, ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), because:

(a)     The copayments, coinsurance, and deductible payments Defendants collected from participants and beneficiaries are "plan assets" within the meaning of ERISA;

(b)     The insurance policies, ASO agreements and other contracts underpinning the Plans are "plan assets" within the meaning of ERISA;

(c)     Through their fraudulent billing scheme as described above, Defendants exercised control over both (i) payments from participants and beneficiaries and (ii) the contracts underpinning the ERISA Plans. They successfully leveraged their relationships to the Class and Subclass members' ERISA Plans to benefit themselves, their

- 23 -

affiliates, and third parties, and their *authority or control* over these significant plan assets enabled them to do so.

72.     In addition, any Plan-paid amounts that were contributed to participant healthcare or durable medical equipment transactions were "plan assets" within the meaning of ERISA. Incident to their fraudulent billing scheme, Defendants also exercised control over these plan assets, making them fiduciaries for purposes of these transactions.

73.     Defendants are also fiduciaries because they exercised discretion to set the prices that the Class and Subclass were and are required to pay for their healthcare products and services. Defendants are required to act in the best interests of the Class and Subclass, but by allowing participants and beneficiaries of ERISA Plans to be subject to the fraudulent billing scheme described herein, Defendants have breached their fiduciary duties.

74.     Defendants are aware of the effect the fraudulent billing scheme is having on the Class and Subclass. Nevertheless, these Defendants have maximized and continue to maximize their revenues at the expense of the Class and Subclass by engaging in the illegal conduct described herein.

75.     Furthermore, in negotiating and entering into a contract on behalf of an ERISA plan, a fiduciary must act prudently and negotiate terms that are reasonable and in the best interests of plan participants. In these negotiations and in the contract that is ultimately agreed upon, a fiduciary cannot place its interests over the interests of the plan participants and beneficiaries. To the extent Defendants have negotiated agreements subject to the fraudulent billing scheme described herein, they have breached their fiduciary duties under ERISA. And through these negotiations, Defendants have also exercised discretionary authority by setting their own margins and compensation for the sale of healthcare products and services.

- 24 -

76.     In addition, Defendant Cigna breached its fiduciary duties under ERISA by retaining other managers—including Defendant CareCentrix—to provide healthcare services, including durable medical equipment, for the benefit of the Class and Subclass, but failing to take reasonable and prudent action to determine whether these managers were fulfilling their own separate fiduciary obligations. For instance, Cigna authorized CareCentrix to set the prices for healthcare products and services, and thus permit these managers to control what the Class and Subclass pays for healthcare services, including durable medical equipment.

77.     When Cigna provided CareCentrix with authority and discretion to control pricing, Cigna assumed the duty to monitor CareCentrix's exercise of that discretionary authority. Cigna further owed and owes the Class and Subclass the duty to establish policies and procedures to monitor CareCentrix's performance of its duties, to monitor their pricing, to monitor the effect of the fraudulent billing scheme described herein on the amount paid by the Class and Subclass, to protect the interests of the Class and Subclass, and to provide complete and accurate information to the Class and Subclass.

78.     But in allowing CareCentrix to violate ERISA, including permitting the Class and Subclass to be subject to the fraudulent billing scheme, and in failing to correct such breaches of duty in a timely fashion, Cigna has breached its duty to monitor CareCentrix's illegal conduct.

79.     Defendant Cigna has also the discretionary authority or control to negotiate on behalf of the Class and Subclass favorable terms when entering into terms with other managers, including CareCentrix. These terms directly impact the prices paid by the Class and Subclass, but by engaging in the conduct described herein, including by participating in the fraudulent billing scheme with CareCentrix, Defendant Cigna has breached its fiduciary duties.

80.     Defendants are also parties in interest under ERISA because (a) they are fiduciaries, ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A); and/or (b) they provided insurance, plan administration, and healthcare management services to Plaintiff's and the Class members' health plans, ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).

81.     As parties in interest, Defendants received direct and indirect compensation for services, some of which was in the form of excess Spread that was collected in exchange for few to no services. Defendants also received and used for their own and their affiliates' benefits "plan assets," including patient cost-sharing and ERISA Plan contracts under which they had access to the ERISA Plans and were able to impose their fraudulent billing scheme on the Class and Subclass.

82.     Finally, even if either Defendant is found not to be a fiduciary, that Defendant is alternatively subject to equitable relief under ERISA, because they had actual or constructive knowledge of the ERISA violations through their role in the fraudulent billing scheme.

**Defendants' ERISA Duties**

83.     **The Statutory Requirements:** ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

84.     **The Duty of Loyalty.** ERISA imposes on a plan fiduciary the duty of loyalty—that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants

and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ." The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

85.    **The Duty of Prudence.** Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence—that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

86.    **The Duty to Inform.** The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: (a) a negative duty not to misinform; (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (c) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

87.    **Prohibited Transactions.** ERISA's prohibited transaction rules bar fiduciaries from certain acts because they are self-interested or conflicted and therefore become per se violations of ERISA § 406(b)—or because they are improper "party in interest" transactions under ERISA § 406(a). As noted above, under ERISA, a "party in interest" includes a fiduciary, as well as entities providing any "services" to a plan, among others. *See* ERISA § 3(14), 29 U.S.C. § 1002(14). ERISA's prohibited transaction rules are closely related to ERISA's duties of loyalty, which are discussed above.

88.     ERISA § 406(a) provides that transactions between a plan and a party in interest

are prohibited transactions unless they are exempted under ERISA § 408:

> (a) Transactions between plan and party in interest
>
> Except as provided in section 1108 of this title:
>
> (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
> (B) lending of money or other extension of credit between the plan and a party in interest;
> (C) furnishing of goods, services, or facilities between the plan and a party in interest;
> (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or
> (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29 U.S.C. § 1106(a).

89.     ERISA § 406(b) provides:

> A fiduciary with respect to a plan shall not—
>
> (1) deal with the assets of the plan in his own interest or for his own account,
> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
> (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).

90.     **Co-Fiduciary Liability.** A fiduciary is liable not only for fiduciary breaches within

the sphere of its own responsibility, but also as a co-fiduciary in certain circumstances. ERISA §

405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary

responsibility of another fiduciary with respect to the same plan in the following circumstances:

> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

> (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

91.     **The Duty to Monitor.** In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA participants and beneficiaries. As noted above, the power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power.

92.     **The Duty Not To Discriminate.** A health insurer may not discriminate against insureds by charging excessive premiums. ERISA § 702 29 USC §1182, states in pertinent part:

> Prohibiting discrimination against individual participants and beneficiaries based on health status.

> (a) In eligibility to enroll.

>> (1) In general. Subject to paragraph (2), a group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, may not establish rules for eligibility (including continued eligibility) of any individual to enroll under the terms of the plan based on any of the following health status-related factors in relation to the individual or a dependent of the individual:

>>> (A)   Health status.

(B)   Medical condition (including both physical and mental illnesses).

(C)   Claims experience.

(D)   Receipt of health care.

(E)   Medical history.

(F)   Genetic information.

(G)   Evidence of insurability (including conditions arising out of acts of domestic violence).

(H)   Disability.

(2)   No application to benefits or exclusions. To the extent consistent with section 701, paragraph (1) shall not be construed—

(A)   to require a group health plan, or group health insurance coverage, to provide particular benefits other than those provided under the terms of such plan or coverage, or

(B)   to prevent such a plan or coverage from establishing limitations or restrictions on the amount, level, extent, or nature of the benefits or coverage for similarly situated individuals enrolled in the plan or coverage.

(3)   Construction. For purposes of paragraph (1), rules for eligibility to enroll under a plan include rules defining any applicable waiting periods for such enrollment.

(b) In premium contributions.

(1)   In general. A group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual.

93.     **Non-Fiduciary Liability.** Under ERISA, non-fiduciaries—regardless of whether they are parties in interest—who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). Accordingly, as to the ERISA claims, even if any Defendant is not found to have fiduciary or party-in-interest status themselves, they must nevertheless restore unjust profits or fees and are subject to other appropriate equitable relief with regard to the transactions at issue in this action, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and well established case law. To the extent that any Defendant is not deemed to be a fiduciary or a party-in-interest with regard to any transaction at issue in this action, they are nevertheless subject to equitable relief under ERISA based on their actual or constructive knowledge of the wrongdoing at issue.

94.     **Rights of Action Under the Plans, for Fiduciary Breach, Prohibited Transactions, and Related Claims.** ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a participant or beneficiary may bring an action to enforce rights under the terms of the plan or to clarify his rights to future benefits under the terms of the plan. Further, ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants and fiduciaries to bring suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." The remedies available pursuant to § 502(a)(3) include remedies for breaches of the fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and for violation of the prohibited transaction rules set forth in ERISA § 406, 29 U.S.C. § 1106. Further, ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409. ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the

responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate. Plaintiff bring their ERISA claims pursuant to ERISA § 502(a)(3) and (2), as well as § 502(a)(1)(B), as further set forth below, because not all the remedies Plaintiff seek are available under all sections of ERISA and, alternatively, Plaintiff are pleading their claims in the alternative.

