UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JEFFREY NEUFELD, AUBREY SREDNICKI, KEVIN JACQUES, NICHOLAS MARSHALL, WILLIAM NINIVAGGI, TROY TERRY, JOYCE WOOD, ROBERT BURNS, TIMOTHY RUTHERSBY, and NATHAN WHEATLEY, individually and on behalf of all others similarly situated, | No. 3:17-cv-1693 |
| | CLASS ACTION |
| Plaintiffs, | **FOURTH AMENDED COMPLAINT** |
| vs. | DEMAND FOR JURY TRIAL |
| CIGNA HEALTH AND LIFE INSURANCE COMPANY, | March 10, 2020 |
| Defendant. | |

CONTENTS

Introduction ......................................................................... 1

Jurisdiction......................................................................... 10

Parties ............................................................................. 12

Relevant Non-Party Managers........................................................ 14

Substantive Allegations ............................................................... 15

Class Action Allegations ............................................................. 46

Count I ............................................................................. 57

Count II............................................................................. 58

Count III ........................................................................... 61

Count IV ........................................................................... 62

Count V............................................................................. 66

Count VI ........................................................................... 76

Prayer for Relief ..................................................................... 77

Plaintiffs, Jeffrey Neufeld, Aubrey Srednicki, Kevin Jacques, Nicholas Marshall, William Ninivaggi, Troy Terry, Joyce Wood, Robert Burns, Timothy Ruthersby, and Nathan Wheatley, by their undersigned attorneys, allege the following based upon their knowledge as set forth herein and upon information and belief. Further additional evidence supporting the claims set forth herein can be obtained after a reasonable opportunity for discovery.

## INTRODUCTION

1.      Plaintiffs, who received health benefits through group health plans issued and administered by Cigna Health and Life Insurance Company and its controlled subsidiaries ("Cigna") (the "Plans"),[1] bring this action on behalf of themselves and a Class and two Subclasses of similarly situated persons alleging violations of (a) the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.; (b) the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*.; and (c) state law, resulting from Defendant's common fraudulent and deceptive scheme to artificially inflate medical costs causing consumers to pay more than they should have paid for medically necessary products and services.

2.      About 90% of all United States citizens are now enrolled in private or public health plans that cover some, or all, of the costs of medical products and services. A feature of most of these plans is the shared cost of medical products and services. Normally, when a patient[2] seeks medically necessary products or services under his or her health care plan, the plan/insurer

---

[1] Unless otherwise specified, the term "Plans" as used herein includes both health plans that are funded by an employer but administered through "administrative-services-only" ("ASO") contracts between Defendant and the plan, and health plans implemented through an insurance policy underwritten and issued by Cigna to cover medical expenses incurred by the plan.

[2] The terms "patient" or "member" refer to a Plan participant or beneficiary under a health benefit Plan issued or administered by Defendant and its affiliates.

pays a portion of the cost and the patient pays the remaining portion of the cost in the form of a copayment or coinsurance or deductible payment.

3.      Defendant Cigna is a fully integrated health insurance company. Cigna provides and administers health benefits plans for patients.

4.      Cigna provides healthcare through a provider network established either by Cigna or third-party network managers who are in the business of managing provider networks. According to Cigna Corporation's Form 10-K:

> **Participating Provider Network**
> We provide our customers with an extensive network of participating health care professionals, hospitals, and other facilities, pharmacies and providers of health care services and supplies. **In most instances, we contract with them directly; however, in some instances, we contract with third parties for access to their provider networks and care management services.** In addition, we have entered into strategic alliances with several regional managed care organizations (e.g., Tufts Health Plan, HealthPartners, Inc., Health Alliance Plan, and MVP Health Plan) to gain access to their provider networks and discounts.

5.      Among the third-party network managers with whom Cigna contracts for access to their provider/vendor networks, Cigna contracts with network managers  CareCentrix, eviCore, and Linkia (defined below and, collectively referred to herein as "managers"). These managers establish networks of medical service and product providers ("providers" or "vendors") to provide health services and products and benefits to patients.

6.      In the cases of Plaintiffs Neufeld, Jacques, Marshall, Ninivaggi, Terry, Wood, Burns, Ruthersby, and Wheatley, Cigna contracted with CareCentrix (defined below) to access its network of providers to provide, among other things, home patient care and durable medical equipment and supplies, including, but not limited to, CPAP equipment and supplies.[3] Some

---

[3] CPAP stands for "continuous positive airway pressure." CPAP machines are used to treat sleep apnea, a disorder in which the patient's breathing is interrupted during sleep.

among the over 9,000 providers in the Carecentrix network provided these products and services to patients.

7.      As set forth below, Defendant has engaged in a scheme to defraud patients by overcharging patients for the cost of medically necessary services and products. Patients, including Plaintiffs and the Class and Subclasses (defined below), paid undisclosed excess charges in exchange for receiving these products and services. Unbeknownst to the Class and Subclass members, Defendant and/or its agents misrepresented the purported costs of these products and services in the form of invoices for increased charges to patients.

8.      The plans of the Plaintiffs, the Class, and the Subclasses mandated that cost-share payments (copayments, coinsurance payments, and deductibles payments) could not exceed the amount paid to the providers and that coinsurance payments could not exceed the product of the applicable coinsurance rate times the amount paid to providers.

9.      Plaintiff Neufeld's Plan, for example, provides that he is required to pay a "portion of Covered Expenses for services and supplies" that is a "Copayment, Coinsurance or Deductible." "Covered Expenses" are "expenses" for "charges" for these services or supplies. "Charges" are the amount "the provider has contracted directly or indirectly with Cigna . . ." Since a "portion" is a "share," the patient, at most, should pay only a share of the amount the provider contracts to be paid for products or services.

10.     Plaintiff Wheatley's Plan, for example, provides that "Coinsurance means the percentage of Covered Expenses the Insured Person is responsible for paying after applicable Deductibles are satisfied." "Deductible means the amount of Covered Expenses each Insured Person must pay for Covered Services each Year before benefits are available under this Policy." "Covered Expenses are the expenses incurred for Covered Services under this Policy for which

Cigna will consider for payment under this Policy. Covered Expenses will never exceed the Negotiated Rate for Participating Providers."

11.     The Plans require Defendant to apply the Plan terms with respect to the computation of benefit payments. Cigna does not meet this obligation. Instead, Cigna bases its cost-shares on the inflated charges made up by Carecentrix, eviCore, and Linkia — charges that regularly exceed the provider's charge by substantial amounts.

12.     Although the express language of the Plans requires Cigna to set cost-shares based on the amount paid to the providers, incredibly, Cigna does not even know how much the providers in Carecentrix's and Linkia's networks charge for providing supplies and services. Cigna collects this information from eviCore, yet Cigna nevertheless fails to use the information to ensure compliance with the Plan terms for members that obtain products or services through eviCore.

13.     Defendant and/or its agents exercised its unilateral discretion to charge patients unauthorized and excessive amounts for products and services that were not based on, or exceeded, the charges by providers.

14.     For example, on June 22, 2017, Plaintiff Neufeld purchased a disposable CPAP filter from J&L Medical Services ("J&L"), an authorized CareCentrix provider, pursuant to his Plan. CareCentrix sent Plaintiff Neufeld an invoice for the filter listing total charges of $25.68 that Plaintiff was required to pay towards his deductible. J&L, the provider, had contracted directly with CareCentrix and indirectly with Cigna to provide the filter for only $7.50, and was in fact paid only $7.50 for the filter.

15.     Hidden from Plaintiff Neufeld, Defendant and/or its agents unilaterally charged Plaintiff an unlawful $18.18 "Spread" over J&L's contracted charge for the product.

- 4 -

16.     Had Defendant lived up to its obligations and its Plan terms, Plaintiff Neufeld would not have been billed more than the $7.50 charge that J&L agreed to be paid by Defendant and/or its agents. Instead, it imposed a hidden premium of almost 350% beyond the total amount Plaintiff should have paid.

17.     As alleged below, Plaintiffs Jacques, Marshall, Ninivaggi, and Terry had plans that contains provisions that were substantively the same as Plaintiff Neufeld's plan and they and Plaintiff Wheatley were similarly overcharged for cost-share payments for benefits purchased or rented from providers/vendors.

18.     Plaintiff Srednicki's Plan similarly provides that she is required to pay a portion of Covered Expenses that is "Coinsurance or a Deductible." "Covered Expenses" are "Expenses" that are the "charge for a covered service or supply." Her Explanation of Benefits ("EOB") further provides that the "Amount Billed" is "[t]he amount charged" by the healthcare provider, and that the "Discount" is "[t]he amount you save" by using a Cigna network provider because "Cigna negotiates lower rates" with "in-network" providers "to help you save money."

19.     As one example of Cigna's fraudulent scheme as it relates to Plaintiff Srednicki, on June 19, 2017, she obtained a blood test from Laboratory Corporation of American Holdings (doing business as "LabCorp"), an in-network provider. The cash price for this test to an uninsured customer of LabCorp was only $449.00. Incredibly, Cigna listed on the EOB that the provider was "HLTH DIAG LAB"—not the actual provider, LabCorp—and that the "Amount Billed" was an astounding $17,362.66, almost 40 times greater than the uninsured cash price. Cigna claimed on the EOB that it had provided a "Discount" of $14,572.66, over 32 times greater than the cash price, and that the "Covered Amount" for the test with a cash price of $449.00 was $2,787.00, more than 6 times greater than the cash price. Cigna further stated on the EOB that

- 5 -

of the "Covered Amount" of $2,787.00, the Plan paid $471.02 (roughly the cash price) and Plaintiff Srednicki was required to pay an additional $2,315.98 in deductible and coinsurance payments.

20.     Upon information and belief "HLTH DIAG LAB" is a doing-business-as pseudonym for Cigna-affiliate Cigna Healthcare of Arizona, Inc.  Cigna, through yet another business name, "Cigna Medical Group," wrongfully and fraudulently "balance-billed" Plaintiff Srednicki $2,315.98. According to a statement at the bottom of its bill, Cigna Medical Group "is the medical group practice division of Cigna HealthCare of Arizona, Inc." When contacted by Plaintiff Srednicki's doctor, the actual lab provider, LabCorp, confirmed orally (but would not do so in writing) that it had been paid *in full* by Cigna with a payment of $471.02.  LabCorp also described the charges on Cigna's fraudulent EOB as "unreasonably high," including the "Amount billed" of $17,362.66 and the supposed "Covered amount" of $2,787.00. Cigna did not disclose to Plaintiff Srednicki in its billing materials the fact that Lab Corp. had been paid in full nor did it disclose that, in fact, there was no "balance" to bill Plaintiff Srednicki.  On information and belief, LabCorp's confirmation to Plaintiff Srednicki's doctor of these facts was in violation of a "gag clause," which explains its unwillingness to confirm certain facts in writing.  In short, Cigna knew that the actual cost of Plaintiff Srednicki's blood test was no more than the $471.02 paid by the Plan, but it employed numerous fraudulent misrepresentations to conceal that fact from Plaintiff Srednicki, including a misrepresentation that the $471.02 test had a value of $17,362.66.

21.     Through this fraudulent billing scheme, Defendant and/or its agents overcharged its customers for medical products and services in violation of the Plans and Defendant's

fiduciary duties. Under Defendant's scheme as illustrated by these actual examples, Defendant's charges were excessive and unlawful.

22.     Defendant violated the Plans and breached its fiduciary duties by secretly determining that Plaintiffs must pay inflated Deductible and/or cost-sharing payments, and secretly collecting those inflated payments from Plaintiffs.

23.     Defendant and/or its agents utilizes the U.S. Mail and interstate wire facilities to engage in its fraudulent billing scheme in violation of RICO. Defendant represented to Plan participants that their payment amounts were based on some portion of the actual cost for the product or service when, in fact, Defendant and/or its agents submits false and intentionally misleading invoices and EOBs to patients to cause them to pay more than the actual cost and Defendant simply pockets the overpayment in the form of "Spread."

24.     In furtherance of Defendant's fraudulent scheme, Defendant's and/or its agents' Provider Manual dictates that participating providers like J&L effectively cannot disclose the existence of the excessive charges as further alleged below. As a result of these "gag clauses," the "Spread" remains hidden from participants and beneficiaries.

25.     Defendant's fraudulent scheme to artificially inflate the costs of medically necessary products or services, and then to surreptitiously retain those excess amounts, jeopardizes the entire health care delivery system. For one, patients are paying higher amounts than they otherwise would have paid had Defendant not artificially inflated the payment amounts. Therefore, patients believe that they are saving money through the use of their health benefits, when, in reality, they are charged excessive amounts beyond what their health plans require them to pay.

26.     Indeed, the very purpose of obtaining or participating in a health plan is to enable patients to receive the purported benefits through the insurance company's negotiating and buying power. That is, patients should never pay more than the charges by the providers under these agreements, while substantial premiums and other costs and fees cover the other expenses of the health plans, including their administration. Moreover, plan administrators such as Cigna and its affiliates and the managers it hires, such as CareCentrix, are paid significant fees as compensation for their services that are entirely separate from the "Spread," making the "Spread" excess, undisclosed profit in exchange for little to nothing.

27.     As a result of Defendant's fraudulent scheme to collect this "Spread," Defendant and/or its agents overcharged Plaintiffs and the other Class and Subclass members for healthcare products and services during the Class Period (defined below). Defendant's misconduct has caused Plaintiffs and the other Class and Subclass members to suffer significant damages. Plaintiffs seek relief as follows:

28.     With regard to ERISA, under **Count I**, ERISA § 502(a)(1)(B) [codified at 29 U.S.C. § 1132(a)(1)(B)], provides that a participant or beneficiary may bring an action to enforce his rights under the terms of the plan or to clarify his rights to future benefits under the terms of the plan. Defendant has violated the ERISA Plans by establishing and charging Spread and should not be allowed to continue to do so.

