**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JEFFREY NEUFELD, AUBREY SREDNICKI, KEVIN JACQUES, NICHOLAS MARSHALL, WILLIAM NINIVAGGI, TROY TERRY, JOYCE WOOD, ROBERT BURNS, TIMOTHY RUTHERSBY, and NATHAN WHEATLEY, individually and on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>vs.<br><br>CIGNA HEALTH AND LIFE INSURANCE COMPANY,<br><br>            Defendant. | No. 3:17-cv-1693-KAD<br><br><br><br>June 7, 2021 |

**DEFENDANT CIGNA HEALTH AND LIFE INSURANCE COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND ........................................................................................5

    I.      CIGNA'S PLANS AND PLAN MEMBERS. ...........................................5

    II.     CIGNA'S PROVIDER NETWORK ARRANGEMENTS HELP
          MANAGE PLAN COSTS. .........................................................................6

    III.    CARECENTRIX PROVIDED SERVICES THAT ADDED
          SIGNIFICANT VALUE FOR MEMBERS..............................................7

    IV.    THE CARECENTRIX AND SUBCONTRACTED PROVIDER
          RATES VARIED CLAIM BY CLAIM, BUT BOTH WERE
          OFTEN LESS THAN COMPARABLE MARKET RATES. ...............10

    V.     CIGNA'S PLAN INTERPRETATION WAS CONSISTENT
          WITH ITS REIMBURSEMENT OF CARECENTRIX.......................12

ARGUMENT ..............................................................................................................16

    I.      PLAINTIFFS HAVE FAILED TO PROVE COMMONALITY
          AND PREDOMINANCE BECAUSE OF PLAN VARIATION. .........16

    A.     The Scope of Cigna's Discretionary Authority Varies Plan by Plan....18

    B.     Determining Whether Cigna Abused Its Direction or
          Misrepresented Plan Language Will Require Interpretation of the
          Terms of the Individual Plans. ................................................................19

    C.     Calculating Each Member's Cost Share Will Vary Depending on
          Plan Terms. ...............................................................................................26

    D.     The Court Will Need to Consider the Terms of Cigna's ASO
          Agreements to Determine Plaintiffs' ERISA Claims. ..........................29

    II.     PLAINTIFFS HAVE NOT PROVEN COMMONALITY OR
          PREDOMINANCE BECAUSE THEY FAIL TO SHOW CLASS-
          WIDE INJURY AND DAMAGES. .........................................................31

    A.     Plaintiffs Have Not Shown Class-Wide Injury With Common
          Proof.........................................................................................................31

    B.     Plaintiffs' Supposedly "Simple Formula" Flunks Comcast...................34

III.     THE RULE 23(B)(3) CLASSES CANNOT BE CERTIFIED FOR
         SEVERAL OTHER REASONS. .......................................................................35

   A.    Even if Plaintiffs' "But-For" World Was Valid, Identifying
         Uninjured Class Members and Calculating Damages Will Require
         Individualized Inquiry...............................................................................36

   B.    Individualized Issues of Reliance Will Predominate Plaintiffs'
         RICO and Breach of Fiduciary Duty Claims. ..........................................41

   C.    Plaintiffs Cannot Prove Their ERISA Claims Without
         Individualized Inquiry...............................................................................44

   D.    This Class Action Will Not Be Manageable or a Superior Method. ...................45

IV.      THE ERISA CLASS IS NOT A RULE 23(B)(1) OR 23(B)(2)
         CLASS. ......................................................................................................46

   A.    Rule 23(b)(1) Does Not Apply to Plaintiffs' Gerrymandered
         ERISA Class. ............................................................................................46

   B.    Rule 23(b)(2) Does Not Apply to Plaintiffs' ERISA Class Either. .......................47

V.       PLAINTIFFS HAVE NOT PROVEN ADEQUACY OR
         TYPICALITY. ............................................................................................49

   A.    Plaintiffs Are Not Adequate Because of Intraclass Conflicts. ...............................49

   B.    Plaintiffs' Claims Are Not Typical of Each Other, Let Alone the
         Class. ........................................................................................................49

CONCLUSION........................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*,
   938 F.3d 1170 (11th Cir. 2019) ...................................................48

*In re Aetna UCR Litig.*,
   2018 WL 10419839 (D.N.J. June 30, 2018) ..............................17, 48, 49

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ...........................................................17, 49

*Audet v. Fraser*,
   332 F.R.D. 53 (D. Conn. 2019) ...................................................35

*Barnes v. Am. Tobacco Co.*,
   161 F.3d 127 (3d Cir. 1998) ......................................................48

*Belfiore v. Procter & Gamble Co.*,
   311 F.R.D. 29 (E.D.N.Y. 2015) ...................................................50

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..............................................................15

*Bond v. Marriott Int'l, Inc.*,
   296 F.R.D. 403 (D. Md. 2014) ....................................................47

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639 (2008) ..............................................................41

*CIGNA Corp. v. Amara*,
   563 U.S. 421 (2011) ..............................................................31

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ...............................................................47

*Cohn v. Mass. Mut. Life Ins. Co.*,
   189 F.R.D. 209 (D. Conn. 1999) ..................................................42

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) .........................................................*passim*

*In re Currency Conversion Fee Antitrust Litig.*,
   230 F.R.D. 303 (S.D.N.Y. 2004), *modified on reconsideration*,
   2005 WL 1705285 (S.D.N.Y. July 22, 2005) .......................................24

*Daniel F. v. Blue Shield of Cal.*,
   305 F.R.D. 115 (N.D. Cal. 2014) ................................................................34, 35, 39

*Del Greco v. CVS Corp.*,
   337 F. Supp. 2d 475 (S.D.N.Y. 2004), *aff'd*, 164 F. App'x 75 (2d Cir. 2006) ................45, 50

*In re Digital Music Antitrust Litig.*,
   321 F.R.D. 64 (S.D.N.Y. 2017) ................................................................34

*Edwards v. N. Am. Power & Gas, LLC*,
   2018 WL 3715273 (D. Conn. Aug. 3, 2018) ................................................31

*Elizabeth W. v. Empire Healthchoice Assurance, Inc.*,
   709 F. App'x 724 (2d Cir. 2017) ................................................................18

*Fay v. Oxford Health Plan*,
   287 F.3d 96 (2d Cir. 2002) ................................................................29

*Firestone Tire & Rubber Co. v. Bruch*,
   489 U.S. 101 (1989) ................................................................18, 44

*Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*,
   301 F.R.D. 116 (S.D.N.Y. 2014) ................................................................50

*Franco v. Conn. Gen. Life Ins. Co.*,
   289 F.R.D. 121 (D.N.J. 2013) ................................................................17, 20, 44, 45

*Franco, v. Conn. Gen. Life Ins. Co.*,
   299 F.R.D. 417 (D.N.J. 2014) ................................................................35

*Hall v. LHACO, Inc.*,
   140 F.3d 1190 (8th Cir. 1998) ................................................................49

*Hecht v. United Collection Bureau, Inc.*,
   691 F.3d 218 (2d Cir. 2012) ................................................................47

*Henry v. Champlain Enters., Inc.*,
   445 F.3d 610 (2d Cir. 2006) ................................................................38

*Holmes v. Secs. Inv'r Prot. Corp.*,
   503 U.S. 258 (1992) ................................................................31

*Kelly v. Honeywell Int'l, Inc.*,
   233 F. Supp. 3d 302 (D. Conn. 2017) ................................................................41

*In re LIBOR-Based Fin. Instr. Antitrust Litig.*,
   299 F. Supp. 430 (S.D.N.Y. Feb. 28, 2018) ................................................................43

*Lipstein v. UnitedHealth Grp.*,
  296 F.R.D. 279 (D.N.J. 2013) ............................................................19

*In re Literary Works in Elec. Database Copyright Litig.*,
  654 F.3d 242 (2d Cir. 2011)............................................................49

*Local 1522 of Council 4 v. Bridgeport Health Care Ctr., Inc.*,
  2018 WL 1419792 (D. Conn. Mar. 21, 2018) ........................13, 46, 47

*Marcucci v. N.Y. Dist. Council of Carpenters Welfare Fund*,
  2001 WL 1356190 (S.D.N.Y. Nov. 5, 2001).......................................45

*McLaughlin v. Am. Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008), *abrogated on other grounds by Phoenix Bond*,
  533 U.S. 639 .....................................................................................41

*McNair v. Synapse Grp. Inc.*,
  672 F.3d 213 (3d Cir. 2012)............................................................48

*N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*,
  798 F.3d 125 (2d Cir. 2015)............................................................30

*Negron v. Cigna Health and Life Insurance Co.*,
  2021 WL 2010788 (D. Conn. May 20, 2021) ............................. *passim*

*Noah U. v. Tribune Co. Med. Plan*,
  138 F. Supp. 3d 1134 (C.D. Cal. 2015) ............................................29

*Novella v. Westchester Cty.*,
  661 F.3d 128 (2d Cir. 2011)............................................................16

*O'Shea v. Littleton*,
  414 U.S. 488 (1974)........................................................................48

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  993 F.3d 774 (9th Cir. 2021) .....................................................36, 38

*Peters v. Aetna Inc.*,
  2019 WL 1429607 (W.D.N.C. Mar. 29, 2019)............................. *passim*

*Peters v. Aetna, Inc.*,
  2019 WL 4440200 (W.D.N.C. Sept. 16, 2019) .......................13, 15, 32

*Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*,
  654 F.3d 618 (6th Cir. 2011) ..........................................................30

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013) .........................................................31

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   934 F.3d 619 (D.C. Cir. 2019) .................................................................36, 37, 38

*In re Rezulin Prods. Liab. Litig.*,
   210 F.R.D. 61 (S.D.N.Y. 2002) ...............................................................................48

*Schalit v. Cigna Life Ins. Co. of N.Y.*,
   539 F. Supp. 2d 715 (S.D.N.Y. 2008)......................................................................30

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
   806 F.3d 71 (2d Cir. 2015).......................................................................................41

*Spann v. AOL Time Warner, Inc.*,
   219 F.R.D. 307 (S.D.N.Y. 2003) .............................................................................45

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
   445 F.3d 311 (4th Cir. 2006) ...................................................................................48

*Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*,
   17 F.3d 38 (2d Cir. 1994) ........................................................................................30

*In re U.S. Foodservice Inc. Pricing Litigation*,
   729 F.3d 108 (2d Cir. 2013)...............................................................................42, 43

*US Airways, Inc. v. McCutchen*,
   569 U.S. 88 (2013)...................................................................................................29

*Valley Drug Co. v. Geneva Pharm., Inc.*,
   350 F.3d 1181 (11th Cir. 2003) ...............................................................................49

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)....................................................................................... *passim*

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
   2014 WL 6888549 (C.D. Cal. Sept. 3, 2014) ...................................................17, 20

*Wood v. Prudential Ret. Ins. & Annuity Co.*,
   2017 WL 3381007 (D. Conn. Aug. 4, 2017) .....................................45, 46, 49, 50

**Statutes**

ERISA § 502(a)(1)(B)..............................................................................................30, 34

**Other Authorities**

Fed. R. Civ. P. 23 ............................................................................................... *passim*

# INTRODUCTION[1]

This putative class action challenges Cigna's use of a third party, CareCentrix, to provide home health services, home infusion services, and durable medical equipment ("DME") to Cigna plan members. For over two decades, CareCentrix saved millions of dollars in healthcare costs for both ERISA plan sponsors (who typically pay claims from their own bank accounts) and Cigna plan members (who typically pay for a portion of their medical care costs through co-insurance and deductibles). CareCentrix did so by not only arranging cost-effective service through subcontracts with healthcare professionals—frequently at lower rates than Cigna would have obtained by contracting with them directly—but also by implementing various cost-saving programs, like steering members to lower-cost settings when appropriate, and coordinating post-discharge care so that members could leave the hospital sooner.

The Cigna-CareCentrix relationship led to substantial medical cost savings for employer-sponsored health plans, their members, and other Cigna customers—roughly *$1 billion* from 2011 to 2016 alone. Cigna was often able to pass down those savings directly to members—for instance, cutting costs for sleep tests by over half between 2016 and 2018. The savings for each individual varied across the universe—depending on the type of healthcare services received, their plan's particular benefits (*e.g.*, how much their plan agreed to pay and how much their plan required the individual to pay for coinsurance, deductibles, and copays, if any), their plan's written terms describing the benefits the plan provided, the subcontractor used, and more. Thus, depending on the particular circumstance, Cigna may pay CareCentrix more or less than what CareCentrix pays the subcontracted provider even though the member (and plan) saved money overall.

---

[1] "Motion" or "Mot." refers to Plaintiffs' Motion for Class Certification (Dkt. 154), "Mem." refers to Plaintiffs' Memorandum in Support (Dkt. 155), and "Ex." refer to exhibits to the Declaration of Warren Haskel filed with this Opposition. Unless otherwise noted, emphasis is added, and internal quotations, alterations, and citations are omitted.

