# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JEFFREY NEUFELD and AUBREY SREDNICKI, KEVIN JACQUES, NICHOLAS MARSHALL, WILLIAM NINIVAGGI, TROY TERRY, JOYCE WOOD, ROBERT BURNS, TIMOTHY RUTHERSBY, and NATHAN WHEATLEY, Individually and on Behalf of All Others Similarly Situated, | Civil No. 3:17-cv-1693-KAD |
| Plaintiffs, | |
| vs. | |
| CIGNA HEALTH AND LIFE INSURANCE COMPANY, | |
| Defendant. | |

**Class Certification Expert Report of Dr. Daniel P. Kessler**

June 7, 2021

CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Table of Contents

I.     Qualifications ................................................................................................................. 3

II.    Scope of Assignment and Summary of Opinions ............................................... 5

III.   Background on Employer-Sponsored Health Insurance ................................... 7

IV.   Background on the Cigna/Carecentrix Relationship ...................................... 17

V.    Plaintiffs' "Overcharges" Do Not Provide a Valid Assessment of Harm Because Their Implicit But-For World Neither Comports With Industry Standards Nor Makes Economic Sense ........................................................................................................................ 20

      A.   Compared to the Correct But-For World, the Agreements Benefited Participants and Sponsors—Benefits That Plaintiffs' "Overcharge" Analysis Fails to Consider ....... 23

      B.   To Determine Which – If Any – Participants Were Harmed Would Require Individualized Inquiry ...................................................................................... 27

VI.   Even Accepting Plaintiffs' Incorrect But-For World, to Correctly Identify Who Was Harmed and by How Much Would Require Individualized Inquiry ................................ 31

      A.   Participant Had Both "Overcharged" and "Undercharged" Claims ......................... 31

      B.   Participant Recovered "Overcharge" On a Later Claim ............................................ 33

      C.   Participant Did Not Pay the Alleged "Overcharge" .................................................. 36

      D.   Participant Was "Overcharged" But Nonetheless Benefited From the Agreements. 38

VII.  Conclusion ................................................................................................................... 42

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Class Certification Expert Report of Dr. Daniel P. Kessler**

## I.      QUALIFICATIONS

1.      I am a tenured professor at the Stanford Graduate School of Business and Stanford Law School; a professor (by courtesy) at the Stanford School of Medicine; a Senior Fellow at Stanford's Hoover Institution and its Institute for Economic Policy Research; and a Research Associate at the National Bureau of Economic Research, the country's leading nonprofit, nonpartisan economic research organization.  I teach a University-wide course in health care finance and regulation at Stanford.  I have also taught courses in health policy at the Wharton School of the University of Pennsylvania and Harvard Law School.  I have served as a consultant to the U.S. Federal Trade Commission, hospitals, health systems, and insurers.  I currently serve on Stanford's Committee on Faculty and Staff Human Resources, which oversees the University's health insurance plans and reports to its Chief Financial Officer.  I obtained a J.D. from Stanford Law School in 1993 and a Ph.D. in economics from MIT in 1994, specializing in law-and-economics and health economics.

2.      My core areas of expertise are health policy, design of health insurance benefits and reimbursement systems, and analysis of medical claims data.  I have published numerous books and papers in peer-reviewed journals on health economics, health insurance, and regulation based on empirical analysis of private health insurance and Medicare claims databases.  I served as the principal investigator for a grant from the U.S. National Institutes of Health to study how Medicare reimbursement policy should account for hospital integration.  I am currently an investigator for a grant from the U.S. Agency for Healthcare Research and Quality to study how physician organizational choices affect the cost and quality of care.  I have also received grant support from the U.S. National Science Foundation, the California Health Care Foundation, and the American Cancer Society.  My full curriculum vitae is attached as Appendix A.

3.      To undertake my analysis in this matter, I considered case documents; deposition testimony; and the studies and reports listed in Appendix B.  I had access to the pleadings and other materials in the discovery record in the case; the materials I considered and relied on in

CONFIDENTIAL – ATTORNEYS' EYES ONLY

reaching my opinions are those listed in Appendix B.  I also received support from staff at Charles River Associates, who provided me with excerpts of Cigna's claims data that I requested and analyzed directly.  If there is additional discovery in the case, I may consider additional information and may supplement this report accordingly.

4.      In the prior four years, I have testified in nine matters:

- Confidential AHLA arbitration involving Cigna Health Corporation (reports and arbitration testimony).

- *In re: Opioid Litigation,* Supreme Court of the State of New York, County of Suffolk, Index No. 400008/2017 (Nassau) and 400001/2017 (Suffolk) (reports and deposition testimony).

- *In re: National Prescription Opiate Litigation*, Case No. 1:17-MD-2804 (report and deposition testimony).

- *State of Washington v. Franciscan Health System, et al.*, United States District Court, Western District of Washington, Case No. 17-cv-05690-BHS (reports and deposition testimony).

- *Peters v. Aetna Inc., et al*., United States District Court, Western District of North Carolina, Case No. 1:15-cv-00109-MR (reports and deposition testimony).

- *BRFHH Shreveport, et al. v. Willis-Knighton Medical Center*, United States District Court, Western District of Louisiana, Case No. 15-cv-2057 (reports and deposition testimony).

- *Lutz Surgical Partners, et al. v. Aetna*, United States District Court, District of New Jersey, Case No. 15-cv-2595 (reports and deposition testimony).

- *Cambie Surgeries Corporation v. Medical Services Commission of British Columbia et al.*, Supreme Court of British Columbia, Vancouver Registry, Case No. S090663 (reports and trial testimony).

- *In re Examworks Group Inc. Shareholder Appraisal Litigation*, Court of Chancery, State of Delaware, Case No. 12688-VCL (reports and deposition testimony).

5.      My billing rate in this matter is $900 per hour, which is my standard rate.  My compensation is not dependent on the content of my testimony or on the outcome of this case.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## II.   SCOPE OF ASSIGNMENT AND SUMMARY OF OPINIONS

6.      Counsel for Cigna asked me to evaluate whether (1) the Cigna/CareCentrix relationship and its reimbursement approach were consistent with industry standards and economic principles and (2) individualized inquiry would be necessary to determine if members of the putative class suffered identifiable and uniform harm, including whether some members of the putative class were harmed at all.

7.      Although Plaintiffs have not specified a method for determining whether any members of the putative classes were harmed, their proposed class definitions and Memorandum of Law appear to define harm to include all payments by participants in a subset of Cigna-serviced plans based on rates that CareCentrix charged Cigna ("CareCentrix Rates") in excess of the rates that CareCentrix paid to its subcontracted providers ("Subcontracted Rates").  This approach is seriously flawed for two overarching reasons, which I will describe in detail.

8.      First, the but-for world implicit in Plaintiffs' theory—that is, the baseline against which Plaintiffs appear to determine whether participants were allegedly "overcharged"— is not valid for the purpose of determining whether any members of the putative classes were harmed.  I show that the but-for world implicit in this theory neither comports with industry standards nor makes economic sense.  At the base of Plaintiffs' theory is an overly simplistic and erroneous notion of the industry in which companies like Cigna negotiate contracts with each individual clinician and facility in their networks, and health plans and patients pay for each individual medical product or health service based on piece rates.  Although that may have been the predominant model decades ago, it ignores that industry participants now understand that they can lower costs and improve quality by shifting to value-based payment.  Instead of paying providers with piece rates, value-based payment rewards providers for the benefit that their entire package of products and services creates for patients.

9.      Value-based payment is now the industry standard.  Cigna has been recognized as a leader in its adoption,[1] and the Cigna/CareCentrix relationship was a canonical example.

---

[1]  See Feb. 21. 2017 Mem. Op., *United States v. Anthem Inc. and Cigna Corp.*, Civ. A. No. 16-193, at 90 (explaining that "Cigna has relied upon innovation to compete, directing its focus on ways to improve member health and

CareCentrix is a specialty-care vendor that supplies home health services such as nursing, home drug infusion, and medical equipment.  CareCentrix also provided significant additional services to Cigna participants and plans beyond typical individual medical products and health services. These services included utilization review, medical training and education assistance, adherence monitoring, credentialing and provider relations, and collection of patient cost-sharing payments.[2]  As I explain below, these services created substantial benefits for both participants and plans.

10.     To compensate CareCentrix for the entire package of products and services that it provides, Cigna and CareCentrix negotiated a series of contracts implementing value-based payment (the "Agreements").  As part of the Agreements, Cigna paid CareCentrix according to a fee schedule that takes into account the cost of the entire package of CareCentrix's services (the CareCentrix Rates), and CareCentrix then paid individual clinicians and facilities for any individual medical products or health services that contributed to the package (the Subcontracted Rates).  Cigna and CareCentrix also agreed to certain performance-based guarantees that could impact CareCentrix's overall compensation to give CareCentrix additional incentives to reduce costs and improve quality for Cigna participants and plans.

11.     Plaintiffs' theory requires the assumption that putative class members would have received the benefits of the Agreements without paying for them.  It assumes either that CareCentrix's additional services would be exempt from participant cost-sharing (despite the fact that employers chose to adopt plans that *required* participant cost-sharing), or CareCentrix would offer its additional services for free, or both.

12.     The consequence of Plaintiffs' but-for world would be that employers would forego CareCentrix's services or CareCentrix would decline to provide them.  In that situation, participants would have obtained services from an alternative Cigna network provider.  This would have made many participants worse off.  Some participants would have paid rates that

---

employer cost outcomes"); at 9 (noting "the growing trend to move from a pure fee-for-service based system to a more value-based model as a means of both lowering the cost and improving the outcome of the delivery of healthcare in this country"); at 91 (noting "testimony from industry participants that clinical engagement and value-based contracting will continue to expand").
[2] CCXNeu000656 at 675-97.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

exceeded not only the Subcontracted Rates, but also the CareCentrix Rates.  Other participants would have received medical care that was more costly and/or less appropriate than that which they actually received.  In fact, as I explain below, the CareCentrix sleep program saved money for participants and sponsors *as a whole* even if it increased the cost of certain sleep supplies for some participants on a claim-by-claim basis.  Thus, for many participants, the Agreements yielded net benefits.  Accounting for these benefits – which Plaintiffs' incorrect but-for world does not do – would require individualized inquiry.

13.     The second fundamental flaw in Plaintiffs' approach is that even in their incorrect but-for world, harm from the Agreements cannot be assessed on a class-wide basis.  Even in Plaintiffs' incorrect but-for world, I show that many allegedly "overcharged" class members were unharmed by or benefited from the Agreements—*including one of the named Plaintiffs*. Determining which allegedly "overcharged" class members were unharmed by or benefited from the Agreements would also require individualized inquiry.

## III.    BACKGROUND ON EMPLOYER-SPONSORED HEALTH INSURANCE

14.     Health insurance provides people with financial protection against the costs of medical care.  Illness is unpredictable, and when people get sick, the costs of medical care may be substantial.  Insurance allows people to avoid the uncertainty associated with the possibility of a large, potentially unaffordable future liability of this sort, and so people are willing to pay more for insurance than their expected costs of care at any point in time.

15.     Most people under the age of 65 obtain their health insurance plan through their or a household member's employer.  In 2018, 68 percent of workers were offered plans sponsored by their employer, and 84 percent of individuals in these workers' households were ultimately covered by the employer plan.[3]  Such individuals are described as participants in the plan.  Both plans and participants generally bear some responsibility for the costs of medical products and health services covered by the plan (often described as "covered expenses" or "allowed amounts").  Participant responsibility can take several forms:[4]

---

[3] Rae M, McDermott D, Levitt L, Claxton G, Long-Term Trends in Employer-Based Coverage, Peterson-KFF Health System Tracker, https://www.healthsystemtracker.org/brief/long-term-trends-in-employer-based-coverage/.
[4] Healthcare.gov online glossary, https://www.healthcare.gov/glossary/.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

- Deductibles are fixed amounts (e.g., $500) that a participant must pay for covered expenses before the plan becomes responsible.
- Coinsurance is the share of covered expenses (e.g., 20%) that a participant must pay after she has met the deductible; the plan is responsible for the remainder.
- Copayments are fixed amounts (e.g., $20) that a participant must pay for covered services; the plan is responsible for the remainder.
- All forms of participant responsibility are often capped at a fixed dollar amount (e.g., $5,000), which is known as the out-of-pocket maximum.

16.     Employers sponsor plans in one of two ways.  Some purchase fully-insured plans, whereby an insurer accepts the risk of plan responsibility and the costs of operating the plan in exchange for a fixed, upfront payment.  This fixed upfront payment is known as the "premium."

17.     Others, especially large employers, self-fund their plans.  In that case, the employer itself accepts the risk of plan responsibility and the costs of operating the plan.  Most self-funded plan sponsors hire a third-party administrator (or "TPA") to contract with providers, handle claims processing, and provide other services.   These plans are sometimes described as administrative-services-only (or "ASO") plans.  For these administrative services, administrators charge the plan a fee per participant per month, per claim, and/or per dollar of claims paid.  More than 85 percent of Cigna's commercial members are in ASO plans.[5]  Although the sponsor of an ASO plan has no formal premium that it pays to an administrator, health policy analysts use the term "premium" or "premium-equivalent" to represent the average monthly amount per participant that the sponsor pays for the plan responsibility plus these costs or fees.