### Defendants Breached Their Duties

95.     Defendants breached the terms of the ERISA Plans and legal obligations, committed breaches of fiduciary duty and prohibited transactions, and harmed Plaintiff and Class and Subclass members in the following ways:

(a)     Plaintiff and Class and Subclass members were unlawfully charged amounts for healthcare services and durable medical equipment that substantially exceeded the amounts actually paid by or agreed to be paid by Defendants and/or their agent managers to the providers for the services or equipment;

(b)     Plaintiff and the Class and Subclass were charged excessive copayments, a material portion of which were neither payments for healthcare services or durable medical equipment, nor were they "co-" payments made in conjunction with Defendants' payment for these services and equipment, as required by the plain language of the Plans, but rather were undisclosed and unlawful payments and premiums to Defendants/managers;

(c)     Plaintiff and Class and Subclass members were overcharged for coinsurance payments in that rather than paying a percentage of the fees that Defendants

and/or managers with which Defendants have contracted actually paid (or agreed to pay) to the providers for the services or equipment, the coinsurance payments were based on substantially inflated amounts;

(d)     Plaintiff and Class and Subclass members were overcharged when making payments toward their deductibles in that rather than paying the lesser of the applicable per occurrence deductible fee or the fee paid to the provider for the healthcare service or equipment, Plaintiff and Class and Subclass members were charged deductible fees that were higher than allowed under the Plans;

(e)     Defendants improperly processed and paid claims they received from providers;

(f)     Defendants discriminated against patients who were required to pay "Spreads" as compared to those who were not;

(g)     Defendants misrepresented and failed to disclose to patients the manner in which they charged for healthcare services, including durable medical equipment, as alleged above;

(h)      Providers were prohibited from disclosing to patients the existence or amount of the Spread;

(i)     Defendants set their own compensation for services performed as fiduciaries by dictating prices, co-payments, co-insurance, deductibles, and contracted rates that resulted in Spread;

(j)     Defendants unilaterally collected their own compensation for services performed as fiduciaries by collecting Spread;

(k)     Defendants set and changed the compensation of their own affiliates and third parties with respect to the Class and Subclass members' ERISA Plans by allocating the proceeds of Spread without heeding the best interests of participants and beneficiaries;

(l)     Defendants maximized their own profits, profits to their affiliates, and profits to third parties, at the expense of the Class and Subclass members who participated in the ERISA Plans;

(m)     Defendants received improper compensation from entities doing business with the ERISA Plans Defendants administered and managed;

(n)     Defendants knew or reasonably should have known that their actions would injure plan participants and beneficiaries;

(o)     Cigna selected plan service managers such as CareCentrix, and Defendants selected providers such as J & L, and negotiated their contracts based on disloyal and self-interested factors and made such decisions without putting the interests of participants and beneficiaries first;

(p)     Defendants failed to stop injuries to Plan participants caused by their co-fiduciaries and service providers; and

(q)     Defendants failed to monitor their appointees, formal delegees, and informal designees in the performance of their fiduciary duties.

96.     Plaintiff and Class and Subclass members were overcharged for and/or paid unauthorized and excessive copayments, coinsurance and deductible payments in connection with the purchase of numerous different types of healthcare services and durable medical equipment.

## CLASS ACTION ALLEGATIONS

97.     Plaintiff brings this action as a class action pursuant to Rule 23 (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the Class and the Subclass defined as follows:

>    **The Class.** All individuals who are or were enrolled in a health benefit plan issued and/or administered by Cigna or its affiliates who received healthcare products or services, excluding outpatient prescription drug benefits, pursuant to such plan and paid an amount for such services or products that was set by Defendants (or their agents) that was higher than the participant payment amount provided by the Plan.

98.     Within the Class there is one Subclass:

>    **The Subclass**. All individuals who are or were enrolled in a health benefit plan issued and/or administered by Cigna or its affiliates for which CareCentrix acted as manager who received healthcare products or services, excluding outpatient prescription drug benefits, pursuant to such plan and paid an amount for such services or products that was set by Defendants (or their agents) that was higher than the participant payment amount provided by the Plan.

99.     Plaintiff reserve the right to redefine the Class and Subclass prior to certification.

100.    **Class Period.** Plaintiff will seek class certification, losses, and other available relief for fiduciary breaches and prohibited transactions occurring within the entire period allowable under ERISA § 413, 29 U.S.C. § 1113, including its fraud or concealment tolling provisions, as well as under RICO, 18 U.S.C. 1961, *et seq*. and the doctrine of equitable tolling. Further, Plaintiff reserves the right to refine the Class Period after they have learned the extent of Defendants' fraud, the length of its concealment, and the time period during which the fraudulent billing scheme was taking place.

101.    Excluded from the Class are Defendants, any of their parent companies, subsidiaries, and/or affiliates, their officers, directors, legal representatives, and employees, any co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

102.    This action is brought, and may properly be maintained, as a Class action pursuant to Fed. R. Civ. P. 23. This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of those provisions.

103.    The Class and Subclass are so numerous that the individual joinder of all of its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiff believes that the total number of Class and Subclass members is in the thousands and that the members of the Class and Subclass are geographically dispersed across the United States. While the exact number and identities of the Class and Subclass members are unknown at this time, such information can be ascertained through appropriate investigation and discovery.

104.    Plaintiff's claims are typical of the claims of the members of the Class and Subclass because Plaintiff's claims, and the claims of all Class and Subclass members arise out of the same conduct, policies and practices of Defendants as alleged herein, and all members of the Class and Subclass are similarly affected by Defendant's wrongful conduct.

105.    There are questions of law and fact common to the Class and Subclass and these questions predominate over questions affecting only individual Class and Subclass members. Common legal and factual questions include, but are not limited to:

(a)     Whether Defendants are fiduciaries under ERISA;

(b)     Whether Defendants are parties in interest under ERISA;

(c)     Whether Defendants breached their fiduciary duties in failing to comply with ERISA as set forth above;

(d)     Whether Defendants acts as alleged above breached ERISA's prohibited transaction rules;

(e)     Whether Defendants breached ERISA § 702;

(f)       Whether Defendants knowingly participated in and/or knew or had constructive knowledge of violations of ERISA, including breaches of fiduciary duty;

(g)       Whether Defendants conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity;

(h)       Whether Defendants conspired to conduct or participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity;

(i)        Whether such racketeering consisted of acts that are indictable pursuant to 18 U.S.C §§ 1341 and 1343;

(j)        Whether Defendants engaged in a scheme to defraud;

(k)       Whether each Defendant was a knowing and active participant;

(l)        Whether the mail, interstate carriers or wire transmissions were used in connection with such scheme to defraud;

(m)      Whether Plaintiff and Class and Subclass members were injured in their property or business as a direct and proximate result of Defendants' racketeering activities;

(n)       Whether Defendants violated the Plans' terms by collecting unlawfully excessive amounts for healthcare services and durable medical equipment, and retaining the resulting "Spread;"

(o)       Whether the members of the Class and/or Subclass have sustained losses and/or damages and/or Defendants have been unjustly enriched, and the proper measure of such losses, damages, and/or unjust enrichment; and

(p)       Whether the members of the Class and/or Subclass are entitled to declaratory and/or injunctive relief.

106.    Plaintiff will fairly and adequately represent the Class and Subclass and have retained counsel experienced and competent in the prosecution of class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class and Subclass. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

107.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class and/or Subclass members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class and/or Subclass to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

108.    Class action status in this action is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class and Subclass, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to each Class and Subclass as a whole.

109.    Class action status in this action is warranted under Rule 23(b)(3) because questions of law or fact common to members of the Class and Subclass predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy. Joinder of all members of the Class is impracticable.

### Exhaustion of Administrative Remedies Does Not Apply or Would Be Futile

110.    Plaintiff and the Class and Subclass are not required to exhaust administrative remedies. Only a claim under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) for benefits could

concern exhaustion of administrative remedies, and Plaintiff and the Class and Subclass do not assert such a claim. They seek to enforce their rights under the terms of the ERISA Plans and clarify future rights concerning hidden and fraudulent charges that exceeded their benefits. Moreover, although Plaintiff and Class and Subclass members made claims for benefits through their providers, Defendants never even attempted to comply with the Regulation concerning reasonable benefit claim procedures, a prerequisite to assertion of an exhaustion defense. Finally, because the injuries to Plaintiff and the Class and Subclass are part of a nationwide, clandestine, computerized scheme, any attempt to rectify the harm through administrative means would be futile and unnecessary.

111.    This fraudulent billing (which directly evidences the overcharging of patients) is pervasive and significantly increases the costs to patients across the country.

112.    Making matters worse, insurer/managers contractually bind providers to keep the scheme secret and they prevent providers from informing patients that they are being overcharged. Put differently, if the patient in the CPAP equipment example above directly asked the provider whether he or she could purchase the CPAP equipment outside of the Plan, the provider would have been contractually prohibited from disclosing a lower available price or from selling it at that lower price—even if the provider could do so at a profit.

113.    Due to Defendants' concealment of their fraudulent billing scheme, Plaintiff and the Class and Subclass did not know and/or did not have reason to know that they were being overcharged for their products and services. Due to the "gag clauses," only in the rarest of circumstances would patients have any inkling that they were being overcharged. And even if they had reason to know they were being overcharged, they did not know the exact amount of the "Spread" they were forced to pay. Thus, Plaintiff and the Class and Subclass did not know and did

not have reason to know that they could make a claim for reimbursement of part of their cost-sharing agreement, much less the specific portion thereof they should request.

114.    It is not clear that Defendants' administrative claims procedures would or could contemplate the return of an overpayment because there has been no denial of benefits, or adverse benefit determination. But even if it could apply, making administrative claims should not be required of Plaintiff and the Class and Subclass. Even utilizing Defendants' claims procedures, if they were available or valid under these circumstances, which they were not, would not make Plaintiff or the Class or Subclass whole. First, it is unlikely this procedure would result in a refund, and is therefore futile and/or unnecessary. Second, even if Defendants' claims procedures could provide a "Spread" reimbursement, Plaintiff and the Class and Subclass are entitled to more, including disgorgement of profits, treble and punitive damages, injunctive relief, and the other remedies described *infra.* In this regard as well, utilizing a claims procedure would be futile and/or unnecessary.

115.    Moreover, under the circumstances alleged here, it would be extremely burdensome and inequitable to require Plaintiff and the Class and Subclass to seek redress through Defendants' claims procedures, where Defendants have intentionally misled consumers, omitted material information, and concealed their unlawful practices. With the proportionately small amount at stake for a given patient relative to the vast profits Defendants are reaping from their fraudulent billing scheme, Defendants' imposition of a claims procedure likely would deter and prevent Plaintiff and the Class and Subclass from obtaining any relief at all, while Defendants would be free to retain an unfair, unlawful, and undisclosed windfall profit due to their fraudulent billing scheme.

116.    Finally, correcting the prices paid by patients on an individualized basis would inevitably result in further unfair, disparate, and discriminatory treatment among those Class and Subclass members who have been reimbursed for the overcharges and those who have not. A far more equitable and cost-effective way to adjudicate overpayments made by the Class and Subclass is for Defendants to disgorge in full these amounts pursuant to their own records that can track such payments for everyone in the Class and Subclass.

117.    For all of these reasons, it would be futile for Plaintiff to demand administratively that Defendants modify the pervasive fraudulent billing scheme that is ingrained in their business.

**Plaintiff and the Class Are Entitled to Tolling Due to Fraud or Concealment**

118.    By its nature, Defendants' fraudulent billing scheme has hidden their unlawful conduct from injured parties.

119.    Neither Plaintiff nor Class or Subclass members knew of the fraudulent billing scheme nor could they have reasonably discovered the existence of the fraudulent billing scheme until shortly before filing this action.