29.     Under **Count II**, ERISA § 406(a) [codified at 29 U.S.C. § 1106(a)], provides that a party in interest shall not receive direct or indirect compensation unless it is reasonable, and prohibits transfers of plan assets and use of plan assets by or for the benefit of fiduciaries and plan service providers. In setting the amount of and taking excessive undisclosed Spread compensation, Defendant allowed and received unreasonable compensation and misused the

assets of the ERISA Plans, including participant contributions and the Plan contracts that provided Defendant with the ability to extract these funds.

30.     Under **Count III**, ERISA § 406(b) [codified at 29 U.S.C. § 1106(b)], provides that a fiduciary shall not deal with plan assets in its own interest or for its own account, act in any transaction involving the plan on behalf of a party whose interests are adverse to participants or beneficiaries, or receive any consideration for its own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan. In setting the amount of and taking Spread compensation, Defendant set its own compensation, received plan assets and consideration for its personal accounts in violation of this provision, and was acting under other conflicts of interest.

31.     Under **Count IV**, ERISA § 404(a)(1) [codified at 29 U.S.C. § 1104(a)(1)], provides that a fiduciary shall discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan, and with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. In setting the amount of and taking excessive undisclosed "Spread" compensation, Defendant has breached its fiduciary duties of loyalty and prudence. Moreover, in failing to apply Plan terms to the computation of benefits, follow the claim procedures in the Plans, or establish and maintain reasonable claim procedures, Defendant has breached its fiduciary duties of loyalty, care, prudence, and diligence.

32.     With regard to RICO, under **Count V**, Cigna engaged in a scheme to defraud in violation of RICO, 18 U.S.C. § 1962(c), by overcharging patients for the cost of medically necessary products and services alleged below and is liable for all statutory remedies.

33.     With respect to the plans not governed by ERISA, under **Count VI**, Cigna committed breaches of contract by violating the plain language of the plans by establishing and charging Spread.

34.     As further alleged below, Plaintiffs seek to represent a nationwide Class of all participants and beneficiaries of health plans administered by Cigna and its subsidiaries. Of these plans, Plaintiffs further seek to represent two subclasses — one for plans governed by ERISA ("ERISA Subclass") and the other for plans not governed by ERISA ("State Law Subclass").

## JURISDICTION

35.     <u>**Subject Matter Jurisdiction.**</u> This court has subject matter jurisdiction over this action pursuant to (a) 28 U.S.C. § 1331, which provides for federal jurisdiction over civil actions arising under the laws of the United States, including ERISA and RICO; (b) 29 U.S.C. § 1132(e)(1) providing for federal jurisdiction of actions brought under Title I of ERISA; and (c) 18 U.S.C. § 1964 providing for federal jurisdiction to prevent and restrain violations of 18 U.S.C. § 1962. Further, declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rules 58 and 65 of the Federal Rules of Civil Procedure. Further, this Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367. This Court also has subject matter jurisdiction over this action pursuant to (a) 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Mr. Wheatley is domiciled in a different state than Defendant; and (b) 28 U.S.C. § 1332(d)(2)(A) because at least one member of the State Law Subclass (defined below) is a citizen of a State different from any Defendant, the aggregate

amount in controversy exceeds five million dollars, exclusive of interest and costs, and the Classes have more than 100 members.

36.     **Personal Jurisdiction.** ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) provides for nationwide service of process. Upon information and belief, Defendant is a resident of the United States and subject to service in the United States, and this Court therefore has personal jurisdiction over it. This Court also has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k)(1)(A) because it would be subject to the jurisdiction of a court of general jurisdiction in Connecticut. Defendant also resides or may be found in this District or has consented to jurisdiction in this District. In any event, this Court has personal jurisdiction over Defendant because a substantial portion of the wrongdoing alleged in this Complaint took place in the State of Connecticut; Defendant is authorized to do business in the State of Connecticut; Defendant conducts business in the State of Connecticut and this District; Defendant has principal executive offices and provides medical products and services in the State of Connecticut and this District; Defendant advertises and promotes its services in the State of Connecticut and this District; Defendant has sufficient minimum contacts with the State of Connecticut; Defendant administers health plans from the State of Connecticut; and/or Defendant otherwise intentionally avails itself of the markets in the State of Connecticut through the marketing and sale of insurance and related products and services in this State so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

37.     **Venue.** Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to the claims herein occurred within this District, Defendant resides in this district, and/or a substantial part of property that is the subject of the action is situated in this District. Venue is also proper in this District pursuant to ERISA §

502(e)(2), 29 U.S.C. § 1132(e)(2), because the Defendant resides or may be found in this District and some or all of the fiduciary breaches or other violations for which relief is sought occurred in or originated in this District. Venue is also proper in this District pursuant to 18 U.S.C. § 1965, because Defendant resides, is found, has an agent, or transacts its affairs in this District, and the ends of justice require that any Defendant residing elsewhere be brought before this Court.

## PARTIES

38.   Plaintiff Neufeld is a citizen and resident of Texas who received coverage under a group health Plan provided by an employer using a governing form plan document provided by Cigna. This Plan is a welfare benefit plan, as that term is defined in 29 U.S.C. § 1002(1)(A), subject to ERISA ("ERISA Plan.") This Plan at all relevant times has been administered by Cigna.

39.   Plaintiff Srednicki is a citizen and resident of Arizona who received coverage under a group health Plan provided by an employer using a governing form plan document provided by Cigna. This Plan is an ERISA Plan that was administered, at all relevant times, by Cigna.

40.   Plaintiff Jacques is a citizen and resident of California who received coverage under a group health Plan provided by an employer using a governing form plan document provided by Cigna. This Plan is an ERISA Plan that was administered, at all relevant times, by Cigna.

41.   Plaintiff Marshall is a citizen and resident of Texas who received coverage under a group health Plan provided by an employer using a governing form plan document provided by Cigna. This Plan is an ERISA Plan that was administered, at all relevant times, by Cigna.

42.   Plaintiff Ninivaggi is a citizen and resident of Colorado who received coverage under a group health Plan provided by an employer using a governing form plan document

provided by Cigna. This Plan is an ERISA Plan that was administered, at all relevant times, by Cigna.

43.    Plaintiff Terry is a citizen and resident of South Carolina who received coverage under a group health Plan provided by an employer using a governing form plan document provided by Cigna. This Plan is an ERISA Plan that was administered, at all relevant times, by Cigna.

44.    Plaintiff Wood is a citizen and resident of Tennessee who received coverage under a group health Plan provided by an employer using a governing form plan document provided by Cigna. This Plan is an ERISA Plan that was administered, at all relevant times, by Cigna.

45.    Plaintiff Burns is a citizen and resident of New Hampshire who received coverage under a group health Plan provided by an employer using a governing form plan document provided by Cigna. This Plan is an ERISA Plan that was administered, at all relevant times, by Cigna.

46.    Plaintiff Ruthersby is a citizen and resident of Colorado who received coverage under a group health Plan provided by an employer using a governing form plan document provided by Cigna. This Plan is an ERISA Plan that was administered, at all relevant times, by Cigna.

47.    Plaintiff Wheatley is a citizen and resident of Missouri who received coverage under an individual health plan using a governing form plan document provided by Cigna. Because this plan is not provided by an employer it is not subject to ERISA. This plan was administered, at all relevant times, by Cigna.

48.     Defendant Cigna, incorporated in Connecticut, is a wholly-owned subsidiary of Cigna Corporation with its principal place of business in Bloomfield, Connecticut.[4] Cigna underwrites life and health insurance policies. The company provides group term life, accidental death and dismemberment, dental, weekly income, and long-term disability insurance. Cigna also administers health benefits for health insurance policies it sells and health plans it administers.

## RELEVANT NON-PARTY MANAGERS

49.     Manager CareCentrix, Inc. ("CareCentrix") is a Delaware corporation with its principal place of business in Hartford, Connecticut. Cigna contracts with CareCentrix for access to its network of providers/vendors that provide various services and supplies, including, but not limited to, durable medical equipment, home healthcare, sleep management, and infant formula needed for the treatment of inborn errors of metabolism.

50.     Manager eviCore healthcare MSI, LLC ("eviCore"), formerly known as Medsolutions, Inc., is a Tennessee corporation with its principal place of business in Bluffton South Carolina. Cigna contracts with eviCore for access to its network of providers/vendors in the field of high-tech radiology.

_____

[4] Cigna Corporation is a global health services organization. In 2015, it reported revenue in excess of $37.9 billion, and the company is currently ranked 79th on the Fortune 500. Cigna operates through three segments: (1) Global Health Care, which is comprised of the Commercial operating segment, which encompasses both the U.S. commercial and certain international health care businesses serving employers and their employees, and other groups, and the Individuals and Government operating segment, which offers Medicare Advantage and Medicare Part D plans to seniors and Medicaid plans; (2) Global Supplemental Benefits, which offers supplemental health, life and accident insurance products in selected international markets and in the U.S.; and (3) Group Disability and Life, which provides group long-term and short-term disability, group life, accident and specialty insurance products and related services.

51.     Manager Linkia, Inc. ("Linkia") is a Maryland corporation with its principal place of business in Bethesda, Maryland. Cigna contracts with Linkia for access to its network of providers/vendors in the field of orthotics and prosthetics.

### SUBSTANTIVE ALLEGATIONS

### Health Plans in General in the United States

52.     Health Plans, including the Plans that provide for healthcare services and medical equipment, are paid for by a premium for a defined period or through employer plans that either provide benefits by purchasing group insurance policies or are self-funded but administered by health insurance companies and their affiliates.[5] Premiums and contributions to coverage in all types of plans can be paid by individual plan participants or beneficiaries, employees, unions, employers or other institutions.

53.     If a Plan covers health care, including durable medical equipment and health care services, the cost is often shared between the patient and the Plan. Such cost sharing can take the form of deductible payments, coinsurance payments and copayments. In general, deductibles are the dollar amounts the patient pays during the benefit period (usually a year) before the Plan starts to make payments. Coinsurance generally requires a patient to pay a stated percentage of the cost of health care or durable medical equipment and healthcare services. Copayments are generally fixed dollar payments made by a patient toward health care or durable medical equipment.

---

[5] According to Cigna, over 85% of its market is in ERISA-covered health plans, while 5% is in the individual market and government-related plans like Medicare. Approximately 83% of Cigna's customers are in "administrative services only" arrangements where Cigna and its affiliates manage and administer self-funded plans, while approximately 17% of plans are insured through Cigna policies. Whatever the plan structure, Cigna and its affiliates contract with managers to access their networks of providers/vendors.

54.     Consumers purchase health insurance and enroll in employer-sponsored health plans to protect them from unexpected high medical costs. Patients, including Plaintiffs and other Class and Subclass members, at a minimum, expect to pay the same prices or better than uninsured or cash-paying individuals for health care services durable medical equipment and supplies. Otherwise, they not only would receive no benefit from their Plans, but also would, in fact, be punished for having a health plan. Therefore, Class and Subclass members reasonably expect to pay less than cash-paying customers who do not have health coverage.

**The Relationships Among Patients/Employers, Providers, Managers and Insurers**

55.     Contractual relationships exist between the employer or individual and the health insurance company that underwrites and/or administers the Plan; the insurer/administrator and the manager; and the insurer/administrator/manager and the provider. An employer or individual buys healthcare coverage from a health insurance company to provide a variety of healthcare benefits, including healthcare services, home healthcare and durable medical equipment..

56.     The following diagram represents (in simplified form) the relationships among the parties when a manager is involved:



(a)     **Employer/Individual–Insurer/Administrator Agreements (*i.e.*, Health Plans).** Employers and individuals buy health Plans which typically provide coverage for healthcare. These Plans contain uniform provisions that set forth key terms such as the mechanism for and amount of the deductible, copayment, and/or coinsurance that a patient must pay to obtain healthcare benefits. Plaintiffs and Class and Subclass members are intended beneficiaries of such agreements. For employer sponsored and

funded Plans, the employer delegates to claims administrators like Defendant the duty to administer claims pursuant to Plan terms.

(b)     **Insurer/Administrator–Manager     Agreements**.     Health insurance/administrator companies, such as Cigna, may contract with and/or own managers to access to their provider networks.

(c)     **Manager–Provider Agreements**. Managers in turn, oversee networks of providers/vendors, including, for example, J&L. The managers contract directly with these "providers," which provide (or vend) healthcare services and medical equipment and supplies directly to the patients. Under these agreements, the providers do not bill the patients directly. Rather, the provider submits a claim on behalf of the patient to the manager and the manager bills the patient. The manager pays the provider only the amount the provider agrees to be paid under its contract with the manager, not the amount the manager bills the patient. For example, the contract between CareCentrix and J&L requires "claims [to] be paid based on the lower of the Provider's usual billed charge or the contracted/negotiated rate."[6] It further provides that "Services should be billed at the contracted rates or authorized rates as appropriate. The Provider Agreement rate is payment in full for covered services and is all inclusive . . . **No billing to the patient or Health Plan of the difference between the negotiated or contracted rate and the Provider's list price is permitted.**" (Emphasis in original.)[7]

---

[6] CareCentrix Provider Manual (Revised, August 2017), 52.

[7] *Id.* at 58.

57.     When the Insurer/Administrator does not use a manager, then the Insurer/Administrator contracts directly with the Provider as in the case of LabCorp and Plaintiff Srednicki.

58.     Pursuant to the health Plans, insurers/administrators must ensure that, when they contract with and direct a manager to act as their agent to manage certain health benefits, the manager follows the Plans' terms, such that patients are not overcharged for their healthcare benefits.

59.     To the contrary, insurers/administrators, and managers, acting as agents and/or in concert with health insurance companies, routinely require that patients pay substantially higher prices for healthcare and durable medical equipment than are allowed under the Plans. Here, Defendant engaged in such practices with respect to Class and Subclass Members' Plans.