Plaintiffs challenge this arrangement, contending that their cost-share should always be based on the ***lower*** of the rate that Cigna negotiated with CareCentrix (the "Cigna-CareCentrix Rate") or the rate that CareCentrix negotiated with its subcontracted providers (the "Subcontracted Rate"). Two other courts recently considered near-identical ERISA and RICO putative class actions. Both denied class certification, for two different reasons.

The first was another case against Cigna, decided just two weeks ago in *Negron v. Cigna Health and Life Insurance Co.*, No. 3:16-cv-1702 (D. Conn.). *See* 2021 WL 2010788 (D. Conn. May 20, 2021). There, plan members (represented by the same counsel as here) challenged how Cigna calculated cost-share for prescription drugs received through pharmacy benefit managers ("PBM"), arguing they should have been charged based on the pharmacy-PBM rate instead of the sometimes-higher PBM-Cigna rate. Just like here, the *Negron* plaintiffs proposed a simplistic class that swept in any member whose plan had three particular provisions, and where the member's co-payment or deductible exceeded the pharmacy rate. *Id.* at *2-3. But as *Negron* recognized, this class definition ignored various ***other*** provisions in Cigna-serviced plans that impacted how much the member would have paid for each drug—which is the real issue the Court must decide. *Id.* at *21-23. Given these plan variations, the Court found that the plaintiffs could not demonstrate commonality or predominance because "there are material differences in language among the thousands of health plans at issue in this action that govern whether the plaintiffs have suffered the same injury or any injury at all." *Id.* at *1.

Another court analyzed very similar claims arising out of another payor's (Aetna) use of a vendor (Optum) for chiropractors and physical therapists in *Peters v. Aetna Inc.*, 2019 WL 1429607 (W.D.N.C. Mar. 29, 2019). There, too, an ERISA plan member contended that her cost-share should always be based on the lower of the Aetna-Optum rate or the Optum-downstream

provider rate. *Id.* at *4. *Peters* rejected that theory, finding it presented an "impossible" but-for world that contemplated Aetna could have obtained Optum's lower rates with its downstream providers even though Optum and its services were removed from the Aetna-Optum-members relationship—a hypothetical "contrary to all economic logic." *Id.* at *6. *Peters* also denied class certification because the plaintiff did not separate out economic winners and losers—that is, uninjured members who actually benefited from the challenged conduct by paying less as a result of the specialty vendor being involved, or those who paid more on some individual claims but then had that overcharge balanced out by undercharges on their *other* claims. *Id.* at *7.

Either of the rationales in *Negron* or *Peters* is enough to preclude class certification. The proposed class here flunks both. <u>First</u>, Plaintiffs cannot show commonality or predominance because, just like in *Negron*, there are material variations in plan provisions that govern claim reimbursement—both in the three plan provisions on which Plaintiffs focus, and also in *other* provisions that Plaintiffs ignore. (Sec. I.) As in *Negron*, these variations "require reference to plan language outside of the Class language that will control whether and how much any Class member has overpaid." *See Negron*, 2021 WL 2010788, at *18. And here, too, the fact that these variations "require individual-specific reference to terms in the plans . . . defeat any assertion of commonality." *See id.* at *21; *see also id.* at *22 (same for "predominance").

<u>Second</u>, Plaintiffs' but-for world is the same mythical Shangri-La that *Peters* rejected. Plaintiffs assume that Cigna would have obtained the lower rates that CareCentrix negotiated with subcontracted providers even if CareCentrix was removed from the equation. This makes no economic sense as an intuitive matter. And an empirical analysis done by Cigna's economic expert confirms that intuition, showing that a majority of putative class members enjoyed *lower* CareCentrix rates compared to the median rate that Cigna negotiated with other network providers.

Third, Plaintiffs' problem is even more acute than in *Peters* because they have made no effort to address proof of class-wide injury. The plaintiff in *Peters* at least offered an expert damages model that tried to exclude uninjured members. Here, Plaintiffs offer **no model at all**, instead asserting that they can sort out winners and losers using a "simple formula" based on "claims data." (Mem. at 16-17.) Such bald promises do not meet Rule 23. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013) (plaintiffs must establish "through evidentiary proof" that injury and damages are "capable of measurement on a classwide basis.").

Plaintiffs here also run into the same winners-and-losers problem as in *Peters*, and the individualized inquiry that will be necessary to identify injured class members and to calculate their damages. They ignore that many putative members are **better off** compared to the but-for world. For example, 7-9% of all members had at least one claim where the CareCentrix Rate was **lower** than the Subcontracted Rate. Plaintiffs also ignore that up to 22% of members hit their out-of-pocket maximums, and that any reductions in cost-share for CareCentrix claims would have been canceled out by cost-share increases for subsequent non-CareCentrix claims—meaning they paid the same amount they would have in Plaintiffs' but-for world and thus were uninjured.

The flaws with Plaintiffs' proposed class do not end there. Below, Cigna details additional problems that preclude certification, including: (1) Plaintiffs' breach of fiduciary duty and RICO claims are premised on supposed misrepresentations in Cigna's plan language, but the named Plaintiffs testified they never read their plan booklets, let alone relied on any supposed misrepresentations (an analysis that would require individualized inquiry); (2) Plaintiffs have not shown that this class action will be manageable or superior to other methods of adjudication given the overwhelming number of individualized inquiries; (3) Plaintiffs' ERISA liability theory runs afoul of Rule 23(b)(1) because it leaves out the "winners" who would be harmed and bound by

4

having to pay higher cost-share based on the Subcontracted Rates; (4) Plaintiffs' Rule 23(b)(2) class fails for the same reasons as their Rule 23(b)(1) class, but also because Plaintiffs are all former plan members who lack standing for prospective injunctive relief, and because their request for retrospective relief—asking Cigna to reprocess claims at Subcontracted Rates—is really a thinly-disguised bid for monetary damages; and (5) Plaintiffs cannot meet Rule 23(a)'s adequacy and typicality requirements because of intra-class conflicts.

For these reasons, and others below, Plaintiffs' Motion should be denied.

## FACTUAL BACKGROUND

### I.   Cigna's Plans and Plan Members.

Cigna both insures and administers health plan benefits for employers and individuals. (Ex. 1, Expert Report of Dr. Daniel Kessler ("Kessler") ¶ 17.) When Cigna insures a benefits plan, individuals covered by the plan (the plan members) and/or their employers pay Cigna a premium, and Cigna is financially responsible for paying the members' claims for covered services. (*Id.* ¶ 16.) These are called fully-insured plans. (*Id.*) More often, however, the employer, not Cigna, funds the plan, so the employer is financially responsible for paying claims, and Cigna provides administrative services only, like processing benefit claims and handling claim appeals. (*Id.* ¶ 17.) Self-funded plans make up approximately 85% of Cigna's business. (*Id.*)

Regardless of the plan funding type, a core principle of managed care is to control overall costs for plans and plans members, rather than just focusing on limiting costs for a particular claim. To that end, Cigna works with plans to provide options for members to receive high quality healthcare at affordable costs. (Ex. 4, Manely Tr. 104:2-6.) One way in which plans manage costs is by only covering expenses for certain services. (Kessler ¶ 15.) Plans may also cover only "in-network" services received from providers that accept discounted rates in exchange for being part of Cigna's network. (*Id.* ¶¶ 18-19.) Plans also limit the amounts that they pay for covered services

to the plan's "allowed amount." (*Id.* ¶ 15.) The in-network allowed amount is generally the rate that Cigna negotiates with its network providers; for out-of-network services, the plan may limit payment through a referenced schedule, such as a percentage of Medicare. (*See id.* ¶¶ 18-19.)

Finally, plans typically manage costs by requiring members to pay a portion of the allowed amount for covered services. Member cost-sharing responsibility may include copayments (a fixed amount), coinsurance (a percentage of the allowed amount), and deductibles (a fixed amount paid before coinsurance). (*Id.* ¶ 15.) To limit members' cost-burden, plans cap member cost-sharing responsibility at an annual out-of-pocket maximum, after which the plan bears all cost for covered expenses. (*Id.* ¶ 15.) These benefits and terms vary from plan to plan, as set out in the benefit booklets plan sponsors provide to members, including the amount of deductibles, coinsurance percentages, and out-of-pocket maximums based on network status. *See infra* Sec. I.C.

## II.     Cigna's Provider Network Arrangements Help Manage Plan Costs.

As explained above, one way in which Cigna's plans manage costs is through discounted rates that Cigna negotiates with healthcare providers, known as "participating" or "network" providers. (Kessler ¶¶ 18-19.) Network providers accept these negotiated rates in exchange for access to Cigna plan members at in-network benefit levels. (*Id.*) For instance, Plaintiff Ninivaggi's plan required members to pay 30% of the cost for home health care from network providers, but 50% of the cost toward a claim for home health care from an out-of-network provider. (Ex. 5, CIGNA_NEUFELD00309990 at -011.) Network providers must also accept the plan's allowed amount in full; no such cap exists for out-of-network providers, which can charge members whatever they choose. (Kessler ¶ 20.) These financial incentives encourage members to see network providers, so network providers see a greater volume of Cigna members. (*Id.* ¶ 18.)

Plaintiffs posit that Cigna must have a direct contract with every provider in its network, and then base cost-share calculations on that contracted rate. But provider contracting is not one-

size-fits-all. (*Id.* ¶ 24.) For instance, Cigna may individually contract with a health professional or facility. (*Id.*) Cigna may also contract with a health system, which includes a regional or national network of hospitals, surgical facilities, and clinicians. (*Id.* ¶ 25.) Or Cigna may contract with entities like laboratories, which may subcontract with other laboratories for more esoteric tests. (*Id.*) Similarly, Cigna may contract with a third-party organization, which in turn subcontracts with individual health professionals to provide services to Cigna's members. (*Id.* ¶ 24.) Examples include independent practice associations ("IPAs"), physician staffing firms, outpatient service firms, physical rehabilitation systems, and vendors that specialize in an area of care, such as medical imaging, chiropractic, or physical therapy ("specialty care vendors"). (*Id.* ¶ 25.)

Health services companies like Cigna are increasingly relying on specialty care vendors because these organizations' expertise and scale can help save people and plans money and improve medical outcomes for patients. (*Id.* ¶ 29.) In addition to the procedure-based services that these organizations' subcontracted providers provide, specialty care vendors (like other third party organizations) typically provide additional services for plans and plan members, such as managing utilization to ensure services are medically appropriate, monitoring patient adherence to treatment plans, and credentialing subcontracted providers. (*Id.* ¶¶ 27, 42-45.) Specialty care vendors may also provide services to subcontracted providers, including medical training and education assistance, records administration, and collection of member cost-share. (*Id.*)

## III.    CareCentrix Provided Services That Added Significant Value for Members.

CareCentrix is a specialty care vendor that served as Cigna's national provider for home health, home infusion, and durable medical equipment during the putative class period. By contracting with CareCentrix, Cigna provided members with access to the more than 9,000 suppliers and health professionals that subcontracted with CareCentrix. (Ex. 6, CIGNA_NEUFELD00451026 at -028.) The rates that CareCentrix negotiated were also heavily

discounted from their subcontracted providers' billed charges. (Ex. 2, Expert Report of Dr. Sean May ("May") ¶ 29 (estimating that members would have paid over ███████ more if they had paid the subcontracted providers' undiscounted charges rather than the amounts owed under their benefit plans).) In addition, CareCentrix offered numerous value-add services that varied by member. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

CareCentrix also provided valuable services to its subcontracted providers, including collecting member cost-share. As explained above, before satisfying the plan's deductible, a member pays the entire allowed amount, and after that the member typically pays coinsurance until hitting the plan's out-of-pocket maximum. ██████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████

███████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████

By 2016, Cigna estimated that the relationship saved roughly *$1 billion* over five years. (Ex. 9, CIGNA_NEUFELD00695142 at -058.) CareCentrix's sleep program is a key example of how CareCentrix achieved this result. In 2013, Cigna engaged CareCentrix to manage members' sleep therapy services. (Ex. 4, 121:19-122:7; Ex. 10, CIGNA_NEUFELD00045054 at -055-056.)

Key to the success of this program, CareCentrix determined when members could be redirected from more costly sleep tests in provider offices to less costly home tests, as well as ways to reduce the overall cost of sleep equipment. (Ex. 10, at -055-056.) CareCentrix also employed respiratory therapists to monitor adherence and compliance with use of sleep equipment. (*Id.* at -056, -058-059.) These therapists would monitor Cigna members' progress in using the equipment, and let them know if they were meeting their therapy goals. (*See* Ex. 11, CCX Neu 001800.)

Before engaging CareCentrix for its sleep program, Cigna estimated that the program would save plans and members 40% to 50% on the nearly $160 million in annual costs for sleep services, with projected savings of $290 million over a five-year period. (Ex. 10, at -055, -070). And the sleep program ultimately delivered those savings. (*See* Ex. 12, CIGNA_NEUFELD00023012 at -014 (explaining that the sleep program delivered "a total of $242 million in savings over four (4) years and a total net savings of $95 million from February 2016-January 2017").)