18.     Insurers and administrators contract with clinicians or facilities (often described as "providers") to supply medical products and health services to participants.  Providers who contract with a plan are known as "network" providers.  From a provider's perspective, being in a network has many benefits.  In order to control costs and ensure quality of care, plans give participants incentives to use network providers, which gives the network providers greater access to a large pool of participants.  In exchange, network providers agree to follow the

---

[5] Funding Sections of Cigna 2019 Annual Report, https://www.cigna.com/static/www-cigna-com/docs/about-us/investor-relations/cigna-2019-annual-report.pdf.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

insurer's or administrator's policies, such as maintenance of minimum quality standards, and to accept the rate they negotiated as payment in full for any products or services they supply.

19.     Networks also benefit participants.  When participants receive products or services from a network provider, they know that they will have protection against being "balance billed"; that is, participants know that their financial responsibility is limited to an amount based on a rate negotiated by the insurer or administrator.  Participants also know that network providers are held to quality standards and monitored for their compliance with conditions designed to ensure patient safety.  Finally, participants may benefit from lower participant responsibility by virtue of pre-negotiated, specially-discounted rates secured by the insurer or administrator.

20.     It is for this reason that essentially all plans in the U.S. operate on a network model.[6] Some plans may also give participants the option to obtain products or services out-of-network. Unlike network providers, out-of-network providers may not have agreed with the insurer or administrator to accept negotiated rates as payment in full.  Their rates generally are equal to their "billed charges."  In the health care industry, billed charges are "list price" rates.  Billed charges are not market rates; they do not necessarily represent an amount that anyone actually pays.  Billed charges are almost always much greater, sometimes many times greater, than the rates that plans negotiate with network providers.[7]

21.     Named Plaintiffs' plans show both the variability in plan terms and the financial incentives that plans give participants to obtain products and services from (lower-cost) network providers.  For example, Mr. Ninivaggi's 2018 Hilton plan had a $750 per person deductible (but not more than $1,500 for his family as a whole) for network providers, but a $1,500 per person deductible (but not more than $3,000 for his family as a whole) for out-of-network providers.[8]

---

[6] Kaiser Family Foundation/Health Research and Educational Trust, Survey of Employer Health Benefits, 2016, p. 79, Exhibit 5.1.
[7] A specific example of an individual participant in a Cigna plan shows why the network model is so valuable to participants and plans. ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████  In the absence of the negotiated network rate, both the plan and participant responsibility would have been significantly greater.
[8] CIGNA_NEUFELD00309990 at 1005.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

His coinsurance rate for home health care from network providers was 30%, but was 50% for out-of-network providers (with a cap of 120 days during the calendar year).[9]  His participant responsibility was capped at $5,000 per person (but not more than $10,000 for his family as a whole) for network providers, but $10,000 per person (but not more than $20,000 for his family as a whole) for out-of-network providers.[10]  Mr. Ruthersby's 2017 Harris Corporation plan had a higher deductible, but no cap on home health visits, and a lower coinsurance rate and out-of-pocket maximum.  His plan had a $1,100 per person deductible (but not more than $2,200 for his family as a whole) for network providers, but a $2,200 per person deductible (but not more than $4,400 for his family as a whole) for out-of-network providers.[11]  His coinsurance rate for home health care from network providers was 25%, but was 45% for out-of-network providers (with no caps).[12]  His participant responsibility was capped at $4,000 per person (but not more than $8,000 for his family as a whole) for network providers, but $8,000 per person (but not more than $16,000 for his family as a whole) for out-of-network providers.[13]

22.     Insurers and administrators compete with one another to develop networks that are broad, of high quality, and of low cost.  Sponsors select an insurer or administrator through a process in which they solicit bids that specify the premium and expected participant responsibility, and evaluate their insurer or administrator retrospectively on their deviation (if any) from their bid.

23.     One of the key inputs to sponsors' decisions is the rates and terms that the insurer or administrator has negotiated with its network providers.  The impact of these rates and terms on the premium and participant responsibility dwarfs the plan's operating costs or any profits that an insurer or administrator might earn.  Figure 1 shows that, in 2015, plan responsibility to providers in the U.S. overall made up 88¢ of each dollar of premiums; the costs of operating the plans made up 9¢, and profits earned by insurers and administrators made up 3¢.

---

[9] Id. at 1011.
[10] Id. at 1006.
[11] CIGNA_NEUFELD00771179 at 191.
[12] Id. at 195.
[13] Id. at 192.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Figure 1:  The U.S. Health Insurance Premium Dollar, 2015



Plan Responsibility for Medical Services

Net Cost Of Insurance

Operating Cost     Profit

88¢        9¢    3¢

Sources:  Payments for services and net cost of insurance proportions from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NationalHealthAccountsHistorical.html. Sherlock Benchmark Administrative Cost Values of Larger Health Plans – 2016 Metrics, Appendix B (Early August Navigator 2017). Profits are the residual share; see https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/index.html, quickref.pdf.

24.     Accordingly, all other things being equal, a lower-cost network affords an insurer or administrator with a competitive benefit in seeking to win business from sponsors.  Insurers and administrators use multiple strategies to develop low-cost networks and thereby maximize their appeal.  Insurers and administrators may contract with individual clinicians directly.  They may also contract with third-party organizations that employ or contract with individual clinicians, such as group practices, independent practice associations ("IPAs"), and other legal entities.  An IPA, for example, is "an organization providing health care by doctors who maintain their own offices and continue to see their own patients but agree to treat enrolled members of the organization for a negotiated lump sum payment or a fixed payment per member or per service provided."[14]

25.     Other examples of third-party organizations include the following:

- Specialty-care vendors, such as eviCore, which contracts with clinicians and facilities to supply radiology, cardiology, gastroenterology, oncology, and laboratory services, and Professional Health Care Network, which contracts with clinicians to supply

---

[14]  Merriam-Webster Medical Dictionary.

11

general nursing, physical therapy, speech therapy, occupational therapy, and
medication management;[15]

- Integrated rehabilitation systems such as Genesis Health Care, which supplies
occupational, physical, and speech therapy; home health; and short- and long-term
skilled nursing care;[16]

- Physician staffing firms such as TeamHealth, which contracts with physicians to
provide staffing to hospitals;[17] and

- Integrated delivery systems such as Tenet and HCA, which owns or contracts with
hospitals, physician practices, and outpatient facilities.[18]

26.     Health policy analysts consider both individual clinicians and third-party organizations
that employ or contract with clinicians to be providers.[19]  As the examples above show, third-
party organizations may be separate from individual clinicians, and may be owned by clinicians,
hospitals, outside investors, or some combination.

27.     Third-party organizations in general, and specialty-care vendors in particular, may
provide non-clinical and other "wraparound" services in addition to treating patients, such as
utilization review, provider relations, and adherence monitoring for patients.[20]  Such wraparound
services may both lower costs and improve quality.  Insurers' and administrators' compensation
of third-party organizations for these services may be folded into the third-party organizations'
rates.

28.     In addition, individual clinicians may contract with third-party organizations to supply
components of the clinicians' services.  For example, Healix contracts with clinicians to supply

---

[15] https://www.evicore.com/ ; https://prohcn.com/
[16] https://www.genesishcc.com.
[17] https://www.teamhealth.com/
[18] https://www.tenethealth.com/; https://hcahealthcare.com/.
[19] See, for example, Mosby's Medical Dictionary (health care provider:  any individual, institution, or agency that
provides health services to health care consumers) or the Farlex Medical Dictionary for the Health Professions and
Nursing (health care provider:  general term for any institution or member of the health care team providing health
care).
[20] Utilization Review, for example, is "the critical evaluation (as by a physician or nurse) of health-care services
provided to patients especially for the purpose of controlling costs … and monitoring the quality of care."  See
Merriam-Webster Medical Dictionary.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

infusion-related services in the clinicians' own offices.[21]  Among other services, Healix procures the drugs and the ancillary equipment necessary to operate in-office infusion clinics.  When an individual clinician contracts with a third-party organization to supply components of the clinician's services, she may fold her compensation of the third-party organization into her rates.

29.    Third-party organizations in general, and specialty-care vendors in particular, may provide care more efficiently than could an individual clinician or facility, by virtue of economies of scale or the integration of complementary services into a single entity.  For example, during the period at issue in this matter, Cigna contracted with eviCore for advanced outpatient imaging services like CT, MRI, and PET scans.[22]  Cigna's contract with eviCore created significant savings for participants and sponsors.  Internal Cigna analysis shows that, after expanding the number of participants who received advanced imaging through eviCore from 2 percent to 26 percent from 2010 to 2012, advanced imaging spending per member-month declined by 6.2 percent, while outpatient radiology spending among the commercially insured nationwide rose by 6.6 percent over the same time period.[23]

30.    Providers generally bill for outpatient services according to the Healthcare Common Procedure Coding System, or HCPCS.  HCPCS is a set of approximately 6,500 codes describing medical products and health services.  HCPCS codes include both Current Procedural Terminology (CPT) codes ("Level I HCPCS codes") and other ("Level II HCPCS") codes that are used primarily to identify products and services that do not have a CPT code.

31.    Insurers and administrators pay providers in different ways.  Traditionally, insurers and administrators paid providers on a "fee-for-service" basis, under which providers received a piece rate for each HCPCS code.  Increasingly, however, insurers and administrators seek to pay providers on a "value-based payment" basis.  Value-based payment is a tool to create incentives to providers to deliver higher-quality care at lower cost (such as by engaging in utilization review).  Value-based payment differs from fee-for-service by basing provider payments on

---

[21] https://healix.net/
[22] CIGNA_NEUFELD00098754.
[23] Compare a decline from $13.35 to $12.52 from CIGNA_NEUFELD00594262 to Health Care Cost Institute 2012 Health Care Cost and Utilization Report, Appendix Table A1, ($194 - $182)/$182.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

something other than a piece rate for each individual medical product or health service.  The Centers for Medicare and Medicaid Services, the division of the U.S. Department of Health and Human Services that administers Medicare and Medicaid, has promoted and currently promotes several value-based payment programs as a matter of public policy.[24]

32.     To implement value-based payment, third-party organizations may offer plans and clinicians different payment methodologies.  For example, many IPAs accept value-based payments from insurers or administrators and pay their contracted individual clinicians on a fee-for-service basis.[25]

33.     When paying a provider by value-based payment, insurers and administrators may calculate the participant responsibility based on rates that do not account for subsequent reductions in the insurer's or administrator's payments to the provider.  For example, Medicare's Merit-based Incentive Payment System bases patient responsibility on rates that do not account for subsequent penalties that Medicare may impose on providers who are later determined to have performed poorly.[26]

34.     One type of value-based payment is "bundled payment."  A bundled payment compensates providers with a single payment for all services related to a specific treatment, condition, or date of service.  A bundled payment creates incentives for providers to eliminate unnecessary services and reduce costs by no longer rewarding them for delivering a greater volume of services without regard to the benefit they yield.

35.     When paying a provider by bundled payment, insurers and administrators may request that providers bill them using HCPCS codes that do not specifically enumerate all of the services that the bundle may include.  Alternatively, insurers and administrators may agree with providers

---

[24] U.S. Centers for Medicare and Medicaid Services, Value-Based Payment Programs, https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/Value-Based-Programs/Value-Based-Programs.html.
[25] Robinson JC, The Alignment and Blending of Payment Incentives within Physician Organizations, Health Services Research 2004:39(5), 1589-1606, 1593, 1597-8.
[26] U.S. Centers for Medicare and Medicaid Services, MIPS Payment Adjustment Fact Sheet, https://www.hhs.gov/guidance/document/2019-mips-payment-adjustment-fact-sheet.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

to fold the medical products and health services typically captured by many HCPCS codes into one HCPCS code.

36.     When paying a provider by bundled payment, insurers and administrators generally calculate the participant responsibility based on the bundled payment rates, not on the rates of the components of the bundle.  For example, in its Request for Applications for its bundled payments for Care Improvement Initiative, the Center for Medicare and Medicaid Innovation specified that patients of providers who participate in the initiative will pay "a fixed Part B copayment in lieu of standard Part B coinsurance [which] will be standard for each hospital and DRG, regardless of actual services rendered to an individual beneficiary."[27]

37.     Insurers and administrators calculate the participant responsibility based on the bundled payment rates for several reasons.  Most importantly, calculating the participant responsibility based on the rates of the components of the bundle may be impossible.  The provider may not report which components are supplied to any particular patient who received the bundle; even if the provider does report the components, it may not have agreed to specific rates for them.

38.     Insurers and administrators also calculate the participant responsibility based on the bundled payment rates for incentive reasons.  Calculating the participant responsibility based on rates of the components, rather than on the bundled payment rate, would give participants the incentive to shift from the more- to the less-costly components of the bundle.  But this would defeat the principal rationale for bundled payment, and for value-based payment in general:  to create incentives for participants to include the value of services as well as the price in their decision process.  In particular, such payment systems try to better align participant responsibility with the clinical benefit that the participant derives from the services in question by moderating the incentives created by traditional cost-sharing.