120.    Until Plaintiff changed carriers and noticed a differential in billing, Defendants' fraudulent billing scheme and their unlawful conduct was hidden from Plaintiff and the Class and Subclass.

121.    Even today, the "gag clauses" in place between Defendants and providers continue to hide Defendants' unlawful conduct from members of the Class and Subclass.

122.    To the extent that any of the causes of action alleged *infra* are subject to a specific statute of limitations, Defendants' fraud or concealment alleged herein *tolls* those requirements, for a specific amount of time to be determined as the litigation progresses.

123.    Further, ERISA's statute of limitations for fiduciary breach claims, ERISA § 413, 29 U.S.C. § 1113, provides that "in the case of fraud or concealment, [an] action may be commenced not later than six years after the date of discovery of such breach or violation."

124.    While the RICO statute does not contain an express limitation period, the United States Supreme Court has held that civil RICO claims must be brought within four years from the discovery of an injury, which limitation is subject to equitable tolling due to defendants' fraudulent concealment of their unlawful conduct. *Rotella v. Wood*, 528 U.S. 549 (2000).

125.    The fraudulent billing scheme—by its nature a secret endeavor by Defendants—remains hidden from most members of the Class and Subclass. Moreover, during the Class Period, as defined above, each Defendant actively and effectively concealed its participation in the fraudulent billing scheme from Plaintiff and other members of the Class and Subclass through "gag clauses" and secrecy policies. There is no question that Plaintiff's claims are timely.

## COUNT I
### For Violations of ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)

126.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

127.    ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) provides that a participant or beneficiary may bring an action to enforce rights under the terms of the plan or to clarify his rights to future benefits under the terms of the plan.

128.    As set forth above, as a result of being overcharged for healthcare services and durable medical equipment, Plaintiff and the Class and Subclass have been and likely will continue to be denied their rights under the Plans to be charged a lower amount for these services and equipment

129.   Plaintiff and the Class and Subclass have been damaged in the amount of the "Spread" compensation that Defendants took for themselves. Plaintiff and the Class and Subclass are entitled to recover the amounts they have been overcharged.

130.   Plaintiff and the Class and Subclass are entitled to enforce their rights under the terms of the plans and seek clarification of their future rights and are entitled to an order providing, among other things:

(a)   That they have been overcharged;

(b)   For an accounting of Defendants' charges and overcharges;

(c)   For payment of all amounts due them in accordance with their rights under the ERISA Plans; and

(d)   For an order that they are entitled in the future not to pay "Spread" or any other additional amounts that conflict with their rights under the ERISA Plans.

## COUNT II

### For Violations of ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)
### and ERISA § 406(a)(1)(C) & (D), 29 U.S.C. § 1106(a)(1)(C) & (D)

131.   Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

132.   ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), provides that a fiduciary shall not cause a plan to engage in a transaction if it knows or should know that the transaction constitutes the payment of direct or indirect compensation in the furnishing of services by a party in interest to a plan.

133.   ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), provides that a fiduciary shall not cause a plan to engage in a transaction if it knows or should know that the transaction

constitutes the transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

134.     As alleged above, Defendants are fiduciaries of the ERISA Plans of the participants and beneficiaries in the Class and Subclass. Defendants are also parties in interest under ERISA in that they are fiduciaries and/or they provided health insurance and/or administrative "services" to Class and Subclass members pursuant to the ERISA Plans. ERISA § 3(14)(A) & (B), 29 U.S.C. § 1002(14)(A) & (B). Thus they were engaged on one or both sides of these § 406(a) prohibited transactions.

135.     As fiduciaries, Defendants caused the ERISA Plans to engage in prohibited transactions as alleged herein.

136.     As parties in interest, Defendants received direct and indirect compensation in the form of undisclosed "Spread" compensation in exchange for the services they provided to Plaintiff and the Class and Subclass pursuant to their health plans. ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C).

137.     The only exception to the prohibition of such compensation is if it was for services necessary for the operation of a plan and such compensation was reasonable. ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2).

138.     While the burden is on Defendants to invoke and establish this exception, the compensation paid to Defendants was not reasonable under ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2) in that the "Spread" compensation was excessive and/or unreasonable in relation to the value of the services provided. Defendants' compensation exceeded the premiums and other fees that were agreed upon for fully providing healthcare services and durable medical equipment.

Further, Defendants as fiduciaries of the ERISA Plans are entitled to receive at most reimbursement for their direct expenses.

139.    Defendants also received transfers of plan assets in that they received excess copayments, coinsurance, or deductible payments by collecting and retaining the "Spread" between those payments and the amount the managers paid the providers. ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

140.    In addition, and in the alternative, Defendants used—and misused—assets of the ERISA Plans by leveraging the contracts underpinning these ERISA Plans to gain access to patients who needed healthcare services and durable medical equipment and would be required to pay copayments, coinsurance, or deductible payments which Defendants could appropriate in their fraudulent billing scheme. Further, Defendants used—and misused—for their own benefit and the benefit of other parties in interest additional assets of the ERISA Plans—the contracts underpinning the ERISA Plans of members of the Class and Subclass—to effectuate their fraudulent billing scheme. ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

141.    Plaintiff and the Class and Subclass have suffered losses and/or damages and/or Defendants have been unjustly enriched in the amount of the "Spread" compensation Defendants took for themselves.

142.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

143.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff and the Class and Subclass, including but not limited to:

(a)     an accounting;

(b)     a surcharge;

(c)     correction of the transactions;

(d)     disgorgement of profits;

(e)     an equitable lien;

(f)     a constructive trust;

(g)     restitution;

(h)     full disclosure of the foregoing acts and practices;

(i)     an injunction against further violations; and/or

(j)     any other remedy the Court deems proper.

## COUNT III

### ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)
### for Violations of ERISA § 406(b), 29 U.S.C. § 1106(b)

144.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

145.    ERISA § 406(b), 29 U.S.C. § 1106(b), provides that a fiduciary shall not (1) deal with plan assets in its own interest or for its own account, (2) act in any transaction involving the plan on behalf of a party whose interests are adverse to participants or beneficiaries, or (3) receive any consideration for its own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

146.    As alleged above, Defendants are fiduciaries to the ERISA Plans. They violated all three subsections of ERISA § 406(b).

147.    As alleged above, both (i) payments from participants and beneficiaries for healthcare and durable medical equipment and (ii) the contracts underpinning the Plaintiff's and the Class and Subclass members' ERISA Plans are plan assets under ERISA.

148.    First, by setting their own compensation from these payments from participants and beneficiaries, collecting their own compensation from that same source, and managing contracts in their own interest or for their own account, Defendants violated ERISA § 406(b)(1). Specifically, in setting the amount of and taking excessive undisclosed "Spread" compensation, Defendants received plan assets and consideration for their personal accounts.

149.    Second, by acting on behalf of each other and on behalf of non-parties who also stood to profit from the fraudulent billing scheme at the expense of Plaintiff and members of the Class and Subclass—and thus with interests adverse to the affected participants and beneficiaries—Defendants engaged in conflicted transactions each time they facilitated, required, or allowed excessive payments resulting in "Spread," in violation of ERISA § 406(b)(2). Under this subsection of ERISA § 406(b), plan assets need not be involved—dealing with a plan is enough.

150.    Third, through their fraudulent billing scheme, Defendants received consideration for their own personal accounts from other parties—including each other, third parties, and the Plaintiff and members of the Class and Subclass—that were dealing with the ERISA Plans in connection with a transaction involving the assets of the ERISA Plans.

151.    Plaintiff and the Class and Subclass have been damaged and suffered losses in the amount of the "Spread" compensation Defendants took through these prohibited transactions.

152.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title

or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

153.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff and the Class and Subclass, including but not limited to:

  (a) an accounting;

  (b) a surcharge;

  (c) correction of the transactions;

  (d) disgorgement of profits;

  (e) an equitable lien;

  (f) a constructive trust;

  (g) restitution;

  (h) full disclosure of the foregoing acts and practices;

  (i) an injunction against further violations; and/or

  (j) any other remedy the Court deems proper.

## COUNT IV

**ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3)
for Violations of ERISA § 404, 29 U.S.C. § 1104**

154.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

155.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan, and with the care, skill, prudence and diligence

under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

156.    In setting the amount of and taking excessive undisclosed "Spread" compensation Defendants have breached their fiduciary duties of loyalty and prudence.

157.    Further, in failing to put the interests of participants and beneficiaries first in managing and administering Plan benefits, Defendants have breached their fiduciary duty of loyalty. And in acting in their own self-interest, Defendants have violated the "exclusive purpose" standard.

158.    The duty to disclose is part of the duty of loyalty. In concealing and failing to disclose to the Class and Subclass that plan participants were paying more in than the cost of the healthcare service or durable medical equipment if purchased outside their respective Plans, and then barring providers from advising Class and Subclass members that they could pay less for a service or equipment by purchasing it outside of their respective plans, Defendants breached this duty. Further, both omissions and misrepresentations are actionable under ERISA's disclosure obligations, and the type that occurred here are not subject to individualized reliance requirements. In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA participants and beneficiaries. As noted herein, the power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power.

159.    Defendant Cigna failed to adequately monitor the activities of Defendant CareCentrix and other managers they authorized to provide healthcare management services to Cigna patients, including *inter alia*, failing to monitor the prices charged for healthcare and durable

medical equipment provided to Plaintiff and the Class and Subclass and permitting and/or participating in the fraudulent billing scheme described herein. As such, Defendant Cigna failed to monitor its appointees, formal delegees, and informal designees in the performance of its fiduciary duties.

160.    Finally, it is never prudent to require or allow excessive compensation in the context of an ERISA-covered plan. In so doing, Defendants violated their duty of prudence.

161.    Plaintiff and the Class and Subclass have been damaged and suffered losses in the amount of the "Spread" compensation Defendant took.

162.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

163.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409.

164.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

165.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff and the Class and Subclass, including but not limited to:

(a)     an accounting;

(b)    a surcharge;

(c)    correction of the transactions;

(d)    disgorgement of profits;

(e)    an equitable lien;

(f)    a constructive trust;

(g)    restitution;

(h)    full disclosure of the foregoing acts and practices;

(i)    an injunction against further violations; and/or

(j)    any other remedy the Court deems proper.

## COUNT V

### ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)
### for Violations of ERISA § 702, 29 U.S.C. § 1182

166.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

167.    ERISA § 702, 29 USC § 1182, states in pertinent part:

Prohibiting discrimination against individual participants and beneficiaries based on health status.

(an) In eligibility to enroll.