**Patients, Participants and Beneficiaries in Defendant's Health Plans Pay Undisclosed, Unauthorized and Excessive Fees**

60.     Defendant in this case has taken the general employer/individual–insurer–manager–provider structure and, through various agreements, created its unlawful, fraudulent billing scheme. Under these agreements, the insurer and/or the manager charges the patients a price (or portion of such a price) for services, equipment, and supplies that is set by the manager and/or insurer/administrator. Alternatively, the insurer or manager charges the patients a flat copayment, which also is set by the Defendant.

61.     The patients' cost-share routinely is higher than the price the insurer and/or manager agreed to pay the provider for providing the health services or equipment to the patients.

62.     Moreover, under the confidentiality provisions of the Provider Agreements, providers cannot tell patients that they are being overcharged, much less sell services or equipment to them at a lower price separate and apart from the Plans. For instance, the Provider

Manual for CareCentrix's provider network states: "As a participant in the CareCentrix network of Providers, you are required to . . . [n]ot, under any circumstance, tell the patient/member that they are not responsible for any co-pays, coinsurance, or deductibles." Accordingly, providers are barred from disclosing that a portion of the co-pays, coinsurance or deductibles are in fact overcharges for which patients are not responsible.

63.     If a provider violates the "gag clause," it risks termination from the insurers' network. As a result, Plaintiffs and the Class and Subclass have been deprived of the opportunity to purchase (or rent) their services, equipment, and supplies not only at prices their Plans dictate, but also at the retail cash price the provider would charge to someone without coverage.

64.     Defendant and the network managers vigorously enforce these gag clauses. For example, after Plaintiff Wood was told the amounts paid to the Provider by Carecentrix, Cigna interrogated her as to the source of her information. When she reached out to the provider, the provider told her, "Per our contract with [Carecentrix], we are not allowed to discuss any pricing. Once we bill them our charges at their 'contracted rates', we have no idea how much they in return charge you."

65.     Using the example of Plaintiff Neufeld's purchase of a CPAP machine above, this is how Defendant's scheme works:

    (a)     The patient's doctor refers the patient to medical-equipment provider J&L.

    (b)     CareCentrix and J&L have a contract under which CareCentrix pays J&L $7.50 for a disposable CPAP filter.

(c)     J&L provides the filter to the patient and then submits a claim on behalf of the patient to CareCentrix in accordance with both the Plan and the Provider Manual.

(d)     CareCentrix then bills the patient an inflated amount that is greater than the equipment cost that the manager pays to the provider. In this instance, CareCentrix billed the patient $25.68.

(e)     Thus, when a patient pays a deductible, as Plaintiff Neufeld did, the patient is overcharged because his payment is based on the inflated amount that CareCentrix charges the patient (or that CareCentrix requires the provider to charge the patient).

(f)     Defendant and/or its agents then secretly and unlawfully pocket the excess $18.18 "Spread."

(g)     Defendant keeps this scheme secret by including the gag clause in the Provider Manuals.

66.     Additional specific examples of Plaintiff Neufeld being overcharged by Defendant for durable medical equipment purchases include the following:

(a)     On or about June 22, 2017, Plaintiff Neufeld was billed by CareCentrix $25.68 for a disposable CPAP filter— *a 342% premium over the actual $7.50 fee* that CareCentrix paid to J&L. Without disclosing it to Plaintiff, Defendant and/or its agents billed Plaintiff Neufeld the $18.18 overcharge or "Spread." Plaintiffs Jacques, Marshall, Terry, Wood, Ruthersby, and Wheatley were likewise overcharged for and misled about the cost of a "disposable CPAP filter."

(b)     On or about June 22, 2017, Plaintiff Neufeld was billed by CareCentrix $147.78 for a full-face Mirage CPAP/BIPAP mask—*a 156% premium over the actual $95 fee* that CareCentrix paid to J&L. Without disclosing it to Plaintiff, Defendant and/or its agents billed Plaintiff Neufeld the $52.78 overcharge or "Spread." Plaintiffs Marshall, Ninivaggi, Terry, Ruthersby, and Wheatley were likewise overcharged for and misled about the cost of a "full-face Mirage CPAP/BIPAP mask."

(c)     On or about June 22, 2017, Plaintiff Neufeld was billed by CareCentrix $37.61 for CPAP headgear—*a 188% premium over the actual $20 fee* that CareCentrix paid to J&L. Without disclosing it to the customer, Defendant and/or its agents billed Plaintiff Neufeld the $17.61 overcharge or "Spread." Plaintiffs Jacques, Marshall, Ninivaggi, Wood, Ruthersby, and Wheatley were likewise overcharged for and misled about the cost of a "CPAP headgear."

(d)     On or about June 22, 2017, Plaintiff Neufeld was billed by CareCentrix $24.43 in coinsurance for CPAP tubing—*a 175% premium over the actual $14 fee* paid to J&L. Without disclosing it to the customer, Defendant and/or its agents billed Plaintiff Neufeld the $10.43 overcharge or "Spread," which Plaintiff paid. Plaintiffs Marshall, Terry, Wood, Ruthersby, and Wheatley were likewise overcharged for and misled about the cost of a "CPAP tubing."

67.     Plaintiff Burns was also overcharged by Cigna in connection with his rental of an oxygen concentrator. Prior to being covered by Cigna, Plaintiff Burns was covered by a health plan issued and administered by Harvard Pilgrim Health Care. While covered by his Harvard Pilgrim health plan, Plaintiff Burns was billed directly by the provider Lincare for his rental of the oxygen concentrator. The allowed amount for the monthly rental under the Harvard Pilgrim

health plan was $42.90 in each of November and December 2018. Beginning in January 2019, Plaintiff Burns changed health plans was now covered by a Cigna health plan, and Plaintiff Burns notified his provider that his insurance had changed. Despite the fact that he had contracted to rent the concentrator directly from Lincare, thereafter, Plaintiff Burns stopped receiving bills directly from Lincare and instead was billed by Carecentrix. The allowed amount for the monthly rental under the Cigna health plan — as billed by Carecentrix was now $176.85 for January 2019 and $180.36 in both February and March 2019 — *a 312% and 320%, respectively, premium over the $42.90 actually charged by Lincare.*

68.     Cigna's mistreatment of Plaintiff Srednicki was even more outrageous. On June 19, 2017, Plaintiff Srednicki obtained a blood test from LabCorp, an in-network provider. Cigna stated on its EOB that the Plan paid $471.02 toward the test and that there was a substantial balance due.  Plaintiff Srednicki's doctor's office contacted LabCorp and asked what it would charge one of its patients for this blood test if the patient did not have insurance.  LabCorp advised the doctor that the cash price for this test to an uninsured customer of LabCorp was even less: $449.00 (an amount that Cigna did not disclose to Plaintiff Srednicki). Yet, Cigna fraudulently listed on the EOB an "Amount Billed" of an astounding $17,362.66, almost 40 times greater than the actual cost that Cigna had negotiated or the uninsured cash price. Cigna further fraudulently listed on the EOB a "Discount" of $14,572.66, over 32 times greater than actual cost or the uninsured cash price, and a "Covered Amount" of $2,787.00, more than 6 times greater than the actual cost or the uninsured cash price. Cigna further fraudulently stated on the EOB that of the "Covered Amount" of $2,787.00, Plaintiff Srednicki was required to pay Cigna an $2,315.98 in deductible and/or coinsurance payments.

69.     Cigna, through an entity called "Cigna Medical Group," knowingly, wrongfully and fraudulently billed Plaintiff Srednicki $2,315.98, even though the actual provider, LabCorp, has confirmed that it was ***paid in full*** for the actual cost of no more than $558.40 for the blood test.

70.     Upon information and belief, Cigna implemented this fraudulent billing scheme through a Cigna captive provider organization, Cigna HealthCare of Arizona, Inc. Although Plaintiff Srednicki received services from LabCorp, the EOB states that the provider to Cigna was Cigna's own "HLTH DIAG LAB." The bill from Cigna Medical Group in turn states that Cigna Medical Group "is the medical group practice division of Cigna HealthCare of Arizona, Inc." The bill also purports to explain the relationship between LabCorp and Cigna Medical Group as follows: "You are receiving this statement for medical or laboratory services at [Cigna Medical Group] facilities, including laboratory services provided at a LabCorp draw station under LabCorp's agreement with Cigna HealthCare of Arizona, Inc. for laboratory management and support services."

71.     Upon information and belief, Cigna implemented the scheme by requiring LabCorp to bill Cigna the actual cost of the blood test, no more than $558.40. Cigna then used Health Diagnostics Lab to create a fictitious invoice to Cigna by billing itself $17,343.99 to generate a wildly inflated "Amount Billed." Cigna then generated a fictitious and wildly inflated "Discount" by reducing the fraudulent "Amount Billed" by $14,572.66 to generate a wildly inflated fictitious "Covered Amount" of $2,787.00. These fictitious amounts were then included on a fraudulent invoice, prepared by Cigna Medical Group, and sent through interstate mail to Plaintiff Srednicki and demanding a fraudulent payment to Cigna Medical Group in the amount of $2,315.98.

- 23 -

72.     These types of overcharges were systematic and imposed on all Class members.

(a)     For example, one participant's infant son required specialized formula. Although the formula could be purchased directly from the manufacturer for $1,270, Carecentrix charged $3,351.60.

(b)     Another participant was charged $75 per can of formula when the same formula could be purchased for $25 per can from Walmart. A Cigna manager described this is as a "huge variation."

(c)     Another participant was charged over $100 per can of formula when he could have purchased directly from *the same provider* for $32.82 per can. This participant in emails to Cigna stated what should have been evident to Cigna: when the price charged using insurance is so much higher, "why anyone would order readily-available formula through a third-party internal nutrition supplier rather than buy it themselves."

(d)     Another participant was charged $73.78 for infant formula when the formula could have been purchased direct from the manufacturer for $49.99 per can.

(e)     And another participant was charged approximately $530 for five cans of formula that could have been purchased in the store for approximately $130.

(f)     Another participant was charged approximately $50 for CPAP filters when the same filters could be purchased online for $4. This participant was charged $164 for mask cushions but found the same cushions online for $20.

(g)     Another participant was charged $350 for a walker that had a "sticker" price of only $89.95.

(h)     Another participant purchased 30 bottles of formula and was charged $810.24 ($27/bottle) even though the provider was only paid $566.40 ($18.88/bottle).

(i)     A participant was charged $332.32 for an ultrasound of the head and neck when the actual provided was only paid $248.

(j)     Another participant was charged $768.65 for a steerable knee walker, but she found that she could purchase the same knee walker directly from an online pharmacy for $220.95.

(k)     A different participant was charged $717.59 for a steerable knee walker, but he found that he could purchase the exact same model from Wal-Mart for $199.

(l)     A participant's daughter was diabetic and required an insulin pump and monthly supplies. The participant was charged $5,974.50 for a new insulin pump, when the same pump could have been purchased online without insurance for $5,200.

(m)     Another participant's son needed an MRI. He contacted Cigna and was told the MRI would cost $666.60; however when the EOB came, it showed that he was charged $804, which was pulled from his HRA account. This participant, who is a family physician, discovered that Cigna was using "middle man" eviCore, which paid $600 to the MRI provider and kept $204 for itself — an overcharge of 34%. He also discovered that eviCore didn't pay the provider within a reasonable time. After it took the $804 from the participant's HRA account, eviCore kept it for at least one month before paying the provider. In an email to others in his organization, the participant protested: "As a family physician I am in the trenches daily with patients trying to navigate a system

- 25 -

that has been created to purposefully confuse the consumer. In my mind there is no value to having Med Solutions [i.e., eviCore] involved in this transaction. . . . I am asking your department to challenge Cigna not to engage in these deceptive practices of using a middle man lest [our organization] take their health insurance needs elsewhere."

(n)     Another participant was charged $670 for an MRI, but he received a bill from the provider which disclosed that the actual charge was $500. Accordingly, he was overcharged by eviCore by 34%. The participant thought this behavior, of charging $170 to authorize an MRI, was "despicable" and "should be looked into."

(o)     Another participant was charged $1,818.74 for home infusion therapy even though the  provider only charged $532, a 242% increase. A Cigna employee, learning of this, commented "That is a HUGE difference" and asked another Cigna employee "Do they have that much of a mark up in pricing? Just doesn't seem right . . . ." When Carecentrix was asked about this "huge" difference, the Carecentrix representative was not concerned about the excessiveness of the charge but instead was focused on determining how Cigna became aware of the amount paid the provider, explaining, "Our providers have strict rules about not discussing our rates. I need to understand how/where you received the amount billed from [provider]."

(p)     Another participant purchased a CPAP machine and humidifier from a provider without providing his insurance information. He was charged and paid $1,285, which he paid, and his invoice stated that it was paid in full. When the provider received his insurance information, however, it refunded the amounts and ran the claim through Carecentrix, which then proceeded to charge the participant $2,090.97 — a 63% increase.

(q)     One member received a prescription from her doctor for an MRI. The patient called eviCore (MedSolutions/Informed Choice) and was told that an MRI was authorized and that she could have the MRI at a local imaging provider, Insight Imaging, and that the charge for the MRI would be $343. About three weeks after she had the MRI, she received a letter from her HRA administrator notifying her that eviCore deducted $536 from her HRA account for the MRI. In an attempt to get answers as to why she was overcharged, she spoke to more than eight representatives between Cigna, eviCore, and Insight Imaging — being sent "back and forth, back and forth." A representative from Insight Imaging admitted that it was paid $400 for the MRI — accordingly eviCore marked up the charge by 34%. A representative from MedSolutions Claims (eviCore) told the participant they were not permitted to talk to her. When she called another number for MedSolutions (eviCore) she was put on hold for 23 minutes. Internal documents show that Cigna's main concern was not on the participant but on the fact that "Informed Choice" disclosed the allowed amount  to her.