The savings from CareCentrix's sleep program flowed down directly to Cigna members. As Cigna's expert Prof. Daniel Kessler explains, sleep tests cost $2,232 per tested participant at the start of the program; the cost fell to $1,018 by 2016-2018, a decrease of 54.3%. (Kessler ¶ 76.) CareCentrix reduced the overall cost of sleep services from $651 per member at the beginning of the program to $582 per member by 2018, a decrease of 10.6%. (*Id.* ¶ 77.) Overall, this translated to millions of dollars in savings for Cigna members and plans. (*Id.* ¶ 78; Ex. 6, at -037 ("significant cost savings" from home sleep program "deeply felt by self-funded groups as home study is SIGNIFICANTLY more cost effective.").)

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ That arrangement
benefited plans and members, since the more effective that CareCentrix was at reducing costs, the
less members paid for sleep services and equipment. (*See* Kessler ¶¶ 72-74.)

CareCentrix's sleep program was only one of the many services that CareCentrix provided
to Cigna members. ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ As with the sleep program, CareCentrix bundled the charges
for its home health services into its procedure-based rates, even though not every service aligned
with a specific procedure code. (*See* Kessler ¶¶ 54-57.)

## IV.   The CareCentrix and Subcontracted Provider Rates Varied Claim By Claim, But Both Were Often Less than Comparable Market Rates.

As explained above, Cigna negotiated rates with CareCentrix based on the total value of
services that CareCentrix provided, not the individual services or supplies that CareCentrix's
subcontracted providers delivered. In turn, like many IPAs, CareCentrix individually negotiated
its own rates with each subcontracted provider on a fee-for-service basis. (*Id.* ¶ 47.) ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

Plaintiffs' challenge focuses on the difference (what they call the "spread") between the CareCentrix Rate and the Subcontracted Rate.[2] For any individual claim, ████████

████████████████████████████████████████████████████████████████████████

████████ ; that, in addition to taking on member cost-share collection, was part of the risk that CareCentrix took on. Indeed, Dr. May's expert analysis shows that the Subcontractor Rate exceeded the CareCentrix Rate for more than 190,000 transactions over the putative class period. In fact, Dr. May estimates that between 7-9% of members with copayment, deductible or co-insurance claims had at least one such claim. (May ¶ 93.)

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Just as important, the CareCentrix Rate was often lower than Cigna's negotiated rate with other network providers. As Prof. Kessler concluded, this means that for many HCPCS codes associated with Plaintiffs' claims, a majority of putative class members benefited from the CareCentrix Rates relative to the median Cigna network rate that they would have paid to another Cigna network provider. (Kessler ¶¶ 69-71.) Prof. Kessler also found instances in which Cigna received a lower rate through CareCentrix than it was able to get when Cigna had directly negotiated with the same health professional. (*Id.* ¶ 66.)

There are several reasons why subcontracted providers often accept lower rates from CareCentrix than what they may have accepted from Cigna. ████████████████████████

---

[2] Plaintiffs' complaint also alleges that Cigna received some kind of clawback with respect to the compensation it paid to CareCentrix. (Dkt. 130 ¶ 23.) The Motion makes no mention of this, ████████████████████████
████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████ CareCentrix

subcontracted providers recognized this was a huge benefit. (*See* Ex. 13, 50:25-51:19 (agreeing it

is a "significant benefit to [provider's] business" that CareCentrix assumes risk of collection

member cost share); Ex. 15, Sweet Tr. at 76:11-21 (agreeing CareCentrix's services "saves the

costs of the customer pay department").) █████████████████████████

██████████████████████████████████████████████████████

███████████████████████

██████████████████████████████████████████████

████████████████████████████████████████ For example,

Mobilcare, which was the CareCentrix-subcontracted provider that supplied Plaintiff Wood with

sleep equipment, also had a direct contract with Blue Cross Blue Shield of Tennessee

("BCBSTN"). (Ex. 16, Gutknecht Tr. 130:10-21.) Mobilcare's rates with BCBSTN were all higher

than the rates it negotiated with CareCentrix. (*Id.*, 131:19-132:13.) And the rates that CareCentrix

charged Cigna and the rates Mobilcare charged to BCBSTN were at least comparable, with the

CareCentrix rates being ***lower*** in some cases despite the fact that CareCentrix was providing

several types of services that Mobilcare did not. (*Compare* Ex. 17, CIGNA_NEUFELD00771839

at -841 (█████ CareCentrix charge to Cigna for E0601, which is a CPAP machine), *with* Ex. 18,

MOBILCARE0000014 at -015 (█████ Mobilcare charge to BCBSTN for E0601).)

## V.    Cigna's Plan Interpretation Was Consistent with Its Reimbursement of CareCentrix.

Because plan language varies from plan to plan, Plaintiffs have tried to isolate members

covered by plans that contained the same three provisions: a term that a member "may be required

to pay a portion of the Covered Expenses," and the same definitions of "Covered Expenses" and

"Charges." (Mot. at 3-4.) As explained in Section I below, Plaintiffs cannot avoid plan variation

by simply excerpting three provisions from benefit booklets that contain scores more, because it is a tenet of ERISA that the plan must be read as a whole.

In any event, Cigna's plan language supported Cigna's calculation of member cost-share using the CareCentrix Rate. (Ex. 19, Jameson Tr. 56:4-57:4.) Plaintiffs' subset of plans define "Covered Expenses" as "the expenses incurred by or on behalf of a person for the charges listed below if they are incurred after he becomes insured for these benefits." (*E.g.*, Ex. 20, CIGNA_NEUFELD00000625 at -653.) The definition of "charges" is "[t]he term 'charges' means the actual billed charges; except when the provider has contracted directly or indirectly with Cigna for a different amount." (*Id.* at -692.)

For decades, Cigna has interpreted the "charge" to be the CareCentrix Rate, since that rate is the only contractual rate negotiated "with Cigna." As explained above, this reflects Cigna's view that CareCentrix is the "provider" of the services (Ex. 21, Beard Tr. 9:9-11 ("CareCentrix is a national provider that we've contracted that does home health and DME and home infusion services"), which is consistent with the terminology in the industry (Kessler ¶ 26), and the definition of "Participating Provider" in these plans, which includes "*any . . . health care* practitioner or *entity* that has a *direct* or indirect *contractual arrangement with Cigna* to provide covered services . . . ." (Ex. 20, at -696); *see also Peters v. Aetna, Inc*., 2019 WL 4440200, at *5 (W.D.N.C. Sept. 16, 2019) [hereinafter "*Peters II*"] (in a case where plaintiff sought to use subcontracted provider rate to calculate patient responsibility, holding that the specialty care vendor was the provider under the plan language because it was the only entity with a contract *with Aetna*). Plaintiffs' plans also afford Cigna the discretion to "interpret and apply plan terms" including the "computation of any and all benefit payments." (Ex. 20, at -688.) As explained *infra* Sec. I.A, that discretion is afforded significant weight under the law.

In contrast, Plaintiffs argue Cigna must interpret the "charge" to be the Subcontracted Rate if it is lower than the CareCentrix Rate. (Mem. at 1-2.) To start, Plaintiffs have not pointed to any language suggesting that they can pick the lesser of the CareCentrix Rate or the Subcontracted Rate. If being consistent, Plaintiffs' liability theory would require Cigna to calculate member cost-share solely on the Subcontracted Rate, but that would mean the putative class would include people who even by Plaintiffs' admission were not injured.

Even in its gerrymandered state, Plaintiffs' theory has no basis in the economics or industry practice—as Prof. Kessler explains, health services companies like Cigna commonly calculate cost-share on rates that include services other than just the specific procedure code billed, which makes economic sense given that plans are designed to have members share in the ultimate cost of their services to align their economic incentives with their plans. (Kessler ¶¶ 37-40.) In fact, basing cost-share on the value-based payment is an approach that has been explicitly adopted by Medicare in some circumstances. (*Id.* ¶ 33, 36.) It also logistically necessary, since the administrator may not know the rates of a subcontracted provider to calculate cost-share. (Kessler ¶ 37.) That was true in this case. (Ex. 4, 73:2-5; *id.*, 74:13-24.)

Plaintiffs' interpretation also has no basis in Cigna's contracts with CareCentrix. Cigna only negotiated a rate with CareCentrix; it was not a party to the contracts between CareCentrix and its subcontracted providers, ███████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████ In fact, Cigna did not know what rates CareCentrix negotiated with its providers. (Ex. 4, 74:13-24.) Plaintiffs thus have no basis to say that CareCentrix's subcontracted providers had contracted rates "with Cigna," as their plans require.

Unable to find any evidence to support their theory, Plaintiffs instead point to two state regulatory inquiries from California and New Jersey to argue that Cigna improperly interpreted its plan language because CareCentrix was not a "provider." (Mem. at 4-6.) As an initial matter, Cigna's interpretation is still appropriate even if CareCentrix was not the provider, because CareCentrix's subcontracted providers indirectly contract to provide services to Cigna members at the rates that CareCentrix negotiates "***with Cigna***." *See Peters*, 2019 WL 4440200, at *5.[3]

The two regulatory inquiries are also irrelevant to whether CareCentrix is a provider under the definition in Cigna's plans. The California Department of Managed Healthcare ("DMHC") inquired whether CareCentrix itself had a license under California law to provide home health care. (Ex. 19, 48:2-13.) This inquiry had nothing to do with Cigna's plan language. (*Id*., 74:15-24 ("[W]e never received a request … to enhance our [plan] definitions.").) Plaintiffs latch on to a line in Cigna's response to the DMHC to suggest that Cigna admitted that CareCentrix does not provide any services to Cigna members. (Mem. at 4.) The context shows this was a reference to ***licensed*** provider services (Ex. 4, 181:25-182:6), ████████████████████████ ████████████████████████████████████████████ Tellingly, the DMHC took no further action, nor requested any changes to the relationship. (*See* Ex. 19, 74:15-24.)

The second inquiry is just as irrelevant. In 2011, the New Jersey Department of Banking and Insurance ("NJ DOBI") conducted an inquiry into American Specialty Health (a chiropractic vendor not at issue in this case) based on state-specific regulations for what are called organized delivery systems ("ODS"). As part of that inquiry, Cigna supplemented the definition of "charges"

---

[3] Plaintiffs' Motion quotes portions of Cigna's motion to dismiss to suggest that CareCentrix does not qualify as a provider under Cigna's plans. (Mem. at 2-3.) But under Rule 12, Cigna had to accept Plaintiffs' allegations as true, including its allegation that CareCentrix was not the provider for Plaintiffs' claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Of course, that is not the standard under Rule 23, which requires a "rigorous analysis." *Comcast*, 569 U.S. at 33.

for New Jersey fully-insured, small group plans—but, at the request of NJ DOBI, the change was limited to **only** chiropractic services and was specific to NJ DOBI's interpretation of state law. (Ex. 24, CIGNA_NEUFELD00853524 at -525; Ex. 25, DiRienzo Tr. 95:18-20.)

Most telling, CareCentrix is also a licensed ODS in the state (Ex. 23, 63:2-14), but NJ DOBI has not sought to implement similar changes applicable to CareCentrix. In fact, no other regulatory body asked Cigna to change its relationship with CareCentrix or its plan language. (Ex. 19, 74:15-24; *see also* Ex. 25, 60:23-25.) ██████████████████████

████████████████████████████████████████████

████████████████████████████████ which clearly treated CareCentrix as a network provider.

## ARGUMENT

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast*, 569 U.S. at 33. To come within the exception, it is "well-established" that "a plaintiff must satisfy all of the requirements of Rule 23, by a preponderance of the evidence, to obtain class certification." *Novella v. Westchester Cty.*, 661 F.3d 128, 148-49 (2d Cir. 2011). This includes the four factors in Rule 23(a) and "at least one of the provisions of Rule 23(b)." *Comcast*, 569 U.S. at 33.

Plaintiffs seek to certify their ERISA class under Rules 23(b)(1), b(2), and b(3), and their RICO class under only (b)(3). None is viable. Plaintiffs fail to show the class meets the Rule 23(a) factors of typicality, adequacy, and commonality as well.

## I.   PLAINTIFFS HAVE FAILED TO PROVE COMMONALITY AND PREDOMINANCE BECAUSE OF PLAN VARIATION.

Plaintiffs seek to certify two (b)(3) classes, but they claim both turn on one common question: whether Cigna violated plan terms "by charging members inflated cost shares." (Mem.

at 1.) "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original). "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* Likewise, Rule 23(b)(3)'s predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). This requires a "close look at whether common questions predominate over individual ones." *Comcast*, 569 U.S. at 34.