39.     Although value-based payment benefits both sponsors and participants in the first instance, the savings ultimately flow to participants.  This is because sponsors ultimately pass on the costs of benefits to the employees themselves.  Some individuals who obtain insurance

---

[27] U.S. Centers for Medicare and Medicaid Services, Center for Medicare and Medicaid Innovation, https://innovation.cms.gov/files/x/bundled-payments-for-care-improvement-request-for-applications.pdf, p. 22.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

through their employer pay for higher premiums when their employers require them to pay part or all of premium increases or plan costs through a payroll deduction.  But even when an employer nominally pays for health coverage, through either a fully-insured or self-funded plan, the participant ultimately bears the burden of higher health costs in one of two ways.  First, those employers who continue to offer insurance will offset the increased cost through lower wages. Employers set a worker's total compensation, including wages plus benefits, based on the value that the worker provides to the firm.  Increases in benefits costs therefore displace wage increases.  Several studies show that increases in the cost of health insurance are passed through to workers in the form of lower wages.[28]  For example, according to this research, state mandates for health insurance benefits result in essentially all of the cost of the mandated services being borne in the form of lower wages by the workers who received them.[29]  Second, when premiums increase, some employers will stop offering insurance to their workers entirely, increase the deductible or coinsurance payments that the plan requires, or reduce the scope of fringe benefits in other ways.[30]

40.      Thus, the fact that participants may have nominally greater participant responsibility in a value-based payment system – because, for example, the insurer or administrator calculated the participant responsibility based on rates that did not account for subsequent reductions in the insurer's or administrator's payments to the provider – does not mean that the participant was harmed in any meaningful or material way.  When value-based payment creates incentives to providers to deliver higher-quality care at lower cost, the benefits ultimately accrue to participants, even if participant responsibility payments increase.  As I discuss below, this was the case with the Cigna/CareCentrix relationship.

---

[28] Gruber J, Health Insurance and the Labor Market, Chapter 12 in Culyer AJ and Newhouse JP, eds., Handbook of Health Economics, 2000, Elsevier, 694.
[29] Emanuel EJ, Fuchs VR, Who Really Pays for Health Care? The Myth of "Shared Responsibility," 299(9) JAMA 2008:1057–9.
[30] Gaynor M, Ho K, Town RJ, The Industrial Organization of Health Care Markets, Journal of Economic Literature. 2015;53(2): 235-84, 236.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## IV.    BACKGROUND ON THE CIGNA/CARECENTRIX RELATIONSHIP

41.    CareCentrix and its predecessor Gentiva began their relationship with Cigna in 1996.
CareCentrix originally provided home health services to Cigna participants.  Over time, the
agreement was amended to expand the scope of services to include durable medical equipment
("DME"), home infusion, and sleep services:[31]

- Home health services include general nursing, physical therapy, occupational therapy,
  home health aides, and social workers.

- DME includes respiratory equipment, hospital beds, walkers, wheelchairs, insulin
  pumps, wound vacuums, and disposable medical supplies.[32]

- Home infusion services include both specialty and non-specialty drugs, as well as
  administration and any nursing services related to the drugs.

- Sleep services include continuous positive airway pressure ("CPAP") equipment and
  disposable supplies plus extensive "wraparound" services.

42.    By contracting with CareCentrix, Cigna was able to provide members with access to the
more than 9,000 clinicians and facilities that subcontracted with CareCentrix.  CareCentrix also
provided wraparound services to reduce costs and improve quality for Cigna participants.  For
instance, depending on the type of referral from a participant's physician, CareCentrix would
arrange for therapeutic sleep services or refer the participant to a Cigna network sleep test
provider in order to diagnose whether the participant needs therapeutic sleep services.  If
CareCentrix arranged care from one of its subcontracted providers, CareCentrix would bill
Cigna.  Sponsors would pay CareCentrix the Cigna plan responsibility according to the
CareCentrix Rates.  CareCentrix then would collect the difference between the plan

---

[31] CIGNA_NEUFELD00000001; CIGNA_NEUFELD00000033; CIGNA_NEUFELD00000071;
CIGNA_NEUFELD00000079; CIGNA_NEUFELD00000088; CIGNA_NEUFELD00000090;
CIGNA_NEUFELD00000138; CIGNA_NEUFELD00000141; CIGNA_NEUFELD00000164;
CIGNA_NEUFELD00000169; CIGNA_NEUFELD00000218; CIGNA_NEUFELD00000222;
CIGNA_NEUFELD00000229; CIGNA_NEUFELD00000244; CIGNA_NEUFELD00000246;
CIGNA_NEUFELD00000248; CIGNA_NEUFELD00000271 CIGNA_NEUFELD00000273;
CIGNA_NEUFELD00000389; CIGNA_NEUFELD00000392; CIGNA_NEUFELD00000394;
CIGNA_NEUFELD00000407; CIGNA_NEUFELD00000412; CIGNA_NEUFELD00000415;
CIGNA_NEUFELD00000417; CIGNA_NEUFELD00000001; CIGNA_NEUFELD00000455;
CIGNA_NEUFELD00023927.
[32] CIGNA_NEUFELD00647409 at -412; CIGNA_NEUFELD00000417.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

responsibility and the CareCentrix Rates – i.e., the participant responsibility – from the participant.

43.     If the participant needed diagnostic testing, CareCentrix would refer the participant to a Cigna network sleep test provider.  CareCentrix sought to direct participants to the lowest cost, most convenient setting of care consistent with the participants' medical needs.  In particular, CareCentrix sought to direct participants to at-home (rather than in-office) sleep testing, when medically appropriate, because at-home sleep testing is significantly less costly and more convenient for participants.[33]

44.     Participants who needed therapeutic sleep services were in some cases enrolled in CareCentrix's iComply program.  iComply would proactively engage with participants and provide ongoing clinical support, enabling participants to make better use of their sleep therapy equipment.[34]  In addition, CareCentrix monitored its sleep equipment suppliers to prevent members from being sent unnecessary supplies and also to make sure that unused equipment is returned, reducing costs for both participants and sponsors.[35]  Subcontracted providers have testified as to the value of the CareCentrix sleep program to Cigna participants.[36]

45.     Other examples of CareCentrix's wraparound services include the following:

- Credentialing of providers, quality assurance, eligibility and benefits verification of participants, and collection of all participant responsibility payments on behalf of subcontracted providers;[37]

- Several value-based payment programs,[38] including one in which CareCentrix agreed to obtain savings for Cigna's participants through reduced home infusion drug costs and increased use of bundled payment;[39] and

---

[33] CCX Neu000656 at 696.
[34] Id.
[35] Id.
[36] Gutknecht (Mobilcare) Tr. 118:5-119:2.
[37] Wogen (CareCentrix) Tr. 18:6-22; CIGNA_NEUFELD00045054 at -066.
[38] See Amendments 12, 15, 21, 24.
[39] Amendment 21; see Amendment 24's per diem rates for an example of bundled payment.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

- Coordination of care for participants requiring services from multiple sources, for example upon discharge from the hospital.[40]

46.     Subcontracted providers have also testified as to the value of CareCentrix's wraparound services, especially CareCentrix's collection of participant responsibility payments.[41] ███

████████████████████████████████████████████████

██████████████████████[42]████████████████████████

████████████████████████████████████████████████

████████████████████████████████████[43]

47.     Because of the value they create, relationships like CareCentrix are common in the industry.  As discussed above, insurers and administrators regularly contract with third-party organizations to provide services to participants.  Third-party organizations may provide non-clinical and other wraparound services in addition to treating patients.  In order to provide these services and implement value-based payment, ultimately for the benefit of participants and sponsors, third-party organizations may offer plans and clinicians different payment methodologies.  Just as CareCentrix did, many IPAs accept value-based payments from insurers or administrators and pay their contracted individual clinicians on a fee-for-service basis.[44]

48.     For this reason, contracts between third-party organizations and insurers or administrators will inevitably sometimes characterize at least some of the cost of non-clinical services as spending on medical products or health services.   Insurers and administrators, in turn, will inevitably sometimes base participant responsibility payments on rates in excess of what third-party organizations pay clinicians, facilities, or any other selected set of subcontractors.  These third-party organizations must incorporate their costs into their rates; otherwise, they could not exist.  Prohibiting third-party organizations from charging more than what they pay clinicians, facilities, or any other selected set of subcontractors would eliminate third-party organizations as

---

[40] Wogen (CareCentrix) Tr. 169:20 – 173:13.
[41] Bunting (Aerocare) Tr. 83:19-84:5; Bunting (Aerocare) Tr. 87:2-11; 87:24-88:10; Sweet (Lincare) Tr. 76:11-21.
[42] Bunting (AeroCare) Tr. 90:2-91:2
[43] Ingram (Apria) Tr. 51:19-52:11; 53:4-8
[44] Robinson JC, The Alignment and Blending of Payment Incentives within Physician Organizations, Health Services Research 2004:39(5), p.1589-1606, 1593, 1597-8.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

an option for insurers and administrators.   Such a prohibition would not reflect the value that third-party organizations create, and ultimately would be detrimental to participants.

## V.   PLAINTIFFS' "OVERCHARGES" DO NOT PROVIDE A VALID ASSESSMENT OF HARM BECAUSE THEIR IMPLICIT BUT-FOR WORLD NEITHER COMPORTS WITH INDUSTRY STANDARDS NOR MAKES ECONOMIC SENSE

49.     The initial step in a proper economic analysis of harm is to define the but-for world that would have resulted in the absence of the alleged wrongdoing in order to specify the baseline against which to compare the economic conditions in the actual world.  From an economic perspective, such a comparison is necessary to determine whether the alleged wrongdoing caused harm, and if so, the extent of that harm.  If the economic conditions in the actual world were equal to or better for the plaintiff than those in the but-for world, then no harm could have occurred.  As a result, determining either the existence or magnitude of economic harm depends crucially on the specification of the but-for world.

50.     Here, Plaintiffs do not expressly define their but-for world, but they define their classes based on the principle that participants were harmed whenever their participant responsibility was based on the CareCentrix Rate *and* that rate was higher than the Subcontracted Rate for the same claim.  Because (as I show below) the CareCentrix Rate may be less than the Subcontracted Rate, Plaintiffs' but-for world is one in which participant responsibility would be based on the lesser of the CareCentrix and the Subcontracted Rates.

51.     Plaintiffs' but-for world is invalid for several reasons.  First, it incorrectly assumes that services other than typical individual medical products and health services have no value (by virtue of the fact that it assumes that participants should not pay for them).  But health care industry participants recognize that typical individual medical products and health services are only one component of overall care, and therefore it will often be in participants' interest to adopt value-based payment arrangements that depend on wraparound services and risk-bearing by providers.

52.     Second, even if it does not assume that services other than typical individual medical products and health services have no value – which it does – it incorrectly assumes that

CONFIDENTIAL – ATTORNEYS' EYES ONLY

participants should not pay for them.  But because CareCentrix's services yielded several benefits for participants, including significant cost savings in sleep services and quality improvements in coordination of services (for example, on discharge from the hospital), it makes economic sense for sponsors to choose plans that would apportion the cost of CareCentrix's services between participants and sponsors.

53.     Third, it incorrectly assumes that participant responsibility could be based on the lesser of the CareCentrix and the Subcontracted Rates.  From an economic perspective, CareCentrix could not accept the lesser of the two Rates without somehow getting compensated for claims that had a CareCentrix Rate that was less than the Subcontracted Rate.  If it did accept the lesser of the rates without compensation, it would lose money.  As I show below, this is more than just a theoretical concern; several participants had CareCentrix Rates that, summed over all of their claims, were less than their Subcontracted Rates.

54.     Basing participant responsibility on the lesser of the CareCentrix and Subcontracted Rates would also destroy the incentive for CareCentrix to use bundled payment.  An example shows why this is the case.  Participant ████████ received an infusion of infliximab at home on October 30, 2018 (HCPCS code J1745) at a CareCentrix Rate of $4,484.48, for which she paid $2,892.32 in participant responsibility.[45]  In addition to the drug itself, CareCentrix billed the participant for its administration with HCPCS code S9379, at a CareCentrix Rate of $182.21, for which she paid $36.44 in participant responsibility.  In total, she paid CareCentrix $2,928.76 (= $2,892.32 + $36.44).

55.     For the first HCPCS code (J1745), CareCentrix paid its subcontracted provider ████ ████████████████████████████████  But for the second HCPCS code (S9379), CareCentrix paid a Subcontracted Rate of ██████  Based on the Subcontracted Rate, the participant responsibility for this second code would have been ██████ instead of ████, so Plaintiffs would classify this participant as harmed in the amount of ████████████████

---

[45] I use the female pronoun for convenience; it is not related to the identity of the participant.

21

56.     Plaintiffs' analysis, however, would neglect the fact that CareCentrix also paid its subcontracted provider ███████ for two other HCPCS codes associated with this home health visit (99601 and 99602), for which it did not charge the participant or her plan.  CareCentrix did not charge the participant or the plan for these two other HCPCS codes because of its bundled payment arrangement with Cigna,[46] whereby it agreed to only charge participants and plans once per day for drug administration at home with HCPCS code S9379 – even if it had to pay its subcontracted provider for additional codes on a fee-for-service basis.