(1) In general. Subject to paragraph (2), a group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, may not establish rules for eligibility (including continued eligibility) of any individual to enroll under the terms of the plan based on any of the following health status-related factors in relation to the individual or a dependent of the individual:

(A) Health status.

(B) Medical condition (including both physical and mental illnesses).

(C) Claims experience.

(D) Receipt of health care.

(E) Medical history.

(F) Genetic information.

(G) Evidence of insurability (including conditions arising out of acts of domestic violence).

(H) Disability.

(2) No application to benefits or exclusions. To the extent consistent with section 701, paragraph (1) shall not be construed—

(A) to require a group health plan, or group health insurance coverage, to provide particular benefits other than those provided under the terms of such plan or coverage, or
(B) to prevent such a plan or coverage from establishing limitations or restrictions on the amount, level, extent, or nature of the benefits or coverage for similarly situated individuals enrolled in the plan or coverage.

(3) Construction. For purposes of paragraph (1), rules for eligibility to enroll under a plan include rules defining any applicable waiting periods for such enrollment.

(b) In premium contributions.

(1) In general. A group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual.

168.    In setting the amount of and taking excessive undisclosed "Spread" compensation,

Defendants have required plan participants and beneficiaries who have medical conditions that

require healthcare services and durable medical equipment that are subject to Defendants' undisclosed excessive "Spreads" to pay greater premiums and contributions than those participants and beneficiaries who do not need healthcare services and durable medical equipment that are subject to Defendants' undisclosed excessive "Spreads" for their health benefits.

169.    Under Defendants' fraudulent billing scheme, Plaintiff and members of the Class and Subclass who needed healthcare services and durable medical equipment that are subject to Defendants' undisclosed excessive "Spreads" were required to pay hidden additional premiums or contributions in order to be able to *use* their benefits as enrollees, thus making the "Spread" amounts a condition of continued enrollment under the plan. Without paying inflated copayments, coinsurance, or deductible payments above and beyond the required participant contributions set forth in their plans, Plaintiff and members of the Class and Subclass could not obtain covered healthcare services and durable medical equipment under the ERISA Plans, the effect of which is that they would not be enrolled in the Plans.

170.    Plaintiff and the Class and Subclass have been damaged and suffered losses in the amount of the "Spread" compensation Defendants took.

171.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

172.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff and the Class and Subclass, including but not limited to:

    (a)    an accounting;

    (b)    surcharge;

(c)     correction of the transactions;

(d)     disgorgement of profits;

(e)     an equitable lien;

(f)     a constructive trust;

(g)     restitution;

(h)     full disclosure of the foregoing acts and practices;

(i)     an injunction against further violations; and/or

(j)     any other remedy the Court deems proper.

## COUNT VI

### ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)
### for Violations of ERISA § 405(a), 29 U.S.C. § 1105(a)

173.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

174.    As alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence and they were prohibited from engaging in self-interested and conflicted transactions.

175.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which it may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Defendants breached all three provisions.

176.    **Knowledge of a Breach and Failure to Remedy.** ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another

- 54 -

fiduciary if it has knowledge of a breach by such other fiduciary, unless it makes reasonable efforts under the circumstances to remedy the breach. Upon information and belief, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

177.   **Knowing Participation in a Breach.** ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Upon information and belief, each Defendant participated in the breaches by the other fiduciaries.

178.   **Enabling a Breach.** ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of its specific responsibilities which give rise to its status as a fiduciary, it has enabled another fiduciary to commit a breach, even without knowledge of the breach. Upon information and belief, each Defendant enabled the breaches by the other fiduciaries.

179.   Plaintiff and the Class and Subclass have been damaged in the amount of the "Spread" compensation Defendants took.

180.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

181.   Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff and the Class and Subclass, including but not limited to:

(a)      an accounting;

(b)     a surcharge;

(c)     correction of the transactions;

(d)     disgorgement of profits;

(e)     an equitable lien;

(f)     a constructive trust;

(g)     restitution;

(h)     full disclosure of the foregoing acts and practices;

(i)     an injunction against further violations; and/or

(j)     any other remedy the Court deems proper.

## COUNT VII

### ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)
### for Knowing Participation in Violations of ERISA

182.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

183.    As noted above, fiduciary status is not required for liability under ERISA where non-fiduciaries participate in and/or profit from a fiduciary's breach or prohibited transaction. Accordingly, Plaintiff makes claims against Defendants even though one or more of them may be found not to have fiduciary status with respect to the ERISA Plans. As nonfiduciaries, they nevertheless must restore unjust profits or fees and are subject to other appropriate equitable relief, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and pursuant to *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000).

184.    To the extent any one or more of them are not found to be fiduciaries, Defendants had actual or constructive knowledge of and participated in and/or profited from the prohibited transactions and fiduciary breaches alleged in Counts II-V by the Defendants who are found to be

- 56 -

fiduciaries, and these nonfiduciaries are liable to disgorge ill-gotten gains and/or plan assets and to provide other appropriate equitable relief, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and *Harris Trust*.

185.   As a direct and proximate result of the fiduciary breaches and prohibited transactions alleged in Counts II-V and the participation therein of the Defendants, Plaintiff and the members of the Class and Subclass directly or indirectly lost millions of dollars and/or plan assets (both participant payments for home healthcare services and durable medical equipment, and Plan contracts) were improperly used to generate profits for the fiduciary Defendants, their affiliates, and third parties. The fiduciary Defendants collected and/or paid these amounts to themselves, their affiliates, or third parties from plan assets or generated them through improper leveraging of plan assets.

186.   Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff and the Class and Subclass, including but not limited to:

(a)    an accounting;

(b)    a surcharge;

(c)    correction of the transactions;

(d)    disgorgement of profits;

(e)    an equitable lien;

(f)    a constructive trust;

(g)    restitution;

(h)    full disclosure of the foregoing acts and practices;

(i)    an injunction against further violations; and/or

(j)    any other remedy the Court deems proper.

## COUNT VIII

### For Violating RICO, 18 U.S.C. § 1962(c)
### Against Cigna on Behalf of the Class

187.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

**General RICO Allegations**

188.    Plaintiff, the Class members, Cigna, and CareCentrix are "persons" within the meaning of RICO, 18 U.S.C. §§1961(3), 1964(c).

189.    At all relevant times, Cigna was associated with separate enterprises consisting of each manager ("Cigna Manager Enterprises"), the names of which are not all currently known to the Plaintiff.

190.    Each manager is a legal entity enterprise within the meaning of 18 U.S.C. §1961(4).

191.    At all relevant times, each Cigna Manager Enterprise has been engaged in, and its activities affect, interstate commerce within the meaning of RICO, 18 U.S.C. §1962(c).

192.    Cigna is legally and factually distinct from each Cigna Manager Enterprise.

193.    Cigna and each manager are separate and distinct from the pattern of racketeering acts in which the Cigna Manager Enterprises engaged.

194.    Cigna agreed to and did conduct affairs and participate in the conduct of each Cigna Manager Enterprise. Cigna operated and managed the affairs of each Cigna Manager Enterprise through, among other ways, contracts, and agreements through which Cigna was able to and did exert control over the respective managers.

195.    On information and belief, each manager has manuals and written policies that describe the manner in which it processes claims for medically necessary healthcare services and equipment provided to Plaintiff and Class members in relation to Cigna.

196. Cigna had the ability to and did in fact direct each Cigna Manager Enterprise to intentionally misrepresent the cost-sharing amount Plaintiff and Class members were required to pay to receive medically necessary healthcare services and equipment. Cigna further directed each Cigna Manager Enterprise to collect a specified cost-sharing amount. This specified cost-sharing amount exceeded the amount Cigna had promised Plaintiff and the Class members they would pay for medically necessary healthcare services and equipment. After Plaintiff and Class members overpaid for the medically necessary services and equipment, Cigna directed each Cigna Manager Enterprise to return some or all of these funds to Cigna.

197. As described herein, each manager is a separate legal entity. Their purpose is to provide Plaintiff and Class members medically necessary healthcare services and equipment in accordance with the terms of their Plans with Cigna. The managers' legitimate and lawful activities are not being challenged in this Complaint.

198. Cigna, however, also directs each Cigna Manager Enterprise to serve an unlawful purpose; that is, to create a mechanism through which Cigna could obtain additional monies beyond what Plaintiff and Class members should have paid under their Plans for medically necessary healthcare services and equipment. This fraudulent billing scheme was not legitimate.

199. Cigna agreed to and did conduct and participate in the conduct of each Cigna Manager Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff and the Class members. Cigna used each Cigna Manager Enterprise to facilitate their goals of overcharging for medically necessary healthcare services and equipment, and were unjustly enriched by overcharging for medically necessary services and equipment.

**Predicate Racketeering Acts**

200.    As described herein, Cigna directly and indirectly conducted and participated in the conduct of each Cigna Manager Enterprise's affairs through a pattern of racketeering and activity in violation of 18 U.S.C. § 1962(c) for the unlawful purpose of defrauding Plaintiff and Class members.

201.    Pursuant to and in furtherance of its fraudulent billing scheme Cigna directed each Cigna Manager Enterprise to commit multiple related predicate acts of "racketeering activity," as defined in 18 U.S.C. §1961(5), prior to, and during, the Class Period and continue to commit such predicate acts, in furtherance of their fraudulent billing scheme, including: (a) mail fraud, in violation of 18 U.S.C. §1341; and (b) wire fraud, in violation of 18 U.S.C. §1343.

202.    As alleged herein, Cigna directed CareCentrix to engage in a fraudulent billing scheme to defraud Plaintiff and Class members. The fraudulent billing scheme entails: (a) Cigna representing to Plaintiff and Class members through form Plan language that they would pay a certain amount for healthcare services and equipment; (b) Cigna entering into agreements with managers, through which the managers agreed to process claims submitted by Plaintiff and the Class members for medically necessary healthcare services and equipment in accordance with the terms of a particular Plan; (c) the managers' creation of provider networks through which Plaintiff and Class members could receive medically necessary healthcare services and equipment by way of agreements requiring providers participating in the networks to charge for medically necessary healthcare services and equipment only the amounts specified by the managers; (d) Cigna Manager Enterprises misrepresenting the correct charge for medically necessary healthcare services and equipment as specified in Plaintiff's and Class members' Plans, and directing providers participating in the provider networks to collect those improper amounts; (e) Cigna's retention,

directly or indirectly,  of a portion of the amounts improperly collected by CareCentrix, in violation of the Plaintiff's and Class members' Plans with Cigna; and (f) Cigna imposing an agreement (1) barring providers from advising Plaintiff and Class members that they could pay less for a healthcare service or equipment by purchasing it outside of their respective Plans and (2) barring providers from selling in a transaction that would avoid the overcharge.