73.     The significant overcharges for equipment and services received from providers was known throughout Cigna. Indeed, internal documents show that some of the complaints were elevated to the office of Cigna's CEO, David Cordani, more than seven years ago.

74.     Upon information and belief: (1) Cigna developed and directed the fraudulent billing scheme through its Plans; (2) Cigna charged or required the managers to charge patients excessive and unlawful copayment, coinsurance or deductible payments, and dictated that these patient payments not be discounted or excused/waived; and (3) Managers and/or Cigna through contracts with providers blocked and/or threatened providers from disclosing the true cost of healthcare services and goods and from disclosing the existence of Spread.

75.     Clearly, Defendant's and/or its agents' collection, and retention of unlawful "Spread" would not be possible if Defendant did not engage in misrepresentations and the true cost of the service or equipment was disclosed to participants and the provider was not prohibited by contract and from disclosing to participants the lower contract price for the services or equipment.

76.     Upon information and belief, these unlawful activities have affected at the very least thousands of participants. The losses to date and the risk of future losses to the participants and beneficiaries of the Plans is great, particularly given that the bulk of Defendant's market is with ERISA-covered health plans—plans whose participants and beneficiaries are owed the highest duties known to law by the fiduciaries that administer and manage these important employee benefits.

**Defendant's Plans with Plaintiffs and the Classes**

77.     Health insurance plans are subject to state regulation. The plan forms typically must be filed with and approved by the appropriate state regulators.

78.     Because they are approved form plans, the relevant terms of the Plans insuring Plaintiffs and Class and Subclass members are substantively the same. For this reason, upon information and belief, the rights relevant to the claims alleged herein are shared by all members of the Class.

79.     These terms of the Plans—and more importantly, how these Plans are administered by Cigna, its controlled subsidiaries, affiliates, and providers—do not differ materially across Plans. Accordingly, upon information and belief, the rights relevant to the claims alleged herein are shared by all members of the Class and Subclass regardless of the funding arrangement underpinning the health plan benefits that Defendant offers and administers.

- 28 -

80.     Plaintiffs' Plans mandated that cost-share payments (copayments, coinsurance payments, and deductibles payments) could not exceed the amount paid to the participating providers and that coinsurance payments could not exceed the product of the applicable coinsurance rate times the amount paid to providers.

**Plans of Plaintiffs Neufeld, Jacques, Terry, Wood, Burns, and Ruthersby**

81.     For example, the Plans of Plaintiffs Neufeld, Jacques, Terry, Wood, and Ruthersby define "Covered Expenses" as "expenses incurred or on behalf of a person for the charges listed below . . . ." These "charges" include, but are not limited to, charges for (a) "Home Health Services"; (b) " purchase or rental of Durable Medical Equipment that is ordered or prescribed by a Physician and provided by a vendor approved by Cigna for use outside a Hospital or Other Health Care Facility"; (c) "coverage for the testing and treatment of PKU" including "formulas and special food products that are part of a diet prescribed by a Physician"; (d) "laboratory services, radiation therapy and other diagnostic and therapeutic radiological procedures"; (e) prosthetic appliances and devices; and (f) orthoses and orthotic devices.

82.     "Charges" are defined in the Plans as the amount "the provider has contracted directly or indirectly with Cigna."

83.     According to the Plans, patients "may be required to pay a portion of the Covered Expenses for services and supplies. That portion is the Copayment, Deductible or Coinsurance." Accordingly, by definition, the Copayment, Deductible, and Coinsurance payments must *only* be a portion of expenses for charges by a provider of healthcare services or equipment.

84.     Pursuant to the Plans, copayments, coinsurance, and deductibles are further defined as follows:

(a)      "Copayments are expenses to be paid by you or your Dependent for covered services."

(b)      "Coinsurance means the percentage of charges for Covered Expenses that an insured person is required to pay under the plan."

(c)      "Deductibles are also expenses to be paid by you or your Dependent. Deductible amounts are separate from and not reduced by Copayments. Copayments and Deductibles are in addition to any Coinsurance. Once the Deductible maximum in The Schedule has been reached, you and your family need not satisfy any further medical deductible for the rest of that year."

### Plaintiff Srednicki's Plan

85.      Plaintiff Srednicki's Plan similarly provides that "Covered Expenses are Medically Necessary Expenses" for "services or supplies." "Expenses" are the "charge for a covered service or supply."

86.      The "Deductible" is the amount of Covered Expenses" that must be paid before the Plan pays those expenses. "Coinsurance" means the "percentage of Covered Expenses that a Covered Person is required to pay."

87.      Plaintiff Srednicki's Explanation of Benefits ("EOB") further defines these terms. It provides that the "Amount Billed" is "[t]he amount charged" by the healthcare provider, and that the "Discount" is "[t]he amount you save" by using a Cigna network provider because "Cigna negotiates lower rates" with "in-network" providers "to help you save money."

### Plaintiff Wheatley's Plan

88.      Plaintiff Wheatley's Plan similarly mandates that cost-share payments (copayments, coinsurance payments, and deductibles payments) could not exceed the amount

paid to the participating providers and that coinsurance payments could not exceed the product of the applicable coinsurance rate times the amount paid to providers. Under Plaintiff Wheatley's Plan, the cost-shares are based on the amount of "Covered Expenses, which "are the expenses incurred for Covered Services under this Policy for which Cigna will consider for payment under this Policy." "***Covered Expenses will never exceed the Negotiated Rate for Participating Providers***." The "Negotiated Rate is the rate of payment that has been negotiated with a Participating Provider for Covered Services."

89.     Pursuant to Plaintiff Wheatley's Plan, copayments, coinsurance, and deductibles are defined as follows:

(a)     "Coinsurance means the ***percentage of Covered Expenses*** the Insured Person is responsible for paying after applicable Deductibles are satisfied.

(b)     "Copayment / Copay is a set dollar amount of Covered Expenses the Insured Person is responsible for paying. ***Copayment does not include . . . charges in excess of Covered Expenses.***"

(c)     "Deductible means the ***amount of Covered Expenses*** each Insured Person must pay for Covered Services each Year before benefits are available under this Policy."

**Defendant Did Not and Cannot Apply Plan Terms in Administering Claims**

90.     Defendant established and implemented a claims adjudication system that cannot adjudicate claims in accordance with Defendant's duties under the Plans on a system-wide basis. Under the Plans, Defendant had a fiduciary duty to apply the Plan terms set forth above in administering Plaintiffs' benefits and calculating Plaintiffs' copayments and coinsurance and deductible payments. Cigna's form Plans provide:

- 31 -

**Discretionary Authority**

The Plan Administrator delegates to Cigna the discretionary authority to interpret and apply plan terms and to make factual determinations in connection with its review of claims under the plan. Such discretionary authority is intended to include, but not limited to, the determination of the eligibility of persons desiring to enroll in or claim benefits under the plan, the determination of whether a person is entitled to benefits under the plan, and the computation of any and all benefit payments. The Plan Administrator also delegates to Cigna the discretionary authority to perform a full and fair review, as required by ERISA, of each claim denial which has been appealed by the claimant or his duly authorized representative.

91.     Here, with respect to Carecentrix's and Linkia's networks, Cigna does not even know how much "the provider has contracted" to be paid.

92.     Cigna does not and cannot not apply Plan terms to the computation of benefit payments or patient cost-share payments. Instead, Defendant simply coded its claims administration system to ensure that the cost-share for all claims was based on the inflated charges by managers such as CareCentrix rather than the actual charges by providers like J & L.

93.     Moreover, as a result of their failure to establish and maintain an appropriate claim adjudication system, Defendant bears the burden of proving that the cost-share it charged was based on the amount paid to the provider. *See, e.g.*, *Estate of Barton v. ADT,* 820 F.3d 1060 (9th Cir. 2016).

**Defendant failed to establish or maintain reasonable claim procedures**

94.     Defendant also established and maintained, on a system-wide basis, benefit-claim procedures that are unreasonable and designed to inhibit and hinder Plaintiffs and class members from paying the correct deductibles, copayments and coinsurance.

95.     A "claim for benefits" is defined specifically in DOL Regulations as a "request for a plan benefit" "in accordance with a plan's reasonable procedures for filing benefit claims." 29 C.F.R. § 2560-503-1 (e).

- 32 -

96.     In this case, the request for the Plan benefit is the request by a patient to a provider to provide benefits pursuant to the Plans. For example, Plaintiff Neufeld's request to J&L for a disposable CPAP filter under the terms of his Plan is a request for benefits under the Regulation and the Plans.

97.     The Plans expressly state the procedure for filing In-Network benefit claims:

> ## How To File Your Claim
> There's no paperwork for In-Network care. Just show your identification card and pay your share of the cost, if any; your provider will submit a claim to Cigna for reimbursement.

98.     In the Neufeld/J&L example, Neufeld's claim was filed when J&L submitted Neufeld's claim to CareCentrix and Cigna.

99.     Cigna failed to establish and maintain reasonable claims procedures for adjudicating the claims filed in this case. Every Plan must "establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations." 29 C.F.R. § 2560-503-1 (b). In particular with respect to notification of benefit determinations, the Regulation requires, among other things, that the notice include (1) the specific reason for a denial of benefits, (2) a reference to the plan provisions on which the determination was based, (3) a description of the review procedures, and (4) the rules relied upon in making the determination. 29 C.F.R. § 2560-503-1 (g).

100.    Defendant systematically violated 29 C.F.R. § 2560-503-1 (g) in notifying Plaintiffs of Cigna's response to Plaintiffs' claims for benefits. In particular, Cigna never told patients the amount paid to the provider or the proper amount of the cost-share payment due under the Plans. Accordingly, Cigna's "notification" does not meet the requirements of 29 C.F.R. § 2560-503-1 (g).

101.     Moreover, Cigna intentionally and fraudulently violated its obligation to follow reasonable claim procedures in that it blocked the providers from disclosing provider payment information to patients pursuant to the "gag clauses." Accordingly, Cigna's supposed claim procedures unduly inhibited and hampered the initiation of claims in violation of 29 C.F.R. § 2560-503-1(b)(3).

## Defendant Is a Fiduciary and Party In Interest

102.     Plaintiffs and the members of the ERISA Subclass (as defined below) are participants in employee welfare benefit plans as that term is defined in 29 U.S.C. § 1002(1)(A), insured or administered by Defendant to provide participants with medical care.

103.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

104.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

105.    In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA Plans and their participants. The power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power. An appointing fiduciary must take prudent and reasonable action to determine whether the appointees are fulfilling their own separate fiduciary obligations.

106.    Defendant is a fiduciary of all of the ERISA Subclass members' ERISA Plans to which it provided health and durable medical equipment benefits or for which it administered such benefits in that it *exercised* discretionary authority or control respecting the following plan management activities, ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), and in that it *had* discretionary authority or discretionary responsibility in the administration of the ERISA Plans of participants and beneficiaries in the ERISA Subclass, ERISA § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii), because, by way of example, it did and/or could do one or more of the following:

(a)    dictate the amount paid to providers for healthcare or durable medical equipment;

(b)    charge and/or dictate the amount the manager charged patients for healthcare or durable medical equipment;

(c)    charge and/or require the manager to charge patients more for healthcare or durable medical equipment than they should have been charged pursuant to the terms of the ERISA Plans, thereby creating and setting the amount of the "Spread;"

(d)    collect and/or require the manager or provider to collect the "Spread" from patients;

(e)     determine the amount of and require the collection of additional profits and compensation for services provided pursuant to the ERISA Plans;

(f)     set its own compensation for services performed as fiduciaries by dictating "Spread;"

(g)     unilaterally collect its own compensation for services performed as fiduciaries by collecting "Spread;"

(h)     set and change the compensation of its own affiliates with respect to the ERISA Plans by allocation of the proceeds of "Spread;"

(i)     calculate cost-shares based on the amount charged by the network managers rather than the amounts the providers agreed to accept;

(j)     prohibit the provider from selling to patients healthcare or durable medical equipment covered by the ERISA Plans at prices that were lower than the prices that the provider/manager was required to charge the patients;

(k)     select and retain the managers that will, in the case of Cigna, assist in certain healthcare management and coordination functions, and perform all healthcare management and coordination;

(l)     manage the provision of healthcare and durable medical equipment, including processing and paying for the services and equipment;

(m)     improperly trade off the interests of plan participants and beneficiaries for the benefit of itself or its affiliates;

(n)     dictate and negotiate whether a type of healthcare or item of durable medical equipment was covered; and

(o)     monitor performances and take appropriate action to protect plan participants and beneficiaries from other fiduciaries' and service providers' failure to act in the best interests of plan participants and beneficiaries.

107.    Moreover, the Plans expressly granted Cigna broad discretionary authority under the Plans, including the authority to determine benefit payments.

108.    The "Spread" was additional compensation for the provision of healthcare services and product coverage that was collected by Defendant and/or its agents that was neither disclosed to nor agreed to by the participants and beneficiaries that were required to make these additional payments to receive their healthcare services or durable medical equipment. Defendant had and exercised discretion to determine the amount of and require the payment of this additional undisclosed compensation, as well as whether to disclose it. ERISA § 3(21)(A)(i), (iii), 29 U.S.C. § 1002(21)(A)(i), (iii).

109.    The "Spread" is additional "premium" within the meaning of ERISA § 702, for the provision of coverage that was collected by Defendant that was neither disclosed to nor agreed to by the participants and beneficiaries that were required to make these additional contributions to receive their healthcare services or durable medical equipment. Defendant had and exercised discretion to determine the amount of and require the payment of this additional undisclosed premium payment, as well as whether to disclose it—or require its concealment. ERISA § 3(21)(A)(i), (iii), 29 U.S.C. § 1002(21)(A)(i), (iii).