In sprawling, nationwide health benefits class actions, like this one, courts have repeatedly found that material variations in benefit plan language are the exact kind of dissimilarity that defeats commonality and predominance. *See, e.g.*, *Negron*, 2021 WL 2010788, at *21 ("[T]he number of variations among the specific plans identified by Cigna and the fact that they require individual-specific reference to terms in the plans outside the Class definition defeat any assertion of commonality across the ERISA Class and Subclass."); *In re Aetna UCR Litig.*, 2018 WL 10419839, at *14 (D.N.J. June 30, 2018) ("[T]he varied nature of the [plan] terms poses insurmountable odds against class certification."); *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 2014 WL 6888549, at *12 (C.D. Cal. Sept. 3, 2014) (commonality and predominance factors not met because "Plaintiffs have not shown that the relevant terms of Wellpoint's plans are common across the [class], or that the Court can determine [Wellpoint's] obligations under those plans on a classwide basis without engaging in a plan-by-plan analysis."); *Franco v. Conn. Gen. Life Ins. Co.*, 289 F.R.D. 121, 136-37 (D.N.J. 2013) (denying ERISA and RICO class certification on predominance grounds because "variations in plan language" precluded plaintiffs from showing "that a common abuse of discretion analysis could be applied classwide").

The most recent of these was *Negron*, in which Cigna plan members challenged how much they paid for services provided by PBMs—as opposed to CareCentrix—based on the same class theory that Plaintiffs offer here: Cigna should have based member cost-share on the PBMs' rates with pharmacies, rather than Cigna's rates with the PBMs. And in *Negron*, like here, Plaintiffs premised their simplistic class definitions on just three pieces of plan language. In reviewing Cigna's plans, however, Judge Meyer recognized that there were "material differences in language among the thousands of health plans at issue." 2021 WL 2010788, at *1. Critically, he found it was necessary to make "individual-specific reference to terms in the plans outside the Class definition," in order to interpret the meaning of the plan, which "defeat[s] any assertion of commonality." *Id.* at *21. The same is true in this case.

### A.     The Scope of Cigna's Discretionary Authority Varies Plan by Plan.

As a threshold issue, Plaintiffs have not shown that the standard of review for Cigna's plan interpretation can be determined on a class-wide basis. When an ERISA plan "gives [its] administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," a court must review a denial of benefits under an "arbitrary and capricious" standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 114-15 (1989). But determining whether the plan has provided such discretionary authority requires individualized inquiry into the terms of the plan because a plan may confer discretion in different ways, and there are no "magic words" required to warrant arbitrary and capricious review. *Elizabeth W. v. Empire Healthchoice Assurance, Inc.*, 709 F. App'x 724, 726 (2d Cir. 2017).

Judge Meyer flagged the variation of Cigna's plan language with respect to discretion as an issue in *Negron*, although he did not need to reach it because of other variation among the plans. As in that case, many of Cigna's plans here vested Cigna with discretionary authority to interpret the plan (*see, e.g.*, Ex. 20, at -688), but some limited that authority (s*ee, e.g.*, Ex. 26,

CIGNA_NEUFELD01032716 at -721, -805, -890), so determining the extent of Cigna's discretionary authority will require individualized review. This variation is the kind that courts have found defeats class certification, even before getting to material differences in plan terms. *See Lipstein v. UnitedHealth Grp.*, 296 F.R.D. 279, 290 (D.N.J. 2013) ("where [an administrator] enjoyed different amounts of discretion" it "could yield a kaleidoscope of 'yeses' and 'nos' across the class" and thus precludes class certification.)

### B.   Determining Whether Cigna Abused Its Direction or Misrepresented Plan Language Will Require Interpretation of the Terms of the Individual Plans.

In this case, Plaintiffs purport to build their class around Cigna's "uniform Plan language" (Mem. at 1) by pointing to three pieces of plan language: (1) a member "may be required to pay a portion of the Covered Expenses"; (2) "The term Covered Expenses means the expenses incurred by or on behalf of a person for the charges listed below if they are incurred after he becomes insured for these benefits"; and (3) "The term 'charges' means the actual billed charges; except when the provider has contracted directly or indirectly with Cigna for a different amount." (Mot. at 2-3). Using these three pieces of language, Plaintiffs argue that members are "required . . . to pay a cost share that was a 'portion' of 'Covered Expenses,'" which are based on the "charges" of the subcontracted providers, not CareCentrix. (Mem. at 1-2.)

But Plaintiffs cannot escape the material variation in the plans at issue by cherry-picking these three terms. As Judge Meyer observed, "ERISA plans are essentially contracts, and courts use familiar rules of contract interpretation when addressing an ERISA plan." *Negron*, 2021 WL 2010788, at *14 (quoting *Lifson v. INA Life Ins. Co. of N.Y.*, 333 F.3d 349, 353 (2d Cir. 2003)). "One such well-established rule is that" the court "must read a plan as a whole, [and] giv[e] terms their plain meanings." *Id.* (quoting *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002)). "[C]ourts properly refuse to certify breach of contract class actions where the claims require

examination of individual contract language" material to the breach. *Id*.

Here, there are several variations in plan language and design that will prevent Plaintiffs from answering the central question for each of their claims. *See id*. *15-*22; *WellPoint*, 2014 WL 6888549, at *20 (no certification "due to the variations among WellPoint's ERISA plans"); *Franco*, 289 F.R.D. at 135, 144 ("The critical liability questions presented by the ERISA claims depend on plan language, and "[t]he plans are necessarily at the root of the [RICO] claims").

**The "Charges" Referred to in "Covered Expenses"**: The linchpin of Plaintiffs' case is what the term "charges" means under Cigna's plans, and Plaintiffs rely solely on how "charges" is defined in the "Definitions" section at the back of named Plaintiffs' and other Cigna plans. While Plaintiffs' interpretation of that language is wrong, *see supra* Background Sec. V, it is also too narrow, because that "charges" definition is not the only place in the plan that explains the meaning of "charges." In fact, the "Covered Expenses" provision—of which Plaintiffs only quote a fragment of a sentence—defines the "charge" for each "Covered Expense" under the plan. (*See, e.g.*, Ex. 20, at -653-663 ("The term Covered Expenses means the expenses incurred by or on behalf of a person for ***the charges listed below***" and going on to describe the "charges" covered under the plan).) Plaintiffs also omit language stating that what is and is not a "Covered Expense" is "determined by Cigna." (*Id.*) These omissions are significant because the "Covered Expenses" section describes the "charges" for "Durable Medical Equipment," and "charges" for "Home Health Services" (*id.* at -658-661)—just to name two sections relevant to CareCentrix services provided to members of the class. Moreover, these provisions vary from plan to plan and materially impact the interpretation of the term "charges" for each plan.

Take for example the "Durable Medical Equipment" section of the "Covered Expenses" provision, which is present in all of the named Plaintiffs' plans. This provision states that "Covered

Expenses" for DME are "***charges*** made for purchase or rental of Durable Medical Equipment that is ordered or prescribed by a Physician and provided by a ***vendor approved by Cigna*** for use outside a Hospital or Other Health Care Facility." (*See, e.g.*, *id.* at -660.) Plaintiffs' motion makes much of the fact that Cigna called CareCentrix a "vendor" (Mem. at 2), but Plaintiffs merely highlight that for DME—which underlie ***all*** of named Plaintiffs' claims—the "charge" that is a "Covered Expense" of which members must pay a "portion" is the one from the "vendor approved by Cigna."[4] This can only be CareCentrix. This language clearly supports Cigna's interpretation that the CareCentrix "charge" is the "charge" for "Covered Expenses" relating to DME. Plaintiffs cannot excise this definition of "charges" relating to DME from the plan and it must be considered in the adjudication of Cigna's plan interpretation.

The problem for Plaintiffs is that other plans that would fall within their class definitions have variations of this "vendor approved by Cigna" language, or do not have it at all. (*Compare* Ex. 27, CIGNA01192417 at -442 ("[C]harges made for the purchase or rental of Durable Medical Equipment that ***is ordered*** or prescribed ***by a provider*** and provided by a ***vendor approved by Cigna***."); *with* Ex. 28, CIGNA01393837 at -868 ("[C]harges made for purchase or rental of Durable Medical Equipment for use outside a Hospital or Other Health Care Facility. . . ."). Then there are plans that address the "charges" for specialized kinds of DME outside of the "Durable Medical Equipment" section. (Ex. 29, CIGNA09584175 at -203 (in the "Home Health Services" section, noting that "medical supplies, appliance and equipment" provided as part of a home health visit or home-infusion covered "only to the extent such charges would have been considered Covered Expenses had a person required confinement in the Hospital as a registered bed patient

_____

[4] As explained *infra*, the use of the term vendor is also consistent with Cigna's agreements with self-funded plan sponsors (called "ASO agreements").

or confinement in a Skilled Nursing Facility."); Ex. 30, CIGNA00812883 at -908 ("Diabetes Equipment and Supplies" addressed in the "Diabetes" section); Ex. 31, CIGNA11119315 at -345 ("charges for Durable Medical Equipment related to diabetes" in general "Covered Expenses" section).) The analysis for these plans would be entirely different than the analysis for the named Plaintiffs' plans and alone represent the type of material variation that defeats class certification. *See Negron*, 2021 WL 2010788, at *21; *Wellpoint*, 2014 WL 68885479 at *6-7.

But on top of this, a significant portion of members in Plaintiffs' putative classes received Home Health or Home Infusion services, not DME like Plaintiffs. The interpretation of their plans would not turn on the "Durable Medical Equipment" definition of "charges" at all. Instead, those plans would be impacted by an entirely different definition of "charges" within "Covered Expenses"—for "Home Health Services"—that requires an entirely different interpretative analysis. For instance, the Home Health Services definition of "charges" may not reference a "vendor," like the DME language, or a "provider," like the "charges" definition Plaintiffs rely on, but have varying definitions all turning on a member's need for healthcare at home. (*Compare* Ex. 29, at -203 (defining "Covered Expenses" as "charges made for Home Health Services under the terms of a Home Health Care Plan established within 14 days after the date Home Health Care begins" and including list of Home Health Services that are "Covered Expenses"), *with* Ex. 20, at -658 ("charges made for Home Health Services when you: require skilled care; are unable to obtain the required care as an ambulatory outpatient; and do not require confinement in a Hospital or Other Health Care Facility").[5] So while the named Plaintiffs' DME claims might turn on whether Cigna appropriately based cost-share on the CareCentrix rate as the "vendor approved by Cigna,"

---

[5]  For Home Health Services, certain CareCentrix services also potentially fall under "Short Term Rehabilitation," which has its own "charges" definition. (Ex. 32, CIGNA00940023 at -042 ("Short-Term Rehabilitative Therapy services provided in the home *are not* subject to the Home Health Services benefit limitations").)

its analysis would turn on different considerations for unnamed plan members' home health and infusion claims. That too defeats class certification. *See Negron*, 2021 WL 2010788, at *21; *Wellpoint*, 2014 WL 68885479 at *6-7.

**The "Charges" Definition**: Plaintiffs also ignore variations in other sections of plans that may inform the definition of "charges" they rely on. For example, two named Plaintiffs' plans— Terry and Burns—contained language in another section that state, "[i]f Cigna contracts with an entity to arrange for the provision of Covered Services through that entity's contracted network of health care providers, the amount that Cigna has agreed to pay that entity is the allowable amount used to determine your coinsurance or deductible payments." (Ex. 33, CIGNA_NEUFELD00771513 at -560.) This language is significant because, even if Plaintiffs' theory that CareCentrix is not the "provider" under their plans is right (Mem. at 1-2)—which it is not (*supra* Background Sec. V)—this language makes clear that when an entity "arrange[s] . . . through that entity's contracted network of health care providers," that entity's "charge" should be used for the purposes of calculating cost-share and deductibles—*i.e.*, the CareCentrix Rate, not the Subcontracted Rate. Plaintiffs make no effort to identify which plans contain this language, but that is a crucial consideration for deciding the ERISA and RICO claims.

Plaintiffs also make much of the plan language change as a result of the NJ DOBI inquiry into ASH. Cigna proposed language that generally applied to all vendors, but NJ DOBI determined the clarification applied only to ASH under NJ law, so Cigna tailored the definition to chiropractic services for these New Jersey small-group plans. Plaintiffs ignore that, at minimum in light of this history and clarifying language, these plans would require a completely different, state-specific analysis than Plaintiffs' own plans even if they all fall within Plaintiffs' class definitions.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████   So Plaintiffs'

attempt to pull state regulatory inquiries into Cigna's interpretation of "charges" sets up a state-by-state inquiry into whether CareCentrix fell within the definition of "provider." *Cf. In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 311-12 (S.D.N.Y. 2004), *modified on reconsideration*, 2005 WL 1705285 (S.D.N.Y. July 22, 2005) (where "the laws of all fifty states would need to be applied" for common law claims, finding predominance defeated). These plans will present a different interpretative analysis than a plan without the chiropractic clarification.