57.     CareCentrix thus absorbed the cost of these additional payments itself.  If not for the bundled payment arrangement, this participant would have incurred additional participant responsibility of ██████ for the payments associated with HCPCS codes 99601 and 99602.  Thus she actually saved ██████████████████, despite the fact that Plaintiffs would classify her as harmed in the amount of $12.58.

58.     Putting aside the fact that Plaintiffs would (incorrectly) classify this participant as harmed when she was not, implementation of their but-for world would destroy the incentive for CareCentrix to use bundled payment.  CareCentrix only agreed to implement bundled payment because it believed it could share in the savings that bundled payment would create for participants and plans.  But in Plaintiffs' but-for world, CareCentrix would be penalized, not rewarded, for using bundled payment.   By imposing such a penalty, Plaintiffs' but-for world would harm putative class members.  There is no way that CareCentrix would have agreed to the bundled payment system described in ¶ 45, much less *promised* to reduce plan and participant responsibility with bundled payment, if it knew that it would be subject to Plaintiffs' but-for world.  Plaintiffs' but-for world would thus eliminate the benefits of bundled payment described in § III.

59.     More broadly, the consequence of Plaintiffs' but-for world would be that sponsors would forego CareCentrix's services or CareCentrix would decline to provide them, and participants would have to obtain services from an alternative Cigna network provider.  As a result, some Cigna participants would have paid rates that exceeded not only the Subcontracted Rates, but

---

[46] CIGNA_NEUFELD00000417 at 442.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

also the CareCentrix Rates.  In addition, other Cigna participants would have received medical care that was more costly and/or less appropriate than that which they actually received.

60.     My conclusion that Plaintiffs' implicit but-for world makes no economic sense does not depend on the specific form through which Cigna accounted for the fees it paid to CareCentrix. Even if it were possible to structure the payment in some other way, CareCentrix would have charged approximately the same amount for its services, the cost of which would have been borne by participants and sponsors (and ultimately by participants).

61.     Thus, the fact that the CareCentrix Rates were in some cases greater than the Subcontracted Rates does not establish that any participant was "harmed" by the Agreements in any meaningful or material way.  Rather, it simply indicates that CareCentrix was compensated for its services and its bearing of the risk inherent in value-based payment.  To consider the Subcontracted Rates to be the but-for world in this case (as Plaintiffs do) has no economic basis, because it assumes that CareCentrix would supply valuable wraparound services and bear risk for free or that Cigna would pay CareCentrix without in turn charging Cigna's plans or participants.

### A.     Compared to the Correct But-For World, the Agreements Benefited Participants and Sponsors—Benefits That Plaintiffs' "Overcharge" Analysis Fails to Consider

62.     As I explain above, Plaintiffs propose a scenario in which participants receive the benefits of the Agreements without paying for them.  Because this scenario would not be accepted by employers and CareCentrix, the correct but-for world would be one in which the Agreements did not exist.  In this world, Cigna participants would have obtained home health services from an alternative Cigna network provider and would have paid that provider's rates.

63.     As discussed above, insurers and administrators compete with one another on the basis of the quality and cost of their networks.  Sponsors evaluate insurers and administrators, both prospectively and retrospectively, in terms of their premiums and expected or average plan responsibility and participant responsibility, which are mostly determined by networks' cost.  For self-funded plans, the reason for this is obvious:  the benefits from a lower-cost network flow

CONFIDENTIAL – ATTORNEYS' EYES ONLY

directly to the sponsors' bottom lines, and ultimately to participants.  Cigna also had a direct incentive to minimize the costs of its network, because Cigna was financially responsible for those costs in its fully-insured plans.  It was therefore in Cigna's economic interest to evaluate the extent to which its network benefited participants and plans as compared to alternative networks that it might have used instead, such as the CareCentrix network.

64.   Cigna acted in accordance with the economic interests of participants and sponsors when it was deciding whether to enter the Agreements.  To achieve corporate approval for the Agreements, Cigna management had to explain how the Agreements could benefit participants and sponsors and provide evidence that they would be likely to do so.[47]  CareCentrix provided analyses to Cigna promoting the CareCentrix network as one that would reduce premiums and participant responsibility while preserving or enhancing quality.[48]  Cigna and CareCentrix staffed a joint operating committee that reviewed regularly whether CareCentrix was saving money for participants and sponsors.[49]

65.   Plaintiffs, however, ignore these benefits of the Agreements.  In doing so, Plaintiffs present an incorrect picture of the economic impact of the challenged conduct, as they assume away the millions of dollars in savings for plans and participants that would result.  To be sure, not every claim by every subcontracted provider had CareCentrix Rates that were lower than the alternative Cigna network rates.  But the aggregate projected savings from the Agreements indicate that they would lead to savings on a substantial portion of claims.  Plaintiffs have not even attempted to investigate the magnitude of these savings.

66.   Participant ████████, for example, received an insulin pump syringe (HCPCS A4232) from Minimed Distribution on October 24, 2011 at a Cigna network rate of $126.69, all of which was participant responsibility.  On March 5, 2012, the same participant received the

---

[47] *See, e.g.*, CIGNA_NEUFELD00045054 at -055, -070 (estimating that transitioning the sleep program to CareCentrix would result in savings of 40% to 50% on the $157 million it was then spending annually on sleep services, with projected savings of $290 million over a 5-year period).

[48] *See, e.g.*, CIGNA_NEUFELD00045603 at -617 (contract renewal slide deck stating "CCX outperforms the benchmarks in all key metrics … delivering $124 mm of annual savings currently").

[49] *See, e.g.*, CIGNA_NEUFELD00023012 at 14 ("The Sleep Management Program continues to perform well with a total of $242 million in savings over four (4) years and a total net savings of $95 million from February 2016-January 2017 which translates into a 534% return on investment (ROI)"); CIGNA_NEUFELD00123096 at 99 ($94.4 million net savings for 2017 and $103.9M net savings for 2018, increasing return on investment to 689%)).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

same equipment from CareCentrix through its contract with Minimed at the CareCentrix Rate of $118.40, all of which was participant responsibility.   As a result of the Agreements, this participant received exactly the same equipment from the same source for $8.29 (= $126.69 - $118.40) less – the difference between the rate Cigna previously negotiated with Minimed and the CareCentrix Rate.  Yet, this same participant would be classified as harmed by Plaintiffs in the amount of $7.20, because the Subcontracted Rate was $111.20 ($7.20 = $118.40 - $111.20).

67.     Participant ▮▮▮▮▮▮▮▮ had a similar experience.  She received a replacement nasal mask cushion (HCPCS A7032) on June 15, 2012 from Norco at a rate of $42.50 with a participant responsibility due to coinsurance of $6.37 (= 0.15 coinsurance rate × $42.50).  On August 21, 2012, the same participant received exactly the same equipment from CareCentrix through its contract with Lincare at a CareCentrix Rate of $22.08 with a participant responsibility of $3.31 (= 0.15 coinsurance rate × $22.08).  As a result of the Agreements, this participant received exactly the same equipment for $3.06 (= $6.37 - $3.31) less – the difference between the rate that Cigna negotiated with Norco and the CareCentrix Rate, multiplied by the coinsurance rate of 15 percent.  Yet, this same participant would be classified as harmed by Plaintiffs in the amount of ▮▮▮, because the Subcontracted Rate was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

68.     Plaintiffs' classification of these participants as harmed makes no economic sense.  Both participants received the same equipment at a lower rate from CareCentrix than they did from a different Cigna network provider.  In fact, in the first example, the participant received the same equipment from the same source – but at the lower CareCentrix Rate.

69.     Table 1 generalizes the analysis above to putative class members who received one or more of six common disposable CPAP supplies.  Table 1 presents the share of CareCentrix claims for these supplies that had a CareCentrix Rate that was less than, similar to, or greater than the median Cigna network rate in the geographic area and year of the putative class member who received the supplies.  Table 1 shows that for many HCPCS codes, the CareCentrix Rates were less than the Cigna median network rate   For A7032 (nasal mask cushion), for example, the CareCentrix Rate was less than or similar to the median Cigna network rate on 77 percent of

claims and greater than the median Cigna network rate on 23 percent of claims.  For A7034 (nasal interface), the CareCentrix/Cigna Rate was less than or similar to the median Cigna network rate on 75 percent of claims, and greater on 25 percent of claims.  Most participants were clearly better off getting these supplies through Cigna's contract with CareCentrix than alternative Cigna network providers.

**Table 1:  CareCentrix Rates Often Less Than the Cigna Network Rate**

| HCPCS | Description | CareCentrix Rate Less Than Cigna Network Rate | CareCentrix Rate Similar To Cigna Network Rate | CareCentrix Rate Greater Than Cigna Network Rate |
|-------|-------------|------|------|------|
| A4604 | Tubing with integrated heating element for use with positive airway pressure device | 3% | 14% | 83% |
| A7032 | Cushion for use on nasal mask interface (replacement only) | 75% | 2% | 23% |
| A7034 | Nasal interface (mask or cannula type) used with positive airway pressure device | 69% | 6% | 25% |
| A7035 | Headgear used with positive airway pressure device | 27% | 25% | 48% |
| A7037 | Tubing used with positive airway pressure device | 81% | 3% | 16% |
| A7038 | Filter, disposable, used with positive airway pressure device | 4% | 2% | 94% |

Notes:
Analysis includes CareCentrix claims with a participant "overcharge" for HCPCS codes for which at least half had 10 or more Cigna network comparator claims in the same MSA or county and year
Similar to means +/- 5 percent; less than and greater than means outside of the +/- 5 percent range.

70.     Moreover, even when CareCentrix was more costly on a per unit basis than the median Cigna network provider, the CareCentrix Rate was still less than some network providers' rates. For example, for HCPCS A4604 (tubing with integrated heating element), the CareCentrix Rate was either less than or similar to the median Cigna network rate on 17 percent of claims, which means that 17 percent of putative class members would have either been harmed or had no impact if they switched to Cigna's alternative network rates for this product.  For A7038 (disposable filter), the CareCentrix Rate was less than or similar to the median Cigna network rate on 6 percent of claims, which means that 6 percent of putative class members would have either been harmed or had no impact if they switched to Cigna's alternative network rates for this product.

71.     According to Plaintiffs' theory, however, every one of these putative class members suffered harm equal to the difference between the CareCentrix and the Subcontracted Rates.

26
CONFIDENTIAL – ATTORNEYS' EYES ONLY

Yet, for three of the six HCPCS codes above, a majority of putative class members *benefited from* the CareCentrix Rates relative to the median Cigna network rate that they would have paid in the absence of the Agreements.  And even if not a majority, at least some portion of putative class members benefited from the CareCentrix Rates in all six examples.

**B.     To Determine Which – If Any – Participants Were Harmed Would Require Individualized Inquiry**

72.     Identifying which participants – if any – were harmed by the Agreements is more complex than the simple examples above suggest.  The Agreements changed not only the rates that participants paid, but also the types of treatments that participants received as a way to reduce plans' and participants' costs overall.  As I explain in ¶¶ 42 - 44, one of the services CareCentrix provided in exchange for its value-based payments was a comprehensive sleep program.  As I show below, the program saved money for plan and participants as a whole, by both redirecting participants from more costly and less convenient in-office to less costly and more convenient at-home sleep tests and reducing the cost of sleep equipment and supplies.  In fact, as I explain below, the financial savings alone (not counting the benefit from the increased convenience) from the program were so large that they overwhelm any "overcharges" that could have occurred.  Thus, even if one were to consider Plaintiffs' "overcharges" as a valid measure of harm – which, as I explain above, they are not – individualized inquiry into the other benefits created by the Agreements would be necessary in order to determine which – if any – participants were harmed on net.

73.     Table 2 provides the basis for my opinion about the magnitude of the benefits from the sleep program.  The Table presents the costs of sleep tests, equipment, and supplies before and after the implementation of the program.  The program was implemented in early 2013.  I use participants' experience in 2011-2012 as the "before" period and participants' experience in 2013-2015 and 2016-2018 as the "after" periods.

**Table 2:  The CareCentrix Sleep Program Benefited Both Participants and Sponsors**

| | Before CareCentrix Sleep Program | | | After CareCentrix Sleep Program | | | | | |
| | 2011-2012 | | | 2013-2015 | | | 2016-2018 | | |
| Description | # patients per year | $/patient | $/member month | # patients per year | $/patient | $/member month | # patients per year | $/patient | $/member month |
|---|---|---|---|---|---|---|---|---|---|
| **Sleep tests** | | | | | | | | | |
| at home | 2802 | $655 | $0.03 | 18121 | $758 | $0.20 | 40276 | $556 | $0.27 |
| in office | 38183 | $2,347 | $1.49 | 19531 | $2,314 | $0.66 | 14417 | $2,308 | $0.41 |
| total | 40984 | $2,232 | $1.52 | 37652 | $1,565 | $0.87 | 54693 | $1,018 | $0.68 |
| **Sleep equipment from CareCentrix** | 40984 | $651 | $0.44 | 37652 | $615 | $0.34 | 54693 | $582 | $0.39 |
| | | | | | | | | | |
| **Total** | 40984 | $2,883 | $1.96 | 37652 | $2,180 | $1.21 | 54693 | $1,599 | $1.07 |

Notes:
CIGNA_NEUFELD00594465.  Analysis includes claims from PHS+ accounts on Cigna's Proclaim system.