203.   Cigna's fraudulent billing scheme includes various misrepresentations and omissions of material fact, including, but not limited to: (a) the representation in the plain form language of the Plans that Plaintiff and Class members would pay a certain amount for healthcare and  equipment with contemporaneous knowledge and intent that Plaintiff and Class members would be charged a higher amount; (b) the failure to disclose that a material portion of the "co-payments" were neither payments for healthcare or equipment nor were they "co-" payments by the patients in conjunction with a payment by the Plans for the healthcare or equipment, as required by the Plans' plain language, but rather were unlawful payments to Cigna; (c) the failure to disclose that payments for healthcare and equipment under deductible portions of health Plans were based on service and equipment prices that exceeded the contracted fee between managers and the providers, as required by the Plans' plain language; (d) the failure to disclose that co-insurance payments were based on service and equipment prices that exceeded the contracted fee between managers and  providers, as required by the Plans' plain language; and (e) the failure to disclose its required agreement (1) barring providers from advising Plaintiff and Class members that they could pay less for a healthcare service or equipment by purchasing it outside of their respective Plans and (2) barring providers from selling in a transaction that would avoid the overcharge.

204.   In sum, Cigna's fraudulent billing scheme took money from Plaintiff and Class members through deceit and false pretenses. Cigna intentionally devised such a fraudulent billing

scheme and were knowing and active participants in the scheme to defraud Plaintiff and Class members. Cigna knew that they overcharged for medically necessary healthcare services and equipment and that they would retain such amounts. Cigna specifically intended to commit fraud, and such intent can be inferred from the totality of the allegations herein.

205.    It was and is reasonably foreseeable to Cigna that mail, interstate carriers and wire transmissions would be used—and mail, interstate carriers and wire transmissions were in fact used—in furtherance of the scheme, including but not limited to the following manner and means: (a) whenever a Plaintiff or Class member seeks to receive healthcare services and equipment, the providers participating in the managers' provider networks enter information into a computer and transmit it via interstate mail or carrier and/or wire transmissions to the managers for processing; (b) Cigna and/or managers collecting of "Spread" money takes place via interstate mail or carrier or wire transmissions; (c) Plaintiff and Class members make payments to managers or providers using credit or debit cards, which require the use of use of interstate wire transmissions; (d) healthcare services and equipment received by Plaintiff and Class members through Cigna's fraudulent scheme were delivered by mail or interstate carrier and (e) Cigna's, or managers' representatives communicated with each other by mail, interstate carrier and or wire transmissions in order to carry out the fraudulent scheme.

206.    Cigna knew that Plaintiff and Class members would reasonably rely on the accuracy, completeness, and integrity of their and managers' statements. The Plaintiff and Class members participants did so rely, to their detriment, on Cigna's misrepresentations and omissions.

207.    Having devised its fraudulent billing scheme and intending to defraud Plaintiff and Class members, on or about the dates set forth below, Cigna intentionally and unlawfully

transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme.

208.    On or about June 22, 2017, Cigna intentionally directed manager, CareCentrix, to fraudulently bill Plaintiff $25.68 for a disposable CPAP filter—*a 342% premium over the actual $7.50 fee* paid to the provider. The statement Cigna directed CareCentrix to deliver was fraudulent because Plaintiff's Plan did not require him to pay that amount and Cigna knew the same.

209.    On or about June 22, 2017, Cigna intentionally directed manager, CareCentrix, to fraudulently bill Plaintiff $147.78 for a full-face Mirage CPAP/BIPAP mask—*a 156% premium over the actual $95 fee* paid to the provider. The statement Cigna directed CareCentrix to deliver was fraudulent because the Plaintiff's Plan did not require him to pay that amount and Cigna knew the same.

210.    On or about June 22, 2017, Cigna intentionally directed manager, CareCentrix, to fraudulently bill Plaintiff $37.61 for CPAP headgear—*a 188% premium over the actual $20 fee* paid to the provider. The statement Cigna directed CareCentrix to deliver was fraudulent because Plaintiff's Plan did not require him to pay that amount and Cigna knew the same.

211.    On or about June 22, 2017, Cigna intentionally directed manager, CareCentrix, to fraudulently bill Plaintiff $24.43 for CPAP tubing—*a 175% premium over the actual $14 fee* paid to the provider. The statement Cigna directed CareCentrix to deliver was fraudulent because Plaintiff's Plan did not require him to pay that amount and Cigna knew the same. Through CareCentrix, Cigna later collected the $10.43 overcharge.

212.    On or about these dates manager, CareCentrix, sent and received U.S. Mail or interstate wire transmissions in connection with (a) determining whether Plaintiff and the services or equipment were covered under his Plan and how much he should pay for the service or

- 63 -

equipment; (b) invoicing Plaintiff; (c) processing Plaintiff's payment for such services or equipment; and (d) processing Cigna's payment to and/or "Spread" from the provider.

213.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

214.    Each such use of U.S. Mail and interstate wire facilities as alleged constitutes a separate and distinct predicate act.

215.    The predicate acts were each related to one another in that: (a) Cigna directed manager, CareCentrix, to undertake each predicate act with a similar purpose of effectuating its scheme to defraud Plaintiff and Class members; (b) each predicate act involved the same participants – Cigna, which directed CareCentrix to make the fraudulent statements and overcharge Plaintiff and Class members; network providers within CareCentrix's provider network, which processed claims and provided services and/or equipment, and Plaintiff and Class members, who received the fraudulent statements and relied upon them in paying the fraudulent amounts for medically necessary healthcare services and equipment; (c) each predicate act involved similar victims – Plaintiff and Class members who purchased medically necessary healthcare services and equipment; and (d) each predicate act was committed the same way – in response to a request from Plaintiff or Class members (or on their behalf by a physician, hospital discharge planner, or other healthcare professional), to purchase medically necessary healthcare services and equipment, the provider participating in CareCentrix's provider network transmitted a request via U.S. Mail or interstate wire to CareCentrix, CareCentrix, using the U.S. Mail or interstate wire, responded directing the provider to execute CareCentrix's scheme, and CareCentrix later effectuated its "Overcharge Scheme" by using the U.S. Mail or interstate wire to overbill the Plaintiff or Class

member; and (e) the predicate acts could not have been conducted, nor Cigna's scheme effectuated, without the existence and use of CareCentrix.

216.   On information and belief, Cigna conducts such racketeering activity through manager, CareCentrix, as an ongoing and regular way of doing business, and continues and will continue to engage in such racketeering activity.

**Injury**

217.   As a direct and proximate result of Cigna's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff and Class members have been injured in their business and property. Plaintiff Class members were injured by reason of Cigna's RICO violations because they directly and immediately overpaid for medically necessary healthcare services and equipment. Their injuries were proximately caused by Cigna's violations of 18 U.S.C. §1962(c) because these injuries were the foreseeable, direct, intended, and natural consequence of Cigna's RICO violations (and commission of underlying predicate acts) and, but for Cigna's RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

218.   Pursuant to RICO, 18 U.S.C. §1964(c), Plaintiff and the Class members are entitled to recover, threefold, their damages, costs, and attorneys' fees from Cigna and other appropriate relief.

### COUNT IX

**For Violating RICO, 18 U.S.C. § 1962(c)**
**Against Cigna on Behalf of the Subclass**

Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

**General RICO Allegations**

219.   Plaintiff, the Subclass members, Cigna, and CareCentrix are "persons" within the meaning of RICO, 18 U.S.C. §§1961(3), 1964(c).

220.    At all relevant times, Cigna was associated with an enterprise consisting of CareCentrix ("CareCentrix Enterprise").

221.    CareCentrix is a legal entity enterprise within the meaning of 18 U.S.C. §1961(4).

222.    At all relevant times, CareCentrix has been engaged in, and its activities affect, interstate commerce within the meaning of RICO, 18 U.S.C. §1962(c).

223.    Cigna is legally and factually distinct from CareCentrix.

224.    Cigna and CareCentrix are separate and distinct from the pattern of racketeering acts in which CareCentrix engaged.

225.    Cigna agreed to and did conduct and participate in the conduct of the CareCentrix Enterprise. Cigna operated and managed the affairs of CareCentrix Enterprise through, among other ways, contracts and agreements through which Cigna was able to and did exert control over CareCentrix.

226.    CareCentrix is Cigna's exclusive national provider of durable medical equipment and coordinator of homecare services.

227.    CareCentrix's Provider Manual provides that "CareCentrix acts as a billing representative of the Provider solely for purposes of submitting a claim to the Health Plan."[8]

228.    On information and belief, CareCentrix also has manuals and written policies that describe the manner in which it processes claims for medically necessary healthcare services and durable medical equipment provided to Plaintiff and Subclass members in relation to Cigna.

229.    Cigna had the ability to and did in fact direct the CareCentrix Enterprise to intentionally misrepresent the cost-sharing amount Plaintiff and Subclass members were required to pay to receive medically necessary healthcare services and durable medical equipment. Cigna

---

[8] CareCentrix Provider Manual (Revised August, 2017) at 54.

further directed CareCentrix to collect a specified cost-sharing amount. This specified cost-sharing amount exceeded the amount Cigna had promised Plaintiff and the Subclass members they would pay for medically necessary healthcare services and durable medical equipment. After Plaintiff and Subclass members overpaid for the medically necessary services and equipment, Cigna directed CareCentrix to return some or all of these funds to Cigna.

230.    As described herein, CareCentrix is a separate legal entity. The purpose of CareCentrix is to provide Plaintiff and Subclass members medically necessary healthcare services and durable medical equipment in accordance with the terms of their Plans with Cigna. CareCentrix provides management services to Cigna and other healthcare services companies. These services include provider network contracting and claims processing services. CareCentrix's legitimate and lawful activities are not being challenged in this Complaint.

231.    Cigna, however, also directs the CareCentrix Enterprise to serve an unlawful purpose; that is, to create a mechanism through which Cigna could obtain additional monies beyond what Plaintiff and Subclass members should have paid under their Plans for medically necessary healthcare services and durable medical equipment. This fraudulent billing scheme was not legitimate.

232.    CareCentrix was founded in 1996 and remains in existence.

233.    Cigna agreed to and did conduct and participate in the conduct of CareCentrix Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff and the Subclass members. Cigna used CareCentrix to facilitate their goals of overcharging for medically necessary healthcare services and durable medical equipment, and were unjustly enriched by overcharging for medically necessary services and equipment.