110.    In addition to its fiduciary status under the foregoing provisions, Defendant is a fiduciary of all of the ERISA Subclass members' ERISA Plans in that it *exercised* authority or control respecting management or disposition of plan assets, ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), because:

- 37 -

(a)     The insurance policies, ASO agreements and other contracts underpinning the Plans are "plan assets" within the meaning of ERISA;

(b)     Through its fraudulent billing scheme as described above, Defendant exercised control over the contracts underpinning the ERISA Plans. Cigna successfully leveraged its relationships to the ERISA Subclass members' ERISA Plans to benefit itself, its affiliates, and third parties, and its *authority or control* over these significant plan assets enabled it to do so.

111.    In addition, any Plan-paid amounts that were contributed to participant healthcare services or durable medical equipment transactions were "plan assets" within the meaning of ERISA. Incident to its fraudulent billing scheme, Defendant also exercised control over these plan assets, making it a fiduciary for purposes of these transactions.

112.    Defendant is also a fiduciary because it exercised discretion to set the prices that the ERISA Subclass were and are required to pay for their healthcare products and services. Defendant is required to act in the best interests of the ERISA Subclass, but by allowing participants and beneficiaries of ERISA Plans to be subject to the fraudulent billing scheme described herein, Defendant has breached its fiduciary duties.

113.    Defendant is aware of the effect the fraudulent billing scheme is having on the ERISA Subclass. Nevertheless, Defendant has maximized and continue to maximize its revenues at the expense of the ERISA Subclass by engaging in the illegal conduct described herein.

114.    Furthermore, in negotiating and entering into a contract on behalf of an ERISA plan, a fiduciary must act prudently and negotiate terms that are reasonable and in the best interests of plan participants. In these negotiations and in the contract that is ultimately agreed upon, a fiduciary cannot place its interests over the interests of the plan participants and

beneficiaries. To the extent Defendant has negotiated agreements subject to the fraudulent billing scheme described herein, it has breached its fiduciary duties under ERISA. And through these negotiations, Defendant has also exercised discretionary authority by setting its own margins and compensation for the sale of healthcare products and services.

115.    In addition, Defendant Cigna breached its fiduciary duties under ERISA by retaining managers CareCentrix, eviCore, and Linkia to access their networks of providers for the benefit of the ERISA Subclass, but failing to take reasonable and prudent action to determine whether these managers were fulfilling their own separate fiduciary obligations. For instance, Cigna authorized its managers to set the prices for healthcare products and services, and thus permit these managers to control what the ERISA Subclass pays for healthcare services, including durable medical equipment.

116.    When Cigna provided its managers with authority and discretion to control pricing, Cigna assumed the duty to monitor the managers' exercise of that discretionary authority. Cigna further owed and owes the ERISA Subclass the duty to establish policies and procedures to monitor the managers' performance of their duties, to monitor their pricing, to monitor the effect of the fraudulent billing scheme described herein on the amount paid by the ERISA Subclass, to protect the interests of the ERISA Subclass, and to provide complete and accurate information to the ERISA Subclass.

117.    But in allowing the managers to violate ERISA, including permitting the ERISA Subclass to be subject to the fraudulent billing scheme, and in failing to correct such breaches of duty in a timely fashion, Cigna has breached its duty to monitor the managers' illegal conduct.

118.    Defendant Cigna has also the discretionary authority or control to negotiate on behalf of the ERISA Subclass favorable terms when entering into terms with its managers. These

terms directly impact the prices paid by the ERISA Subclass, but by engaging in the conduct described herein, including by participating in the fraudulent billing scheme with the managers, Defendant Cigna has breached its fiduciary duties.

119.    Defendant is also a party in interest under ERISA because (a) it is a fiduciary, ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A); and/or (b) it provided insurance, plan administration, and healthcare management services to Plaintiffs' the Class members' health plans, ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).

120.    As a party in interest, Defendant received direct and indirect compensation for services, some of which was in the form of excess Spread that was collected in exchange for few to no services. Defendant also received and used for its own and its affiliates' benefits "plan assets," including patient cost-sharing and ERISA Plan contracts under which it had access to the ERISA Plans and were able to impose its fraudulent billing scheme on the Class and Subclass.

**Defendant's ERISA Duties**

121.    **The Statutory Requirements:** ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

122.    **The Duty of Loyalty.** ERISA imposes on a plan fiduciary the duty of loyalty— that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ." The duty of loyalty entails a duty to avoid conflicts of

interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

123.    **The Duty of Prudence.** Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence—that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

124.    **The Duty to Inform.** The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: (a) a negative duty not to misinform; (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (c) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

125.    **Prohibited Transactions.** ERISA's prohibited transaction rules bar fiduciaries from certain acts because they are self-interested or conflicted and therefore become per se violations of ERISA § 406(b)—or because they are improper "party in interest" transactions under ERISA § 406(a). As noted above, under ERISA, a "party in interest" includes a fiduciary, as well as entities providing any "services" to a plan, among others. *See* ERISA § 3(14), 29 U.S.C. § 1002(14). ERISA's prohibited transaction rules are closely related to ERISA's duties of loyalty, which are discussed above.

126.    ERISA § 406(a) provides that transactions between a plan and a party in interest are prohibited transactions unless they are exempted under ERISA § 408:

(a) Transactions between plan and party in interest

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;
(B) lending of money or other extension of credit between the plan and a party in interest;
(C) furnishing of goods, services, or facilities between the plan and a party in interest;
(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or
(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29 U.S.C. § 1106(a).

127. ERISA § 406(b) provides:

A fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account,
(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).

128. **The Duty to Monitor.** In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA participants and beneficiaries. As noted above, the power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power.

- 42 -

129.    **Rights of Action Under the Plans, for Fiduciary Breach, Prohibited Transactions, and Related Claims.** ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a participant or beneficiary may bring an action to enforce rights under the terms of the plan or to clarify his rights to future benefits under the terms of the plan. Further, ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants and fiduciaries to bring suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." The remedies available pursuant to § 502(a)(3) include remedies for breaches of the fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and for violation of the prohibited transaction rules set forth in ERISA § 406, 29 U.S.C. § 1106. Further, ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409. ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate. Plaintiffs bring their ERISA claims pursuant to ERISA § 502(a)(3) and (2), as well as § 502(a)(1)(B), as further set forth below, because not all the remedies Plaintiffs seek are available under all sections of ERISA and, alternatively, Plaintiffs are pleading their claims in the alternative.

- 43 -

**Defendant Breached Its Duties**

130.    Defendant breached the terms of the ERISA Plans and legal obligations, committed breaches of fiduciary duty and prohibited transactions, and harmed Plaintiffs and ERISA Subclass members in the following ways:

(a)    Plaintiffs and ERISA Subclass members were unlawfully charged amounts for healthcare services and durable medical equipment that substantially exceeded the amounts actually paid by or agreed to be paid by Defendant and/or its agent managers to the providers for the services or equipment;

(b)    Plaintiffs and the ERISA Subclass were charged excessive copayments, a material portion of which were neither payments for healthcare services or durable medical equipment, nor were they "co-" payments made in conjunction with Defendant's payment for these services and equipment, as required by the plain language of the Plans, but rather were undisclosed and unlawful payments and premiums to Defendant/managers;

(c)    Plaintiffs and ERISA Subclass members were overcharged for coinsurance payments in that rather than paying a percentage of the fees that Defendant and/or managers with which Defendant has contracted actually paid (or agreed to pay) to the providers for the services or equipment, the coinsurance payments were based on substantially inflated amounts;

(d)    Plaintiffs and ERISA Subclass members were overcharged when making payments toward their deductibles in that rather than paying the lesser of the applicable per occurrence deductible fee or the fee paid to the provider for the healthcare service or equipment, Plaintiffs and ERISA Subclass members were charged deductible fees that were higher than allowed under the Plans;

- 44 -

(e)      Defendant failed to apply Plan terms in the computation of benefits and otherwise improperly processed and paid claims it received from providers;

(f)      Defendant discriminated against patients who were required to pay "Spreads" as compared to those who were not;

(g)      Defendant misrepresented and failed to disclose to patients the manner in which it charged for healthcare services, including durable medical equipment, as alleged above and otherwise failed to establish and maintain reasonable claim procedures;

(h)      Providers were prohibited from disclosing to patients the existence or amount of the Spread which, among other things, is an unreasonable claim procedure;

(i)      Defendant set its own compensation for services performed as fiduciaries by dictating prices, co-payments, co-insurance, deductibles, and contracted rates that resulted in Spread;

(j)      Defendant unilaterally collected its own compensation for services performed as fiduciaries by collecting Spread;

(k)      Defendant set and changed the compensation of its own affiliates and third parties with respect to the ERISA Subclass members' ERISA Plans by allocating the proceeds of Spread without heeding the best interests of participants and beneficiaries;

(l)      Defendant maximized its own profits, profits to its affiliates, and profits to third parties, at the expense of the ERISA Subclass members who participated in the ERISA Plans;

(m)      Defendant received improper compensation from entities doing business with the ERISA Plans Defendant administered and managed;

(n)     Defendant knew or reasonably should have known that its actions would injure plan participants and beneficiaries;

(o)     Cigna selected managers CareCentrix, eviCore, and Linkia, and selected providers such as J & L, and negotiated its contracts based on disloyal and self-interested factors and made such decisions without putting the interests of participants and beneficiaries first;

(p)     Defendant failed to stop injuries to Plan participants caused by their co-fiduciaries and service providers;

(q)     Defendant failed to monitor its appointees, formal delegatees, and informal designees in the performance of their fiduciary duties; and

(r)     Defendant misrepresented that it could and would set cost-shares based on provider charges when it did not have access to such information, or had such information and ignored it.

131.    Plaintiffs and ERISA Subclass members were overcharged for and/or paid unauthorized and excessive copayments, coinsurance and deductible payments in connection with the purchase or rental of numerous different types of healthcare services and durable medical equipment.

**CLASS ACTION ALLEGATIONS**

132.    Plaintiffs bring this action as a class action pursuant to Rule 23 (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the Class, the ERISA Subclass, and State Law Subclass, defined as follows:

**The Class.** All individuals who (1) are or were members of a health plan issued and/or administered by Cigna or its affiliates, which provides that deductible payments, copayments, or coinsurance payments must be based on, and may not exceed, the amount paid to participating (or network) providers; (2) received healthcare products or services from providers in the networks of CareCentrix, Inc.,

eviCore healthcare MSI, LLC, or Linkia, Inc. pursuant to such Cigna health plans; and (3) made a deductible payment, copayment, and coinsurance payment for such products or services that was not based on or exceeded the amount paid to a participating (or network) provider.

133.   Within the Class there are two Subclasses:

**The ERISA Subclass.** All individuals who (1) are or were members of a health plan issued and/or administered by Cigna or its affiliates and governed by ERISA, which provides that deductible payments, copayments, or coinsurance payments must be based on, and may not exceed, the amount paid to participating (or network) providers; (2) received healthcare products or services from LabCorp providers in the networks of CareCentrix, Inc., eviCore healthcare MSI, LLC, or Linkia, Inc. pursuant to such Cigna health plans; and (3) made a deductible payment, copayment, and coinsurance payment for such products or services that was not based on or exceeded the amount paid to a participating (or network) provider.

**The State Law Subclass.** All individuals who (1) are or were members of a health plan issued and/or administered by Cigna or its affiliates and not governed by ERISA, which provides that deductible payments, copayments, or coinsurance payments must be based on, and may not exceed, the amount paid to participating (or network) providers; (2) received healthcare products or services from LabCorp or providers in the networks of CareCentrix, Inc., eviCore healthcare MSI, LLC, or Linkia, Inc. pursuant to such Cigna health plans; and (3) made a deductible payment, copayment, and coinsurance payment for such products or services that was not based on or exceeded the amount paid to a participating (or network) provider.

134.   Plaintiffs reserve the right to redefine the Class and Subclasses prior to certification.

135.   **Class Period.** Plaintiffs will seek class certification, losses, and other available relief for ERISA violations, breaches of contract, and RICO violations occurring within the entire period allowable under relevant law, including, but not limited to, the entire period allowable under ERISA § 413, 29 U.S.C. § 1113, including its fraud or concealment tolling provisions, as well as under RICO, 18 U.S.C. 1961, *et seq*. and the doctrine of equitable tolling. Further, Plaintiffs reserve the right to refine the Class Period after they have learned the extent

of Defendant's fraud, the length of its concealment, and the time period during which the fraudulent billing scheme was taking place.

136.    Excluded from the Class are Defendant, any of its parent companies, subsidiaries, and/or affiliates, its officers, directors, legal representatives, and employees, any co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

137.    This action is brought, and may properly be maintained, as a Class action pursuant to Fed. R. Civ. P. 23. This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of those provisions.

138.    The Class and Subclasses are so numerous that the individual joinder of all of its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the total number of Class and Subclasses members is in the thousands and that the members of the Class and Subclasses are geographically dispersed across the United States. While the exact number and identities of the Class and Subclasses members are unknown at this time, such information can be ascertained through appropriate investigation and discovery.

139.    Plaintiffs' claims are typical of the claims of the members of the Class and Subclasses because Plaintiffs' claims, and the claims of all Class and Subclasses members arise out of the same conduct, policies and practices of Defendant as alleged herein, and all members of the Class and Subclasses are similarly affected by Defendant's wrongful conduct.