**<u>The "Portion" Clause:</u>** As with their flawed interpretations of the "Covered Expenses" and "Charges" language, Plaintiffs incompletely interpret the language that a member "may be required to pay a portion of the Covered Expenses." For example, as Judge Meyer recognized in *Negron*, what exactly the "portion" is varies plan by plan; it can include a "Copayment" or "Deductible" or "Co-insurance," some combination of the three, or something else entirely. *Compare Negron*, 2021 WL 2010788, at *20 *with* (Ex. 20, at -639 ("portion" is "Copayment, Deductible or Coinsurance"); Ex. 34, CIGNA_NEUFELD01033215 at -236 at ("portion" is "the Coinsurance"); Ex. 35, CIGNA02661640 at -649 ("portion" is "the Deductible or Coinsurance"); Ex. 36, CIGNA08149826 at -837 ("portion is "the Coinsurance Amount, Deductible or Coinsurance").)

As Judge Meyer explained, that means Plaintiffs cannot interpret the "portion" clause in isolation, because the language often requires "reference to other parts of the plan" like the definitions of "Copayment," "Deductible" or "Coinsurance." *See Negron*, 2021 WL 2010788, at *20-*21. And these definitions vary in material ways. For instance:

- Plaintiffs key their interpretation off the terms "Covered Expenses," and "charges," but Plaintiff Neufeld's own plan does not refer to either term in the definitions of "Copayments" and "Deductibles."[6] Thus, Plaintiffs' "uniform" interpretation of "charges" and "Covered Expenses" does not apply to these cost-share types in Plaintiff Neufeld's plan.

- This is true for other plans that Plaintiffs include in their putative classes. For instance, some plans state that "Copayments are *expenses* to be paid by you or your dependent for *the services received*." (*See, e.g.*, Ex. 37, CIGNA01795266 at -278.) As explained above (Background Sec. III), CareCentrix provided a wide array of services to Cigna members that were part of the CareCentrix Rate; while Plaintiffs argue these are not "Covered Expenses," (Mem. at 6, n.4), these plans tie copayments or deductibles to "services received" or "expenses," not "Covered Expenses," so they will require a different analytical framework than what Plaintiffs argue should apply to their class.

- Some plans define "Coinsurance" based on "Covered Expenses" or "charges" but expressly state that it will be based on what *Cigna* pays (*i.e.*, the CareCentrix Rate). For instance, the Law Offices of Peter G. Angelos plan specifically states that coinsurance will be a percentage of the amount "*that is paid by Cigna*." (Ex. 38, CIGNA08908635 at -647.) The Metropolitan Nashville plan similarly states that "your Co-insurance *will be based upon the same dollar amount of payment that CIGNA HealthCare uses to calculate its portion of the claims payment* to the Hospital or other Providers." (Ex. 39, CIGNA01259006 at -015.)

- Other plans key "Co-insurance" off something other than "charges" or "Covered Expenses," including by simply referencing "expenses" and "allowables," or cap the amount a member

---

[6] *Compare* Ex. 20, at -639 ("Copayments are *expenses* to be paid by you or your Dependent for *covered services*. Deductibles are also *expenses* to be paid by you or your dependent."), *with id.* ("The term Coinsurance means the *percentage of charges for Covered Expenses* that an insured person is required to pay under the plan").

may owe. (Ex. 28, at -906 ("expenses"), Ex. 40, CIGNA00712095 at -106 ("average cost ").)

Ultimately, as Judge Meyer explained, "it is plaintiffs who bear the burden of satisfying Rule 23(a)'s threshold requirements, including that of commonality." *Negron*, 2021 WL 2010788, at *21. It is "not Cigna's burden to disprove it." *Id.* But Plaintiffs offer no evidence that the terms of the plans they seek to include in their classes are actually uniform, nor do they offer any methodology whatsoever for identifying plans that contain this supposedly "uniform" language.

The sample of plans discussed above shows no such uniformity exists. And as Judge Meyer observed, the Court cannot just "take plaintiffs' word that other variations do not exist in all the other thousands of plans that fall under the Class . . . definitions." *Id*. Like in *Negron*, Plaintiffs' supposed "uniform" plan language actually presents a "whack-a-mole approach" to plan interpretation that "is not tenable" for adjudication at class certification. *Id*. "[I]t is holes with moles all the way down." *Id.*

## C.     Calculating Each Member's Cost Share Will Vary Depending on Plan Terms.

In addition to the variation in plan definitions, Plaintiffs also cannot show uniformity across how members' cost-share are calculated. Plaintiffs state that the "principal common question at the center of this litigation" is "whether Cigna's systematic calculation of cost shares" based on the CareCentrix Rate violated members' plans. (Mem. at 3.) But as Judge Meyer found in *Negron*, "variations in how each Class . . . member's cost-share payment is calculated . . . would be material," such that "[i]f the plans provide for different methods or means of calculating that amount—rather than a single method or means," then denial of certification is appropriate. *Negron*, 2021 WL 2010788, at *15. And just like in *Negron*, there is nothing "systematic" about the calculation of cost shares for Plaintiffs' putative classes, 2021 WL 2010788, at *15, because there is no "single method or means" for calculating a member's cost share across all of Cigna's plans. (May ¶¶ 38-40); *see also Negron*, 2021 WL 2010788, at *15 ("some of the plans whose language

meets the Class . . . definition" in this case "also have other provisions that may impact the calculation of what members should have paid.").

As an initial matter, none of the Plaintiffs have copayment claims, and none of their plans requires DME or home health copays. In contrast, some plans for putative class members have specific DME copays, but these plans vary in dollar amount, when the copay applies, what services it applies to, and how any additional cost-share is calculated. (*See, e.g.*, Ex. 41, CIGNA01316565 at -581 ("[n]o charge after $75 per item copay," with the further note that the "$75 copay" is "per item, per month"); Ex. 32, at -773 ($75 per item copay for DME, without per month, per item requirement, but also calls for a 10% coinsurance payment from the member after they meet their deductible); Ex. 43, CIGNA01198322 at -339 ("[n]o charge after the $50 per office visit copay"); Ex. 44, CIGNA07948174 at -199 ("$20 per day copay").)

Moreover, Plaintiffs do not explain how a member with a copayment claim could have been injured under their theory if copayments are fixed fees—the member would owe the same amount regardless of the difference in the CareCentrix Rate and Subcontracted Rate. (May ¶ 61.) For Plaintiffs' theory to work, their theory would have to be that members owe the lesser of the relevant copayment amount from the plan's Schedule and the Subcontracted Rate. (*Id.*) Even with that assumption, however, Dr. May shows scenarios where a member would not actually pay less under Plaintiffs' theory. (*Id.* ¶ 64 (showing claim of a member with a $25 copay, where the CareCentrix Rate was higher than the Subcontracted Rate, but both were higher than the $25 copay).) And Dr. May also provides other examples of how changing the copayment then impacts the member's deductible and co-insurance payments, resulting in four different calculations of cost-share for members who received the same services at the same CareCentrix and Subcontracted

Rates. (*Id.* ¶ 67.) This is precisely the kind of variation that Judge Meyer found was not a "single method or means" for calculating cost share. *See Negron*, 2021 WL 2010788, at *15-*17.

The issue goes beyond just copayments. Other plans have benefit-specific deductibles for DME that are different from the plan deductible in the Schedule. (*See, e.g.*, Ex. 45, CIGNA01213074 at -091 ("$300 DME deductible per Calendar Year, then 90% after plan deductible"); Ex. 46 CIGNA08293057 at -068, -073 ("$200 DME deductible per Contract Year, then 100%" compared to $400 plan deductible). Likewise, plans have benefit-level deductibles for Home Health Services too. (Ex. 47, CIGNA03561786 at -804 ("Regardless of the Individual Plan Deductible, the Home Health Care Deductible will not exceed $50."); Ex. 48, CIGNA00710272 at -287 ("75% after the $50 Home Health Care deductible").) And many plans have separate copayments for Short Term Rehabilitation, which would include speech therapy, occupational therapy, and physical therapy provided in the home. (Ex. 49, CIGNA00703526 at -541 ("No charge after the $20 PCP or $30 Specialist per office visit copay" with a note that "Outpatient Short Term Rehab copay applies, regardless of place of service, including the home").)

On top of this, plans may have: (i) deductible levels that vary based on the type of insured (Ex. 50, CIGNA01232753 at -766); (ii) different deductible carry-over periods (Ex. 51, CIGNA00694025 at -036); and/or (iii) different methods for accumulating deductibles and out-of-pocket maximums. (*Compare* Ex. 52, CIGNA_NEUFELD009755886 at -902 (deductibles and out-of-pocket maximums do not cross-accumulate across in- and out-of-network services) *with* Ex. 53, CIGNA00690810 at -821 *&* Ex. 54, CIGNA01431532 at -540 (plans with different kinds of cross-accumulation).) Determining a member's deductible or coinsurance payment based on a different rate (*i.e.*, the Subcontracted Rate) could require consulting all, some, or none of these

provisions. It would depend on the plan year, the member's other claims, and the in-/out-of-network break-down of those claims—none of which could be determined on a class-wide basis.

Ultimately, what this list of variables proves is that the proposed class members' cost-share "can only be determined by consulting varying terms of individual plans." *Negron*, 2021 WL 2010788, at *15. Thus, "there is no common question" and class certification is inappropriate. *Id.*

### D.     The Court Will Need to Consider the Terms of Cigna's ASO Agreements to Determine Plaintiffs' ERISA Claims.

Plaintiffs also ignore the impact that Cigna's ASO agreements with self-funded plan sponsors will have on the evaluation of Plaintiffs' claims. For instance, many of Cigna's ASO agreements with plan sponsors disclosed that Cigna could calculate benefits using "fee-for-service charges for various vendors and other providers/arrangers of health care services" like CareCentrix. (Ex. 55, CIGNA_NEUFELD00774307 at -325.) This disclosure tracks the "vendor" language in the "Durable Medical Equipment" definition of "charges" described above, further supporting Cigna's interpretation of the "charges" definition to mean the CareCentrix Rate.

Plaintiffs cannot simply ask the Court to ignore ASO agreements because they contain terms outside a member's plan benefit booklet. "Courts construe ERISA plans, as they do other contracts, by looking to the terms of the plan *as well as to other manifestations of the parties' intent*." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 89 (2013); *see also Fay*, 287 F.3d at 104 (holding that the Court would have to "look to the language of the policy and other indicia of the intent of the policy's creator."). This includes ASO agreements. *See Noah U. v. Tribune Co. Med. Plan*, 138 F. Supp. 3d 1134, 1146 (C.D. Cal. 2015) (discussing administrative services contracts "as a means of interpreting the written language of the Plan Documents").

Some plans also state that Cigna's actions will directed or governed by ASO agreements. (Ex. 39, at -011 (coverage decisions "based on the terms of this Plan" and "the ASA"); Ex. 56,

CIGNA07268887 at -906 (Cigna will apply "coverage as directed by the Plan Administrator, through an administrative agreement with the University").) For these plans—which Plaintiffs make no effort to identify—the Court will need to refer to the ASO agreements, because Cigna could not have abused its discretion or breached its fiduciary duties if it was acting in accordance with these agreements. *Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*, 17 F.3d 38, 45 (2d Cir. 1994) ("[I]n exercising [contractual] right[s], [a party] cannot be said to have acted in bad faith.").

Just as important, Cigna's relationship with each plan varies, and Cigna's duties and its discretion will turn on the terms of its ASO agreements. *See Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 631 (6th Cir. 2011) (denying Rule 23(b)(3) class because different administrative services agreements established different functions and responsibilities). For example, for self-funded plans subject to ERISA, Cigna is not a proper defendant under ERISA § 502(a)(1)(B) when it does not "exercise[] total control over claims for benefits under the terms of the plan." *See N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*, 798 F.3d 125, 132 (2d Cir. 2015). "Total control" occurs when the administrator had "'sole and absolute discretion' to deny benefits" and "ma[de] 'final and binding' decisions as to appeals of those denials.'" *Id.* For some plans within the ERISA class definition, Cigna does not exercise such control. (*See, e.g.*, Ex. 26, at -790.) Plaintiffs make no effort to identify these plans.[7]

---

[7] Even before the Court can address whether Cigna abused its discretion under ERISA, it will need to determine whether each plan is subject to ERISA. *See Schalit v. Cigna Life Ins. Co. of N.Y.*, 539 F. Supp. 2d 715, 717 (S.D.N.Y. 2008). Plaintiffs suggest that they intend to rely on unidentified "records" regarding whether ERISA governs a particular plan (Mem. at 14 & n.6), but those notations are not determinative. *See Schalit*, 539 F. Supp. 2d at 717. Nor are they necessarily reliable. (May ¶ 43 & n.42 (noting that City of Gary health plan, Ex. 57, CIGNA08885899, which would not be an ERISA plan, shows an "Y" ERISA indicator in the transaction data).)