74.     Before the program, sleep tests were mostly performed in a provider's office or a sleep clinic.  Of the 40,984 patients per year who received sleep tests in 2011-2012, 2,802 received their sleep test at home (7 percent) and 38,183 received their sleep test in office (93 percent). The cost of the in-office sleep test was much greater:  $2,347 as compared to $655.  In total, sleep tests cost participants and sponsors $2,232 per tested participant.  This translated into a cost for sleep tests of $1.52 per participant per month, when distributed over all the participants enrolled in a plan.  Among the tested population of 40,984, many received therapeutic sleep treatment, including sleep equipment and supplies from CareCentrix.  The cost of the sleep equipment and supplies per tested participant was $651; when distributed over all the participants enrolled in a plan, this translated into $0.44 per participant per month.

75.     After the program, many more sleep tests were performed at home.  By 2013-2015, sleep tests were approximately evenly distributed between at-home and in-office.  By 2016-2018, sleep tests were mostly performed at home.  At the same time, the number of sleep tests grew dramatically, enabling many more participants to be tested.  Of the 54,693 patients per year who received sleep tests in 2016-2018, 40,276 received their sleep test at home (74 percent) and 14,417 received their sleep test in office (26 percent).

28
CONFIDENTIAL – ATTORNEYS' EYES ONLY

76.     The shift from in-office to at-home sleep tests resulted in dramatic savings for participants and sponsors.[50]  In 2011-2012, sleep tests cost $2,232 per tested participant; by 2013-2015, the cost per tested participant had fallen to $1,565, and by 2016-2018, to $1,018. The shift from in-office to at-home sleep tested not only saved money for tested participants but also for participants overall – despite the huge expansion in the number of tested participants.  In 2011-2012, Cigna plans and participants spent $1.52 per participant per month on sleep tests, but by 2016-2018, they spent only $0.68.

77.     The program also resulted in substantial savings for participants and sponsors on the cost of sleep equipment and supplies.  In 2011-2012, sleep equipment and supplies cost $651 per tested participant; but by 2016-2018, sleep equipment and supplies cost only $582 per tested participant, a 10.6 percent decrease.  This change was due at least in part to the ongoing clinical support provided by CareCentrix, which enabled participants to make better use of their sleep therapy equipment and prevented participants from being sent unnecessary supplies.  Like the rest of the benefits of the program, these benefits are ignored by Plaintiffs, who examine only the rates per piece of equipment, not the type or volume of equipment that was used.

78.     The savings from CareCentrix's program were so vast that they overwhelm any "overcharges" that this population could have incurred.  To see this, assume that utilization review, iComply, and provider monitoring resulted in no savings in the cost of equipment and supplies – which is false – and further assume that *all of the cost of sleep equipment and supplies from CareCentrix was an "overcharge."*  In other words, assume the Subcontracted Rates for sleep equipment and supplies were *zero*, that CareCentrix was able to obtain the sleep equipment and supplies it supplied to participants for free.  If this were the case, in 2016-2018, according to Plaintiffs' theory, Cigna participants and sponsors would have been harmed by $582 per tested participant – the full cost of the sleep equipment and supplies.  Even with this wildly unrealistic assumption, the Agreements still saved money for participants and sponsors.  From 2011-2012 to 2016-2018, the cost of sleep tests declined by $1,214 per tested participant ($2,232 - $1,018),

---

[50] Sleep tests were always performed by other Cigna network sleep testing providers, not CareCentrix, so the cost per test was always independent of the CareCentrix Rates.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

which is more than double the cost of all the equipment used by a tested participant, on average, in 2016-2018 ($582).

79.     The example of Mr. Terry – a named Plaintiff in this case – shows why any fix to Plaintiffs' incorrect but-for world would necessarily involve individualized inquiry. ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████[51] ████████████████████████████████████████████

████████████████████████████████████████████████████

███████████

80.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████[52]  Because Mr. Terry's plan had a

deductible of $1,500 and a coinsurance rate of 20%, he would have paid $1,656.25 (= $1,500 + (0.20 × ($2,281.23 - $1,500)).  Thus, the Agreements saved Mr. Terry $1,306.25 on the cost of

█████████████

81.     In determining that Mr. Terry was harmed by "overcharges," Plaintiffs ignore this savings.  Indeed, Mr. Terry's savings from the ████████████████ was so large that even if *all* of Mr. Terry's subsequent participant responsibility for CareCentrix in 2017 were overcharges – that is, assuming that the Subcontracted Rates for all of the subsequent products and services he obtained from CareCentrix in 2017 were *zero* – he still would have saved money.  In 2017, Mr. Terry had total participant responsibility to CareCentrix of $1,017.33,[53] which is smaller than the $1,306.25  that he saved by virtue of CareCentrix's utilization review program by $288.92 (= $1,306.25 - $1,017.33).

82.     This dramatic result shows, in particularly stark form, why the but-for world implicit at the heart of Plaintiffs' case makes no economic sense.  A named Plaintiff benefited from the

---

[51] Terry Tr. 183:16-184:3; 191:13-194:2.
[52] CIGNA_NEUEELD00594465.
[53] I provide detail on Mr. Terry's CareCentrix claims, along with ████████████████, in my backup materials.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Agreements by such a large amount that, even if Plaintiffs' overcharges were an accurate measure of harm – which they are not – he actually ended up paying less than he would have in Plaintiffs' (incorrect) but-for world.

## VI.   EVEN ACCEPTING PLAINTIFFS' INCORRECT BUT-FOR WORLD, TO CORRECTLY IDENTIFY WHO WAS HARMED AND BY HOW MUCH WOULD REQUIRE INDIVIDUALIZED INQUIRY

83.   As the example above shows, Plaintiffs do not correctly identify which participants were harmed, due to Plaintiffs' incorrect specification of the but-for world.  The flaws in Plaintiffs' approach, however, are even deeper.  Even accepting Plaintiffs' obviously incorrect but-for world, their assessment of who was harmed and by how much is incorrect.  Fundamentally, this is because some putative class members who Plaintiffs would allege were "harmed" under Plaintiffs' incorrect approach either benefited from the Agreements or recovered all of their alleged "harm."  Any logical assessment of harm would need to account for the benefits or recoveries that the very same putative class members obtained.  These examples show that to determine correctly which participants were harmed, and by how much, would require detailed analysis at the level of each individual participant.

### A.   Participant Had Both "Overcharged" and "Undercharged" Claims

84.   For a simple example of this flaw, consider a participant who (a) had claims where the CareCentrix Rates were greater than the Subcontracted Rates (and therefore had an alleged "overcharge"), but (b) also had claims where the CareCentrix Rates were less than the Subcontracted Rates (and therefore had an "undercharge").  Plaintiffs simply ignore the claims for which the participant benefited, and based on this incomplete analysis would claim that this participant was "overcharged."  But to determine the actual impact of the challenged conduct on such a participant, one would need to consider both (a) claims where the participant responsibility was based on lower rates and (b) claims where the participant responsibility was based on higher rates.  According to the definition of their putative class, Plaintiffs exclude the possibility of such an analysis.

85.   Plaintiffs' exclusion of such an analysis is not economically rational:  a participant with "overcharges" that were smaller in magnitude than her "undercharges" would not have been

31

harmed in any meaningful or material way.  Because Plaintiffs' exclusion of such an analysis necessarily follows from their putative class definition, Plaintiffs' putative class definition also does not establish a common theory by which class members were harmed.

86.     Participants with both "undercharged" and "overcharged" claims are not just a theoretical concern.  Table 3 summarizes the claim history of an actual participant (███████) who had exactly such circumstances in 2016.  Table 3 shows whether (and by how much) this participant's responsibility would have been higher or lower on each claim—including those that Plaintiffs would ignore—in the actual world as compared to Plaintiffs' (incorrect) but-for world.

**Table 3:  Participant Had "Undercharges" That Exceeded "Overcharges"**

| Sequence [A] | CareCentrix Rate [B] | | Actual Participant Responsibility [D] | | Harm or Benefit in Plaintiffs' Incorrect But-for World [H] |
|---|---|---|---|---|---|
| 1 | $452.38 | | $90.47 | | Benefit |
| 2 | $51.96 | | $10.39 | | Harm |
| 3 | $51.96 | | $10.39 | | Harm |
| 4 | $51.96 | | $10.39 | | Harm |
| Total | $608.26 | | $121.64 | | Benefit |

87.     Column [A] of Table 3 shows the sequence of each of this participant's four claims in time.  Column [B] reports the CareCentrix Rate; column [C] reports the Subcontracted Rate. Column [D] reports the participant responsibility in the actual world – that is, the participant responsibility that was based on the CareCentrix Rate.  Column [E] reports what the participant responsibility would have been in Plaintiffs' but-for world – that is, the participant responsibility based on the Subcontracted Rate.  Column [F] reports the difference between the actual and Plaintiffs' but-for participant responsibility.  Column [G] reports Plaintiffs' alleged "overcharge."  According to Plaintiffs, column [F] is equal to column [G], so long as column [F] is positive.  Plaintiffs ignore claims for which column [F] is negative, however – that is, claims

CONFIDENTIAL – ATTORNEYS' EYES ONLY

where there was an "undercharge." Column [H] reports whether a claim would result in harm or benefit to a putative class member as defined by Plaintiffs' (incorrect) but-for world.

88.     Plaintiffs would consider only claims 2, 3 and 4 in their analysis; they would ignore claim 1. On claims 2-4, Plaintiffs would allege that the participant was "overcharged" by ▮▮▮ per claim —the difference between the actual participant responsibility and what the participant responsibility would be in their but-for world (= coinsurance rate of $0.20 \times$ (CareCentrix Rate of $51.96 – Subcontracted Rate of ▮▮▮)). According to Plaintiffs, this participant therefore would incur "overcharges" totaling ▮▮▮ (= ▮▮▮ $\times$ 3, column [G]).

89.     Plaintiffs would ignore claim 1 in their analysis.  In this claim, the participant was *better off* in the actual world than she would be in the but-for world because the CareCentrix Rate was lower than the Subcontracted Rate.  But instead of netting these benefits against the supposed harm, Plaintiffs would simply ignore the benefits.  Specifically, on claim 1, the participant was responsible for ▮▮▮ less (= coinsurance rate of $0.20 \times$ (CareCentrix Rate of $452.38 – Subcontracted Rate of ▮▮▮)) in the actual world than she would be in the but-for world.  In fact, the total "undercharge" that this Participant incurred on claim 1 from the Agreements of ▮▮▮ exceeded the alleged "overcharge" that this she incurred on claims 2 – 4 of ▮▮▮.  In total, this participant's responsibility was actually reduced by ▮▮▮ (= ▮▮▮▮▮, column [F]) based on the application of the CareCentrix Rates instead of the Subcontracted Rates.

90.     Even as compared to Plaintiffs' (incorrect) but-for world, this participant actually benefited from having their responsibility based on the CareCentrix Rates, rather than the Subcontracted Rates.  And yet, because they would simply ignore the claims for which the participant benefited, Plaintiffs would erroneously classify this participant as having suffered an "overcharge."

### B.    Participant Recovered "Overcharge" On a Later Claim

91.     The need for individualized inquiry, however, extends beyond simply accounting for claims (which Plaintiffs would ignore) where the CareCentrix Rates were less than the Subcontracted Rates.  As I show in detail below, because of the impact of plan terms such as the

CONFIDENTIAL – ATTORNEYS' EYES ONLY

out-of-pocket maximum, the impact of the challenged conduct on any particular participant or claim can only be assessed through a detailed analysis of the individual participant's claims history.  Thus it is not possible to calculate what participant responsibility on a claim would have been in *any* but-for world—including Plaintiffs' (incorrect) but-for world—without considering *all* of a participant's claims in the but-for world in that plan year as well.

92.    Mr. Jacques, a named Plaintiff, provides an example of this phenomenon.  Table 4 reports [54] ██████████████



**Table 4:  Mr. Jacques Was Not Harmed, Even In Plaintiffs' Incorrect But-for World**

93.    Mr. Jacques had ████████████

---

[54] Mr. Jacques's CareCentrix claims in 2017 were under his Intuit plan, which has a plan year that begins on August 1st of each year. (CIGNA_NEUFELD00771446 at 455.) Mr. Jacques had CareCentrix claims in January and June of 2017 so these claims occurred under the August 1, 2016 through July 31, 2017 plan year.