**Predicate Racketeering Acts**

234.    As described herein, Cigna directly and indirectly conducted and participated in the conduct of CareCentrix Enterprise's affairs through a pattern of racketeering and activity in violation of 18 U.S.C. § 1962(c) for the unlawful purpose of defrauding Plaintiff and Subclass members.

235.    Pursuant to and in furtherance of its fraudulent billing scheme Cigna directed CareCentrix to commit multiple related predicate acts of "racketeering activity," as defined in 18 U.S.C. §1961(5), prior to, and during, the Class Period and continue to commit such predicate acts, in furtherance of their fraudulent billing scheme, including: (a) mail fraud, in violation of 18 U.S.C. §1341; and (b) wire fraud, in violation of 18 U.S.C. §1343.

236.    As alleged herein, Cigna directed CareCentrix to engage in a fraudulent billing scheme to defraud Plaintiff and Subclass members. The fraudulent billing scheme entails: (a) Cigna representing to Plaintiff and Subclass members through form Plan language that they would pay a certain amount for healthcare services and durable medical equipment; (b) Cigna entering into agreements with CareCentrix and other managers, through which the managers agreed to process claims submitted by Plaintiff and the Subclass members for medically necessary healthcare services and durable medical equipment in accordance with the terms of a particular Plan; (c) CareCentrix's creation of provider networks through which Plaintiff and Subclass members could receive medically necessary healthcare services and durable medical equipment by way of agreements requiring providers participating in the networks to charge for medically necessary healthcare services and durable medical equipment only the amounts specified by the managers; (d) CareCentrix's misrepresenting the correct charge for medically necessary healthcare services and durable medical equipment as specified in Plaintiff's and Subclass members' Plans,

and directing providers participating in the provider networks to collect those improper amounts; (e) Cigna retention, directly or indirectly, of a portion of the amounts improperly collected by CareCentrix, in violation of the Plaintiff's and Subclass members' Plans with Cigna; and (f) Cigna imposing an agreement (1) barring providers from advising Plaintiff and Subclass members that they could pay less for a healthcare service or durable medical equipment by purchasing it outside of their respective Plans and (2) barring providers from selling in a transaction that would avoid the overcharge.

237.    Cigna's fraudulent billing scheme includes various misrepresentations and omissions of material fact, including, but not limited to: (a) the representation in the plain form language of the Plans that Plaintiff and Subclass members would pay a certain amount for healthcare and durable medical equipment with contemporaneous knowledge and intent that Plaintiff and Subclass members would be charged a higher amount; (b) the failure to disclose that a material portion of the "co-payments" were neither payments for healthcare or durable medical equipment nor were they "co-" payments by the patients in conjunction with a payment by the Plans for the healthcare or durable medical equipment, as required by the Plans' plain language, but rather were unlawful payments to Cigna; (c) the failure to disclose that payments for healthcare and durable medical equipment under deductible portions of health Plans were based on service and equipment prices that exceeded the contracted fee between CareCentrix and the providers, as required by the Plans' plain language; (d) the failure to disclose that co-insurance payments were based on service and equipment prices that exceeded the contracted fee between CareCentrix and the providers, as required by the Plans' plain language; and (e) the failure to disclose its required agreement (1) barring providers from advising Plaintiff and Subclass members that they could pay less for a healthcare service or durable medical equipment by purchasing it outside of their

respective Plans and (2) barring providers from selling in a transaction that would avoid the overcharge.

238.    In sum, Cigna's fraudulent billing scheme took money from Plaintiff and Subclass members through deceit and false pretenses. Cigna intentionally devised such a fraudulent billing scheme and were knowing and active participants in the scheme to defraud Plaintiff and Subclass members. Cigna knew that they overcharged for medically necessary healthcare services and durable medical equipment and that they would retain such amounts. Cigna specifically intended to commit fraud, and such intent can be inferred from the totality of the allegations herein.

239.    It was and is reasonably foreseeable to Cigna that mail, interstate carriers and wire transmissions would be used—and mail, interstate carriers and wire transmissions were in fact used—in furtherance of the scheme, including but not limited to the following manner and means: (a) whenever a Plaintiff or Subclass member seeks to receive healthcare services and durable medical equipment, the providers participating in CareCentrix's provider networks enter information into a computer and transmit it via interstate mail or carrier and/or wire transmissions to CareCentrix for processing; (b) Cigna and/or CareCentrix's collecting of "Spread" money takes place via interstate mail or carrier or wire transmissions; (c) Plaintiff and Subclass members make payments to CareCentrix using credit or debit cards, which require the use of use of interstate wire transmissions; (d) healthcare services and durable medical equipment received by Plaintiff and Subclass members through Cigna's fraudulent scheme were delivered by mail or interstate carrier and (e) Cigna's, CareCentrix's representatives communicated with each other by mail, interstate carrier and or wire transmissions in order to carry out the fraudulent scheme.

240.    Cigna knew that Plaintiff and Subclass members would reasonably rely on the accuracy, completeness, and integrity of their and CareCentrix's statements. The Plaintiff and

Subclass members participants did so rely, to their detriment, on Cigna's misrepresentations and omissions.

241.    Having devised its fraudulent billing scheme and intending to defraud Plaintiff and Subclass members, on or about the dates set forth below, Cigna intentionally and unlawfully transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme.

242.    On or about June 22, 2017, Cigna intentionally directed CareCentrix to fraudulently bill Plaintiff $25.68 for a disposable CPAP filter—*a 342% premium over the actual $7.50 fee* paid to the provider. The statement Cigna directed CareCentrix to deliver was fraudulent because Plaintiff's Plan did not require him to pay that amount and Cigna knew the same.

243.    On or about June 22, 2017, Cigna intentionally directed CareCentrix to fraudulently bill Plaintiff $147.78 for a full-face Mirage CPAP/BIPAP mask—*a 156% premium over the actual $95 fee* paid to the provider. The statement Cigna directed CareCentrix to deliver was fraudulent because the Plaintiff's Plan did not require him to pay that amount and Cigna knew the same.

244.    On or about June 22, 2017, Cigna intentionally directed CareCentrix to fraudulently bill Plaintiff $37.61 for CPAP headgear—*a 188% premium over the actual $20 fee* paid to the provider. The statement Cigna directed CareCentrix to deliver was fraudulent because Plaintiff's Plan did not require him to pay that amount and Cigna knew the same.

245.    On or about June 22, 2017, Cigna intentionally directed CareCentrix to fraudulently bill Plaintiff $24.43 for CPAP tubing—*a 175% premium over the actual $14 fee* paid to the provider. The statement Cigna directed CareCentrix to deliver was fraudulent because Plaintiff's

Plan did not require him to pay that amount and Cigna knew the same. Through CareCentrix, Cigna later collected the $10.43 overcharge.

246.    On or about these dates CareCentrix sent and received U.S. Mail or interstate wire transmissions in connection with (a) determining whether Plaintiff and the services or equipment were covered under his Plan and how much he should pay for the service or equipment; (b) invoicing Plaintiff; (c) processing Plaintiff's payment for such services or equipment; and (d) processing Cigna's payments to and/or "Spread" from the provider.

247.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

248.    Each such use of U.S. Mail and interstate wire facilities as alleged constitutes a separate and distinct predicate act.

249.    The predicate acts were each related to one another in that: (a) Cigna directed CareCentrix to undertake each predicate act with a similar purpose of effectuating its scheme to defraud Plaintiff and Subclass members; (b) each predicate act involved the same participants – Cigna, which directed CareCentrix to make the fraudulent statements and overcharge Plaintiff and Subclass members; network providers within CareCentrix's provider network, which processed claims and provided services and/or equipment, and Plaintiff and Subclass members, who received the fraudulent statements and relied upon them in paying the fraudulent amounts for medically necessary healthcare services and durable medical equipment; (c) each predicate act involved similar victims – Plaintiff and Subclass members who purchased medically necessary healthcare services and durable medical equipment; and (d) each predicate act was committed the same way – in response to a request from Plaintiff or Subclass members (or on their behalf by a physician, hospital discharge planner, or other healthcare professional) to purchase medically necessary

healthcare services and durable medical equipment, the provider participating in CareCentrix's provider network transmitted a request via U.S. Mail or interstate wire to CareCentrix. CareCentrix, using the U.S. Mail or interstate wire, responded directing the provider to execute CareCentrix's scheme, and CareCentrix later effectuated its "Overcharge Scheme" by using the U.S. Mail or interstate wire to overbill the Plaintiff or Subclass member; and (e) the predicate acts could not have been conducted, nor Cigna's scheme effectuated, without the existence and use of CareCentrix.

250.    On information and belief, Cigna conducts such racketeering activity through CareCentrix as an ongoing and regular way of doing business, and continues and will continue to engage in such racketeering activity.

**Injury**

251.    As a direct and proximate result of Cigna's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff and Subclass members have been injured in their business and property. Plaintiff Subclass members were injured by reason of Cigna's RICO violations because they directly and immediately overpaid for medically necessary healthcare services and durable medical equipment. Their injuries were proximately caused by Cigna's violations of 18 U.S.C. §1962(c) because these injuries were the foreseeable, direct, intended, and natural consequence of Cigna's RICO violations (and commission of underlying predicate acts) and, but for Cigna's RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

252.    Pursuant to RICO, 18 U.S.C. §1964(c), Plaintiff and the Subclass members are entitled to recover, threefold, their damages, costs, and attorneys' fees from Cigna and other appropriate relief.

## COUNT X

### For Violating RICO, 18 U.S.C. § 1962(c)
### Against CareCentrix on Behalf of the Subclass

253.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

**General RICO Allegations**

254.    Plaintiff, Subclass members, and CareCentrix are "persons" within the meaning of RICO, 18 U.S.C. §§1961(3), 1964(c).

255.    At all relevant times, CareCentrix conducted or participated in the conduct of an enterprise alternatively alleged for the purpose of this Count as consisting of (a) an association-in-fact enterprise of CareCentrix and all providers in CareCentrix's provider network; (b) separate two-party association-in-fact enterprises of CareCentrix and each provider in CareCentrix's provider network; or (c) an association-in-fact enterprise of all providers in CareCentrix's provider network (collectively, the " CareCentrix-Network Enterprise").

256.    The CareCentrix-Network Enterprise is an association in fact enterprise within the meaning of 18 U.S.C. §1961(4).