140.    There are questions of law and fact common to the Class and Subclasses and these questions predominate over questions affecting only individual Class and Subclass members. Common legal and factual questions include, but are not limited to:

(a)    Whether Defendant is a fiduciary under ERISA;

(b)    Whether Defendant is a party in interest under ERISA;

(c)     Whether the network managers or parties in interest under ERISA;

(d)     Whether Defendant breached its fiduciary duties in failing to comply with ERISA as set forth above;

(e)     Whether Defendant acts as alleged above breached ERISA's prohibited transaction rules;

(f)     Whether Defendant conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity;

(g)     Whether Defendant conspired to conduct or participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity;

(h)     Whether such racketeering consisted of acts that are indictable pursuant to 18 U.S.C. §§ 1341 and 1343;

(i)     Whether Defendant engaged in a scheme to defraud;

(j)     Whether each Defendant was a knowing and active participant;

(k)     Whether the mail, interstate carriers or wire transmissions were used in connection with such scheme to defraud;

(l)     Whether Plaintiffs and Class and Subclass members were injured in their property or business as a direct and proximate result of Defendant's racketeering activities;

(m)     Whether Defendant violated the Plans' terms by collecting unlawfully excessive amounts for healthcare services and durable medical equipment, and retaining the resulting "Spread;"

(n)     Whether the members of the Class and/or Subclasses have sustained losses and/or damages and/or Defendant has been unjustly enriched, and the proper measure of such losses, damages, and/or unjust enrichment; and

(o)     Whether the members of the Class and/or Subclasses are entitled to declaratory and/or injunctive relief.

141.    Plaintiffs will fairly and adequately represent the Class and Subclasses and have retained counsel experienced and competent in the prosecution of class action litigation. Plaintiffs has no interests antagonistic to those of other members of the Class and Subclasses. Plaintiffs is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

142.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class and/or Subclass members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class and/or Subclasses to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

143.    Class action status in this action is warranted under Rule 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class and Subclasses, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to each Class and Subclass as a whole.

144.    Class action status in this action is warranted under Rule 23(b)(3) because questions of law or fact common to members of the Class and Subclasses predominate over any questions affecting only individual members, and class action treatment is superior to the other

available methods for the fair and efficient adjudication of this controversy. Joinder of all members of the Class is impracticable.

**Exhaustion of Administrative Remedies Occurred or<br>Does Not Apply or Would Be Futile**

145. Plaintiff Srednicki fully exhausted her administrative remedies and was summarily rejected by Cigna. On September 25, 2017, Plaintiff Srednicki appealed the decision of Cigna as set forth in her EOB. In connection with that appeal, she set forth in detail all of the material facts concerning her claim as set forth above and she attached supporting documentation.

146. On October 30, 2017, Cigna summarily denied the appeal with a form letter that did not even address the merits of her claim as set forth above. Cigna further stated as follows:

> This decision represents the final step of the **internal** appeal process. However, if your plan is governed by ERISA, you also have the right to bring legal action under Section 502 (a) of ERISA within three (3) years.

To the extent that Cigna's internal appeals process even applies, this action is the "legal action" that Cigna recognized in its internal appeal process.

147. Plaintiff Jacques fully exhausted administrative remedies. On February 15, 2019, he filed a grievance/appeal letter complaining of the overcharges using Cigna's online grievance submission webpage. After not hearing back from Cigna, on April 12, 2019, Plaintiff Jacques called Cigna and spoke with a care representative who represented that she was creating an inquiry record with the Grievance Team. That same day, he again submitted his grievance/appeal using the online grievance submission webpage. As of July 9, 2019, Cigna has still not responded to Plaintiff Jacques about his grievance. He is therefore deemed to have exhausted under governing Department of Labor regulations.

148.    Plaintiff Marshall fully exhausted administrative remedies. On or around April 15, 2019, he mailed his grievance/appeal letter to Cigna. On April 23, 2019, Plaintiff Marshall received a letter from Cigna acknowledging receipt of his letter and notifying him that he would receive a decision by May 19, 2019. As of July 9, 2019, Cigna has still not delivered a decision to Plaintiff Marshall about his grievance/appeal. He is therefore deemed to have exhausted under governing Department of Labor regulations.

149.    Plaintiff Ninivaggi fully exhausted administrative remedies. On or around December 17, 2018, he mailed a grievance/appeal letter  to Cigna. He was informed by Cigna by letter dated February 18, 2019, that his grievance/appeal was denied and that Cigna believed the charges were proper. On or around March 13, 2019, he mailed a second-level grievance/appeal letter  to Cigna. He was informed by Cigna by letter dated March 28, 2019, that his grievance/appeal was again denied.

150.    Plaintiff Terry fully exhausted administrative remedies. On February 25, 2019, he mailed a grievance/appeal letter to Cigna. He was informed by Cigna by letter dated April 4, 2019, that his grievance/appeal was denied and that Cigna believed the charges were proper.

151.    Plaintiff Wood fully exhausted administrative remedies. She filed an appeal which was received by Cigna on November 2, 2019. As of January 31, 2020, Cigna has still not delivered a decision to Plaintiff Wood about her grievance/appeal. She is therefore deemed to have exhausted.

152.    Plaintiff Wheatley fully exhausted administrative remedies. On or around February 5, 2019, he mailed his grievance/appeal letter to Cigna. On April 23, 2019, Plaintiff Wheatley received a letter from Cigna acknowledging receipt of his grievance/appeal letter and representing that he would receive another letter updating him about his grievance/appeal by

March 6, 2019. As of July 9, 2019, Cigna has still not followed up with Plaintiff Wheatley about his grievance/appeal. He is therefore deemed to have exhausted under governing Department of Labor regulations.

153.    As a result of Plaintiffs' exhaustion of the administrative appeals process in relation to the pervasive fraudulent overcharge scheme that is the basis for this action, Plaintiffs, the Class, and Subclass are not required to exhaust administrative remedies.

154.    Moreover, only a claim under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) for benefits could concern exhaustion of administrative remedies, and Plaintiffs and the ERISA Subclass do not assert such a claim. They seek to enforce their rights under the terms of the ERISA Plans and clarify future rights concerning hidden and fraudulent charges that exceeded their benefits. Moreover, although Plaintiffs and ERISA Subclass members made claims for benefits through their providers, Defendant never even attempted to comply with the Regulation concerning reasonable benefit claim procedures, a prerequisite to assertion of an exhaustion defense. Finally, because the injuries to Plaintiffs and the ERISA Subclass are part of a nationwide, clandestine, computerized scheme, any attempt to rectify the harm through administrative means would be futile and unnecessary.

155.    This fraudulent billing (which directly evidences the overcharging of patients) is pervasive and significantly increases the costs to patients across the country.

156.    Making matters worse, insurers/managers contractually bind providers to keep the scheme secret and they prevent providers from informing patients that they are being overcharged. Put differently, if the participant in the CPAP equipment example above directly asked the provider whether he or she could purchase (or rent) the CPAP equipment outside of

the Plan, the provider would have been contractually prohibited from disclosing a lower available price or from selling it at that lower price—even if the provider could do so at a profit.

157.    Due to Defendant's concealment of its fraudulent billing scheme, Plaintiffs and the Class and Subclasses did not know and/or did not have reason to know that they were being overcharged for their products and services. Due to the "gag clauses," only in the rarest of circumstances would patients have any inkling that they were being overcharged. And even if they had reason to know they were being overcharged, they did not know the exact amount of the "Spread" they were forced to pay. Thus, Plaintiffs and the Class and Subclasses did not know and did not have reason to know that they could make a claim for reimbursement of part of their cost-sharing agreement, much less the specific portion thereof they should request.

158.    It is not clear that Defendant's administrative claims procedures would or could contemplate the return of an overpayment because there has been no denial of benefits, or adverse benefit determination. But even if it could apply, making administrative claims should not be required of Plaintiffs and the Class and Subclasses. Even utilizing Defendant's claims procedures, if they were available or valid under these circumstances, which they were not, would not make Plaintiffs or the Class or Subclasses whole. First, as is evident from the perfunctory, non-responsive denial of Plaintiffs'  administrative claim, it is clear that this procedure would not result in a refund, and is therefore futile and/or unnecessary. Second, even if Defendant's claims procedures could provide a "Spread" reimbursement, Plaintiffs and the Class and Subclass are entitled to more, including disgorgement of profits, treble and punitive damages, injunctive relief, and the other remedies described *infra.* In this regard as well, utilizing a claims procedure would be futile and/or unnecessary.

159.    Additionally, with respect to Carecentrix's and Linkia's network, Cigna does not even know how much "the provider has contracted" to be paid.  Accordingly, Cigna does not and cannot not apply Plan terms to the computation of benefit payments or patient cost-share payments.

160.    Moreover, under the circumstances alleged here, it would be extremely burdensome and inequitable to require Plaintiffs and the Class and Subclasses to seek redress through Defendant's claims procedures, where Defendant has intentionally misled consumers, omitted material information, concealed their unlawful practices and provided Plaintiffs with no relief and a non-responsive answer to their administrative complaints. With the proportionately small amount at stake for a given patient relative to the vast profits Defendant is reaping from its fraudulent billing scheme, Defendant's imposition of a claims procedure likely would deter and prevent Plaintiffs and the Class and Subclasses from obtaining any relief at all, while Defendant would be free to retain an unfair, unlawful, and undisclosed windfall profit due to their fraudulent billing scheme.

161.    Finally, correcting the prices paid by patients on an individualized basis would inevitably result in further unfair, disparate, and discriminatory treatment among those Class and Subclass members who have been reimbursed for the overcharges and those who have not. A far more equitable and cost-effective way to adjudicate overpayments made by the Class and Subclasses is for Defendant to disgorge in full these amounts pursuant to their own records that can track such payments for everyone in the Class and Subclasses.

162.    For all of these reasons, it would be futile for Plaintiffs to demand administratively that Defendant modify the pervasive fraudulent billing scheme that is ingrained in its business.

**Plaintiffs and the Class Are Entitled to Tolling Due to Fraud or Concealment**

163.    By its nature, Defendant's fraudulent billing scheme has hidden their unlawful conduct from injured parties.

164.    Neither Plaintiffs nor Class or Subclass members knew of the fraudulent billing scheme nor could they have easily or reasonably discovered the existence of the fraudulent billing scheme until shortly before filing the administrative appeal and this action.

165.    Until Plaintiff Neufeld changed carriers and noticed a differential in billing, Defendant's fraudulent billing scheme and their unlawful conduct was hidden and actively concealed from Plaintiffs and the Class and Subclasses.

166.    Even today, the "gag clauses" in place between Defendant and providers continue to hide Defendant's unlawful conduct from members of the Class and Subclasses.

167.    To the extent that any of the causes of action alleged *infra* are subject to a specific statute of limitations, Defendant's fraud or concealment alleged herein *tolls* those requirements, for a specific amount of time to be determined as the litigation progresses.

168.    Further, ERISA's statute of limitations for fiduciary breach claims, ERISA § 413, 29 U.S.C. § 1113, provides that "in the case of fraud or concealment, [an] action may be commenced not later than six years after the date of discovery of such breach or violation."

169.    While the RICO statute does not contain an express limitation period, the United States Supreme Court has held that civil RICO claims must be brought within four years from the discovery of an injury, which limitation is subject to equitable tolling due to Defendant's fraudulent concealment of its unlawful conduct. *Rotella v. Wood*, 528 U.S. 549 (2000).

170.    The fraudulent billing scheme—by its nature a secret endeavor by Defendant—remains hidden from most members of the Class and Subclasses. Moreover, during the Class

Period, as defined above, each Defendant actively and effectively concealed its participation in the fraudulent billing scheme from Plaintiffs and other members of the Class and Subclasses through "gag clauses" and secrecy policies. There is no question that Plaintiffs' claims are timely.

## COUNT I

### ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)
### on Behalf of the ERISA Subclass

171.   Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

172.   ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) provides that a participant or beneficiary may bring an action to enforce rights under the terms of the plan or to clarify his rights to future benefits under the terms of the plan.

173.   As set forth above, as a result of being overcharged for healthcare services and durable medical equipment, Plaintiffs and the ERISA Subclass have been and likely will continue to be denied their rights under the Plans to be charged a lower amount for these services and equipment

174.   Plaintiffs and the ERISA Subclass have been damaged in the amount of the "Spread" compensation that Defendant took for itself. Plaintiffs and the ERISA Subclass are entitled to recover the amounts they have been overcharged.

175.   Plaintiffs and the ERISA Subclass are entitled to enforce their rights under the terms of the plans and seek clarification of their future rights and are entitled to an order providing, among other things:

        (a)     That they have been overcharged;

        (b)     For an accounting of Defendant's charges and overcharges;

(c)      For payment of all amounts due them in accordance with their

rights under the ERISA Plans;

(d)      For readjudication of the claims on which they were overcharged;

and

(e)      For an order that they are entitled in the future not to pay "Spread"

or any other additional amounts that conflict with their rights under the ERISA Plans.

## COUNT II

**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**for Violations of ERISA § 406(a)(1)(C) & (D), 29 U.S.C. § 1106(a)(1)(C) & (D)**
**on Behalf of the ERISA Subclass**

176.    Plaintiffs incorporate by reference each and every allegation above as if set forth

fully herein.

177.    ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), provides that a fiduciary shall

not cause a plan to engage in a transaction if it knows or should know that the transaction

constitutes the payment of direct or indirect compensation in the furnishing of services by a party

in interest to a plan.

178.    ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), provides that a fiduciary shall

not cause a plan to engage in a transaction if it knows or should know that the transaction

constitutes the transfer to, or use by or for the benefit of a party in interest, of any assets of the

plan.

179.    As alleged above, Defendant is a fiduciary of the ERISA Plans of the participants

and beneficiaries in the ERISA Subclass. Defendant is also a party in interest under ERISA in

that it is a fiduciary and/or it provided health insurance and/or administrative "services" to

ERISA Subclass members pursuant to the ERISA Plans. ERISA § 3(14)(A) & (B), 29 U.S.C.

§ 1002(14)(A) & (B). Thus it was engaged on one or both sides of these § 406(a) prohibited transactions.

180.   As a fiduciary, Defendant caused the ERISA Plans to engage in prohibited transactions as alleged herein.

181.   As a party in interest, Defendant received direct and indirect compensation in the form of undisclosed "Spread" compensation in exchange for the services it provided to Plaintiffs and the ERISA Subclass pursuant to their health plans. ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C).

182.   The only exception to the prohibition of such compensation is if it was for services necessary for the operation of a plan and such compensation was reasonable. ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2).