## II.   PLAINTIFFS HAVE NOT PROVEN COMMONALITY OR PREDOMINANCE BECAUSE THEY FAIL TO SHOW CLASS-WIDE INJURY AND DAMAGES.

Putting aside the variation of the plan terms for the thousands of plans at issue in this litigation, Plaintiffs also cannot show that the "hundreds of thousands" of Cigna members comprising their classes were actually harmed. Nor do Plaintiffs offer a methodology that attempts to ascertain what Cigna members might be owed or how their damages can be calculated on a class-wide basis. Plaintiffs' Motion should be denied for this independent reason.

### A.   Plaintiffs Have Not Shown Class-Wide Injury With Common Proof.

Proving injury is a requirement of Plaintiffs' ERISA and RICO claims. *See CIGNA Corp. v. Amara*, 563 U.S. 421, 444 (2011) (ERISA plaintiff seeking monetary relief must "show . . . actual harm"); *Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 279 (1992) (Congress limited "RICO's civil remedies to those who have suffered injury in fact."). The commonality requirement of Rule 23(a)(2) requires that "there are questions of law or fact common to the class," but relevant here, "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Dukes*, 564 U.S. at 345; *Edwards v. N. Am. Power & Gas, LLC*, 2018 WL 3715273, at *7 (D. Conn. Aug. 3, 2018) (same). And proving injury with common evidence is required to show predominance under Rule 23(b) as well. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013) (under predominance factor, "the common evidence" must "show all class members suffered some injury.").

"[D]etermining the existence of an economic harm and the magnitude of such harm depends on properly defining the 'but-for world.'" *Peters*, 2019 WL 1429607, at *6. In this case, Plaintiffs premise their ERISA and RICO classes on the theory that putative class members were injured because Cigna calculated their cost-sharing responsibility based on the CareCentrix Rate,

not the Subcontracted Rate. (Mot. at 2-3.) Plaintiffs' "but-for" world of receiving the Subcontracted Rates is wrong for two reasons.

First, Plaintiffs' but-for world is inconsistent with plan language. Plaintiffs assume putative class members had the right to pay their cost share based on the Subcontracted Rate even though Cigna's contract is with CareCentrix. But this assumption makes no sense. Plaintiffs' plans define the charges on which their responsibility is based on the rate that "the provider has contracted directly or indirectly **with Cigna**" (Ex. 33, at -579), and the only rate that Cigna negotiated was with CareCentrix; Cigna had no right to avail itself of the Subcontracted Rates. In fact, this is the situation addressed by the *Peters* court**,** which held that Aetna could not have abused its discretion by calculating member cost-share on its rate with Optum, rather than Optum's subcontracted providers. *See Peters II*, 2019 WL 4440200, at *5. The court held this was "the only reasonable interpretation of the relevant contracts" because "Aetna had no contracts with Optum's [downstream providers]," and "Optum provided the network of therapists to Aetna members." *See id.* at *5. So too with Cigna and CareCentrix.

Second, the *Peters* court also held that Plaintiffs' but-for world never existed as a matter of basic economics. Like this case, the plaintiff there contended that her cost-share should always be based on the lower of the Aetna-Optum rate or the Optum-subcontracted provider rate. *Peters*, 2019 WL 1429607, at *4. But the Court found that the plaintiff's proposed but-for world was "impossible" because it contemplated that Optum was removed from the Aetna-Optum-members relationship, but that Aetna would have somehow **still** obtained the lower downstream rates that Optum provided—a hypothetical that was "contrary to all economic logic." *Id.* at *6. "Either the services provided by Optum would have to have been provided (by someone) for no charge or the downstream providers would have continued to charge Aetna the higher rates." *Id.*

That is why the correct but-for world is not one where putative class members received the Subcontracted Rates, but one where Cigna individually contracted with each subcontracted provider. (Kessler ¶ 62); *see also Peters*, 2019 WL 1429607, at *7. But in that world, at least some plan members would have paid more in cost-share than they did based on the CareCentrix Rates.

In fact, Prof. Kessler's analysis shows that Cigna's median contracted rates with its network providers were often ***higher*** than Cigna's rates with CareCentrix, let alone the Subcontracted Rates. (Kessler ¶¶ 70-71.) There are also examples of providers that directly contracted with Cigna, and their rates went ***down*** when they subcontracted with CareCentrix, meaning members were charged ***less*** based on the CareCentrix Rate than under the provider's prior contracted rate with Cigna. (*Id.* ¶ 66.) That makes economic sense, given that CareCentrix provided several services, including collecting cost share, that saved subcontracted providers money. *Supra* Background Sec. IV. The result: one of named Plaintiffs' suppliers, Mobilcare, had much higher contracted rates through a direct contract with Blue Cross Blue Shield than its contracted rate with CareCentrix. *Supra* Background Sec. IV.

Moreover, by forgoing the CareCentrix relationship in the proper but-for world, members and plans would pay more for the care that Plaintiffs would have received. CareCentrix's sleep program, for example, cut sleep test costs in half, and reduced the cost of sleep equipment by 10%. (Kessler ¶¶ 76-77.) As Prof. Kessler explains, the millions of dollars in savings achieved through this program overwhelm any alleged "overcharges" a plan member would have experienced even where a CareCentrix Rate was higher than the Subcontracted Rate. (*Id.* ¶ 78.) That includes Plaintiff Terry, who ended up saving $288.92. (*Id.* ¶ 81.) Thus, the but-for world without these savings is one where putative class members lose. *See Peters*, 2019 WL 1429607, at *7.

So not only have Plaintiffs not met their burden to show a but-for world in which all putative class members would benefit, but the record shows the opposite: at least some putative class members would have paid more. No class can be certified as a result. *See id.*

### B.   Plaintiffs' Supposedly "Simple Formula" Flunks *Comcast*.

Plaintiffs also offer no evidence that they can calculate damages on a class-wide basis. "[I]t is incumbent upon Plaintiffs, not Defendants, to present a damages model that can be used on a class-wide basis based on common proof." *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 78 (S.D.N.Y. 2017); *see also Comcast*, 569 U.S. at 33-34 (plaintiffs must establish "through evidentiary proof" that damages are "capable of measurement on a classwide basis."). Plaintiffs' class damages theory also "must be consistent with its liability case." *Comcast*, 569 U.S. at 35.

Plaintiffs fail to meet this burden for two reasons. <u>First</u>, Plaintiffs assert that damages can be calculated using their "simple formula" and that there is "claims data" to determine a member's damages. (Mem. at 16-17.) But the Supreme Court in *Comcast* rejected that "at the class certification stage *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary," because that would render "Rule 23(b)(3)'s predominance requirement to a nullity." 569 U.S. at 36. Here, Plaintiffs offer no expert or model proving they can actually calculate class-wide damages; for that reason alone, they fail to satisfy *Comcast*.

Moreover, in cases where benefit plan members have sought money damages, like this one, plaintiffs cannot meet their burden under *Comcast* unless they can show how damages can be calculated class-wide with **evidence**. *See Daniel F. v. Blue Shield of Cal.*, 305 F.R.D. 115, 130 (N.D. Cal. 2014) (denying class certification of ERISA § 502(a)(1)(B) claim; finding plaintiffs failed to satisfy *Comcast*). Like Plaintiffs here, the plan member in *Daniel F.* argued "(without proof) that damages" under ERISA could be "calculated based on information obtained from Blue Shield's records, or on the application of Blue Shield's own claims processing procedures." *Id.*

The court found this was insufficient because Plaintiffs "have presented no model establishing that damages are capable of measurement on a classwide basis." *Id.* at 130-31. So too here.

Trying to defend their "simple formula," Plaintiffs cite pre-*Comcast* cases suggesting that their burden to show class-wide damages is light. (Mem. at 16-17.) But that is not the law now. *See Comcast*, 569 U.S. at 35 (the court must conduct a "rigorous analysis" of the evidence). And the one post-*Comcast* case that Plaintiffs cite was a securities fraud case where the plaintiffs put in expert reports based on damages methodologies approved by other courts. *See Audet v. Fraser*, 332 F.R.D. 53, 74 (D. Conn. 2019). Plaintiffs, in contrast, have not disclosed a single expert, let alone served a report that might pass muster under *Daubert*.

<u>Second</u>, Plaintiffs offer no evidence how their class definitions and "simple formula" are consistent with their theory of liability. Plaintiffs' liability theory depends on a single plan interpretation that Cigna must calculate member cost-share on Subcontracted Rates, not the CareCentrix Rate; to be valid, Plaintiffs' theory must apply to ***all*** plan members, not just to those members who would benefit under Plaintiffs' theory because the Subcontracted Rates were lower. But that is exactly what Plaintiffs' class definitions and simple formula try to do; their class-wide damages theory fails as a result. *See Franco*, *v. Conn. Gen. Life Ins. Co.*, 299 F.R.D. 417, 430 (D.N.J. 2014) [hereinafter "*Franco II*"] (denying class certification in part because of "a disconnect between plan language and the method proposed by Subscriber Plaintiffs to determine the class members' damages in a cohesive manner").

## III.   THE RULE 23(B)(3) CLASSES CANNOT BE CERTIFIED FOR SEVERAL OTHER REASONS.

The commonality and predominance issues that precluded class certification in *Negron* and *Peters* are just some of the hurdles that Plaintiffs face. Others include individualized issues of injury, damages, and reliance that pose problems for both predominance and manageability.

35

**A.      Even if Plaintiffs' "But-For" World Was Valid, Identifying Uninjured Class Members and Calculating Damages Will Require Individualized Inquiry.**

"Without common proof of injury and causation . . . plaintiffs cannot establish predominance." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 623 (D.C. Cir. 2019) [hereinafter "*Rail Freight II*"]. "When considering if predominance has been met, a key factual determination courts must make is whether" Plaintiffs' class "sweeps in uninjured class members." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774, 791 (9th Cir. 2021). "If a substantial number of class members in fact suffered no injury, the need to identify those individuals will predominate." *Id.*; *see also Peters*, 2019 WL 1429607, at *9 ("A proposed class challenging conduct that did not harm—and in fact benefitted—some proposed class members fails to establish the commonality required for certification," let alone predominance.) Predominance is also not met if "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Comcast*, 569 U.S. at 34.

Here, even if Plaintiffs' but-for world was valid, the individualized inquiry needed **to** determine whether a putative class member was uninjured, and their damages if they were, would overwhelm any common issues. <u>First</u>, Plaintiffs do not factor in the savings from the CareCentrix relationship or what this means on a member-by-member basis. But even named Plaintiffs' experience shows that such inquiry is necessary. In Plaintiff Terry's case, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, saving Mr. Terry $1,306.25. (Kessler ¶¶ 80-81.) After accounting for Mr. Terry's cost share, Mr. Terry ended up saving $288.92 for his services overall, even when taking into the supposed "overcharge" he received on the equipment he received through CareCentrix. (*Id.*)

So even if Plaintiffs were right about the but-for world, Mr. Terry was a net ***winner***, and not harmed. *See Peters*, 2019 WL 1429607, at *8 (finding that, when considering the plaintiffs'

36

entire claims history, "[t]he Plaintiff benefited from the Agreements, even using [expert's] flawed definition of injury based on his economically unrealistic 'but-for world'"). And as Prof. Kessler explains (Kessler ¶¶ 82-84), identifying other "winners" will require significant individualized inquiry. *Rail Freight II*, 934 F.3d at 624-25 ("Uninjured class members cannot prevail on the merits" and because some putative class members had not been injured—"all of [those putative class members] would need individualized adjudications of causation and injury.").

Second, Plaintiffs do not account for Cigna members with claims that were both economic "winners" and "losers" under Plaintiffs' theory. This phenomenon occurs because the CareCentrix Rate is not always higher than the Subcontracted Rate, so member cost share would be lower when based on the CareCentrix Rate than it would be based on the Subcontracted Rate. In fact, 7% to 9% of putative class members had "winners" claims. (May ¶ 93.)

Plaintiffs have not put in any evidence to show how they would actually exclude these "winners." Prof. Kessler shows an example of a plan member who had one claim where their cost-share was ███ *lower* using CareCentrix Rate, and three claims that were ███ higher, totaling ███. (Kessler ¶ 89.) On balance, the member came out ███ *ahead*. (*Id.*) But because Plaintiffs' proposed class only counts the negative claims, this member would have purported damages of ███, even though the member would actually have no interest in having their plan adopt Plaintiffs' interpretation. (*Id.*) Determining if the 7% to 9% of members like this one were actually injured, and what their damages would be, would require significant individualized inquiry. (May ¶¶ 93-94); *Peters*, 2019 WL 1429607, at *7 ("Without considering the entirety of a participant's claim history for the entire year, a participant who, over the history of his or her claim history benefited from the Agreements, would be incorrectly classified as having been harmed."); *see also*

*Henry v. Champlain Enters., Inc*., 445 F.3d 610, 624 (2d Cir. 2006) ("The aim of ERISA is to make the plaintiffs whole, but not to give them a windfall.").