34

████████████████,[55] █████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

94.   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████

95.   ████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

96.   Not surprisingly, the extra participant responsibility that Mr. Jacques would incur in
Plaintiffs' but-for world is exactly equal to his alleged "overcharges." ████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

---

[55] Compare the explanation of benefits for claims 2 – 4 (JACQUES_00042, JACQUES_00048, and JACQUES_00054, respectively) which indicate that he had met his out-of-pocket maximums for the plan year to the explanation of benefits for claim 1 (JACQUES_00036), which does not have this note.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

[REDACTED]

97.     In short, Mr. Jacques experienced zero economic impact—neither net harm nor net benefit—in his 2017 plan year due to the Agreements, as compared to Plaintiffs' but-for world.

[REDACTED] And yet, by ignoring some claims and focusing on others, Plaintiffs would erroneously conclude that Mr. Jacques suffered an "overcharge," even though he was responsible for exactly the same amount in the actual world as he would be in their own (incorrect) but-for world.  This "false positive" result plainly shows that Plaintiffs "overcharge" cannot identify either harm correctly—even in the case of a named Plaintiff.

### C.     Participant Did Not Pay the Alleged "Overcharge"

98.     Even if Plaintiffs were to consider all of a participant's previous claims in the but-for world in plan years in which the participant suffered an "overcharge" – which they do not – there would still be a need for individualized inquiry.  This is because whether a participant actually suffered harm depends on the amount of participant responsibility that CareCentrix actually collected.  As compared to any but-for world, if a putative class member did not actually pay her "overcharge," then she cannot have suffered any harm because CareCentrix writes off this unpaid cost-share as bad debt after 18 months.[56]  An individual inquiry is necessary to assess this issue.

99.     Mr. Neufeld, another named Plaintiff, provides an example of this phenomenon.  Table 5 summarizes [REDACTED] Columns [A] – [E] in Table 5

---

[56] Sofiane (CareCentrix) Tr. 81:20-82:9.

36

CONFIDENTIAL – ATTORNEYS' EYES ONLY

are defined in the same way as columns [A] – [E] in Tables 3 and 4.  But column [F] of Table 5 reports what the participant actually paid to CareCentrix.  Column [G] reports not the difference between actual and but-for participant responsibility (as was reported in Tables 3 and 4), but *the difference between actual and but-for participant responsibility if the participant actually paid*.  Column [H] reports the "overcharge" that Plaintiffs would calculate, not taking into account whether or how much of the "overcharge" the participant actually paid.

**Table 5:  Mr. Neufeld's "Overcharges" Far Exceed Any Harm He Might Have Suffered**



100.    The last row of Table 5 shows that Mr. Neufeld had total 2017 participant responsibility, based on the CareCentrix Rates, of ███ (column [D]).  Had the participant responsibility for these claims been based on the Subcontracted Rate, Mr. Neufeld would have paid ████ (column [E]).   According to Plaintiffs' theory, Mr. Neufeld was therefore "overcharged" by ██████████, column [H]).

101.    However, Mr. Neufeld testified that he had only ever paid CareCentrix for the participant responsibility on his first claim in the amount of ████ – a fact captured by column [F].  Thus it is not possible for him to have been harmed by ████; in fact, even in Plaintiffs' (incorrect)

37
CONFIDENTIAL – ATTORNEYS' EYES ONLY

but-for world, he would be harmed by only ██████, the difference between his actual participant responsibility and the but-for participant responsibility that he actually paid (column [G]).  But Plaintiffs offer no way to determine which participants actually paid any participant responsibility *at all*, much less to determine how much participants *actually paid on at-issue claims*.

**D.     Participant Was "Overcharged" But Nonetheless Benefited From the Agreements**

102.    Even if Plaintiffs were to propose a method that accounted seriatim for the scenarios outlined in §§ VI.B and VI.C above – which they do not – there would still be a need for individualized inquiry.  This is because the scenarios interact with one another to affect whether and how much harm a participant suffered, even in Plaintiffs' incorrect but-for world.  Indeed, the scenarios might interact with one another to make allegedly "overcharged" participants *better off* in the actual as compared to the but-for world.

38

CONFIDENTIAL – ATTORNEYS' EYES ONLY

103.    Participant ████████ provides an example of this phenomenon.  This participant's claims from CareCentrix are summarized in Table 6.

**Table 6:  Participant Was "Overcharged" But Nonetheless Benefited from the Agreements**

| Sequence [A] | CareCentrix Rate [B] | | Actual Participant Responsibility [D] | | Plaintiffs' "Overcharge" [H] |
|---|---|---|---|---|---|
| 1 | $175.26 | | $175.26 | | $85.26 |
| 2 | $176.85 | | $176.85 | | $86.85 |
| 3 | $176.85 | | $35.37 | | $17.37 |
| 4 | $176.85 | | $35.37 | | $17.37 |
| 5 | $176.85 | | $35.37 | | $17.37 |
| 6 | $176.85 | | $35.37 | | $17.37 |
| 7 | $176.85 | | $35.37 | | $17.37 |
| 8 | $176.85 | | $35.37 | | $17.77 |
| 9 | $176.85 | | $35.37 | | $17.77 |
| 10 | $176.85 | | $0.00 | | $0.00 |
| 11 | $176.85 | | $0.00 | | $0.00 |
| 12 | $176.85 | | $0.00 | | $0.00 |
| Total | $2,120.61 | | $599.70 | | $294.50 |

All the columns in Table 6 are defined in the same way as the columns in Table 5.  As Table 6 shows, this participant had 12 CareCentrix claims in 2018.  On claims 1 and 2, she had actual participant responsibility of $175.26 and $176.85, respectively, which went towards her plan's deductible.  Had her participant responsibility for these claims been based on the Subcontracted Rate, she would have had ████ of participant responsibility on each.  According to Plaintiffs' theory, she was therefore "overcharged" on these claims by ████████████████ ████████████████████████, column [H]).

104.    Such an analysis incorrectly assesses harm on these claims, even accepting Plaintiffs' (incorrect) but-for world.  According to CareCentrix's records, this participant never paid CareCentrix any of the $352.11 (= $175.26 + $176.85) in deductible responsibility on claims 1 and 2.  Thus on claims 1 and 2 she was not harmed – a fact captured by columns [F] and [G] – despite having an alleged "overcharge."

105.    Plaintiffs' assessment of harm on claims 3 and 4 would also be incorrect.  This participant paid $35.37 in coinsurance on each of claims 3 and 4 (= coinsurance rate of 0.20 × CareCentrix Rate of $176.85).  Because each of claims 3 and 4 had a Subcontracted Rate of ████, which would lead to a participant responsibility of ████ (= coinsurance rate of 0.20 × Subcontracted Rate of ████), Plaintiffs would calculate an "overcharge" of ████████ ████ on each.

106.    However, instead of being harmed on claims 3 and 4 in the actual versus Plaintiffs' (incorrect) but-for world, this participant benefited.   This is because, in the but-for world, she would not have satisfied her deductible prior to claim 3; instead, she would have satisfied it in the middle of claim 4.  The date when she would leave the deductible phase (in which she was responsible for 100% of the relevant rate) for the coinsurance phase (in which she was responsible for 20% of the relevant rate) of her plan changed in the but-for world because the rate for claims 1 and 2 changed.  Swapping the CareCentrix for the Subcontracted Rate on claims 1 and 2, as the but-for world would do, would pull this participant back into the deductible phase of her plan for claim 3 and part of claim 4.  As such, she would have additional deductible responsibility for claims 3 and 4 in the but-for world that she did not have in the actual world, making her total participant responsibility on claims 3 and 4 greater in the but-for versus the actual world.  Specifically, in the but-for world, she would have owed ████ on claim 3 and ████ on claim 4, as compared to $35.37 on each in the actual world.  As a consequence, her participant responsibility on claims 3 and 4 would be ████████████████ and ████ ████████ greater in the but-for versus the actual world.

107.    In Plaintiffs' (incorrect) but-for world, they would calculate an "overcharge" of ████ (coinsurance rate of 0.20 × CareCentrix Rate of $176.85) - (coinsurance rate of 0.20 ×

40

Subcontracted Rate of ████ )) on each of claims 5 – 7 and an "overcharge" of ████
(coinsurance rate of 0.20 × CareCentrix Rate of $176.85) - (coinsurance rate of 0.20 ×
Subcontracted Rate of ████ )) on each of claims 8 – 9.

108.    Plaintiffs' would ignore claims 10 – 12 in their "overcharge" calculation because this
participant had no participant responsibility (and paid nothing) in the actual world.  Under some
specifications of Plaintiffs' (incorrect) but-for world, this participant would have benefited in the
actual versus the but-for world.  Determining whether this participant benefited from the actual
world would depend on whether the but-for world would assume that she would have paid or
failed to pay her increased participant responsibility in the but-for world.  If the but-for world
assumed that she would have paid her participant responsibility on claims 10 – 12, then she
would have benefited from the actual world in the amount of $52.80 (= $17.60 × 3).  If the but-
for world assumed that she would fail to pay her participant responsibility on claims 10 – 12,
then she would have neither benefit nor harm on these claims.  In order to make my assessment
of this participant's harm in Plaintiffs (incorrect) but-for world as large as possible, I make the
latter assumption of neither benefit nor harm on claims 10 – 12.

109.    Regardless, under any possible version of Plaintiffs' (incorrect) but-for world, this
participant benefited from the Agreements by at least $15.30.  She did not pay her deductible
responsibility on claims 1 and 2, and although she paid her coinsurance responsibility on claims
3 – 9, she would have owed more on claims 3 – 9 in Plaintiffs' (incorrect) but-for world, once
the participant responsibility on claims 3 and 4 was recalculated to account for the impact of the
but-for world on the first two claims.  Nonetheless, according to the method implied by
Plaintiffs' putative class definition, this participant was harmed in the amount of ████ .

## VII.   CONCLUSION

110.    As illustrated by the case studies of several named Plaintiffs, as well as several examples based on the actual experiences of putative class members, a detailed individualized inquiry is needed to assess the impact of the challenged conduct on any individual participant.  Plaintiffs have not proposed such an inquiry.  Instead, they have offered a putative class definition that rules out such inquiry.  As a result, the method necessarily implied by their class definition does not reliably identify harm among putative class members, and labels class members as "overcharged" when they actually benefited or were not harmed.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Signed on the 7th of June, 2021, at Stanford, CA.

_____

Daniel P. Kessler

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Appendix A**

**Curriculum Vitae**

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Daniel P. Kessler**
Law School, Graduate School of Business, Hoover Institution,
and Stanford Institute for Economic Policy Research
Stanford University
Stanford, CA 94305
(650) 725-1519, fkessler@stanford.edu

## Education

| | |
|---|---|
| Ph.D. | Economics, Massachusetts Institute of Technology, 1994 |
| J.D. | Stanford Law School, 1993 |
| B.A. | Economics, Harvard University, 1988 |

## Academic Positions

Professor, by courtesy, Stanford School of Medicine, Department of Medicine, Center for
    Primary Care and Outcomes Research, 2021-
Director of Research, Hoover Institution, 2019-
Senior Fellow, Stanford Institute for Economic Policy Research, 2016-
Professor, Stanford Law School, 2009-
Professor, by courtesy, Stanford School of Medicine, Department of Health Research and Policy,
    2008-20
David S. and Ann M. Barlow Professor in Management, Graduate School of Business,
    Stanford University, 2007-10
Visiting Professor, Harvard Law School, 2007
Senior Fellow, Hoover Institution, Stanford University, 2006-
Professor, by courtesy, Stanford Law School, 2004-2009
Professor, Graduate School of Business, Stanford University, 2003-
Visiting Associate Professor, Wharton School, University of Pennsylvania, 2002-03
Associate Professor, Graduate School of Business, Stanford University, 1998-2003
Assistant Professor, Graduate School of Business, Stanford University, 1994-98

## Awards, Fellowships, and Other University Affiliations

Affiliate, Stanford Center on Longevity, 2008-
Health Care Research Award, National Institute for Health Care Management Foundation, 2003
Fellow, Center for Advanced Study in the Behavioral Sciences, 2003-04
Graduate School of Business Trust Faculty Fellow, 2000-01
Affiliate, Center for Social Innovation, Stanford Graduate School of Business, 2000-
Research Associate, National Bureau of Economic Research, 1999-
Public Policy Advising Award, Stanford University, 1998
Kenneth J. Arrow Award for Best Paper in Health Economics, International Health Economics
    Association, 1997
Affiliate, Center for Health Policy, Stanford University, 1997-
Class of 1969 Faculty Scholar, Stanford Graduate School of Business, 1997-98
National Fellow, Hoover Institution, 1997-98
John M. Olin Faculty Fellow, 1996-97
Faculty Research Fellow, National Bureau of Economic Research, 1994-99

45
CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Academic Publications**

"Does Multispecialty Practice Enhance Physician Market Power?" with Laurence C. Baker and M. Kate Bundorf, *American Journal of Health Economics* 6(3): 324-47 (2020).

"The Effects of Medicare Advantage on Opioid Use," with Laurence C. Baker and M. Kate Bundorf, *Journal of Health Economics* 70: 102278 (2020).

"Why Don't Commercial Health Plans Use Prospective Payment?" with Laurence C. Baker, M. Kate Bundorf, and Aileen M. Devlin, *American Journal of Health Economics* 5(4):465-80 (2019).