257.    At all relevant times, the CareCentrix-Network Enterprise has been engaged in, and its activities affect, interstate commerce within the meaning of RICO, 18 U.S.C. §1962(c).

258.    CareCentrix is legally and factually distinct from the  CareCentrix-Network Enterprise.

259.    CareCentrix and the CareCentrix-Network Enterprise are separate and distinct from the pattern of racketeering acts in which they engaged.

260.    CareCentrix agreed to and did conduct and participate in the conduct of the CareCentrix-Network Enterprise's affairs. CareCentrix operated and managed the affairs of the

CareCentrix-Network Enterprise through a series of uniform contracts, agreements, and provider manuals with providers through which CareCentrix was able to and did exert control over the CareCentrix-Network Enterprise.

261.    For example, CareCentrix issues a Provider Manual to providers participating in the CareCentrix-Network Enterprise.[9] Pursuant to the Provider Manual, providers are required to, among other things:

(a)    Submit billing for authorized services and/or products to CareCentrix at least monthly and within timely filing requirements at the designated address for claims and submit no billing to the primary Health Plan for services/products unless directed to do so by CareCentrix in writing. Provider Manual at 16.

(b)    Not bill the patient/member for covered services or for services where payment is denied because the provider did not comply with your Provider Agreement or this Provider Manual. *Id.*

(c)    Not, under any circumstance, tell the patient/member that they are not responsible for any co-pays, coinsurance or deductibles. Providers are paid for authorized covered services in accordance with their contract rates. Those payments are not reduced by the applicable copay, coinsurance or deductible, and CareCentrix assumes the Provider's burden of collecting these amounts. Although the patient is not responsible to pay copays, coinsurance or deductibles to the Provider since the Provider has been paid in full, the patient is responsible for remitting those amounts to CareCentrix. *Id.*

(d)    Promptly return to CareCentrix any overpayments for services provided under the Provider Agreement. *Id.*

---

[9] http://www.carecentrix.com/ProviderResources/ProviderManual.pdf (Revised 2017).

(e) Adhere to all other principles, practices and procedures found in the Provider Agreement, CareCentrix Provider Manual, and contractual relationships between CareCentrix and its Health Plan customers. *Id*. at 17.

262. CareCentrix providers are also required to render services and provide equipment pursuant to the Provider Agreement whenever a patient presents an insurance card that includes the name or logo of any of CareCentrix's customers, including, but not limited to, Aetna (Florida and Georgia), Florida Blue, Horizon Healthcare Services, Inc., Beech Street, Cigna (including Great West), ConnectiCare, Coventry, Public Employees Insurance Agency (PEIA), Neighborhood Health Plan (NHP), Amgen, Fallon, Humana and Cofinity.

263. Additionally, even if a request is made directly from a patient (or his or her physician) to a provider, pursuant to the Provider Manual, CareCentrix has the right to select an alternative provider to service the request.

264. In operating and managing the affairs of the CareCentrix-Network Enterprise, CareCentrix exploited the uniform contracts and agreements it entered into with providers to implement the fraudulent "Overcharge Scheme."

265. In particular, CareCentrix defrauded Plaintiff and Subclass members by overcharging for the cost of medically necessary healthcare services and durable medical equipment. CareCentrix overcharged for medically necessary healthcare services and durable medical equipment by intentionally misrepresenting the cost-sharing amount Plaintiff and Subclass members were required to pay to receive such services and equipment. The represented cost-sharing amount exceeded the amount set by the Plans for medically necessary healthcare services and durable medical equipment. At all relevant times, CareCentrix directed the affairs of the CareCentrix-Network Enterprise by enforcing provisions of CareCentrix's Provider Manual

that prohibited providers from disclosing the overcharge practice to Plaintiff and the Subclass members or from selling medically necessary healthcare services and durable medical equipment at a price that avoided the overcharge; and by threatening providers that attempted to reveal or avoid the "Overcharge Scheme" with removal from CareCentrix's network of providers.

266.   As described herein, the CareCentrix-Network Enterprise has an ascertainable structure and has functioned and continues to function with a common purpose and as a continuous unit. The purpose of the CareCentrix-Network Enterprise is to provide Plaintiff and Subclass members medically necessary healthcare services and durable medical equipment in accordance with the terms of their Plans. Through the CareCentrix-Network Enterprise, CareCentrix provides durable medical equipment and healthcare services on behalf of Cigna and other healthcare services companies. These legitimate and lawful activities are not being challenged in this Complaint.

267.   The members of the CareCentrix-Network Enterprise also, however, share a fraudulent common purpose to create an unlawful mechanism through which CareCentrix could secretly obtain additional monies beyond what Plaintiff and Subclass members should have paid under their Plans for medically necessary healthcare services and durable medical equipment and the members maintain their participation in and income from the network. This "Overcharge Scheme" was not legitimate.

268.   To provide its services, the  CareCentrix-Network Enterprise functions as a continuing, cohesive unit. CareCentrix processes claims received from providers in its provider network and specifies which medically necessary healthcare services and durable medical equipment Plaintiff and Subclass members may receive through their Plans. Providers participating in CareCentrix's provider network provide healthcare services and durable medical

equipment to Plaintiff and Subclass members and submit claims and convey insurance information to CareCentrix.

269.    On information and belief, the CareCentrix-Network Enterprise has continually existed for several years and remains in existence.

270.    CareCentrix agreed to and did conduct and participate in the conduct of the CareCentrix-Network Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff and the Subclass members. CareCentrix used the CareCentrix-Network Enterprise to facilitate its goal of overcharging for medically necessary healthcare services and durable medical equipment and was unjustly enriched by overcharging for medically necessary healthcare services and durable medical equipment.

**Predicate Racketeering Acts**

271.    As described herein, CareCentrix directly and indirectly conducted and participated in the conduct of the CareCentrix-Network Enterprise's affairs through a pattern of racketeering and activity in violation of 18 U.S.C. § 1962(c) for the unlawful purpose of defrauding Plaintiff and Subclass members.

272.    Pursuant to and in furtherance of its fraudulent "Overcharge Scheme," CareCentrix has committed multiple related predicate acts of "racketeering activity," as defined in 18 U.S.C. §1961(5), prior to, and during, the Class Period and continues to commit such predicate acts, in furtherance of its "Overcharge Scheme," including: (a) mail fraud, in violation of 18 U.S.C. §1341; and (b) wire fraud, in violation of 18 U.S.C. §1343.

273.    As alleged herein, CareCentrix engaged in a fraudulent "Overcharge Scheme" to defraud Plaintiff and Subclass members. The "Overcharge Scheme" entails: (a) CareCentrix's entering into agreements with the other Defendants through which it agreed to process claims

submitted on behalf of Plaintiff and the Subclass members for medically necessary healthcare services and durable medical equipment in accordance with the terms of a particular Plan; (b) CareCentrix's creation of a provider network through which Plaintiff and Subclass members could receive medically necessary healthcare services and durable medical equipment and entering into agreements requiring providers participating in the provider network to charge for medically necessary healthcare services and durable medical equipment only the amounts specified by CareCentrix, and prohibiting providers participating in the provider network from discussing any other amount with Plaintiff or Subclass members; (c) CareCentrix's misrepresenting the correct charge for medically necessary healthcare services and durable medical equipment as specified in Plaintiff and Subclass members' Plans; and (d) CareCentrix's retention, directly or indirectly, of a portion of the amounts improperly collected, in violation of the Plaintiff and Subclass members' Plans, and enforcing its agreements with providers participating in the provider network to prevent them from disclosing or avoiding the unlawful and improper plan or scheme.

274. The "Overcharge Scheme" includes various misrepresentations and omissions of material fact, including, but not limited to: (a) the failure to disclose that a material portion of the "co-payments" were neither payments for healthcare services and durable medical equipment nor were they "co-" payments by the patients in conjunction with a payment by the insurer for the healthcare services and durable medical equipment, as required by the Plans' plain language, but rather were unlawful payments to CareCentrix or Cigna; (b) the failure to disclose that payments under deductible portions of health insurance policies were based on prices that exceeded the contracted fee between CareCentrix and providers participating in CareCentrix's provider network, as required by the Plans' plain language; (c) the failure to disclose that the co-insurance payments were based on prices that exceeded the contracted fee between the CareCentrix and

providers participating in CareCentrix's provider network, as required by the Plans' plain language; and (d) the failure to disclose its agreement (1) barring providers from advising Plaintiff and Subclass members that they could pay less for healthcare services and durable medical equipment by purchasing such services or equipment outside of their respective Plans and (2) barring providers from selling in a transaction that would avoid the overcharge.

275.    In sum, the "Overcharge Scheme" took money from Plaintiff and Subclass members through deceit and false pretenses. CareCentrix intentionally devised and/or implemented the "Overcharge Scheme" and was a knowing and active participant in the "Overcharge Scheme" to defraud Plaintiff and Subclass members. CareCentrix knew that it overcharged for the costs of medically necessary healthcare services and durable medical equipment. CareCentrix specifically intended to commit fraud, and such intent can be inferred from the totality of the allegations herein.

276.    It was and is reasonably foreseeable to CareCentrix that mail, interstate carriers and wire transmissions would be used — and mail, interstate carriers and wire transmissions were in fact used — in furtherance of the "Overcharge Scheme," including but not limited to the following manner and means: (a) whenever a Plaintiff or Subclass member seeks to receive healthcare services and durable medical equipment, the providers participating in CareCentrix's provider network enter information into a computer and transmit it via interstate mail or carrier and/or wire transmissions to CareCentrix for adjudication; (b) CareCentrix's receipt of money takes place via interstate mail or carrier or wire transmissions; (c) Plaintiff and Subclass members make payments using credit or debit cards, which require the use of use of interstate wire transmissions; (d) healthcare services and durable medical equipment purchased through CareCentrix's fraudulent scheme were delivered by mail or interstate carrier and (e) CareCentrix's representatives and

providers participating in CareCentrix's provider network communicated with each other by mail, interstate carrier and or wire transmissions in order to carry out the fraudulent scheme.

277.    CareCentrix knew that providers participating in CareCentrix's provider network and Plaintiff and Subclass members would reasonably rely on the accuracy, completeness, and integrity of CareCentrix's statements. The providers participating in CareCentrix's provider network and Plaintiff and Subclass members participants did so rely, to their detriment, on CareCentrix's misrepresentations and omissions.

278.    Having devised and/or implemented the "Overcharge Scheme," and intending to defraud Plaintiff and Subclass members, on or about the dates set forth below, CareCentrix intentionally and unlawfully transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme.