183.   While the burden is on Defendant to invoke and establish this exception, the compensation paid to Defendant was not reasonable under ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2) in that the "Spread" compensation was excessive and/or unreasonable in relation to the value of the services provided. Defendant's compensation exceeded the premiums and other fees that were agreed upon for fully providing healthcare services and durable medical equipment. Further, Defendant as a fiduciary of the ERISA Plans is entitled to receive at most reimbursement for their direct expenses.

184.   Defendant also received transfers of plan assets by collecting and retaining the "Spread" between those payments and the amount the managers paid the providers. ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

185.   In addition, and in the alternative, Defendant used—and misused—assets of the ERISA Plans by leveraging the contracts underpinning these ERISA Plans to gain access to

patients who needed healthcare services and durable medical equipment and would be required to pay copayments, coinsurance, or deductible payments which Defendant could appropriate in its fraudulent billing scheme. Further, Defendant used—and misused—for its own benefit and the benefit of other parties in interest additional assets of the ERISA Plans—the contracts underpinning the ERISA Plans of members of the ERISA Subclass—to effectuate its fraudulent billing scheme. ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

186.   Plaintiffs and the ERISA Subclass have suffered losses and/or damages and/or Defendant has been unjustly enriched in the amount of the "Spread" compensation Defendant took for itself.

187.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

188.   Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiffs and the ERISA Subclass, including but not limited to:

      (a)    an accounting;

      (b)    a surcharge;

      (c)    readjudication of the claims on which they were overcharged;

      (d)    disgorgement of profits;

      (e)    an equitable lien;

      (f)    a constructive trust;

      (g)    restitution;

      (h)    full disclosure of the foregoing acts and practices;

(i)      an injunction against further violations; and/or

(j)      any other remedy the Court deems proper.

### COUNT III

**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**for Violations of ERISA § 406(b), 29 U.S.C. § 1106(b)**
**on Behalf of the ERISA Subclass**

189.    Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

190.    ERISA § 406(b), 29 U.S.C. § 1106(b), provides that a fiduciary shall not (1) deal with plan assets in its own interest or for its own account, (2) act in any transaction involving the plan on behalf of a party whose interests are adverse to participants or beneficiaries, or (3) receive any consideration for its own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

191.    As alleged above, Defendant is a fiduciary to the ERISA Plans. It violated ERISA § 406(b)(1) and (3).

192.    As alleged above, the contracts underpinning the Plaintiffs' and the ERISA Subclass members' ERISA Plans are plan assets under ERISA.

193.    First, by managing contracts in their own interest or for their own account, Defendant violated ERISA § 406(b)(1). Specifically, in setting the amount of and taking excessive undisclosed "Spread" compensation, Defendant received plan assets and consideration for its personal accounts.

194.    Second, through its fraudulent billing scheme, Defendant received consideration for its own personal accounts from other parties—including CareCentrix, eviCore, Linkia, and the Plaintiffs and members of the ERISA Subclass—that were dealing with the ERISA Plans in connection with a transaction involving the assets of the ERISA Plans.

195.    Plaintiffs and the ERISA Subclass have been damaged and suffered losses in the amount of the "Spread" compensation Defendant took through these prohibited transactions.

196.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

197.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiffs and the ERISA Subclass, including but not limited to:

       (a)    an accounting;

       (b)    a surcharge;

       (c)    readjudication of the claims on which they were overcharged;

       (d)    correction of the transactions;

       (e)    disgorgement of profits;

       (f)    an equitable lien;

       (g)    a constructive trust;

       (h)    restitution;

       (i)    full disclosure of the foregoing acts and practices;

       (j)    an injunction against further violations; and/or

       (k)    any other remedy the Court deems proper.

### COUNT IV

**ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3)**
**for Violations of ERISA § 404, 29 U.S.C. § 1104**
**on Behalf of the ERISA Subclass**

198.    Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

199.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan, and with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

200.    In setting the amount of and taking excessive undisclosed "Spread" compensation Defendant has breached its fiduciary duties of loyalty and prudence.

201.    Further, in failing to put the interests of participants and beneficiaries first in managing and administering Plan benefits, Defendant has breached its fiduciary duty of loyalty. And in acting in its own self-interest, Defendant has violated the "exclusive purpose" standard.

202.    The duty to disclose is part of the duty of loyalty. In concealing and failing to disclose to the ERISA Subclass that plan participants were paying more in than the cost of the healthcare service or durable medical equipment or supplies if purchased (or rented) outside their respective Plans, and then barring providers from advising ERISA Subclass members that they could pay less for a service or equipment by purchasing it outside of their respective plans, Defendant breached this duty. Further, both omissions and misrepresentations are actionable under ERISA's disclosure obligations, and the type that occurred here are not subject to individualized reliance requirements. In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA participants and

beneficiaries. As noted herein, the power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power.

203.    Defendant further breached its fiduciary duties by failing to apply Plan terms to the computation of benefits and misrepresenting that it would set cost-shares based on provider charges when it did not even have access to such information, or had such information and ignored it.

204.    Defendant further breached its fiduciary duties by failing to follow the claim procedures set forth in the Plans and failing to establish and maintain reasonable claim procedures.

205.    Defendant Cigna failed to adequately monitor the activities of CareCentrix, eviCore, and Linkia — which were authorized to bill patients for services, equipment, products, and supplies provided by providers/vendors in their provider networks — including *inter alia*, failing to monitor the prices charged for healthcare and durable medical equipment provided to Plaintiffs and the ERISA Subclass and permitting and/or participating in the fraudulent billing scheme described herein. As such, Defendant Cigna failed to monitor its appointees, formal delegatees, and informal designees in the performance of its fiduciary duties.

206.    Finally, it is never prudent to require or allow excessive compensation in the context of an ERISA-covered plan. In so doing, Defendant violated its duty of prudence.

207.    Plaintiffs and the ERISA Subclass have been damaged and suffered losses in the amount of the "Spread" compensation Defendant took.

208.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any

losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

209.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409.

210.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

211.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiffs and the ERISA Subclass, including but not limited to:

      (a)    an accounting;

      (b)    a surcharge;

      (c)    readjudication of the claims on which they were overcharged;

      (d)    correction of the transactions;

      (e)    disgorgement of profits;

      (f)    an equitable lien;

      (g)    a constructive trust;

      (h)    restitution;

      (i)    full disclosure of the foregoing acts and practices;

      (j)    an injunction against further violations; and/or

      (k)    any other remedy the Court deems proper.

## COUNT V

### For Violations of RICO, 18 U.S.C. § 1962(c)
### on Behalf of the Class

212.    Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

### General RICO Allegations

213.    Plaintiffs, the Class members, Cigna, and the managers are "persons" within the meaning of RICO, 18 U.S.C. §§1961(3), 1964(c).

214.    At all relevant times, Cigna was associated with separate enterprises consisting of each manager ("Cigna Manager Enterprises").

215.    Managers are each a legal entity enterprise within the meaning of 18 U.S.C. §1961(4).

216.    At all relevant times, each Cigna Manager Enterprise has been engaged in, and its activities affect, interstate commerce within the meaning of RICO, 18 U.S.C. §1962(c).

217.    Cigna is legally and factually distinct from each Cigna Manager Enterprise.

218.    Cigna and each manager are separate and distinct from the pattern of racketeering acts in which the Cigna Manager Enterprises engaged.

219.    Cigna agreed to and did conduct affairs and participate in the conduct of each Cigna Manager Enterprise. Cigna operated and managed the affairs of each Cigna Manager Enterprise through, among other ways, contracts, and agreements through which Cigna was able to and did exert control over the respective managers.

220.    On information and belief, each manager has manuals and written policies that describe the manner in which it processes claims for medically necessary healthcare services and equipment provided to Plaintiffs and Class members in relation to Cigna.

221.     Cigna had the ability to and did in fact direct each Cigna Manager Enterprise to intentionally and/or recklessly misrepresent the cost-sharing amount Plaintiffs and Class members were required to pay to receive medically necessary healthcare services and equipment. Cigna further directed each Cigna Manager Enterprise to collect a specified cost-sharing amount. This specified cost-sharing amount exceeded the amount Cigna had promised Plaintiffs and the Class members they would pay for medically necessary healthcare services and equipment. After Plaintiffs and Class members overpaid for the medically necessary services and equipment, Cigna directed each Cigna Manager Enterprise to return some or all of these funds to Cigna.

222.     As described herein, each manager is a separate legal entity. Their purpose is to provide Plaintiffs and Class members medically necessary healthcare services and equipment in accordance with the terms of their Plans with Cigna. The managers' legitimate and lawful activities are not being challenged in this Complaint.

223.     Cigna, however, also directs each Cigna Manager Enterprise to serve an unlawful purpose; that is, to create a mechanism through which Cigna could obtain additional monies by causing Plaintiffs and Class members overpay for medically necessary healthcare services and equipment. Cigna either received this money directly as a result of the overcharges or indirectly by lowering its expenses in that it pushed the cost of administering the networks onto the Class. This fraudulent billing scheme was not legitimate.

224.     Cigna agreed to and did conduct and participate in the conduct of each Cigna Manager Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally and/or recklessly defrauding Plaintiffs and the Class members. Cigna used each Cigna Manager Enterprise to facilitate their goals of overcharging for medically

necessary healthcare services and equipment, and were unjustly enriched by overcharging for medically necessary services and equipment.

### Predicate Racketeering Acts

225.    As described herein, Cigna directly and indirectly conducted and participated in the conduct of each Cigna Manager Enterprise's affairs through a pattern of racketeering and activity in violation of 18 U.S.C. § 1962(c) for the unlawful purpose of defrauding Plaintiffs and Class members.

226.    Pursuant to and in furtherance of its fraudulent billing scheme Cigna directed each Cigna Manager Enterprise to commit multiple related predicate acts of "racketeering activity," as defined in 18 U.S.C. §1961(5), prior to, and during, the Class Period and continue to commit such predicate acts, in furtherance of its fraudulent billing scheme, including: (a) mail fraud, in violation of 18 U.S.C. §1341; and (b) wire fraud, in violation of 18 U.S.C. §1343.

227.    For instance, as alleged herein, Cigna directed managers to engage in a fraudulent billing scheme to defraud Plaintiffs and Class members. The fraudulent billing scheme entails: (a) Cigna representing to Plaintiffs and Class members through form Plan language that they would pay a certain amount for healthcare services and equipment; (b) Cigna entering into agreements with managers, through which the managers agreed to provide access to the their networks of providers and/or process claims submitted by Plaintiffs and the Class members for medically necessary healthcare services and equipment in accordance with the terms of a particular Plan; (c) the managers' creation of provider networks through which Plaintiffs and Class members could receive medically necessary healthcare services and equipment by way of agreements requiring providers participating in the networks to charge for medically necessary healthcare services and equipment only the amounts specified by the managers; (d) Cigna

Manager Enterprises misrepresenting the correct charge for medically necessary healthcare services and equipment as specified in Plaintiffs' and Class members' Plans, and directing providers participating in the provider networks to collect those improper amounts; (e) Cigna's retention, directly or indirectly,  of a portion of the amounts improperly collected by the managers, in violation of the Plaintiffs' and Class members' Plans with Cigna; and (f) Cigna imposing an agreement (1) barring providers from advising Plaintiffs and Class members that they could pay less for a healthcare service or equipment by purchasing it outside of their respective Plans and (2) barring providers from selling in a transaction that would avoid the overcharge.

228.    Cigna's fraudulent billing scheme includes various misrepresentations and omissions of material fact, including, but not limited to: (a) the representation in the plain form language of the Plans that Plaintiffs and Class members would pay a certain amount for healthcare and  equipment based on the amounts the providers agreed to accept, with contemporaneous knowledge and intent that Plaintiffs and Class members would be charged a higher amount that was not based on the amounts the providers agreed to accept; (b) the failure to disclose that a material portion of the "co-payments" were neither payments for healthcare or equipment nor were they "co-" payments by the patients in conjunction with a payment by the Plans for the healthcare or equipment, as required by the Plans' plain language, but rather were unlawful payments to Cigna; (c) the failure to disclose that payments for healthcare and equipment under deductible portions of health Plans were based on service and equipment prices that were not based on, or exceeded, the contracted fee between managers and the providers, as required by the Plans' plain language; (d) the failure to disclose that co-insurance payments were based on service and equipment prices that were not based on, or exceeded, the contracted fee

between managers and  providers, as required by the Plans' plain language; and (e) the failure to disclose its required agreement (1) barring providers from advising Plaintiffs and Class members that they could pay less for a healthcare service or equipment by purchasing it outside of their respective Plans and (2) barring providers from selling in a transaction that would avoid the overcharge.

229.    In sum, Cigna's fraudulent billing scheme took money from Plaintiffs and Class members through deceit and false pretenses. Cigna intentionally and/or recklessly devised such a fraudulent billing scheme and were knowing and active participants in the scheme to defraud Plaintiffs and Class members. Cigna knew or recklessly disregarded the fact that it overcharged for medically necessary healthcare services and equipment and that it would retain such amounts either directly or indirectly by pushing the cost of its networks on to Class members. Cigna specifically intended to commit fraud, and/or recklessly disregarded the rights of its members, and such intent or recklessness can be inferred from the totality of the allegations herein.

230.    It was and is reasonably foreseeable to Cigna that mail, interstate carriers and wire transmissions would be used—and mail, interstate carriers and wire transmissions were in fact used—in furtherance of the scheme, including but not limited to the following manner and means: (a) whenever a Plaintiff or Class member seeks to receive healthcare services and equipment, the providers participating in the managers' provider networks enter information into a computer and transmit it via interstate mail or carrier and/or wire transmissions to the managers for processing; (b) Cigna and/or managers collecting of "Spread" money takes place via interstate mail or carrier or wire transmissions; (c) Plaintiffs and Class members make payments to managers or providers using credit or debit cards, which require the use of use of interstate wire transmissions; (d) healthcare services and equipment received by Plaintiffs and Class

members through Cigna's fraudulent scheme were delivered by mail or interstate carrier and (e) Cigna's, or managers' representatives communicated with each other by mail, interstate carrier and/or wire transmissions in order to carry out the fraudulent scheme.