Third, Plaintiffs ignore that the interplay between members' co-insurance, deductibles, and out-of-pocket maximums likewise mean that certain members suffered no injury. For example, Plaintiff Jacques paid a supposed "overcharge" on his first claim for CareCentrix in 2016 ███ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████ Either way, he paid the same amount of money. His 2016 claims are thus a "false positive" showing that he was damaged when, in reality, he suffered no harm. (*Id.*)

Analysis from Cigna's damages expert, Dr. May, shows that the potential impact for both the RICO and ERISA classes is significant: between 16% to 22% of the members with a claim within Plaintiffs' proposed class potentially hit their out-of-pocket maximums. (May ¶ 112.) Dr. May also identifies examples where members who met their deductible, paid a copayment, or received services with a "bundled" payment were not harmed as well because of how their claims would actually be recalculated in the but-for world. (*Id.* ¶¶ 65, 79, 100.) Without knowing if those members were uninjured, like Plaintiff Jacques, the class cannot be certified. *Olean*, 993 F.3d at 793 (courts consider a de minimis number of uninjured class members to be *5-6%*, "[b]ut under any rubric, if Plaintiffs' model is unable to show impact for more than one-fourth of the class members, predominance has not been met.").

Identifying other members who were not harmed, or whose damages should be reduced, because (1) they hit their out of pocket maximum (May ¶ 113), (2) met their deductible (*id.* ¶ 105), (3) paid a copayment below the CareCentrix and Subcontracted Rates (*id.* ¶¶ 122-23), or

received services with a "bundled" payment (*id.* ¶ 79), is "necessarily an individual inquiry" because it would involve looking at the member's entire claims history, their benefit plans and benefits—which vary significantly in amount and accumulation methodologies[8]—and individual EOBs to determine their benefit accumulations. (Kessler ¶ 93; May ¶ 111.) This analysis would need to be done for *every* member for *every* plan year where they may have a potential claim that falls in one of Plaintiffs' classes. (*See* May Secs. IV-V.)

This individualized inquiry is precisely what the predominance requirement forbids. *See, e.g.*, *Peters*, 2019 WL 1429607, at *8 (holding that "[b]ecause of the impact of plan terms such as the deductible and out-of-pocket maximum, the impact of the Defendants' challenged conduct on any particular participant or claim can only be assessed through a detailed analysis of an individual participant's claims history considered in the context of that participant's particular plan."); *Daniel F.*, 305 F.R.D. at 131 (calculating damages will "require manual review of each claimant's records, as well as discovery on what each claimant actually paid, what he/she still owes, the nature of the services provided . . . thus necessitating mini-trials on individualized issues.").

<u>Fourth</u>, Plaintiffs' putative class definitions include a significant number of plan members who suffered no actual loss because they did not actually pay any amounts to CareCentrix. CareCentrix was responsible for collecting member cost-share, but it did not collect close to ████ of what members actually owed. (May ¶ 115.) ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ This huge group of uninjured class members is fatal to Plaintiffs' classes. *See Peters*, 2019 WL 1429607, at *8 ("[I]n those cases

---

[8]  The transaction data does not include a member's benefit selections, only their accumulations, so any calculation of damages would require reviewing the member's benefit plan. (May ¶ 51.)

where the downstream provider did not in fact collect or pursue payment from the participant, the participant suffered no injury and thus could not be included in the class."). Plaintiffs offer no evidence to show how they would exclude this uninjured group.

Fifth, Plaintiff Wood testified that her secondary insurer paid a portion of her charges to CareCentrix. (Ex. 59, Wood Tr. 141:14-142:12.) Plaintiffs offer no way to identify putative class members, like Plaintiff Wood, who similarly had secondary insurance for part of their claims because Cigna does not typically know when a member submits a claim for secondary insurance. (May ¶¶ 133-35.) As Dr. May explains, there could be tens of thousands of claims where members had secondary insurance pay some or all of their claims, and there is no way to determine that without deposing each putative class member, as Cigna did with Plaintiff Wood. (*Id.* ¶ 135.)

Sixth, there is a disconnect between Plaintiffs' class definitions and the named Plaintiffs' claims, which further highlights the individualized inquiry necessary to calculate damages. (*Id.* ¶ 44.) For example, some of the named Plaintiffs testified that they are disputing the cost-sharing amounts for only a subset even of those claims. (*Id.*, Fig. 2) Plaintiffs have offered no method to account for these individual idiosyncrasies on a class-wide basis. (*Id.* ¶ 45.)

Seventh, and as explained further explained above, Plaintiffs' class definition is keyed off of three pieces of plan language, but Plaintiffs offer no methodology for identifying the benefit booklets containing that language for over 26,000 Cigna clients over a ten-year period. (*Id.* ¶ 41.) Cigna's benefit plan language is not uniform, and in fact, Plaintiff Jacques' plan booklets for 2017 and 2018 would actually fall outside Plaintiffs' class definition because they are missing one of the three excerpts of language that define the class. (*Id.*) Plaintiffs do not deal with this variation, or how damages could be calculated without individualized inquiry into the language of each plan.

### B.   Individualized Issues of Reliance Will Predominate Plaintiffs' RICO and Breach of Fiduciary Duty Claims.

Plaintiffs will need to prove reliance to prevail on their RICO and ERISA breach of fiduciary duty claims. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 656 & n.6 (2008) (contrary to Plaintiffs' incorrect assertion in their brief, "of course, a misrepresentation can cause harm only if a recipient of the misrepresentation relies on it."); *Kelly v. Honeywell Int'l, Inc.*, 233 F. Supp. 3d 302, 319 (D. Conn. 2017) (for "a breach of fiduciary duty claim based on a material misrepresentation or omission" plaintiff "must establish detrimental reliance."). Certification is inappropriate where "reliance is too individualized to admit of common proof.'" *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 223 (2d Cir. 2008), *abrogated on other grounds by Phoenix Bond*, 533 U.S. 639; *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 87 (2d Cir. 2015) ("Because proving causation will ordinarily require proving reliance . . . it is quite difficult, though not impossible, to certify a class in a RICO mail-fraud case.").

This is the typical case where Plaintiffs must show reliance. Plaintiffs concede as much, alleging "that Plaintiffs and Class members . . . received the fraudulent statements and ***relied upon them*** in paying the fraudulent amounts for medically necessary healthcare services and equipment." (Dkt. 130 ¶ 245; *see also id.* ¶ 230 (for breach of fiduciary duty).)

Critically, Plaintiffs offer no evidence that anyone—class members or otherwise—actually relied on this purported misrepresentation. (Mem. at 18-20.) In fact, multiple Plaintiffs testified they never read their plan documents before the lawsuit. (*See, e.g.*, Ex. 59, 18:15-18:23; Ex. 60, Neufeld Tr. 190:6-18.) They also could not identify any false or misleading statements that Cigna made in those documents. (Ex. 59, 124:15-125:5; Ex. 61, Ninivaggi Tr. 146:6-12.) If Plaintiffs never read their plans and could not identify any misrepresentations, they could not have relied on them. That this was only discerned through depositions shows "it is impossible to proceed with

adjudication of these claims in the form of a class action." *See Cohn v. Mass. Mut. Life Ins. Co.*, 189 F.R.D. 209, 216–17 (D. Conn. 1999).

Plaintiffs acknowledge none of this case law. Instead, they point to *In re U.S. Foodservice Inc. Pricing Litigation*, 729 F.3d 108, 118 (2d Cir. 2013), arguing they do not need to prove individual reliance by class members. But, as Judge Meyer held in *Negron* that case is distinguishable for a number of reasons. *Negron*, 2021 WL 2010788, at *22.

To start, in *U.S. Foodservice*, "the Second Circuit was considering different contracts and different evidence than the case here." *Id.* at 23. There, the defendant's own expert admitted that the contracts at issue "essentially all [say] the same thing,'" which is unlike here, where "plaintiffs have not shown that the relevant definitions are consistent across the Class plans, at least not without an examination of the individual plans themselves." *See id*. *U.S. Foodservice* also turned on two common issues not present here or in *Negron*—that the UCC governed all of the contracts at issue and that the plaintiffs' implied covenant claims turned on the defendant's good faith. *See id.* "Rather, the question [here and in *Negron*] is, as framed by plaintiffs, whether Cigna miscalculated the cost-share payments of every Class member by not using the [Subcontracted Rate]." *See id.* Likewise, the misrepresentations in *U.S. Foodservice* were in uniform customer invoices, whereas both here and in *Negron*, the alleged misrepresentations are in the plans themselves, which vary. *See id.* Thus, Plaintiffs' claims "require reference to the individual plans, with material variations in terms and provisions that may affect how that calculation is done" which is "fatal to plaintiff's efforts to certify a class across thousands of plans." *Id.*

The evidence in this case reinforces Judge Meyer's conclusion. First, the named Plaintiffs conceded they cannot even identify a single misrepresentation, let alone one that Cigna supposedly uniformly made to every member in the class. (*Supra* at 41-42.) Moreover, several named Plaintiffs

42

testified their issue was not that Cigna supposedly misrepresented their cost-share obligations by basing it on the CareCentrix Rate, rather than the Subcontracted Rate; instead, they thought the CareCentrix Rate was too high. (*See* Ex. 62, Burns Tr. 44:2-8; Ex. 61, 116:21-25; Ex. 63, Ruthersby Tr. 29:7-15.) Finally, several Plaintiffs testified that they **knew** about the difference between the CareCentrix Rate and the Subcontracted Rate before they paid their claims. (Ex. 60, 201:12-202:25; Ex. 61, 257:15-258:2.) Not only that, but they each received explanation of benefits that expressly disclosed CareCentrix as the provider for their claims, giving them all the information they needed to challenge Cigna's plan interpretation. (Ex. 64, CIGNA_NEUFELD00000548; Ex. 65, Neufeld_00030.)[9] This, too, distinguishes this case from *U.S. Foodservice*, where there was "no such individualized proof indicating knowledge or awareness of the fraud by any plaintiffs." 729 F.3d at 120.

Second, the fact that some members were better off under Cigna's interpretation precludes a finding of a class-wide presumption of reliance. For example, *In re LIBOR-Based Fin. Instr. Antitrust Litig.*, 299 F. Supp. 430, 570-71 (S.D.N.Y. Feb. 28, 2018), which distinguished *U.S. Foodservice*, declined to presume class-wide reliance by lenders "with no net exposure to LIBOR is far more likely to have been **indifferent** to the level at which LIBOR is set, and is far less likely to have relied on LIBOR at all"—an inquiry that would require "evidence specific to that lender." So too here, where a Cigna member that would have been better off paying the CareCentrix Rate would likely be "indifferent" to any supposed misrepresentations about the Subcontracted Rate.

---

[9]  As in *Negron*, Plaintiffs also refer to so-called "gag clauses" and a scheme to conceal the Subcontracted Rates. (Mem. at 7.)  Judge Meyer did not find this evidence raised a common issue. *Negron*, 2021 WL 2010788, at *24. ████████████████████████████████████████████████████████  And as the named Plaintiffs testified, the provisions were not enforced. (Ex. 60, 158:8-16; *see also* Ex. 59, 178:17-21.)

**C.      Plaintiffs Cannot Prove Their ERISA Claims Without Individualized Inquiry.**

When an ERISA plan "gives [its] administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," a court must review a denial of benefits under an "arbitrary and capricious" standard. *Firestone*, 489 U.S. at 115. Under this standard, the court "must take into consideration the unique facts and circumstances of each benefits determination" which "arise in many different contexts and circumstances, and therefore, the factors to be considered will be varied and case-specific." *Franco*, 289 F.R.D. at 136 (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115-16 (2008)).

Here, the "unique" circumstances for each member will influence the court's determination of the reasonableness of Cigna's interpretation of "charges" to mean the CareCentrix rate. For example, Cigna's interpretation was not unreasonable for a net "winner" or for a member who benefited like Plaintiff Terry. Similarly, the reasonableness of Cigna's interpretation will turn on other factors, such as whether Cigna's interpretation was supported by other terms in a particular member's plan (*see supra* Sec. I.B), or Cigna's agreement with the member's employer (*see supra* Sec. I.D). Because these factors vary by member, determining whether Cigna abused its discretion will require a member-by-member review. *See Franco*, 289 F.R.D. at 136.

Even Plaintiffs' argument that CareCentrix was not a "provider" because it did not provide "direct" services to Cigna members requires individualized inquiry because it will turn on whether each member actually received "direct" services. ████████████████████████████ ████████████████████████████████████████████ rapist, received "direct" services from CareCentrix. (Ex. 11.) The abuse of discretion analysis for his claims will be different than for a plan member who had only indirect contact with CareCentrix. Each member's

502(a)(1)(B) claim will be a mini-trial as a result. *See Franco*, 289 F.R.D. at 136-37.[10]

**D.     This Class Action Will Not Be Manageable or a Superior Method.**

In light of all of the variation and individualized inquiry described above, Plaintiffs have failed to show that this class action will be manageable or "superior to other available methods." Fed. R. Civ. P. 23(b)(3). Courts have recognized that "[r]equiring the Court to conduct such inquiries into thousands of plans would be unmanageable" particularly where Plaintiffs have "not shown that it will be unnecessary to conduct highly individualized, fact-intensive inquiries," *Wood v. Prudential Ret. Ins. & Annuity Co.*, 2017 WL 3381007, at *6 (D. Conn. Aug. 4, 2017); *see also Spann v. AOL Time Warner, Inc.*, 219 F.R.D. 307, 321 (S.D.N.Y. 2003) (same).