"Competition in Outpatient Procedure Markets," with Laurence C. Baker and M. Kate Bundorf, *Medical Care* 57(1): 36-41 (2019).

"Neurophysiological monitoring during cervical spine surgeries:  Longitudinal costs and outcomes," with John P. Ney, *Clinical Neurophysiology* 129: 2245-51 (2018).

"ACA Marketplace Premiums and Competition Among Hospitals and Physician Practices," with Maria Polyakova, M. Kate Bundorf, and Laurence C. Baker, *American Journal of Managed Care* 24(2): 85-90 (2018).

"The Effect of Medicare Advantage on Hospital Admissions and Mortality" with Christopher Afendulis and Michael Chernew, *American Journal of Health Economics* 3(2): 254-79 (2017).

"Hospital Ownership of Physicians:  Hospital Versus Physician Perspectives" with Laurence C. Baker, Aileen M. Devlin, and M. Kate Bundorf, *Medical Care Research and Review*: 1-12 (2016).

"The Effect of Hospital/Physician Integration on Hospital Choice" with Laurence C. Baker and M. Kate Bundorf, *Journal of Health Economics* 50: 1-8 (2016).

 "Medicare Advantage Plans Pay Hospitals Less Than Traditional Medicare Pays" with Laurence C. Baker and M. Kate Bundorf, *Health Affairs* 35: 1444-51 (2016).

"Does Health Plan Generosity Enhance Hospital Market Power?" with Laurence C. Baker and M. Kate Bundorf, *Journal of Health Economics* 44: 54-62 (2015).

"Designing Antitrust Policy for Accountable Care Organizations," with Laurence C. Baker and M. Kate Bundorf, *Journal of Competition Law & Economics* 11: 317-29 (2015).

"Expanding Patients' Property Rights in Their Medical Records," with Laurence C. Baker and M. Kate Bundorf, *American Journal of Health Economics* 1: 82-100 (2015).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

"Patient Preferences Explain a Small But Significant Share of Regional Variation in Medicare Spending," with Laurence C. Baker and M. Kate Bundorf, *Health Affairs* 33: 957-63 (2014).

"Vertical Integration:  Hospital Ownership of Physician Practices Is Associated With Higher Prices and Spending," with Laurence C. Baker and M. Kate Bundorf, *Health Affairs* 33: 756-76 (2014).

"Medical Malpractice, Defensive Medicine, and Physician Supply," in the *Encyclopedia of Health Economics*, Volume 2, ed. Anthony J. Culyer, Elsevier (2014).

"Why Are Medicare and Commercial Insurance Spending Weakly Correlated?" with Laurence C. Baker and M. Kate Bundorf, *American Journal of Managed Care* 20: e8-e14 (2014).

"Regulatory Neutrality Is Essential To Establishing A Level Playing Field For Accountable Care Organizations" with Gary E. Bacher, Michael E. Chernew, and Stephen M. Weiner, *Health Affairs* 32: 1426-32 (2013).

"Reforming Medicare," *Tax Law Review* 65 (2012): 811-833.

"How Should Risk Adjustment Data Be Collected?" *Inquiry* 49 (Summer 2012): 127-140.

"Reforming the Tax Preference for Employer Health Insurance," with Joseph Bankman, John F. Cogan, and R. Glenn Hubbard, in *Tax Policy and the Economy, Volume 26*, ed. Jeffrey Brown, MIT Press (2011).

"Vertical Integration and Optimal Reimbursement Policy," with Christopher C. Afendulis, *International Journal of Health Care Finance and Economics* 11 (2011):  165-179.

"The Effect of Tax Preferences on Health Spending," with John F. Cogan and R. Glenn Hubbard, *National Tax Journal* 64 (September 2011):  795-816.

"The Effect of Bivalirudin on Costs and Outcomes of Treatment of ST-segment Elevation Myocardial Infarction," with Eugene Kroch and Mark A. Hlatky, *American Heart Journal* 162 (2011):  494-500.

"Evaluating the Medical Malpractice System and Options for Reform," *Journal of Economic Perspectives* 25 (2011): 93-110.

"Does Patient Satisfaction Affect Patient Loyalty?" with Deirdre Mylod, *International Journal of Health Care Quality Assurance* 24 (2011): 266-73.

*Regulation versus Litigation:  Perspectives from Economics and Law*, ed., University of Chicago Press (2011).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

"The Persuasive Effects of Direct Mail: A Regression Discontinuity Approach," with Alan
    Gerber and Marc Meredith, *Journal of Politics* 73 (January 2011): 140-55.

"HMO Coverage Reduces Variations in the Use of Health Care Among Patients Under Age
    Sixty-five" with Laurence Baker and M. Kate Bundorf, *Health Affairs* 29 (November
    2010): 2068-74.

"The Effect of Massachusetts Health Reform on Employer-sponsored Insurance Premiums,"
    with John F. Cogan and R. Glenn Hubbard, *Forum for Health Economics and Policy* 13
    (2010): article 5.

"The Effect of Medicare Coverage for the Disabled on the Market for Private Insurance," with
    John F. Cogan and R. Glenn Hubbard, *Journal of Health Economics* 29 (May 2010):  pp.
    418-25.

"Why Is Health Reform So Difficult?" with David Brady, *Journal of Health Politics, Policy, and
    Law* 35 (April 2010): 161-75.

"Who Supports Health Reform?" with David Brady, *PS: Political Science and Politics* 43
    (January 2010): 1-6.

"Putting the Public's Money Where Its Mouth Is," with David Brady, *Health Affairs* 28
    (September/October 2009): w917-w925.

"Do Markets Respond to Quality Information?  The Case of Fertility Clinics," with M. Kate
    Bundorf, Natalie Chun, and Gopi Shah Goda, *Journal of Health Economics* 28 (2009):
    718-27.

"Empirical Study of the Civil Justice System," with Daniel L. Rubinfeld, in the
    *Handbook of Law and Economics*, eds. A. Mitchell Polinsky and Steven Shavell,
    North-Holland (2007).

"Tradeoffs from Integrating Diagnosis and Treatment in Markets for Health Care," with
    Christopher Afendulis, *American Economic Review* 97 (June 2007): 1013-20.

"Evaluating Effects of Tax Preferences on Health Care Spending and Federal Revenues," with
    John F. Cogan and R. Glenn Hubbard, in *Tax Policy and the Economy, Volume 21*, ed.
    James Poterba, MIT Press (2007).

"The Effects of the Medical Liability System in Australia, the UK, and the US," with Nicholas
    Summerton and John R. Graham, *Lancet* 368 (2006): 240-46.

"The Effect of Cardiac Specialty Hospitals on the Cost and Quality of Care," with Jason Barro
    and Robert Huckman, *Journal of Health Economics* 25 (2006): 702-21.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

"The Effects of the US Malpractice System on the Cost and Quality of Care," with David
Becker, in *Medical Malpractice and the US Health Care System: New Century, Different
Issues*, eds. William Sage and Rogan Kirsch, Cambridge University Press (2006).

"Making Markets Work: Five Steps to a Better Health Care System," with John F. Cogan and R.
Glenn Hubbard, *Health Affairs* 24 (November/December 2005): 1447-57.

*Healthy, Wealthy, and Wise: Five Steps to a Better Health Care System*, with John F. Cogan and
R. Glenn Hubbard, Hoover Institution/AEI Press (1st. ed., 2005; 2nd. ed., 2011).

"The Effects of Competition on Variation in the Quality and Cost of Medical Care," with Jeffrey
Geppert, *Journal of Economics and Management Strategy* 14 (2005): 575-89.

"Impact of Malpractice Reforms on the Supply of Physician Services," with David Becker and
William Sage, *JAMA* 293 (6/1/05): 2618-25.

"Detecting Medicare Abuse," with David Becker and Mark McClellan, *Journal of Health
Economics* 24 (2005): 189-210.

"The Medical Liability System: Current Debates," in *Power to the Patient: Selected Health Care
Issues and Policy Solutions*, ed. Scott W. Atlas, Hoover Institution Press (2005).

"Toward Better Drugs for Less (book review)," *Science* 306 (12/24/04): 2192-3.

"Advance Directives and Medical Treatment at the End of Life," with Mark McClellan, *Journal
of Health Economics* 23 (2004): 111-27.

"Is More Information Better?  The Effects of 'Report Cards' on Health Care Providers," with
David Dranove, Mark McClellan, and Mark Satterthwaite, *Journal of Political Economy*
111 (2003), pp. 555-88.

"Ownership Form and Trapped Capital in the Hospital Industry," with Henry Hansmann and
Mark McClellan, in *The Governance of Not-for-Profit Firms*, Edward L. Glaeser ed.,
University of Chicago Press (2003).

"How Liability Law Affects Medical Productivity," with Mark McClellan, *Journal of Health
Economics* 21 (2002), pp. 931-55.

"The Effects of Hospital Ownership on Medical Productivity," with Mark McClellan, *RAND
Journal of Economics* 33 (Autumn 2002), pp. 488-506.

*A Global Analysis of Technological Change in Health Care: Heart Attack*, ed., with Mark
McClellan, University of Michigan Press (2002).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

"Technological Change in Heart Attack Care in the United States: Causes and Consequences,"
with Mark McClellan, Nathan Every, Alan Garber, Paul Heidenreich, Mark Hlatky,
Joseph Newhouse, and Olga Saynina, in *A Global Analysis of Technological Change in
Health Care: Heart Attack*, ed., with Mark McClellan, University of Michigan Press
(2002).

"Malpractice Pressure, Managed Care, and Physician Behavior," with Mark McClellan, in
*Regulation Through Litigation*, W. Kip Viscusi ed., Brookings Institution Press (2002).

"Does Party Matter in Senators' Voting Behavior?  An Historical Test Using Tariff Votes," with
David Brady and Judith Goldstein,  *Journal of Law, Economics, and Organization* 18
(April 2002), pp. 140-54.

"Malpractice Law and Health Care Reform: Optimal Liability Policy in an Era of Managed
Care," with Mark McClellan, *Journal of Public Economics* 84 (2002), pp. 175-197.

"Technological Change Around the World: Evidence from Heart Attack Care," authored as the
TECH Research Network, *Health Affairs* 20 (May/June 2001), pp. 25-42.

"Prevailing Wage Laws and Construction Labor Markets," with Lawrence Katz, *Industrial and
Labor Relations Review* 54 (January 2001), pp. 259-74.

"What Do Prosecutors Maximize? An Analysis of the Federalization of Drug Crimes," with
Anne Morrison Piehl and Edward Glaeser, *American Law and Economics Review* 2
(2000), pp. 259-90.

Review of *Measuring the Prices of Medical Treatments* (Jack E. Triplett, ed.), *Journal of
Economic Literature* XXXVIII (September 2000), pp. 664-6.

"Is Hospital Competition Socially Wasteful?" with Mark McClellan, *Quarterly Journal of
Economics* 115 (May 2000), pp. 577-615.

"Designing Hospital Antitrust Policy to Promote Social Welfare," with Mark McClellan, in
*Frontiers in Health Policy Research: Volume 2*, ed. Alan Garber, MIT Press (1999).

"A Global Analysis of Technological Change in Health Care: The Case of Heart Attacks," with
Mark McClellan for the TECH Investigators, *Health Affairs* 18 (May/June 1999), pp.
250-55.

"Using Sentence Enhancements to Distinguish Between Deterrence and Incapacitation," with
Steven Levitt, *Journal of Law and Economics* 42 (April 1999), pp. 343-365.

"The Link Between Liability Reforms and Productivity: Some Empirical Evidence," with
Thomas Campbell and George Shepherd, *Brookings Papers on Economic
Activity: Microeconomics* (1998).

"The Role of Discretion in the Criminal Justice System," with Anne Morrison Piehl, *Journal of Law, Economics, and Organization* 14 (Winter 1998), pp. 256-276.

"The Law and Economics of Tying Arrangements: Lessons for Competition Policy Treatment of Intellectual Property," with William Baxter, in *Competition Policy and Intellectual Property Rights in the Knowledge-Based Economy*, eds. Robert Anderson and Nancy Gallini, Industry Canada Research Series, University of Calgary Press (1998).

"The Effects of Malpractice Pressure and Liability Reforms on Physicians' Perceptions of Medical Care," with Mark McClellan, *Law and Contemporary Problems* 60 (Winter 1997), pp. 81-106.

"Institutional Causes of Delay in the Settlement of Legal Disputes," *Journal of Law, Economics, and Organization* 12 (Winter 1996), pp. 432-460.

"Dynamics of Cosponsorship," with Keith Krehbiel, *American Political Science Review* 90 (September 1996), pp. 555-566.

"Do Doctors Practice Defensive Medicine?" with Mark McClellan, *Quarterly Journal of Economics* 111 (May 1996), pp. 353-390.

"Explaining Deviations from the Fifty Percent Rule: A Multimodal Approach to the Selection of Cases for Litigation," with Thomas Meites and Geoffrey Miller, *Journal of Legal Studies* 35 (January 1996), pp. 233-261.

"Liability Reforms and Economic Performance," with Thomas Campbell and George Shepherd, in *The Mosaic of Economic Growth*, eds. Ralph Landau, Timothy Taylor, and Gavin Wright, Stanford University Press (1996).