279.    On or about June 22, 2017, CareCentrix directed a provider to provide Plaintiff with medical necessary equipment or services and thereafter CareCentrix fraudulently billed Plaintiff $25.68 for a disposable CPAP filter—*a 342% premium over the actual $7.50 fee* paid to the provider. The statement CareCentrix delivered was fraudulent because Plaintiff's Plan did not require him to pay that amount and CareCentrix knew the same.

280.    On or about June 22, 2017, CareCentrix directed a provider to provide Plaintiff with medical necessary equipment or services and thereafter CareCentrix fraudulently billed Plaintiff $147.78 for a full-face Mirage CPAP/BIPAP mask—*a 156% premium over the actual $95 fee* paid to the provider. The statement CareCentrix delivered was fraudulent because Plaintiff's Plan did not require him to pay that amount and CareCentrix knew the same.

281.   On or about June 22, 2017, CareCentrix directed a provider to provide Plaintiff with medical necessary equipment or services and thereafter CareCentrix fraudulently billed Plaintiff $37.61 for CPAP headgear—*a 188% premium over the actual $20 fee* paid to the provider. The statement CareCentrix delivered was fraudulent because Plaintiff's Plan did not require him to pay that amount and CareCentrix knew the same.

282.   On or about June 22, 2017, CareCentrix directed a provider to provide Plaintiff with medical necessary equipment or services and thereafter CareCentrix fraudulently billed Plaintiff $24.43 for CPAP tubing—*a 175% premium over the actual $14 fee* paid to the provider. The statement CareCentrix delivered was fraudulent because Plaintiff's Plan did not require him to pay that amount and CareCentrix knew the same. Through the  CareCentrix-Network Enterprise, CareCentrix or Cigna later collected the $10.43 overcharge.

283.   On or about these dates, (a) providers in CareCentrix's provider network, sent and received U.S. Mail or interstate wire transmissions in connection with determining whether the Plaintiff and the services and/or equipment were covered under the Plans; and (b) CareCentrix sent via U.S. mail or interstate wire transmissions and processed the Plaintiff's invoices and payments for such services and equipment.

284.   The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

285.   Each such use of U.S. Mail and interstate wire facilities as alleged constitutes a separate and distinct predicate act.

286.   The predicate acts were each related to one another in that: (a) CareCentrix directed a provider through the U.S. mails or wire to provide Plaintiff with equipment or services and CareCentrix then overbilled Plaintiff and Subclass members through the U.S. mail or wire;

(b) each predicate act involved the same participants –CareCentrix, which made the fraudulent statements and overcharged Plaintiff and Subclass members; network providers within CareCentrix's provider network, which processed claims and provided services and/or equipment, and Plaintiff and Subclass members, who received the fraudulent statements and relied upon them in paying the fraudulent amounts for medically necessary healthcare services and durable medical equipment; (c) each predicate act involved similar victims – Plaintiff and Subclass members who purchased medically necessary healthcare services and durable medical equipment; and (d) each predicate act was committed the same way – in response to a request from Plaintiff or Subclass members (or on their behalf by a physician, hospital discharge planner, or other healthcare professional), to purchase medically necessary healthcare services and durable medical equipment, the provider participating in CareCentrix's provider network transmitted a request via U.S. Mail or interstate wire to CareCentrix, CareCentrix, using the U.S. Mail or interstate wire, responded directing the provider to execute CareCentrix's scheme, and CareCentrix later effectuated its "Overcharge Scheme" by using the U.S. Mail or interstate wire to overbill the Plaintiff or Subclass member; and (e) the predicate acts could not have been conducted, nor Cigna's scheme effectuated, without the existence and use of CareCentrix.

287.    On information and belief, CareCentrix conducts such racketeering activity as an ongoing and regular way of doing business, and continues and will continue to engage in such racketeering activity.

**Injury**

288.    As a direct and proximate result of CareCentrix's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff have been injured in their business and property. Plaintiff and Subclass members were injured by reason of CareCentrix's RICO violations because

they directly and immediately overpaid for medically necessary healthcare services and durable medical equipment. Their injuries were proximately caused by CareCentrix's violations of 18 U.S.C. §1962(c) because these injuries were the foreseeable, direct, intended, and natural consequence of CareCentrix's RICO violations (and commission of underlying predicate acts) and, but for CareCentrix's RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

289.    Pursuant to RICO, 18 U.S.C. §1964(c), Plaintiff and the Subclass members are entitled to recover, threefold, their damages, costs, and attorneys' fees from CareCentrix and other appropriate relief.

## COUNT XI

### Violation of RICO, 18 U.S.C. §1962(d)
### Against All Defendants on Behalf of the Class and Subclass

290.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

291.    During the Class Period, Defendants agreed and conspired to violate 18 U.S.C. § 1962(c). Specifically, Defendants conspired with themselves and/or with other unnamed health insurance companies that use CareCentrix to engage in the fraudulent billing scheme. Defendants conspired with themselves and/or with other unnamed managers to engage in the fraudulent billing scheme. Defendants conduct and participate, directly or indirectly, in the conduct of the affairs of the Cigna Manager Enterprise, the CareCentrix Enterprise, and/or the  CareCentrix-Network Enterprise through a pattern of racketeering activity (described above) which resulted in Plaintiff and Class and Subclass members overpaying for medically necessary healthcare services and durable medical equipment. The conspiracy to violate 18 U.S.C. §1962(c) constitutes a violation of 18 U.S.C. §1962(d).

292.    In furtherance of this conspiracy, Cigna and/or CareCentrix and their co-conspirators committed numerous overt acts, as alleged above, in the pattern of racketeering described above, including mail fraud, in violation of 18 U.S.C. §1341; and (b) wire fraud, in violation of 18 U.S.C. §1343. Cigna and/or CareCentrix agreed to and did engage in a fraudulent billing scheme to defraud Plaintiff and Class and Subclass members (described above). Cigna and/or CareCentrix intended to defraud Plaintiff and Class and Subclass members by overcharging for medically necessary healthcare services and durable medical equipment (described above). Cigna and/or CareCentrix reasonably foresaw that the U.S. Mail and/or interstate wire would be used in furthering the fraudulent billing scheme. Cigna and/or CareCentrix used the U.S. Mail and/or interstate wire to effectuate the fraudulent billing scheme by transmitting various misrepresentations and omissions of material fact resulting in overcharges for medically necessary healthcare services and durable medical equipment (described above).

293.    Cigna and/or CareCentrix knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the fraudulent billing scheme (described above).

294.    As a direct and proximate result, and by reason of the activities of Cigna and/or CareCentrix and their conduct in violation of 18 U.S.C. §1962(d), Plaintiff and the Class and Subclass have been injured in their business and property within the meaning 18 U.S.C. §1964(c) and are entitled to recover treble damages, together with the costs of this lawsuit, expenses, and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class and Subclass, prays for relief as follows as applicable for the particular claim:

A. Certifying this action as a class action and appointing Plaintiff and the counsel listed below to represent the Class and Subclass;

B. Finding that Defendants are fiduciaries and/or parties in interest as defined by ERISA;

C. Finding that Defendants violated their fiduciary duties of loyalty and prudence to Class and Subclass members and awarding Plaintiff and the Class and Subclass such relief as the Court deems proper;

D. Finding that Defendants engaged in prohibited transactions and awarding Plaintiff and the Class and Subclass such relief as the Court deems proper;

E. Finding that Defendants denied Plaintiff, the Class, and the Subclass benefits and their rights under the policies and awarding such relief as the Court deems proper;

F. Enjoining Defendants from further such violations;

G. Finding that Plaintiff and the Class and Subclass are entitled to clarification of their rights under the ERISA Plans and awarding such relief as the Court deems proper;

H. Awarding Plaintiff, the Class, and the Subclass damages, surcharge, and/or other monetary compensation as deemed appropriate by the Court;

I. Ordering Defendants to restore all losses to Plaintiff and the Class and Subclass and disgorge unjust profits and/or other assets of the ERISA Plans

J. Adopting the measure of losses and disgorgement of unjust profits most advantageous to Plaintiff and the Class and Subclass to restore Plaintiff's losses, remedy Defendants' windfalls, and put Plaintiff in the position that he would have been in if the fiduciaries of the ERISA Plans had not breached their duties or committed prohibited transactions;

K.      Ordering other such remedial relief as may be appropriate under ERISA, including the permanent removal of Defendants from any positions of trust with respect to the ERISA Plans of the members of the Class and Subclass and the appointment of independent fiduciaries to serve in the roles Defendants occupied with respect to the ERISA Plans of the Class and Subclass;

L.      Awarding treble damages in favor of Plaintiff and the Class members against all Defendants for all damages sustained as a result of Defendants' violations of RICO, in an amount to be proven at trial, including interest thereon;

M.      Awarding Plaintiff, the Class, and the Subclass equitable relief to the extent permitted by the above claims;

N.      Finding that Defendants are jointly and severally liable as fiduciaries and/or co-fiduciaries and/or parties in interest;

O.      Awarding Plaintiff's counsel attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to ERISA § 502(g)(1), 29 U.S.C. 1132(g)(1), and/or the common fund doctrine;

P.      Awarding Plaintiff's counsel attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to RICO, 18. U.S.C. § 1964(c).

Q.      Awarding Plaintiff, the Class, and the Subclass their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

R.      Finding that Defendants are jointly and severally liable for all claims; and

S.      Awarding such other and further relief as may be just and proper, including pre-judgment and post-judgment interest on the above amounts.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

Dated: October 6, 2017

/s/ *Robert A. Izard*

Robert A. Izard (ct01601)
Craig A. Raabe (ct04116)
Christopher M. Barrett (ct30151)
**IZARD, KINDALL & RAABE, LLP**
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: 860-493-6292
Facsimile: 860-493-6290
rizard@ikrlaw.com
craabe@ikrlaw.com
cbarrett@ikrlaw.com

William H. Narwold (ct00133)
Mathew Jasinski, (ct27520)
**MOTLEY RICE LLC**
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone: 860-882-1681
Facsimile: 860-882-1682
bnarwold@motleyrice.com
mjasinski@motleyrice.com

Ronen Sarraf
Joseph Gentile
**SARRAF GENTILE LLP**
14 Bond Street, Suite 212
Great Neck, NY 11021
Telephone: 516-699-8890
Facsimile: 516-699-8968
ronen@sarrafgentile.com
joseph@sarrafgentile.com