231.    Having devised its fraudulent and/or reckless billing scheme , on or about the dates set forth below, Cigna intentionally and/or recklessly transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme.

232.    On or about June 22, 2017, Cigna intentionally directed manager CareCentrix to fraudulently bill Plaintiff Neufeld $25.68 for a "disposable CPAP filter" — *a 342% premium over the actual $7.50 fee* paid to the provider. The statement Cigna directed CareCentrix to deliver was fraudulent because Plaintiff's Plan did not require him to pay that amount and Cigna knew the same.

233.    Plaintiffs Jacques, Marshall, Terry, and Wheatley were likewise overcharged for and misled about the cost of a "disposable CPAP filter." Plaintiff Jacques was charged $51.84 for a "disposable CPAP filter" on August 27, 2018. Plaintiff Marshall was charged $51.84 for a "disposable CPAP filter" on February 14, 2018. Plaintiff Terry was charged $51.36 for a "disposable CPAP filter" on July 20, 2017. Plaintiff Ruthersby was charged $52.86 for a "disposable CPAP filter" on June 27, 2019. Plaintiff Wheatley was charged $51.36 for a "disposable CPAP filter" on February 23, 2017 and again on May 24, 2017.

234.    On or about June 22, 2017, Cigna intentionally directed manager CareCentrix to fraudulently bill Plaintiff Neufeld $147.78 for a "full-face Mirage CPAP/BIPAP mask" — *a 156% premium over the actual $95 fee* paid to the provider. The statement Cigna directed

CareCentrix to deliver was fraudulent because the Plaintiff's Plan did not require him to pay that amount and Cigna knew the same.

235.    Plaintiffs Marshall, Ninivaggi, Terry, and Wheatley were likewise overcharged for and misled about the cost of a "full-face Mirage CPAP/BIPAP mask." Plaintiff Marshall was charged $149.12 for a "full-face Mirage CPAP/BIPAP mask" on February 14, 2018. Plaintiff Ninivaggi was charged $149.12 for a "full-face Mirage CPAP/BIPAP mask" on October 26, 2018. Plaintiff Terry was charged $147.78 for a "full-face Mirage CPAP/BIPAP mask" on July 20, 2017. Plaintiff Ruthersby was charged $152.08 for a "full face Mirage CPAP/BIP mask" on February 6, 2019 and again on June 27, 2019. Plaintiff Wheatley was charged $147.78 for a "full-face Mirage CPAP/BIPAP mask" on February 23, 2017 and again on May 24, 2017.

236.    On or about June 22, 2017, Cigna intentionally directed manager CareCentrix to fraudulently bill Plaintiff Neufeld $37.61 for "CPAP headgear" — *__a 188% premium over the actual $20 fee__* paid to the provider. The statement Cigna directed CareCentrix to deliver was fraudulent because Plaintiff's Plan did not require him to pay that amount and Cigna knew the same.

237.    Plaintiffs Jacques, Marshall, Ninivaggi, and Wheatley were likewise overcharged for and misled about the cost of a "CPAP headgear." Plaintiff Jacques was charged $37.95 for a "CPAP headgear" on August 27, 2018. Plaintiff Marshall was charged $37.95 for a "CPAP headgear" on February 14, 2018. Plaintiff Ninivaggi was charged $37.95 for a "CPAP headgear" on October 26, 2018. Plaintiff Ruthersby was charged $38.70 for a "CPAP headgear" on February 6, 2019. Plaintiff Wheatley was charged $37.61 for a "CPAP headgear" on February 23, 2017.

238.    On or about June 22, 2017, Cigna intentionally directed manager CareCentrix to fraudulently bill Plaintiff Neufeld $24.43 for "CPAP tubing" — *a 175% premium over the actual $14 fee* paid to the provider. The statement Cigna directed CareCentrix to deliver was fraudulent because Plaintiff's Plan did not require him to pay that amount and Cigna knew the same. Through CareCentrix, Cigna later collected the $10.43 overcharge.

239.    Plaintiffs Marshall, Terry, and Wheatley were likewise overcharged for and misled about the cost of a "CPAP tubing." Plaintiff Marshall was charged $24.65 for a "CPAP tubing" on February 14, 2018. Plaintiff Terry was charged $24.43 for a "CPAP tubing" on July 20, 2017. Plaintiff Ruthersby was charged $25.14 for a "CPAP tubing" on February 6, 2019. Plaintiff Wheatley was charged $24.43 for a "CPAP tubing" on February 23, 2017 and again on May 24, 2017.

240.    Plaintiff Wood was likewise overcharged by Carecentrix for CPAP equipment and supplies received from provider MobileCare Medical on or around August 1, 2019. Although the provider, MobileCare Medical, received $690.25 for the equipment and supplies, Carecentrix charged $1,239.72 for this equipment and supplies — *a 79.6% premium over the amount received by the provider*.

241.    Plaintiff Burns was also overcharged by Cigna in connection with his rental of an oxygen concentrator. Prior to being covered by Cigna, Plaintiff Burns was covered by a health plan issued and administered by Harvard Pilgrim Health Care. While covered by his Harvard Pilgrim health plan, Plaintiff Burns was billed directly by the provider Lincare for his rental of the oxygen concentrator. The allowed amount for the monthly rental under the Harvard Pilgrim health plan was $42.90 in each of November and December 2018. Beginning in January 2019, Plaintiff Burns changed health plans was now covered by a Cigna health plan, and Plaintiff Burns

- 73 -

notified his provider that his insurance had changed. Thereafter, Plaintiffs Burns stopped receiving bills directly from Lincare and instead was billed by Carecentrix. The allowed amount for the monthly rental under the Cigna health plan — as billed by Carecentrix was now $176.85 for January 2019 and $180.36 in both February and March 2019 — *a 312% and 320%, respectively, premium over the $42.90 actually charged by Lincare.*

242.     On or about these dates manager CareCentrix sent and received U.S. Mail or interstate wire transmissions in connection with (a) determining whether Plaintiffs and the services or equipment were covered under their Plans and how much they should pay for the service or equipment; (b) invoicing Plaintiffs; (c) processing Plaintiffs' payments for such services or equipment; and (d) processing Cigna's payments to and/or "Spread" from the provider.

243.     The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

244.     Each such use of U.S. Mail and interstate wire facilities as alleged constitutes a separate and distinct predicate act.

245.     The predicate acts were each related to one another in that: (a) Cigna directed managers to undertake each predicate act with a similar purpose of effectuating its scheme to defraud Plaintiffs and Class members; (b) each predicate act involved the same participants – Cigna, which directed managers, CareCentrix, eviCore, or Linkia, to make the fraudulent statements and overcharge Plaintiffs and Class members; network providers/vendors within managers' provider/vendor network, which processed claims and provided services and/or equipment, and Plaintiffs and Class members, who received the fraudulent statements and relied upon them in paying the fraudulent amounts for medically necessary healthcare services and

equipment; (c) each predicate act involved similar victims – Plaintiffs and Class members who purchased or rented medically necessary healthcare services and equipment; and (d) each predicate act was committed the same way – in response to a request from Plaintiffs or Class members (or on their behalf by a physician, hospital discharge planner, or other healthcare professional), to purchase or rent medically necessary healthcare services and equipment, the provider participating in managers' provider network transmitted a request via U.S. Mail or interstate wire to manager; the manager, using the U.S. Mail or interstate wire, responded directing the provider to execute the scheme; and manager later effectuated the "Overcharge Scheme" by using the U.S. Mail or interstate wire to overbill the Plaintiffs or Class members; and (e) the predicate acts could not have been conducted, nor Cigna's scheme effectuated, without the existence and use of the managers.

246.    On information and belief, Cigna conducts such racketeering activity through managers, CareCentrix, eviCore, and Linkia, as an ongoing and regular way of doing business, and continues and will continue to engage in such racketeering activity.

**Injury**

247.    As a direct and proximate result of Cigna's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs and Class members have been injured in their business and property. Plaintiffs and Class members were injured by reason of Cigna's RICO violations because they directly and immediately received through interstate wires or mail a fraudulent demand for payment, incurred a corresponding debt and paid fraudulent charges for medically necessary healthcare services and durable medical equipment. Their injuries were proximately caused by Cigna's violations of 18 U.S.C. §1962(c) because these injuries were the foreseeable, direct, intended, and natural consequence of Cigna's RICO violations (and commission of

underlying predicate acts) and, but for Cigna's RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

248.    Pursuant to RICO, 18 U.S.C. §1964(c), Plaintiffs and the Class members are entitled to recover, threefold, their damages, costs, and attorneys' fees from Cigna and other appropriate relief.

## COUNT VI

### Breach of Contract
### on Behalf of the State Law Subclass

249.    Plaintiff Wheatley incorporates by reference each and every allegation above as if set forth fully herein.

250.    Defendant offered, sold, and administered health insurance policies and ASO policies in all 50 states during the Class Period alleged herein.

251.    The Plans constitute contracts under the laws of each of the states in which they were sold and/or administered, and in all material respects for this action, the Plans are uniform contracts.

252.    The definitions of the terms used in the State Law Subclass members' Plans are materially the same, including, but not limited to, the definitions of the Plan terms such as: "Covered Expense," "Copayment," "Coinsurance," and "Deductible."

253.    Plaintiff Wheatley and the State Law Subclass members are participants in the Plans. Defendant offered and/or administered these Plans either directly or pursuant to delegation from Plan sponsors.

254.    Defendant breached the Plans in each of the fifty states by requiring participants and beneficiaries to pay cost-share amounts in excess of the amounts authorized in the Plans.

255.    Plaintiff Wheatley and the State Law Subclass members have suffered damages as result of Defendant's breaches.

256.    Plaintiff and the State Law Subclass members are entitled to recover damages and other appropriate relief, as alleged below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class and Subclasses, pray for relief as follows as applicable for the particular claim:

A.    Certifying this action as a class action and appointing Plaintiffs and the counsel listed below to represent the Class and Subclasses;

B.    Finding that Defendant is a fiduciary and/or a party in interest as defined by ERISA;

C.    Finding that Defendant violated its fiduciary duties of loyalty and prudence to ERISA Subclass members and awarding Plaintiffs and ERISA Subclass such relief as the Court deems proper;

D.    Finding that Defendant engaged in prohibited transactions and awarding Plaintiffs and the Class and Subclass such relief as the Court deems proper;

E.    Finding that Defendant denied Plaintiffs, the Class, and the Subclasses benefits and their rights under the policies and awarding such relief as the Court deems proper;

F.    Enjoining Defendant from further such violations;

G.    Finding that Plaintiffs and the ERISA Subclass are entitled to clarification of their rights under the Plans and awarding such relief as the Court deems proper;

H.    Awarding Plaintiffs, the Class, and the Subclasses damages, surcharge, and/or other monetary compensation as deemed appropriate by the Court;

I.       Ordering Defendant to restore all losses to Plaintiffs and the Class and Subclasses and disgorge unjust profits and/or other assets of the Plans;

J.       Adopting the measure of losses and disgorgement of unjust profits most advantageous to Plaintiffs and the ERISA Subclass to restore Plaintiffs' losses, remedy Defendant's windfalls, and put Plaintiffs in the position that he would have been in if the fiduciaries of the ERISA Plans had not breached it duties or committed prohibited transactions;

K.       Ordering other such remedial relief as may be appropriate under ERISA, including the permanent removal of Defendant from any positions of trust with respect to the ERISA Plans of the members of the ERISA Subclass and the appointment of independent fiduciaries to serve in the roles Defendant occupied with respect to the ERISA Plans of the ERISA Subclass;

L.       Awarding treble damages in favor of Plaintiffs and the Class members against all Defendant for all damages sustained as a result of Defendant's violations of RICO, in an amount to be proven at trial, including interest thereon;

M.       Awarding Plaintiffs, the Class, and the Subclasses equitable relief to the extent permitted by the above claims;

N.       Awarding Plaintiffs' counsel attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to ERISA § 502(g)(1), 29 U.S.C. 1132(g)(1), and/or the common fund doctrine;

O.       Awarding Plaintiffs' counsel attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to RICO, 18. U.S.C. § 1964(c).

P.      Awarding Plaintiffs, the Class, and the Subclasses their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

Q.      Awarding such other and further relief as may be just and proper, including pre-judgment and post-judgment interest on the above amounts.

### JURY TRIAL DEMANDED

Plaintiffs hereby demands a trial by jury.


Respectfully submitted,


Dated:  March 10, 2020                    */s/ Robert A. Izard*
                                          Robert A. Izard (ct01601)
                                          Craig A. Raabe (ct04116)
                                          Christopher M. Barrett (ct30151)
                                          **IZARD, KINDALL & RAABE, LLP**
                                          29 South Main Street, Suite 305
                                          West Hartford, CT 06107
                                          Telephone: 860-493-6292
                                          Facsimile: 860-493-6290
                                          rizard@ikrlaw.com
                                          craabe@ikrlaw.com
                                          cbarrett@ikrlaw.com

                                          William H. Narwold (ct00133)
                                          Mathew Jasinski, (ct27520)
                                          **MOTLEY RICE LLC**
                                          One Corporate Center
                                          20 Church Street, 17th Floor
                                          Hartford, CT 06103
                                          Telephone: 860-882-1681
                                          Facsimile: 860-882-1682
                                          bnarwold@motleyrice.com
                                          mjasinski@motleyrice.com

                                          Ronen Sarraf
                                          Joseph Gentile
                                          **SARRAF GENTILE LLP**
                                          14 Bond Street, Suite 212
                                          Great Neck, NY 11021
                                          Telephone: 516-699-8890
                                          Facsimile: 516-699-8968

ronen@sarrafgentile.com
joseph@sarrafgentile.com