As explained above, this class action is rife with individualized issues—injury, damages, plan language, and reliance. But even before getting to those issues, Plaintiffs make no effort to explain how they intend to match up the thousands of benefit plans with millions of plan member claims to determine if a member is one of the classes. (May ¶¶ 41-43.) For example, Plaintiffs' definition excludes Plaintiff Jacques' Visa plan. (*Compare* Mot. at 2-3, *with* Ex. 3, Decl. of Karen Anderson, Ex. 1.) Nor do Plaintiffs explain how they would match Cigna and CareCentrix claims data to determine which members "paid" CareCentrix to gain access to the RICO class. (May ¶¶ 47-48, 115-16 (unable to match claims for at least a million transactions).) Thus, even figuring out who is in or out of the class will turn on individualized inquiry, and the class action is therefore not a superior method of adjudication. *Wood*, 2017 WL 3381007, at *6.

---

[10]   Plaintiffs do not address variation in plan appeal procedures (some plans have one level, others have two) which will be critical in determining whether a member exhausted their pre-suit administrative remedies. *See Del Greco v. CVS Corp.*, 337 F. Supp. 2d 475, 484-85 (S.D.N.Y. 2004), *aff'd*, 164 F. App'x 75 (2d Cir. 2006). The same goes for the statute of limitations for ERISA claims (*e.g.*, Ex. 66, CIGNA_NEUFELD00771072 at -163 (two years); Ex. 20, at -692 (three years)), which will need to be evaluated on an individualized basis. *See Marcucci v. N.Y. Dist. Council of Carpenters Welfare Fund*, 2001 WL 1356190, at *1 (S.D.N.Y. Nov. 5, 2001).

## IV.    THE ERISA CLASS IS NOT A RULE 23(B)(1) OR 23(B)(2) CLASS.

### A.    Rule 23(b)(1) Does Not Apply to Plaintiffs' Gerrymandered ERISA Class.

To certify a Rule 23(b)(1) class, courts must consider if "the proposed class fails to include a substantial number of person with claims similar to those of the class members." *Local 1522 of Council 4 v. Bridgeport Health Care Ctr., Inc.*, 2018 WL 1419792, at *8 (D. Conn. Mar. 21, 2018). This is particularly apt in ERISA cases, where "[t]he Second Circuit has . . . held that a duty owed to a plan as a whole must be enforced on behalf of the plan, rather than by individual beneficiaries or a subset of beneficiaries." *Id.* (citing *Coan v. Kaufman*, 457 F.3d 250 (2d Cir. 2006)).

Plaintiffs' ERISA class violates this fundamental tenet of Rule 23(b)(1). Plaintiffs define their class to include only a portion of plan members, but Plaintiffs base their claims on a plan interpretation that would impact the plan as a whole. Specifically, Plaintiffs contend Cigna misinterpreted its plans by calculating cost-share based on CareCentrix Rates, not Subcontracted Rates. But if the Court applied this theory to plans as a whole, some plan members would have paid ***more*** cost-share because the CareCentrix Rate was often less than the Subcontracted Rate.

For example, the Subcontracted Rate was higher than the CareCentrix rate for over 190,000 transactions. (May ¶ 93.) And 7% to 9% of members with a least one claim where the Subcontracted Rate was lower than the CareCentrix Rate had a claim where the Subcontracted Rate was higher. (*Id.*) This includes members of the named Plaintiffs' plans. (*Id.* ¶¶ 81-95.)

To avoid this outcome, Plaintiffs' proposed class excludes individual claims that, if based on the Subcontracted Rate, would cause the plan member to be worse off. But by including the claims of some plan members and not others, Plaintiffs' proposed class would ***necessarily*** lead to divergent outcomes for members governed by the same plan language. Rule 23(b)(1) does not permit such cherry-picking. *Loc. 1522 of Council 4*, 2018 WL 1419792, at *8 (denying an under-inclusive proposed class; noting that ERISA provides for a duty to the entire plan, and that the

46

majority of cases certified under ERISA are composed of **all** members of a given plan); *Bond v. Marriott Int'l, Inc.*, 296 F.R.D. 403, 409 (D. Md. 2014) ("Certification under Rule 23(b)(1) is usually inappropriate where the alleged conduct harmed some participants and helped others.").

### B.      Rule 23(b)(2) Does Not Apply to Plaintiffs' ERISA Class Either.

Plaintiffs next seek to certify their ERISA class "under Rule 23(b)(2) to obtain an order requiring Cigna to reprocess the claims and recompense any cost-share overpayments." (Mem. at 3.) As a threshold issue, "the under-inclusivity of [Plaintiffs' ERISA class] is as much a problem under (b)(2) as it is under (b)(1), for the same reasons articulated with respect to (b)(1)." *See Local 1522*, 2018 WL 1419792, at *13. But a 23(b)(2) class is improper for four more reasons.

First, injunctive relief is improper because Plaintiffs can make "no showing of any real or immediate threat that the plaintiff will be wronged again." *See City of Los Angeles v. Lyons,* 461 U.S. 95, 111 (1983); *see also Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 223 (2d Cir. 2012) (Rule 23(b)(2) certification improper where there were "no reference[s] to ongoing injury or risk of future injury."). In fact, the only case that Plaintiffs cite granting limited retrospective injunctive relief is distinguishable because it concerned a declaration reversing a blanket denial of treatment, not the recalculation of cost-share to provide monetary relief at issue here. (Mem. at 15 (citing *Meidl v. Aetna, Inc.*, 2017 WL 1831916, at *22 (D. Conn. May 4, 2017)).)

Nor is future injury conceivable. Named Plaintiffs are not current Cigna members (Ex. 67) and the CareCentrix relationship is no longer in effect,[11] so there is no ongoing threat of harm. *See McNair v. Synapse Grp. Inc.,* 672 F.3d 213, 224 (3d Cir. 2012) (no 23(b)(2) class where there was

---

[11] *See* Mem. at 8. Plaintiffs represented to Cigna that their putative class period runs from October 2011 to December 31, 2019. (Ex. 68, Mar. 15, 2021 email from Christopher Barrett.) Cigna's contract with CareCentrix expired in January 2021, when Cigna switched to another specialty care vendor, eviCore, that it had acquired through its transaction with Express Scripts. (Ex. 4, 16:19-24, 78:23-79:4; Ex. 69, Sawyer Tr. 34:10-13.)

"no reasonable likelihood" of future injury, as plaintiffs were no longer customers and "thus not currently subject to [defendant's] allegedly deceptive techniques."); *Thorn v. Jefferson-Pilot Life Ins. Co.,* 445 F.3d 311, 331 (4th Cir. 2006) (same). Thus, Plaintiffs may not "seek relief on behalf of [themselves] or any other member of the class." *O'Shea v. Littleton,* 414 U.S. 488, 494 (1974).

Second, the proposed Rule 23(b)(2) class is improper because "monetary relief is not incidental to the injunctive or declaratory relief." *See Dukes*, 564 U.S. at 360. Plaintiffs request an injunction "requiring Cigna to reprocess all Class member claims" at the "Provider Rate instead of the CareCentrix Rate." (Mem. at 15.) But the monetary relief received from the reprocessing of claims would not be "incidental" to the injunctive relief sought—it would be the entire purpose, as Plaintiffs effectively seek "recompense for cost-share overpayments." (*See* Mem. at 3.) Rule 23(b)(2) certification is therefore not appropriate. *See Aetna UCR Litig.,* 2018 WL 10419839, at *25 (declining to certify 23(b)(2) class where "from the outset, this lawsuit was quite evidently about money damages"); *AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*, 938 F.3d 1170, 1177–78 (11th Cir. 2019) (finding plaintiff's claim for injunctive and declaratory relief under Rule 23(b)(2) was effectively "a fig leaf attempting to cover its demand for past relief").

Third, Plaintiffs' Rule 23(b)(2) class is not "cohesive." *See In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 75 (S.D.N.Y. 2002); *see also Barnes v. Am. Tobacco Co*., 161 F.3d 127, 142-43 (3d Cir. 1998) (A (b)(2) class requires "*more* cohesiveness" than a (b)(3) class because (b)(2) class members cannot opt out.) As explained in Sections I-III, the individualized inquiries and intra-class conflicts that plague Plaintiffs' (b)(3) classes impede certification of a (b)(2) class too. *See Aetna UCR Litig.*, 2018 WL 10419839, at *26 (refusing to certify a 23(b)(2) class in part because an injunction would likely result in some class members owing money after reprocessing).

Finally, certification under Rule 23(b)(2) will be impossible to carry out across the class. For instance, Cigna is no longer the claims administrator for some of the plans at issue (*e.g.* Terry Tr. 25:3-15), so it is unable to carry out this reprocessing. *See Hall v. LHACO, Inc.*, 140 F.3d 1190, 1196 (8th Cir. 1998) (a former plan administrator "is in no position, where it is no longer associated with the Plan, to pay out benefits."). Because reprocessing will not be possible for these class members, there is no injunctive relief appropriate for the class as a whole. *Dukes*, 564 U.S. at 360.

## V.   PLAINTIFFS HAVE NOT PROVEN ADEQUACY OR TYPICALITY.

### A.   Plaintiffs Are Not Adequate Because of Intraclass Conflicts.

Adequacy is designed "to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. As explained above (Secs. II-IV), the proposed classes are inherently in conflict. Both classes contain members who benefited from Cigna's relationship with CareCentrix, like Plaintiff Terry, as well as members who would pay more on net if the Subcontracted Rate is used rather than the CareCentrix Rate. So while some named Plaintiffs may have been harmed under Plaintiffs' theory, they cannot represent the plan members who were not. *In re Literary Works in Elec. Database Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) (class certification denied where proposed class have interests that were "antagonistic" to one another.); *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1190 (11th Cir. 2003) ("[N]o circuit has approved of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives.").[12]

### B.   Plaintiffs' Claims Are Not Typical of Each Other, Let Alone the Class.

"The central feature for typicality is that plaintiffs assert that defendants committed the

---

[12] Plaintiffs are also not adequate representatives because, as former Cigna plan members, they cannot seek prospective injunctive relief. *Wood*, 2017 WL 3381007, at *5.

same wrongful acts in the same manner, against all members of the class." *Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 132 (S.D.N.Y. 2014). The record shows that Plaintiffs' claims are not typical of each other, let alone of the rest of the class.

For example, Plaintiff Terry received a CPAP machine ███████████████████ ██████████████████████████████████████ Former Plaintiff Marshall ███████████████████████████████████████, which had both clinical and economic benefits to the member. (Ex. 11; Ex. 7, 212:6-213:12.) Those were different experiences than Plaintiffs Neufeld and Burns, who transitioned from other insurance and did not receive the benefit of the sleep program. (Ex. 60, 142:25-143:7; Ex. 62, 30:17-22.) These intra-plaintiff differences, let alone intra-class differences, show that typicality has not been met. *See Dukes*, 564 U.S. at 359-60; *Wood*, 2017 WL 3381007, at *5 (D. Conn. Aug. 4, 2017) (typicality not met because class was so varied that resolution appropriate for the lead plaintiff could differ to that suitable for other participants).

Finally, Plaintiffs will be subject to individual defenses. ███████████████████ ██████████████████████████, and may lack standing to sue. ███████████████ ███████████████████ And some named Plaintiffs did not exhaust administrative remedies (*e.g.*, Ex 62, 84:12-20), so their ERISA claims may be premature or even barred. *See DelGreco*, 337 F. Supp. 2d at 484-85. These unique defenses "threaten to become the focus of the litigation" and preclude certification. *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 64 (E.D.N.Y. 2015).

## <u>CONCLUSION</u>

For the above reasons, the Court should deny Plaintiffs' Motion to Certify a Class.

Dated: June 7, 2021
New York, New York

/s/ Warren Haskel
Joshua B. Simon (*Pro Hac Vice*)
Warren Haskel (*Pro Hac Vice*)
Dmitriy Tishyevich (*Pro Hac Vice*)
Richard W. Nicholson Jr. (*Pro Hac Vice*)
Caroline Incledon (*Pro Hac Vice*)
Chelsea Cosillos (*Pro Hac Vice*)

McDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, NY  10173
Telephone: (212) 547-5400
jsimon@mwe.com
whaskel@mwe.com
dtishyevich@mwe.com
rnicholson@mwe.com
cincledon@mwe.com
ccosillos@mwe.com

James M. Sconzo (ct04571)
CARLTON FIELDS P.A.
One State St., Suite 1800
Hartford, CT 06103
Telephone: 860-392-5000
Facsimile: 860-392-5058
jsconzo@carltonfields.com

*Attorneys for Defendant Cigna Health and
Life Insurance Company*