"Fault, Settlement, and Negligence Law," *RAND Journal of Economics* 26 (Summer 1995), pp. 296-313.

"Toward a Consistent Theory of the Welfare Analysis of Agreements," with William Baxter, *Stanford Law Review* 47 (April 1995),  pp. 301-317.

"Birth Order, Family Size, and Achievement: Family Structure and Wage Determination," *Journal of Labor Economics* 9 (October 1991), pp. 413-426.

**Academic Manuscripts in Progress**
"Can Ranking Hospitals on the Basis of Patients' Travel Distances Improve Quality of Care?" NBER Working Paper 11419.

**Nonacademic Publications**
"The Health of Obamacare," *Wall Street Journal*, December 11, 2015, p. C3.

"By Reducing Competition, ObamaCare Raises Costs," *Investor's Business Daily*, June 11, 2014, p. A13.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

"ObamaCare is Raising Insurance Costs," *Wall Street Journal*, June 4, 2013, p. A13.

"The Coming ObamaCare Shock," *Wall Street Journal*, April 30, 2013, p. A17.

"ObamaCare's Broken Promises," *Wall Street Journal*, February 1, 2013, p. A13.

"Real Medicare Reform," *National Affairs*, Fall 2012.

"The Wrong Remedy for Health Care," *Wall Street Journal*, June 29, 2012, p. A13.

"ObamaCare's Bogus Cost Savings," *Wall Street Journal*, March 14, 2012, p. A12.

"Medicare Reform:  Obama vs. Ryan," with John Taylor, *Wall Street Journal*, August 17, 2011, p. A15.
"How Health Reform Punishes Work," *Wall Street Journal*, April 25, 2011, p. A15.

"ObamaCare and the Truth About Cost Shifting," with John F. Cogan and R. Glenn Hubbard, *Wall Street Journal*, March 11, 2011, p. A15.

"Voters on Obamacare:  Informed and Opposed," with David W. Brady and Douglas Rivers, *Wall Street Journal*, October 15, 2010, p. A17.

"Health Care: The Prognosis," with John F. Cogan, *Hoover Digest* (2010).

"A Better Way to Reform Health Care," with John F. Cogan and R. Glenn Hubbard, *Wall Street Journal*, February 25, 2010, p. A13.

"Health Care Is Hurting Democrats," with David W. Brady and Douglas Rivers, *Wall Street Journal*, January 19, 2010, p. A17.

"Public Opinion and Health Reform," with David W. Brady, *Wall Street Journal*, October 22, 2009, p. A15.

"Doubling Down on a Flawed Insurance Model," with John F. Cogan and R. Glenn Hubbard, *Wall Street Journal*, September 25, 2009, p. A15.

"The Uninsured's Hidden Tax on Health Insurance Premiums in California: How Reliable is the Evidence?" with John F. Cogan, Matthew Gunn, and Evan J. Lodes, *Hoover Essays in Public Policy* (2007).

"Not a Panacea..." with John F. Cogan and R. Glenn Hubbard, *Wall Street Journal*, February 9, 2006, p. A12.

"Keep Government Out," with John F. Cogan and R. Glenn Hubbard, *Wall Street Journal*, January 13, 2006, p. A12.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

"Reforming Health Care," *Hoover Digest* (2005).

"Reforming Malpractice Liability," *Hoover Digest* (2005).

"Brilliant Deduction" with John F. Cogan and R. Glenn Hubbard, *Wall Street Journal*, December 8, 2004, p. A12.

"Healthy, Wealthy, and Wise," with John F. Cogan and R. Glenn Hubbard, *Wall Street Journal*, May 4, 2004, p. A20.

"Want to Sue HMOs?  It'll Cost You," *Wall Street Journal*, July 25, 2001, p. A16.

"The Economic Effects of the Liability System," *Hoover Essays in Public Policy* (1998).

"Robbing Smokers to Pay Lawyers," with Jeremy Bulow, *Wall Street Journal*, April 7, 1998, p. A16.

"If You Smoke, Florida Wants to Tax You," with Jeremy Bulow, *Wall Street Journal*, November 26, 1997, p. A16.

**Case Studies**

"Asian Neighborhood Design," with Lauren Dutton and Melinda Tuan, Stanford GSB (1998) (updated in 2003 by Rick Aubry and Susan Mackenzie).

"The Roberts Enterprise Development Fund," with Lauren Dutton, Jed Emerson, and Melinda Tuan, Stanford GSB (1998).

"Echelon and the Home Automation Standard," with David Baron, Keith Krehbiel, Erik Johnson, and Michael Ting, Stanford GSB (1997).

"The European Union Carbon Tax," with David Baron and Daniel Diermeier, Stanford GSB (1996).

**Unpublished Reports**

"Cost Shifting in California Hospitals: What is the Effect on Private Payers?" for the California Foundation for Commerce and Education (2007).

"The Determinants of the Cost of Medical Liability Insurance," for Physician Insurers Association of America (2006).

"The Effects of Behavioral Health Interventions on Health Care Costs," for the Foundation for Better Health (2005).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

"The Effects of Pharmaceutical Price Controls on the Cost and Quality of Medical Care: A Review of the Empirical Literature," for Pharmaceutical Research and Manufacturers of America (2004).

"The Impact of the Balanced Budget Act of 1997 on Skilled Nursing Care in California," with Chris Afendulis, Jeffrey Geppert, and Owen Kearney, for the California Health Care Foundation (2003).

**<u>Referee/Reviewer</u>**

American Cancer Society; *American Journal of Health Economics; American Economic Review; Health Affairs;  Journal of Health Economics; Journal of Health Politics, Policy, and Law; Journal of Law, Economics, and Organization; Journal of Law and Economics; Journal of Legal Studies; Journal of Political Economy;* National Science Foundation; National Institutes of Health; *RAND Journal of Economics; Quarterly Journal of Economics*

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Appendix B**
**Materials Considered and Relied On**

<u>Deposition Testimony</u>

Bunting (Aerocare) Tr.

Gutknecht (Mobilcare) Tr.

Ingram (Apria) Tr.

Neufeld Tr.

Sofiane (CareCentrix) Tr.

Sweet (Lincare) Tr.

Terry Tr.

Wogen (CareCentrix) Tr.


<u>Case Materials</u>

CCXNeu000656.

cigna_dataexport_03272020.dmp.

CIGNA_NEUFELD00000001.

CIGNA_NEUFELD00000033.

CIGNA_NEUFELD00000071.

CIGNA_NEUFELD00000079.

CIGNA_NEUFELD00000088.

CIGNA_NEUFELD00000090.

CIGNA_NEUFELD00000138.

CIGNA_NEUFELD00000141.

CIGNA_NEUFELD00000164.

CIGNA_NEUFELD00000169.

CIGNA_NEUFELD00000218.

CIGNA_NEUFELD00000222.

CIGNA_NEUFELD00000229.

CIGNA_NEUFELD00000244.

CIGNA_NEUFELD00000246.

CIGNA_NEUFELD00000248.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

CIGNA_NEUFELD00000271.

CIGNA_NEUFELD00000273.

CIGNA_NEUFELD00000389.

CIGNA_NEUFELD00000392.

CIGNA_NEUFELD00000394.

CIGNA_NEUFELD00000407.

CIGNA_NEUFELD00000412.

CIGNA_NEUFELD00000415.

CIGNA_NEUFELD00000417.

CIGNA_NEUFELD00000455.

CIGNA_NEUFELD00023012.

CIGNA_NEUFELD00023927.

CIGNA_NEUFELD00045054.

CIGNA_NEUFELD00045603.

CIGNA_NEUFELD00098754.

CIGNA_NEUFELD00104542 to CIGNA_NEUFELD00104550.

CIGNA_NEUFELD00104551.

CIGNA_NEUFELD00104552 to CIGNA_NEUFELD00104933.

CIGNA_NEUFELD00123096.

CIGNA_NEUFELD00309990.

CIGNA_NEUFELD00594262.

CIGNA_NEUFELD00594465.

CIGNA_NEUFELD00647409.

CIGNA_NEUFELD00771179.

CIGNA_NEUFELD00771446.

CIGNA_NEUFELD00773459 to CIGNA_NEUFELD00773476.

CIGNA_NEUFELD00773493 to CIGNA_NEUFELD00773520.

CIGNA_NEUFELD00773522.

CIGNA_NEUFELD00773539 to CIGNA_NEUFELD00773553.

CIGNA_NEUFELD00773555 to CIGNA_NEUFELD00773557.

CIGNA_NEUFELD00773566 to CIGNA_NEUFELD00773584.

CIGNA_NEUFELD00773585 to CIGNA_NEUFELD00773587.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

CIGNA_NEUFELD00773592 to CIGNA_NEUFELD00773610.

CIGNA_NEUFELD00773618 to CIGNA_NEUFELD00773635.

CIGNA_NEUFELD00773637.

CIGNA_NEUFELD00773638 to CIGNA_NEUFELD00773644.

CIGNA_NEUFELD00773663 to CIGNA_NEUFELD00773678.

CIGNA_NEUFELD00773688 to CIGNA_NEUFELD00773714.

CIGNA_NEUFELD00773724 to CIGNA_NEUFELD00773738.

CIGNA_NEUFELD00773739.

CIGNA_NEUFELD00773740 to CIGNA_NEUFELD00773743.

CIGNA_NEUFELD00773758 to CIGNA_NEUFELD00773762.

CIGNA_NEUFELD00773772 to CIGNA_NEUFELD00773797.

CIGNA_NEUFELD00773799 to CIGNA_NEUFELD00773807.

CIGNA_NEUFELD00773826 to CIGNA_NEUFELD00773835.

CIGNA_NEUFELD00773845 to CIGNA_NEUFELD00773853.

CIGNA_NEUFELD00773882 to CIGNA_NEUFELD00774079.

CIGNA_NEUFELD00774764.

CIGNA_NEUFELD00774810.

CIGNA_NEUFELD01072089 to CIGNA_NEUFELD01072109.

CIGNA_NEUFELD01072110 to CIGNA_NEUFELD01072113.

CIGNA_NEUFELD01072114 to CIGNA_NEUFELD01072161.

JACQUES_00036.

JACQUES_00042.

JACQUES_00048.

JACQUES_00054.


Commercial Websites

https://hcahealthcare.com/

https://healix.net/

https://prohcn.com/

https://www.evicore.com/

https://www.genesishcc.com/

https://www.teamhealth.com/

CONFIDENTIAL – ATTORNEYS' EYES ONLY

https://www.tenethealth.com/

<u>Other Materials</u>

Cigna 2019 Annual Report, https://www.cigna.com/static/www-cigna-com/docs/about-us/investor-relations/cigna-2019-annual-report.pdf.

Emanuel EJ, Fuchs VR, Who Really Pays for Health Care? The Myth of "Shared Responsibility," 299(9) JAMA 2008: 1057–9.

Farlex Medical Dictionary.

Gaynor M, Ho K, Town RJ, The Industrial Organization of Health Care Markets, Journal of Economic Literature. 2015;53(2): 235-84, 236.

Gruber J, Health Insurance and the Labor Market, Chapter 12 in Culyer AJ and Newhouse JP, eds., Handbook of Health Economics, 2000, Elsevier, 694.

Health Care Cost Institute 2012 Health Care Cost and Utilization Report Healthcare.gov online glossary, https://www.healthcare.gov/glossary/

Kaiser Family Foundation/Health Research and Educational Trust, Survey of Employer Health Benefits, 2016, p. 79, Exhibit 5.1.

Merriam-Webster Medical Dictionary.

Mosby's Medical Dictionary.

Rae M, McDermott D, Levitt L, Claxton G, Long-Term Trends in Employer-Based Coverage, Peterson-KFF Health System Tracker, https://www.healthsystemtracker.org/brief/long-term-trends-in-employer-based-coverage/.

Robinson JC, The Alignment and Blending of Payment Incentives within Physician Organizations, Health Services Research 2004:39(5), 1589-1606.

Sherlock Benchmark Administrative Cost Values of Larger Health Plans – 2016 Metrics, Appendix B (Early August Navigator 2017).

*U.S.  v. Anthem Inc. and Cigna Corp.*, Civ. A. No. 16-193 (Feb. 21. 2017 Mem. Op).

U.S. Centers for Medicare and Medicaid Services, Center for Medicare and Medicaid Innovation, https://innovation.cms.gov/files/x/bundled-payments-for-care-improvement-request-for-applications.pdf.

U.S. Centers for Medicare and Medicaid Services, MIPS Payment Adjustment Fact Sheet, https://www.hhs.gov/guidance/document/2019-mips-payment-adjustment-fact-sheet .

CONFIDENTIAL – ATTORNEYS' EYES ONLY

U.S. Centers for Medicare and Medicaid Services, National Health Expenditure Data, https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NationalHealthAccountsHistorical.html.; https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/index.html, quickref.pdf.

U.S. Centers for Medicare and Medicaid Services, Value-Based Payment Programs, https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/Value-Based-Programs/Value-Based-Programs.html.

CONFIDENTIAL – ATTORNEYS' EYES ONLY